**THE UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | |
|---|---|
| Food Not Bombs Houston, | ) |
| Brandon Walsh, | ) |
| | ) |
| Plaintiffs, | ) Case No. _____ |
| | ) Jury Trial Demanded |
| v. | ) |
| | ) |
| The City of Houston, Texas, | ) |
| | ) |
| Defendant. | ) |
| | ) |

**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

Plaintiffs Food Not Bombs Houston ("FNBH") and Brandon Walsh ("Walsh") respectfully submit the following Original Complaint for Declaratory and Injunctive Relief against the City of Houston, Texas ("the City") and show as follows:

## I.   INTRODUCTION

1.      For over twenty-five years, FNBH has provided free meals to any hungry person in Houston. Its mission is in its name: FNBH shares food to inspire the public to participate in changing society and focus our resources on solving problems like hunger, homelessness, and poverty while seeking an end to war and the destruction of the environment.

2.      FNBH spreads this message by providing food four times a week on public property near the Houston Central Public Library ("Central Library") and just across the street from City Hall. Many FNBH members wear t-shirts that say, "Food Not Bombs" and "Poverty Isn't a Crime." FNBH also displays a banner with the Food Not Bombs logo that advances the same rallying cry

as their T-Shirts, "Poverty Isn't a Crime." Their food sharing events are open to any member of the public, although many who attend are unhoused or otherwise economically vulnerable.

3.      Like many major cities, homelessness is a matter of significant public concern to Houston residents and the City's response to housing insecurity has generated significant local and national attention. FNBH is widely known by Houstonians both before and after the sudden police crackdown on their activities and its message that "Poverty Isn't a Crime" has resonated with people across Houston.  FNBH's message has been so effective over its history that it has gained a substantial following and has members ranging from children to people in their seventies.

4.      For over twenty-five years, FNBH and its members provided food without being criminally cited or prosecuted. In 2012, the Houston City Council passed what is now §§ 20-252 and 20-257 of the Houston City Code (together, "the Anti-Food Sharing Ordinance" or "the Ordinance") prohibiting charitable food sharing on all public property without express prior permission from the City and subjecting food sharing events to regulations promulgated by the Houston Health Department ("Health Department"). In reality, though, the City rarely, if ever, enforced the Anti-Food Sharing Ordinance and even expressly designated the Central Library as an approved location for FNBH's events. The City changed its policies in March of 2023 when it began citing and prosecuting FNBH's members under the Anti-Food Sharing Ordinance. At the same time, the City exercised its authority under § 20-257 to adopt burdensome and unjustified restrictions on all food sharing activities within the City.

5.      At the Direction of then-Mayor Sylvester Turner and the Houston Health Department ("Health Department"), Houston Police Department officers began citing FNBH members under § 20-252 on March 1, 2023, and gave them notices stating that the *only* public place they could share food in the entire City of Houston is a police station parking lot at 61 Riesner

Street, Houston, Texas 77002 ("61 Riesner Street"). The City has also posted notices in downtown Houston stating: "If you want to conduct charitable food service on City property, you must do so at. . . 61 Riesner Street, Houston, Texas 77002."

6.      By its terms, § 20-252 makes it "unlawful for any organization or individual to sponsor or conduct a food service event on public or private property without the advance written consent of the public or private property owner." City of Houston City Code § 20-252. A food service event is defined as any time "charitable food services are provided to more than five individuals." *Id.* § 20-251. "Charitable food services" is further defined as "providing food without charge, payment or other compensation to benefit those in need at an outdoor location not owned, leased or controlled by the individual or organization providing the food." *Id.* The Ordinance does not define what it means for a person to be "in need."

7.      Section 20-257 directs the Directors of the Health and Parks Departments to establish a list of approved park and other city properties where individuals may share food and directed the Director of the Health Department to "develop rules, regulations, and criteria for the use of other city property." *Id.* § 20-257. Section 20-257 provides no standards guiding the Health and Parks Departments' authority to promulgate rules, allowing these departments to change the rules governing food sharing whenever they want without explanation, such as limiting all food sharing on all City property to a single location: 61 Riesner Street.

8.      61 Riesner Street is not only impractical to access for people with health and mobility issues, but it would also change the character and visibility of FNBH events.

9.      Since March 1, 2023, members of FNBH have received over 89 citations, potentially totaling more than $178,000 in fines. Despite this harsh and cruel crackdown on charitable food sharing, during that same time, FNBH has served thousands of meals. In

conducting these events, FNBH has not only served the hungry, but also communicated its message of community self-reliance and mutual aid and brought awareness to the unfair treatment of homeless people.

10.     Walsh is one of dozens of FNBH members who regularly shares food at FNBH events. Like the FNBH slogan, he does so to express his disagreement with the City's response to homelessness and overinvestment in policing. Since he began volunteering in June of 2023, Walsh attends about three FNBH events a week. He helps organize the food sharing and surrounding social media posts about FNBH's activities. While Walsh himself has not received a ticket, he regularly sees other members receive tickets and reasonably fears he could receive a citation under the Anti-Food Sharing Ordinance.

11.     Hoping that the sudden crackdown on food sharing may have simply been the ill-informed mandate of former Mayor Turner, Plaintiffs submitted a petition on January 8, 2024 signed by over 180 organizations and 24,000 individual signatories to Mayor John Whitmire and the entire City Council requesting that the City cease enforcement of the Ordinance, repeal the Anti-Food Sharing Ordinance, and dismiss all pending citations under the Ordinance. However, in the weeks that followed, FNBH's members have continued to receive citations. The City Attorney's Office even attempted to put one FNBH member on trial for violating the Ordinance, but it could not fill a jury because too many potential jurors objected to the fine the City was seeking.

12.     The City's crackdown on FNBH's food sharing violates the First Amendment in three respects: First, the Anti-Food Sharing Ordinance violates the First Amendment both on its face and as applied to Plaintiffs by imposing an invalid prior restraint on Plaintiffs' protected expressive conduct. Second, even if not a prior restraint, the Anti-Food Sharing Ordinance fails

intermediate scrutiny both on its face and as applied to Plaintiffs since it restricts Plaintiffs' protected expressive conduct without constitutionally adequate justification. Third, and finally, the Anti-Food Sharing Ordinance violates Plaintiffs' First Amendment right to expressive association by forcing them to associate with the Houston Police Department in a location further away from the community they have served for decades.

13.     Now Plaintiffs seek a declaration that §§ 20-252 and 20-257 violate the First Amendment and an injunction prohibiting the City and its officers, employees, and agents from enforcing the Anti-Food Sharing Ordinance.

## II.     JURISDICTION AND VENUE

14.     This is a civil rights action arising under 42 U.S.C. § 1983 and the First and Fourteenth Amendments to the United States Constitution. This Court has jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1343, federal question jurisdiction.

15.     Venue in this Court is proper pursuant to 28 U.S.C. § 1391 because the events or omissions giving rise to the claim occurred in this district.

## III.     PARTIES

16.     Plaintiff Food Not Bombs Houston is an unincorporated association affiliated with the grassroots international Food Not Bombs movement. FNBH engages in food sharing to communicate its message that food is a human right, not a privilege, and that our society can end hunger and poverty if we redirect our collective resources from the military and war. FNBH shares food with anyone, without restriction, to communicate its message and exhibit what a community based on mutual aid looks like. The Anti-Food Sharing Ordinance infringes on the group's ability to communicate its message without risking citation or arrest for assembling and sharing food on public property.

17.     Plaintiff Brandon Walsh is a member of FNBH who regularly volunteers at FNBH events to protest in the City's treatment of unhoused and economically vulnerable people. Walsh regularly engages in conduct that arguably violates the Anti-Food Sharing Ordinance and fears prosecution for engaging in his protected expression.

18.     Defendant City of Houston, Texas is a municipal corporation chartered under the laws of the State of Texas. Plaintiffs challenge an Ordinance enacted by the City of Houston and enforced by the City and its officers, employees, and agents. The City may be served at the City Secretary's Office at 900 Bagby, P101, Houston, Texas 77002.

## IV.     FACTUAL ALLEGATIONS

### A. Plaintiffs Share Food to Protest War, Poverty, and the City's Response to Homelessness.

19.     Since 2005, FNBH has served free vegan and vegetarian meals on public property near the Central Library in downtown Houston.

20.     As their name makes clear, Food Not Bombs Houston is not charity, but instead a political association expressing a political message that government entities should divest money from war, policing, and weaponry, and instead redirect that money to meet basic human needs. Thus, its food sharing events are a form of protest.

21.     FNBH conveys its message and vision for Houston by sharing food four times a week near the Central Library and City Hall. FNBH's food sharing events are open to anyone who wants food. By serving food in a prominent downtown location, FNBH hopes to inspire members of the public to similarly provide mutual aid to others and ask their governments to divest from war and invest in basic human needs.

22.     In addition to sharing food outside the Central Library, FNBH and its members occasionally share food on other public property, such as when there are leftovers from one of

6

their library food sharing events or when they receive food donations that they distribute immediately to people instead of waiting for the next event near the Central Library.

23.     As a member of FNBH, Walsh takes part in organizing FNBH's activities. Approximately three times a week, Walsh goes to FNBH events near the Central Library. He helps set up food distributions, records aspects of the events for social media, and serves food. Walsh began participating in June of 2023 because he agreed with FNBH's message of community mutual aid and investment in people's direct needs. Because of the power of FNBH's message and community, Walsh seeks to continue participating in FNBH events in the future.

24.     FNBH serves vegan and vegetarian food intentionally to protest the cruel treatment of animals and the negative environmental impact the meat industry has on the planet.

25.     Further, Plaintiffs' message is of prominent political importance in the City. There are thousands of people experiencing homelessness in Houston. Newly elected Mayor John Whitmire stated that homelessness is one of his leading agenda items and Former Mayor Turner called homelessness one of the City's top priorities. While the City has taken some measures to curb the rise in housing insecurity, it has failed to meet the needs of many hungry Houstonians. And given the large and visible number of homeless people downtown, it is indisputable that homelessness is of enormous public concern in Houston.

26.     Plaintiffs' message is clear to both the broader public and the City. Broadly, sharing food when at least 13.8% of Houstonians experience food insecurity directly communicates Plaintiffs' critique of the City's treatment of those struggling to reliably have food. FNBH's members frequently wear shirts at food sharing events with "Food Not Bombs" and "Poverty Isn't a Crime" prominently displayed on them. FNBH also hangs a large banner at their food sharing events that says, "FOOD NOT BOMBS" and "POVERTY ISN'T A CRIME." Any person walking

by their events would recognize that FNBH supports feeding people, opposes war, and believes that "poverty isn't a crime."

27.     The following photos, taken by Walsh, depict FNBH's food sharing events, banner, and logo:

 



28.     FNBH's slogan—"Poverty isn't a crime"—reflects Plaintiffs' belief that Houston and other governments weaponize police and criminal law enforcement against homeless people to get them off the streets instead of providing food, housing, and health care.

29.     Because of the universal concern religious groups express for the homeless, many members also share food out of a commitment to their religious principles.

30.     The City's enforcement against FNBH members shows that it recognizes FNBH's message. In numerous citations issued to FNBH members, Houston Police Department officers explicitly marked "Food Not Bombs" on the criminal complaint and described the crime as "feed homeless" on the citations. Even now, the police reports describing Anti-Food Sharing Ordinance violations will identify the person receiving the citation as with Food Not Bombs. From the City's perspective, then, FNBH is a clearly identifiable group with a clearly identifiable message: provide people food instead of spending money on bombs.

**B.  The City Suddenly Begins Enforcing its Anti-Food Sharing Ordinance in March of 2023.**

31.     After over two decades of communicating its message by sharing food citation-free, the City began criminally citing and prosecuting FNBH members in March of 2023. The City is prosecuting them under § 20-252 of the Houston City Code, which prohibits food sharing without prior written consent from the City on all public property. The text, history, and current enforcement of the Anti-Food Sharing Ordinance demonstrate the substantial impact it has on Plaintiffs' ability to communicate their message.

32.     In 2012, the City passed an ordinance adopting a slew of restrictions on charitable food services intended to impede organizations and individuals from providing free food to the public. First, as noted above, § 20-252 makes it "unlawful for any organization or individual to sponsor or conduct a food service event on public or private property without the advance written

consent of the public or private property owner." City of Houston City Code § 20-252. A food service event is defined as any time "charitable food services are provided to more than five individuals." *Id.* § 20-251. "Charitable food services" is further defined as "providing food without charge, payment or other compensation to benefit those in need at an outdoor location not owned, leased or controlled by the individual or organization providing the food." *Id*

33.     Second, the City adopted provisions creating a "Charitable Food Service Program" whereby groups or individuals can join as members and receive a certificate as a "a recognized charitable food service provider." *Id.* § 20-254. The program is entirely optional. In addition to being entirely optional, joining the program has no effect on whether the City will grant authorization to a group to share food on public property and individuals and groups in the program remain limited to only serving food at 61 Riesner Street.

34.     Finally, the 2012 ordinances included a provision directing the City's Directors of the Health and Parks Departments to establish a list of approved park and other city properties where individuals may share food and directed the Director of the Health Department to "develop rules, regulations, and criteria for the use of other city property." *Id.* § 20-257. While the Ordinance delegates authority to City agencies to develop "rules, regulations, and criteria for the use" of public property for food service events, it contains no standards for the development of these rules and allows these departments to change the rules whenever they want.

35.     Pursuant to this standardless rulemaking authority, the Health Department created new rules in 2023 concerning locations for charitable food distribution. Specifically, approved public locations must, for the first time, have at least ten dedicated parking spaces, adequate trash containers, and two portable bathrooms with handwashing stations available 24 hours per day, 7 days per week.

36.    To date, the Health Department has not provided any justification for these heavy-handed restrictions. The Anti-Food Sharing Ordinance applies to any food service event serving six or more people. Thus, the City is forcing all charitable feedings on city property—regardless of where they take place, who they serve, or how many people attend—to have ten parking spaces and bathrooms available 24/7. One individual who wanted to share six hamburgers with six hungry people on a city sidewalk could not do so without first setting up ten dedicated parking spaces and two portable restrooms with handwashing stations that are open 24/7.

37.    Ironically, the City's sole pre-approved location, 61 Riesner Street, does not meet the City's own regulations for charitable feeding sites as its bathrooms are frequently locked outside of feeding hours and there are no free public parking spaces.

38.    Crucially, and despite the regulations described above, the City and Health Department retain complete authority to determine which, if any, public locations to authorize for food sharing. That is, even if a location satisfies the conditions described above, the City and its Health Department are not required to authorize food sharing. Instead, the Health Department's regulations are necessary but not sufficient requirements for getting permission to serve food on public property.

39.    Notwithstanding its unbridled authority to arbitrarily deny food sharing privileges, the City has historically used its discretion to grant food sharing privileges. For example, shortly after the City passed the Anti-Food Sharing Ordinance and in response to an immense public backlash against the law, then-Mayor Anise Parker "designated Central Houston Public Library Plaza as an approved charitable food service location for Food Not Bombs" in an official City advisory.[1] In the same advisory, then-Mayor Parker described eight other organizations and

---

[1] City of Houston, *Facts about Voluntary Homeless Feeding Registration Program* https://perma.cc/SPT2-5X3Z (Sept. 5, 2012) [permalink captured Oct. 5, 2023].

individuals who had received authorization to use City-owned property for food sharing.[2] This advisory is still up on the City's website as of January 17, 2024.

40.     From 2012 through January of 2023, FNBH conducted its food sharing events and served tens of thousands of meals without receiving any citations.

41.     Now, more than a decade later, the City is using its unbridled authority to deny food sharing privileges without explanation. Seemingly overnight, City employees posted signs surrounding the Central Library stating that food sharing at or near the library would be prohibited after February 24, 2023. According to the signs, anyone wanting to "conduct charitable food service on City property. . . must do so at . . . 61 Riesner Street, Houston, Texas 77002."

42.     61 Riesner Street, known locally as the "old police station," is a Houston Police Department administrative building outside of downtown and on the opposite side of the 45 Freeway from the Houston Central Library. It is approximately a 20-minute walk from FNBH's current serving location and would require people to cross several poorly lit intersections and roads. When charitable food service events do occur at 61 Riesner Street, several police officers patrol the parking lot during the entire event.

43.     The current enforcement and implementation of the Anti-Food Sharing Ordinance mandates that all food sharing activities on public property occur at 61 Riesner Street, regardless of how safely and orderly Plaintiffs conduct their food sharing. This current regime for food sharing is a sharp and arbitrary break from the City's prior practice, both before and after the Anti-Food Sharing Ordinance's passage in 2012.

---

[2] *Id.*

**C. The City's Anti-Food Sharing Ordinance Imposes Severe Restrictions on Plaintiffs and Others.**

44.     Under the City's current enforcement regime, Plaintiffs' only option to avoid citations and criminal prosecution is to serve food at 61 Riesner Street. But the parking lot of an old police station is not an adequate alternative for Plaintiffs' protected expression.

45.     **First,** and most importantly, sharing food at 61 Riesner Street is directly at odds with Plaintiffs' message and the purpose of their association. As explained, *supra* ¶¶ 16, 17, 20, 28, Plaintiffs share food to protest the City's overinvestment in policing and militarization and underinvestment in meeting the material needs of the City's most vulnerable. Forcing Plaintiffs to attempt conveying this message on police station property irreparably alters the content of their message and association by making it seem as though Plaintiffs are working with the City and the very Police Department that is criminalizing its members.

46.     Further, one of the defining features of food services at 61 Riesner Street is the presence of Houston police officers providing "security" for the entire food service. People seeking food must first line up before the feeding to receive a meal ticket from Houston Police Department officers. At any given feeding at 61 Riesner Street, numerous police officers patrol the parking lot. Again, this forced association would damage the clarity of Plaintiffs' message and the character of their association as a group standing in solidarity with unhoused and poor people. As expressed clearly on Plaintiffs' shirts, the phrase "Poverty isn't a crime" reflects Plaintiffs' disagreement with the persistent use of criminal laws to harm poor people. Serving at 61 Riesner Street forces Plaintiffs to associate with the very people they perceive to be unjustly enforcing criminal laws against Houstonians experiencing poverty. Without a shred of irony, the Anti-Food Sharing Ordinance forces a group who criticizes the police's response to homelessness to express their message at a police station.

47.     **Second,** sharing food at 61 Riesner Street would substantially minimize the impact of Plaintiffs' message. Plaintiffs share food on public property and in public view of one of the most politically important areas in Houston—City Hall. Plaintiffs share food on the doorstep of City Council and in a location where many people can see their activities. By contrast, the parking lot of 61 Riesner Street is on the opposite side of the 45 Freeway from central downtown Houston and has less public visibility and traffic than the area in which FNBH has served food for nearly two decades. By requiring all charitable food sharing to take place at a site that is less visible to members of the public, the City is also sending the message that it wants people who are unhoused or hungry to be less visible.

48.     But even if 61 Riesner Street were equally public, the fact it is in police station likely means that many people who have been coming to FNBH events for years would be deterred from going to a food sharing. Many people that regularly attend FNBH events have had a variety of negative interactions with law enforcement, whether that means being arrested, cited, or harassed without formal legal consequences. Particularly for the unhoused individuals that attend FNBH events, increased exposure to law enforcement at a police station would significantly deter some from attending in the first place. Moving to 61 Riesner Street, then, would likely reduce the number of people there to associate with, and receive the message of, Plaintiffs.

49.     Relatedly, 61 Riesner Street is an approximately 20-minute walk away from Plaintiffs' current location for sharing food. While for some this may seem like a leisurely walk, for many of the regular attendees of FNBH events, the walk from downtown to 61 Riesner Street would prohibit their attendance. Many people who attend FNBH events suffer from chronic medical conditions, use aids like wheelchairs or canes to ambulate, or suffer from other disabilities that make walking the 20 minutes under a major freeway underpass arduous or even impossible.

Others must carry all of their possessions with them at all times to ensure they do not get stolen, making traveling this distance impracticable.

50.     In sum, the Anti-Food Sharing Ordinance, and the City's requirement to serve exclusively at 61 Riesner Street, imposes severe restrictions on Plaintiffs' protected activity by (1) irreparably changing the nature of their association and expression, and (2) limiting the audience available for their protected expression.

51.     The City has given FNBH and its members, including Walsh, the untenable choice of giving up their message or continuing to receive criminal citations. By opting not to give up their message by moving to 61 Riesner Street, FNBH members have now received over 89 citations, amounting to $178,000 in potential fines.

52.     This has significantly harmed FNBH members who have received citations. In addition to the financial burden of paying the citation if found guilty, they have had to find lawyers, take time off work and school, arrange child care, and arrange transportation in order to attend court hearings.

53.     FNBH is also entirely volunteer-run, so it relies on volunteers and volunteer groups who want to help out by bringing food, preparing food, or distributing it at our food sharing events.

54.     Since the enforcement of the Ordinance against them, some volunteers stopped participating in FNBH's food sharing events for fear of prosecution. Some still help out in the background by preparing or bringing food, but stopped attending FNBH's events.

55.     Walsh is one of the few who have not yet received a citation. However, he has watched many of his friends and fellow volunteers receive citations and helped them navigate the difficulties that frequent court appearances have wrought. At any given FNBH event, police

officers could cite Walsh under the Anti-Food Sharing Ordinance. Three times a week he remains at risk of a citation while engaging in protected expression.

56.     Based on this enforcement history and the text of the Anti-Food Sharing Ordinance, Plaintiffs' food sharing activities are arguably proscribed by the law. Plaintiffs imminently expect these enforcement activities to continue. As then-Mayor Turner said in mid-December, the police will continue enforcing the Anti-Food Sharing Ordinance against FNBH members if they continue to serve food near the Central Library. To this day, FNBH members continue receiving citations and watch police officers deter hungry people from attending their events.

**D. The City's Anti-Food Sharing Ordinance Serve No Constitutionally Adequate Purpose.**

57.     According to the September 5, 2012 advisory from then-Mayor Annise Parker, the ostensible purpose of the ordinance was to (1) "improve the quality, quantity and distribution of food provided outdoors;" (2) "expand the opportunities for the homeless to connect with service providers;" and (3) "reduce the disproportionate environmental impact of food service operations."[3] Still today, the Health Department's website lists these same justifications as the basis for the Anti-Food Sharing Ordinance.[4] Former Mayor Turner also provided a fourth justification for the City's sudden enforcement of the formerly unused ordinance— FNBH's food sharing food events near the library "discourag[ed] families, children and others from using it."[5] Reiterating this view in an email, Former Mayor Turner stated, "Chief Finner we are losing the

---

[3] City of Houston, *Facts about Voluntary Homeless Feeding Registration Program* https://perma.cc/SPT2-5X3Z (Sept. 5, 2012) [permalink captured Oct. 5, 2023].
[4] Houston Health Department, *Charitable Feeding*, https://www.houstonhealth.org/services/permits/food-permits/charitable-feeding.
[5] Sylvester Turner (@SylvesterTurner), Twitter (Aug. 4, 2023, 8:51 A.M.), https://twitter.com/SylvesterTurner/status/1687461372022472704

library. I am inclined to close the Central Library as a cooling center. . . The feeding outside the library must come to an end."[6]

58.    Whatever weight these supposed justifications may have in the abstract, they fail to support the Ordinance's vesting of unbridled discretion in city officials to approve or disapprove public property for food sharing or the City's selection of only one piece of public property in a city as large as Houston as the sole location for food sharing.

59.    But even taking the justifications individually demonstrates they fail to justify the severe burden imposed by the Anti-Food Sharing Ordinance.

60.    Regarding improved food distribution, the Anti-Food Sharing Ordinance has had the opposite effect. Prior to 2012, Houston had a coalition of food service groups that provided food in many public locations. After 2012, and particularly after the sudden enforcement of the Anti-Food Sharing Ordinance in March 2023, most of these groups have disappeared under the threat of enforcement. Instead, the City has begun funding its preferred organization under its "Dinner to Home" program to share food at 61 Riesner Street on the same nights and at the same time as FNBH's feedings. In essence, the City has monopolized food sharing by outlawing food sharing in all public areas where it has traditionally permitted it, while subsidizing certain organizations to provide food at the City's only approved location. The end result is less food sharing and more hungry members of the Houston community.

61.    Similarly, the City's purported desire to connect homeless individuals with service providers fails to justify the Anti-Food Sharing Ordinance's restrictions. By reducing the approved charitable feeding locations to one parking lot in the entire City, the City has decreased the ability

---

[6] R.A. Schuetz, *Emails show Turner, Central Library strategizing to limit homeless presence*, HOUS. CHRON. (Jan. 9 2024), https://www.houstonchronicle.com/news/houston-texas/housing/article/turner-emails-homeless-losing-library-cooling-18587459.php.

of service providers to reach unhoused people who are unwilling or unable to access 61 Riesner Street. Not only were less restrictive means available to achieve its interest, the City actually implemented restrictions directly contrary to its stated interests.

62.     Regarding the environmental impact of food sharing, food sharing groups can and do bring trash bags or share near public trashcans. To the extent this issue even exists, it is better remedied by providing trash receptacles and designating additional food sharing locations than it is remedied by the monumental restrictions the City has placed on food sharing.

63.     For Plaintiffs in particular, this justification makes even less sense. As explained, Plaintiffs share exclusively vegan and vegetarian food, in part, due to the devastating environmental impact of the meat industry. They take care at every event to clean up after themselves and those they serve. They help curb, rather than contribute to, the environmental impact of the food industry by serving plant-based food that would otherwise go to waste.

64.     Finally, former Mayor Turner's suggestion that food sharing discourages families, children, and others from using the library is a manufactured justification to explain his sudden desire to punish Plaintiffs and others to the maximum extent allowed by law. Plaintiffs serve food at 7:30 PM, an hour and a half after the Central Library has already closed.  By that time, the gate to the Central Library is already locked. There has also been no uptick in threats or other reports due to people receiving food near the library, as they have for over two decades.

65.     Former Mayor Turner's comments about families being discouraged from using the library, even if it had factual support, are much closer to giving some residents a "heckler's veto" over the protected expression of others. But as courts have frequently held, a "heckler's veto" is

an unconstitutional basis to close off a public forum.[7] In addition, the Central Library is open to the public, and the public includes unhoused and food insecure residents in Houston.

66.     For FNBH specifically, there is also no evidence to explain the City's sudden change of course after ten years of serving food without enforcement of the Anti-Food Sharing Ordinance. FNBH engaged in its protected activity long before the City ever enforced § 20-252 with no material adverse effects. Then-Mayor Parker recognized as much shortly after passing the ordinance in 2012. Ten years later, FNBH's history of successful food sharing only demonstrates the lack of support for the City's purported justifications for enforcing the Anti-Food Sharing Ordinance.

67.     In sum, the City's justifications for the Anti-Food Sharing Ordinance lack factual support, fail to justify the specific restrictions at issue, and are even more specious when applied to Plaintiffs' expressive activities.

## V.     CLAIMS FOR RELIEF

### Count I: 42 U.S.C. § 1983

### (Free Speech –Invalid Time, Place, Manner, Restriction Facially & As Applied)

68.     All prior paragraphs are reincorporated here by reference.

69.     Section 1983 makes Defendant liable "in an action at law, suit in equity, or other proceeding for redress" when persons suffer a "deprivation of any rights, privileges, or immunities secured by the Constitution" due to the City's Anti-Food Sharing Ordinance. 42 U.S.C. § 1983.

70.     The First Amendment, as incorporated through the Fourteenth Amendment, prohibits laws "abridging the freedom of speech . . . or the right of the people to peaceably

---

[7] See, e.g., Beckerman v. City of Tupelo, Miss., 664 F.2d 502, 509 (5th Cir. 1981) ("There is a host of Supreme Court cases dealing with the issue of the 'hecklers' veto.' In almost every instance it is not acceptable for the state to prevent a speaker from exercising his constitutional rights because of the reaction to him by others.") (collecting cases).

assemble." U.S. Const. Amend. I. These rights lie at "the foundation of a government based upon the consent of an informed citizenry." *Bates v. City of Little Rock*, 361 U.S. 516, 522–23 (1960). As such, the Constitution protects the First Amendment "not only against heavy-handed frontal attack, but also from being stifled by more subtle governmental interference." *Id.* at 523 (collecting cases).

71.     A City or municipality can be held liable for its conduct under § 1983 if Plaintiffs demonstrate: "(1) an 'official policy or custom,' (2) that 'a policy maker can be charged with actual or constructive knowledge,' and (3) 'a constitutional violation whose 'moving force' is that policy (or custom).'" *Moore v. LaSalle Mgmt. Co., L.L.C.*, 41 F.4th 493, 509 (5th Cir. 2022) (quotation omitted). Plaintiffs challenge an official City policy that restricts their protected expression without constitutionally adequate justification.

72.     On its face, the Anti-Food Sharing Ordinance restricts expressive conduct protected by the First Amendment. *Texas v. Johnson*, 491 U.S. 397, 404 (1989) ("[The First Amendment's] protection does not end at the spoken or written word."). Plaintiffs and countless others share food to convey messages such as support for those in need and various other messages regarding poverty and homelessness.

73.     The Anti-Food Sharing Ordinance also restricts expressive conduct protected by the First Amendment as applied to Plaintiffs. Plaintiffs share food to protest war and poverty, demonstrate that food is a human right, and convey their dissatisfaction with the City's response to homelessness. A reasonable person would interpret one or all of these messages based on the surrounding circumstances of FNBH's food sharing events.

74.     Further, the City has enforced the Ordinance to prohibit food sharing on *all* public property except a single police station parking lot. Many of the locations where food sharing has

traditionally occurred are places that have long been recognized as "quintessential public forums" where "the rights of the state to limit expressive activity are sharply circumscribed." *Perry Educ. Ass'n v. Perry Local Educators Ass'n*, 460 U.S. 37, 45 (1983).

75.     As a restriction on protected expression in traditional public forums, the City must show the Anti-Food Sharing Ordinance is narrowly tailored to serve a significant government interest and leave open ample alternative avenues for speech. *See McCullen v. Coakley*, 573 U.S. 464, 486 (2014). This standard requires the City to demonstrate a "close fit between ends and means" to prevent "sacrific[ing] speech for efficiency." *Id.* (alteration in original) (quotation omitted). The Anti-Food Sharing Ordinance fails to meet that standard in all respects.

76.     As explained, *supra* § IV.D, none of the City's stated justifications for the ban on food sharing pass muster. Broadly, none of the interests have any factual support and, even if they did, they fail as "significant" interests that can justify restricting First Amendment freedoms. They have even less force as applied to Plaintiffs who have engaged in expressive activity arguably proscribed by the Ordinance for decades largely without issue.

77.     Nor are the City's four interests tailored to the Anti-Food Sharing Ordinance. **First,** the restriction has severely reduced charitable food sharing across the City rather than help coordinate such activities. **Second,** the City's interest in connecting homeless individuals with service providers is frustrated by the City's severe restriction of food sharing locations. **Third**, the vast majority of food sharing events, including Plaintiffs', intentionally leave no environmental impact. Moreover, less restrictive alternatives could satisfy this interest such as making additional locations available with sufficient trash receptacles or providing trash receptacles to groups seeking to share food. **Fourth**, and finally, the City's interest in criminalizing food sharing to

encourage families to come to the library is nonsensical because FNBH's food sharing events happen after the library has already closed its doors.

78.     At bottom, the City's stated justifications lack constitutionally adequate support by their own terms. But even assuming the City could justify some hypothetical restriction on food sharing, they certainly do not justify the City's draconian policy that such activities can only occur at 61 Riesner Street.

79.     The Ordinance therefore violates the First Amendment on its face and as applied to Plaintiffs by imposing an unconstitutional restriction on protected expressive activity. Because the City has acted and threatened to act under the color of state law to deprive Plaintiffs of rights secured by the First Amendment, Plaintiffs may sue to seek relief under § 1983.

### Count II: 42 U.S.C. § 1983

### (Free Speech – Invalid Prior Restraint)

80.     All prior paragraphs are incorporated here by reference.

81.     The First Amendment, as incorporated against the States through the Fourteenth Amendment and enforceable through 42 U.S.C. § 1983, protects expression against unconstitutional prior restraints. "It has long been held that ordinances regulating speech contingent on the will of an official—such as the requirement of a license or permit . . . are unconstitutional burdens on speech classified as prior restraints." *Chiu v. Plano Indep. Sch. Dist.*, 339 F.3d 273, 280 (5th Cir. 2003). The Anti-Food Sharing Ordinance operates as a prior restraint by foreclosing Plaintiffs' expressive activity in advance and relegating all expressive food sharing to a single public location in Houston.

82.     As a prior restraint, the Anti-Food Sharing Ordinance must contain "narrow, objective, and definite standards to guide the licensing authority." *Forsyth Cnty., Ga. v. Nationalist*

*Movement*, 505 U.S. 123, 131 (1992) (quoting citing *Shuttlesworth v. City of Birmingham, Ala.*, 394 U.S. 147, 150–51 (1969)).

83.     Sections 20-252 and 20-257 grant unbridled discretion to the City to determine which public properties, if any, can serve as a food sharing location. Even if a potential food sharing location meets the "regulations" promulgated by the Health Department—for example, providing sufficient dedicated parking places—the City still retains the ultimate authority to authorize or deny the use of a forum for any reason or no reason at all. Section 20-257 also provides no standards guiding the Health and Parks Departments' authority to promulgate rules, allowing these departments to change the rules whenever they want without explanation. This is the exact type of unbridled discretion the First Amendment forbids and breaks with the City's usual practice of mandating approval of a public forum once certain requirements are met. *Cf.* Houston City Code § 25-6(a)(2) (*requiring* special events officer to grant permit upon certain findings).

84.     The Anti-Food Sharing Ordinance, therefore, imposes an invalid prior restraint on protected expressive activity facially and as applied to Plaintiffs. Because the City has acted and threatened to act under the color of state law to deprive Plaintiffs of rights secured by the First Amendment, Plaintiffs may sue to seek relief under § 1983.

## Count III: 42 U.S.C. § 1983

### (Expressive Association – As Applied)

85.     All prior paragraphs are reincorporated here by reference.

86.     The Supreme Court has "long understood as implicit in the right to engage in activities protected by the First Amendment a corresponding right to associate with others." *Americans for Prosperity Found. v. Bonta*, 141 S. Ct. 2373, 2382 (2021) (quotation omitted). When evaluating claims of expressive association, courts first "determine whether the group

engages in 'expressive association,'" meaning the group "associate[s] together . . . to 'advanc[e] beliefs and ideas.'" *Mote v. Walthall*, 902 F.3d 500, 506–07 (5th Cir. 2018) (quoting *Boy Scouts of Am. v. Dale*, 530 U.S. 640, 648 (2000) and *Abood v. Detroit Bd. of Educ.*, 431 U.S. 209, 233–34 (1977)).

87.     Once a restriction impinges the rights of expressive association, the restriction must satisfy strict scrutiny, meaning the restriction must serve a "compelling state interest that cannot be achieved through means significantly less restrictive of associational freedoms." *Knox v. Serv. Emps. Intl Union, Loc. 1000*, 567 U.S. 298, 310 (2012) (quotation omitted).

88.     The Anti-Food Sharing Ordinance violates these principles.

89.     **First,** there can be little debate Plaintiffs associate together to advance their beliefs that our community can do more to support the economically vulnerable by prioritizing the investment of public dollars in meeting people's basic needs rather than policing, militarization, and environmental destruction.

90.     **Second,** the Anti-Food Sharing Ordinance seriously burdens that association by forcing Plaintiffs to irreparably alter the character of their association. *See supra* ¶¶ 45, 46, 48.

91.     **Third,** and finally, the restriction on Plaintiffs' expressive association fails any level of constitutional scrutiny and certainly the strict scrutiny courts apply in cases of compelled association. *See McDonald v. Longley*, 4 F.4th 229, 246 (5th Cir. 2021). For the reasons stated previously, *supra* ¶¶ 68-79 (Count I), the Ordinance imposes a restriction on Plaintiffs' protected association without a constitutionally adequate justification.

92.     The Anti-Food Sharing Ordinance, therefore, imposes an unconstitutional restriction on expressive association as applied to Plaintiffs. Because the City has acted and

threatened to act under the color of state law to deprive Plaintiffs of rights secured by the First Amendment, Plaintiffs may sue to seek relief under § 1983.

## Count IV: 28 U.S.C. § 2201

### (Declaratory Judgment)

93.     All prior paragraphs are reincorporated here by reference.

94.     Section 2201(a) provides: "In a case of actual controversy within its jurisdiction . . . any court of the United States . . . may declare the rights and other legal relations of any interested party seeking such declaration[.]"

95.     This case presents an actual controversy between Plaintiffs and the City of Houston as to whether §§ 20-252 and 20-257 of the Houston City Code violate Plaintiffs' First Amendment rights both on its face and as applied to them. As alleged, Plaintiffs claim the Anti-Food Sharing Ordinance violates their First Amendment rights.

96.     Plaintiffs seeks a declaration that §§ 20-252 and 20-257 of the Houston City Code violate the Constitution on its face and as applied to Plaintiff.

## VI.     REQUESTS FOR RELIEF

Plaintiffs respectfully request the following relief:

a) A judgment declaring §§ 20-252 and 20-257 of the Houston City Code violate the United States Constitution under the First Amendment, as incorporated against the states through the Fourteenth Amendment.

b) A permanent injunction prohibiting the City of Houston and its officials, employees, and agents from enforcing §§ 20-252 and 20-257 anywhere in the City.

c) A permanent injunction prohibiting the City of Houston and its officials, employees, and agents from enforcing §§ 20-252 and 20-257 against Plaintiffs, FNBH members, and FNBH volunteers.

d) An award to Plaintiffs of costs and attorney's fees; and

e) Any other and further relief this Court deems just and proper.

Dated: January 30, 2024

Respectfully submitted,

/s/*Randall Hiroshige*
Randall Hiroshige
Texas Bar No. 24124299
Southern District No. 3708688
randy@texascivilrightsproject.org
Dustin Rynders
Texas State Bar No. 24048005
Southern District No. 685541
dustin@texascivilrightsproject.org
Travis Fife
Texas Bar No. 24126956
Southern District No. 3734502
travis@texascivilrightsproject.org
Texas Civil Rights Project
1405 Montopolis
Austin, Texas 78741
Telephone: 512-474-5073

Remington Alessi
Texas Bar No. 24120245
Southern District No. 3596602
Remington@TexasChainsawLawyer.com
PO Box 230381
Houston, Texas 77223
Tel. (281) 438-3733
Fax. (713) 583-7973

**ATTORNEYS FOR PLAINTIFFS**