United States District Court
Southern District of Texas
**ENTERED**
February 14, 2024
Nathan Ochsner, Clerk

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| FOOD NOT BOMBS HOUSTON et al, | § § | |
| *Plaintiffs*, | § § | |
| v. | § § | CIVIL ACTION NO. 4:24-CV-0338 |
| CITY OF HOUSTON, TEXAS | § § § | |
| *Defendant.* | § § | |

### ORDER

Pending before the Court is Plaintiffs Food Not Bombs Houston ("FNBH") and Brandon Walsh's (collectively, "Plaintiffs") Motion for Temporary Restraining Order and Preliminary Injunction. (Doc. No. 4). The Court held a hearing on the Motion on February 12, 2024, where it heard testimony from witnesses and arguments from counsel from both sides. Upon considering the evidence, the parties' arguments, and the applicable law, the Court hereby GRANTS Plaintiff's Motion for Preliminary Injunction for the reasons set forth below.

**I.    Background**

This case involves the constitutionality of § 20-252 and § 20-257 of the Houston City Code ("the Charitable Food Sharing Ordinance" or "the Ordinance"). Plaintiff FNBH is an organization that provides free meals to food insecure people in Houston. FNBH provides these meals four evenings per week and has been doing so for nearly two decades. According to FNBH, the organization serves food to protest the manner in which the government spends tax revenue; specifically, FNBH serves food to urge the government to invest more resources into solving problems like hunger, homelessness, and poverty rather than spending those resources on war and violence. FNBH spreads this message not only by using traditional means of protests (including

signs, banners, t-shirts, etc.), but also by publicly sharing food and eating with people experiencing homelessness. The meals are vegetarian or vegan and are usually donated from local businesses that otherwise would have let the food go to waste. At its events, FNBH has a large banner with the group's name and slogan "Poverty Isn't a Crime," and members wear coordinated t-shirts. Plaintiff Walsh is a FNBH member.

The Charitable Food Sharing Ordinance was passed in early 2012. In short, the Ordinance makes it illegal to conduct or sponsor a charitable food service event without the consent of the property owner, including on *all* public property.

Section 20-252 sets out the following:

> **"Use of property without consent prohibited.**
> It shall be unlawful for any organization or individual to sponsor or conduct a food service event on public or private property without the advance written consent of the public or private property owner or other individual with lawful control of the property.

(Ord. No. 2012-269, § 2, 4-4-2012, eff. 7-1-2012).

Section 20-257 sets out the following:

> **Use of city parks and other city property for food service events.**
> The director of the parks department shall develop rules, regulations, and criteria for the use of park properties for food service events and shall maintain a list of park properties with areas approved for food service events. The director of public health shall develop rules, regulations, and criteria for the use of other city property for food service events and shall maintain a list of such properties with areas approved for food service events. The parks department and the health department shall coordinate designation of such properties to avoid redundancy and maximize the most effective use of the properties.

(Ord. No. 2012-269, § 2, 4-4-2012, eff. 7-1-2012; Ord. No. 2015-820, § 17, 8-26-2015)

As noted in the above section, the Charitable Food Sharing Ordinance subjects the food sharing events to regulations promulgated by the Houston Health Department. Most of these

2

"requirements" are, however, optional. For example, the regulation encourages, but does not require, food sharing programs to register, obtain free food-handling training, and schedule the food service on the City's website. Only one regulation is actually mandatory. As stated in the regulations, "[t]he only mandatory step is a requirement to obtain owner consent before using either public or private property for food service of more than five people."[1] (Defendant's Exhibit 2).

When the Ordinance was passed in 2012, FNBH obtained consent from then Mayor Annise Parker to host its food sharing events at the Houston Central Public Library across from City Hall. FNBH believes that this is an ideal location for its food-oriented protest because it is highly visible. Mayor Parker also approved eight other city-owned properties for food sharing. In February of 2023, under the administration of Mayor Sylvester Turner, the City withdrew its consent to use these locations, including consent to use the Central Library. Instead, the City gave consent for food sharing events at only one location—61 Reisner Street, Houston Texas (formerly a Houston Police Department station).

The City of Houston believes that coordinating all food sharing events at 61 Reisner is the best course of action to solve homelessness and the difficulties that come with it. The City works with "data-driven" methods to maximize impact. For example, the City has shifted from a shelter-based approach to end homelessness to a housing-based approach. City officials testified that an organized feeding system at 61 Reisner will also assist with its goals by increasing predictability for the homeless population. Moreover, because 61 Reisner is a unified location, the City contends

---

[1] FNBH does not challenge the portion of the Ordinance and accompanying regulations that pertains to obtaining owner consent for food sharing on *private* property. In this instance, "owner consent" means permission from the mayor.

that it will optimize outcomes for homeless individuals because there are other social services offered at that location as well, including mental health and housing resources.

Finally, the City believes that a unified system at 61 Reisner will reduce health risks associated with food sharing. The location includes increased sanitation (food washing stations and portable bathrooms), decreased vehicle traffic, more trash receptacles, and improved lighting and electricity as compared with other potential food sharing locations such as the library.

FNBH takes several issues with this location. Not only is it the sole location offered by the City (which may result in overlapping schedules from charitable groups), but it also demonstrates the complete discretion vested in city officials to determine where it conducts its protests. While the City views 61 Reisner's decreased traffic as a positive factor for safety, FNBH contends that the location is less visible and therefore cannot spread its message as effectively. Moreover, part of FNBH's mission is to protest war and what it believes are other inappropriate applications of tax-payer funds, and it contends that being associated with the old police station is at odds with this mission.

These reasons, among others, have caused FNBH to disregard the City's attempts to push all food sharing to 61 Reisner and, by extension, to disregard the Ordinance. Rather than move its operations to 61 Reisner, FNBH has continued to conduct its food sharing at the Central Library. FNBH members and volunteers have been issued over 89 tickets (corresponding to what they claim are potentially $178,000 in fines). Several FNBH volunteers claim that they have stopped volunteering for fear of receiving a ticket. FNBH and Walsh filed this lawsuit alleging that the Charitable Food Sharing Ordinance, facially and as applied, violates their First Amendment rights of free speech and expressive association. Specifically, in the present motion, Plaintiffs request that the Court find that they have a substantial likelihood on the merits of their "as-applied"

4

challenge. Consequently, Plaintiffs ask that the Court enter a temporary injunction enjoining the City of Houston and its officers, employees, and agents from enforcing § 20-252 and § 20-257 of the Houston City Code against Plaintiffs, FNBH members, and FNBH volunteers at the Central Library location.

With this background in mind, the Court turns to the legal merits of Plaintiffs' motion.

## II.   Legal Standard

A party seeking a preliminary injunction generally must show: (1) a substantial likelihood of success on the merits, (2) irreparable injury if the injunction is not granted, (3) that the injury outweighs any harm to the other party, and (4) that granting the injunction will not disserve the public interest. *Daniels Health Scis., L.L.C. v. Vascular Health Scis., L.L.C.*, 710 F.3d 579, 882 (5th Cir. 2013) (citing *Byrum v. Landreth*, 566 F.3d 442, 445 (5th Cir.2009)). "A preliminary injunction is an extraordinary remedy and should only be granted if the plaintiffs have clearly carried the burden of persuasion on all four requirements." *Nichols v. Alcatel USA, Inc.*, 532 F.3d 364, 372 (5th Cir. 2008) (citation and quotation marks omitted).

## III.   Analysis

### a. *Likelihood of Success on the Merits*

The first factor for the Court to consider is whether Plaintiffs have demonstrated a substantial likelihood of success on the merits of their as-applied constitutional challenge. Plaintiffs argue that the Charitable Food Sharing Ordinance is an unconstitutional restriction of their First Amendment rights for three independent reasons: (1) it is an invalid prior restraint that gives unbridled discretion to City officials; (2) it is an unconstitutional time, place, and manner restriction because it is not narrowly tailored to a significant governmental interest and does not leave ample alternative channels, and (3) it violates the expressive association rights by dictating

that individuals may only engage in their expressive association at one location within the City of Houston.

### i. *Expressive Conduct under the First Amendment*

The threshold inquiry in this case is whether Plaintiffs are engaging in expressive conduct protected by the First Amendment. The First Amendment prohibits laws "abridging the freedom of speech . . . or the right of the people to peaceably assemble." U.S. Const. Amend. I. The Supreme Court has "long recognized that [the First Amendment's] protection does not end at the spoken or written word." *Texas v. Johnson*, 491 U.S. 397, 404 (1989).

In *Spence v. Washington*, 418 U.S. 405 (1974), the Supreme Court held that conduct receives First Amendment protection where "[a]n intent to convey a particularized message [is] present, and in the surrounding circumstances the likelihood [is] great that the message would be understood by those who viewed it." *Id.* at 410–11. In subsequent cases, however, the Supreme Court relaxed the "particularized message" requirement by holding protected expressive conduct need not convey "a narrow, succinctly articulable message." *Hurley v. Irish-Am. Gay, Lesbian & Bisexual Grp. of Bos.*, 515 U.S. 557, 569 (1995). As the Eleventh Circuit articulated, "in determining whether conduct is expressive, we ask whether the reasonable person would interpret it as *some* sort of message, not whether an observer would necessarily infer a *specific* message." *Holloman ex rel Holloman v. Hartland*, 370 F.3d 1252, 1270 (11th Cir. 2004). "Whether food distribution [or sharing] can be expressive activity protected by the First Amendment under particular circumstances is a question to be decided in an as-applied challenge[.]" *Santa Monica Food Not Bombs v. City of Santa Monica*, 450 F.3d 1022, 1032 (9th Cir. 2006).

6

Applying this expressive conduct jurisprudence, the Court finds that FNBH's food sharing is expressive conduct.[2] The likelihood is great that an observer would appreciate FNBH's message based on the context of the protest. Even setting aside the words on FNBH's banners and t-shirts, the political message of feeding the hungry, eating with them, and doing so on public property, would be understood by an onlooker.

This finding is consistent with other Circuit precedent. The Eleventh Circuit examined the food sharing protest by Fort Lauderdale Food Not Bombs and similarly found that the food sharing was expressive conduct protected by the First Amendment. In doing so, the Eleventh Circuit examined the context of the food sharing. Specifically, the Circuit found that the (1) presence of signage, (2) the public nature of the events, (3) the public forum status of parks, (4) the fact that homelessness was an issue of public concern, and (5) the inherently expressive nature of food sharing, all supported the conclusion that Fort Lauderdale Food Not Bombs was engaged in a form of protected expression. *Fort Lauderdale Food Not Bombs v. City of Fort Lauderdale*, 901 F.3d 1235, 1242–43 (11th Cir. 2018).

The Court finds that the activity, context, and environment here are nearly identical to those above, such that an neutral observer would understand that Plaintiffs engage in food sharing as part of and with the intent to protest the "criminalization of poverty," "overinvestment in war" and "policing at the expense of the hungry." (Doc. No. 4 at 10). As such, Plaintiffs are engaged in expressive conduct protected by the First Amendment.

---

[2] This Court understands that a cogent argument can be made that the mere act of feeding the homeless might not qualify as protected First Amendment expressive behavior. This Court need not decide this issue; rather, it finds that the act of providing food to the food insecure, when combined with FNBH's other activities, is an inherent part of the Plaintiffs' political protest because it is not practical to separate one from the other.

7

### ii. *Prior Restraint on Speech*

Plaintiffs' first basis for challenging the constitutionality of the Charitable Food Sharing Ordinance is that, as applied to their protected activity, it is an unconstitutional prior restraint. "It has long been held that ordinances regulating speech contingent on the will of an official—such as the requirement of a license or permit . . . are unconstitutional burdens on speech classified as prior restraints." *Chiu v. Plano Indep. Sch. Dist.*, 339 F.3d 273, 280 (5th Cir. 2003). "Any system of prior restraints of expression comes . . . bearing a heavy presumption against its constitutional validity." *Bantam Books, Inc. v. Sullivan*, 372 U.S. 58, 70–71 (1963).

Any prior restraint on protected activity must be "related to [a] legitimate government interest" and "narrowly drawn to prevent discretionary decision-making." *Beckerman v. City of Tupelo, Miss.*, 664 F.2d 502, 509 (5th Cir. 1981) (citing *Shuttlesworth v. City of Birmingham, Ala.*, 394 U.S. 147, 153 (1969)). This requires "narrow, objective, and definite standards to guide the licensing authority." *Forsyth Cnty., Ga. v. Nationalist Movement*, 505 U.S. 123, 131 (1992) (quoting *Shuttlesworth*, 394 U.S. at 150–51). Such standards "provide the guideposts that check the licensor and allow courts quickly and easily to determine whether the licensor is discriminating against disfavored speech." *City of Lakewood v. Plain Dealer Publ'g Co.*, 486 U.S. 750, 758 (1988).

Under the Ordinance, it is a crime to sponsor or conduct a food service event "without the advance written consent of the public . . . property owner." Houston City Code § 20-252. Neither the Ordinance's text nor any administrative guidance explains why the City has selected only one location, and why that location, as opposed to others, was the sole place chosen. Houston City Code § 20-257 delegates authority to City agencies to develop "rules, regulations, and criteria for the use" of public property for food service events, it contains no standards for how these rules will be developed and seems to allow City agencies to change the rules at any time.

8

The latest rules promulgated by the Health Department have little bearing on how an approved location is chosen. The rules state that the approved location will have (1) adequate parking, (2) adequate trash containment, and (3) restrooms and hand washing stations available 24 hours per day, 7 days per week. (Defendant's Exhibit 2). These three requirements are deemed *necessary* by the City[3] but not *sufficient*—that is, there is no guarantee that if a location meets these requirements, it may become an approved location. The rules do *not* provide a mechanism for how to apply to get a location approved, what standards will be applied when reviewing an application for a new location, and whether a location will actually be approved. Plaintiffs argue that this lack of criteria leaves the decision of whether to grant consent to the whims of city officials.

The Court agrees. The history of the Ordinance itself makes clear that the avenues for speech depend solely on the discretion of the Mayor. Under former Mayor Parker, nine public locations were available for food-sharing; under Mayor Turner, only 61 Reisner was available. There was no reasoning provided for this change, nor was there any evidence that the formerly approved locations were no longer feasible.[4] Moreover, the language of the Ordinance does not even guarantee that at least one location will be permitted. It is therefore theoretically possible that, as property owner, the City could withdraw all consent as to any public forum. This would completely eliminate Plaintiffs' ability to engage in their protest.

In *Forsyth Cnty*, the Supreme Court reasoned that the decision of how much to charge for police protection (and whether to charge at all) was left to the "unbridled discretion" of the

---

[3] The Court notes that some evidence indicated that even 61 Reisner does not meet these 3 necessary requirements. For example, FNBH members have observed padlocks on the restrooms at 61 Reisner, suggesting that the restrooms are not available 24-7.

[4] City officials testified that 61 Reisner was a better location because the City had (or could locate) other services for the homeless nearby. It could also guarantee certain facilities and security. While this makes sense, it is not enough to justify banning all other locations to groups exercising their First Amendment rights.

9

administrator who was not required to rely on any objective factors, did not need to provide any explanation, and whose decision was not reviewable. 505 U.S. at 133. Applying this reasoning here, the decision of where to allow food sharing (and whether to allow food sharing at all) is left to the whims of the Mayor's office, whose discretion appears to be unbridled and whose decision is not reviewable. Therefore, Plaintiffs have demonstrated a substantial likelihood of success on the merits of their as-applied prior restraint claim.

### iii. *Unconstitutional Time, Place, and Manner Restriction*

Plaintiffs' second basis for challenging the constitutionality of the Charitable Food Sharing Ordinance is that, as applied to their protected activity, it is an unconstitutional time, place, and manner restriction.

Even where the government does not attempt to prohibit speech on the basis of content, intermediate scrutiny "prevents the government from too readily 'sacrific[ing] speech for efficiency." *McCullen v. Coakley*, 573 U.S. 464, 486 (2014) (quoting *Riley v. Nat'l Fed. of Blind of N.C., Inc.*, 487 U.S. 781, 795 (1988)). Under this level of scrutiny, the government must prove the restriction is "**narrowly tailored** to serve a **significant governmental interest**, and [] leave[s] open **ample alternative channels** for communication of the information." *Id.* at 477 (quotation omitted) (emphasis added). Narrow tailoring requires the City to show that the Charitable Food Sharing Ordinance does not "burden substantially more speech than is necessary." *Id.* at 486 (quoting *Ward v. Rock Case Against Racism*, 491 U.S. 781, 799 (1989)). A regulation is invalid where "a substantial portion of the burden on speech does not serve to advance its goals." *Id.* (quotation omitted).

Here, Plaintiffs contend that the Ordinance is neither narrowly tailored to a significant government interest, nor does it leave ample alternative channels for communicating its message. The Court agrees.

First, the Ordinance is not narrowly tailored to a significant government interest. The government interests offered by the City included its interest in promoting public health and food safety, as well as its interest in minimizing vermin and unifying its efforts to support Houston's homeless. While the City undoubtedly has, and should have, an interest in public health and safety, the requirements of the Ordinance are divorced from this justification. As noted, attending the City's food safety training is *optional* under the regulations, and the location of 61 Reisner has no inherent food safety assurances associated with it (it is, essentially, a parking lot). Serving expired or contaminated food is not illegal under the Ordinance so long as it is at 61 Reisner. Since there is no nexus between the health and safety of the food and the City's location, the Ordinance is not narrowly tailored to the significant government interest. The City may impose restrictions on the conduct of individuals with regard to health and safety, but it cannot limit that conduct to certain locations in the name of health and safety when there are no actual health and safety protocols tied to those locations. Although the City's other interests—minimizing vermin and coordinating efforts to solve homelessness—may very well be legitimate government interests, they, too, appear to be divorced from the sole requirement of the Ordinance (obtaining the City's consent).

Second, the Ordinance does not leave open adequate alternative channels of communication. "[A]n alternative forum is not sufficient if it 'foreclose[s] a speaker's ability to reach one audience even if it allows the speaker to reach other groups.'" *Sarre v. City of New Orleans*, 420 F. App'x 371, 376 (5th Cir. 2011) (quoting *Gresham v. Peterson*, 225 F.3d 899, 907 (7th Cir. 2000)). Currently, the Ordinance leaves only one channel of communication—61 Reisner. Plaintiffs contend, and this Court agrees, that 61 Reisner is an inadequate protest alternative because it alters FNBH's audience (both people being served food and those observing) and FNBH's message. As noted above, FNBH serves food as a form of protest to encourage

governments to "divert resources away from war, policing, and environmental destruction and towards meeting people's direct material needs." (Doc. No. 4 at 19). Forcing FNBH to engage in that protected expression at 61 Reisner changes the impact of that message for multiple reasons. It may give the appearance that FNBH is working with the City rather than criticizing the City. Moreover, the 61 Reisner location is further from the center of downtown and has much less visibility than the Central Library location, potentially further diluting the impact of plaintiffs' message. It is also the location of the former police station—a group with which the Plaintiffs would rather not be identified. In effect, the City concedes these factors; it conceded at the hearing that the Plaintiffs could protest at their chosen location as long as they did not hand out food.

For the reasons above, the Court agrees at this stage with Plaintiffs that the Ordinance is not narrowly tailored to a significant government interest and does not leave open ample adequate alternative channels of communication. Therefore, Plaintiffs have shown they are substantially likely to succeed on the merits of their claim that, as applied, the Ordinance is an unconstitutional time, place, and manner restriction.

### iv. *Expressive Association*

Plaintiffs' third and final basis for challenging the constitutionality of the Charitable Food Sharing Ordinance is that, as applied to their protected activity, it is an unconstitutional restraint on their expressive association. Having found a substantial likelihood of the success on the merits of two other bases above, the Court need not address this third independent basis for the unconstitutionality of the Ordinance at this stage of litigation. The Court's decision not to address this argument is not a comment on the merits, or lackthereof, of this third argument.

### b. *Likelihood of Irreparable Harm*

Having found that the Plaintiffs have established a likely violation of their First Amendment rights, the remaining three injunction factors similarly fall in their favor. The second factor requires that Plaintiffs show a substantial threat of irreparable harm if the injunction is not granted.

Under Fifth Circuit precedent, "'[t]he loss of First Amendment freedoms for even minimal periods of time unquestionably constitutes irreparable injury.'" *Opulent Life Church*, 697 F.3d 279, 295 (5th Cir. 2012) (quoting *Elrod v. Burns*, 427 U.S 347, 373 (1976)); *see also* 11A Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, Federal Practice and Procedure § 2948.1 (2d ed. 1995) ("When an alleged deprivation of a constitutional right is involved, most courts hold that no further showing of irreparable injury is necessary."). This is true whether the "First Amendment interests [are] either threatened or in fact being impaired at the time relief [is] sought." *Elrod*, 427 U.S. at 373.

Here, given that FNBH members have already received citations and continue to face the threat of prosecution for violating the Ordinance, the Court finds that the Plaintiffs have made a sufficient showing of irreparable harm.[5]

### c. *Balancing the Equities and Public Interest*

Likewise, the third and fourth factor weigh in Plaintiffs favor for granting an injunction. The third preliminary injunction factor requires the Court to balance the harm to the parties. "The third preliminary injunction factor requires [Plaintiffs] to show that, absent an injunction, [their] threatened injury outweighs any harm [the City] will suffer as a result of the injunction." *Opulent Life*, 697 F.2d at 297. As discussed above, the threatened injury to Plaintiffs is an irreparable harm

---

[5] The Court notes it has a second case in which it is alleged that the Plaintiff actually *was* ticketed by the police for an alleged violation of the Ordinance while at a FNBH rally. *See Picone v. Ancira et al.*, 4:23-cv-1206.

to their First Amendment rights. As for the City, it contends that it would suffer harm as a result of the injunction because the goals of the Ordinance would be frustrated—namely, there could be increased sanitation, health, safety, and trash-related risks. The City's interests, however, do not clearly implicate the constitution, and these addressing these risks may be achieved through less restrictive means. Moreover, the Court is crafting its security requirement so as to minimize the effect on the City. Upon balancing these harms, the Court finds that Plaintiffs have met their burden on the third factor.

Finally, the fourth factor requires the Plaintiffs show that the injunction will not disserve the public interest. The Fifth Circuit has consistently held that "injunctions protecting First Amendment freedoms are always in the public interest." *Texans for Free Enter. v. Tex. Ethics Comm'n*, 732 F.3d 535, 539 (5th Cir. 2013); *see also Ingebretsen ex rel. Ingebretsen v. Jackson Pub. Sch. Dist.*, 88 F.3d 274, 280 (5th Cir. 1996) (holding that where a law violates the First Amendment "the public interest was not disserved by an injunction preventing its implementation."). Therefore, Plaintiffs succeed on the fourth and final factor as well. Accordingly, the Court hereby GRANTS Plaintiff's Motion (Doc. No. 4) and will enter an order of preliminary injunction enjoining the City of Houston and its officers, employees, and agents from enforcing § 20-252 and § 20-257 of the Houston City Code against FNBH members and volunteers at the Central Library.

## IV. Bond

The final issue the Court must address is how to address the security requirement in Rule 65(c). Fed. R. Civ. Proc. 65. The Plaintiffs have asked that the bond be waived because there is no risk of monetary loss to the city. By contrast, the City has asked for a heightened bond to address the risks associated with a food sharing event located at a property other than 61 Reisner. Having considered the arguments of counsel, evidence, and legitimate concerns of the City, the Court gives

14

Plaintiffs the following choice. The Plaintiffs may elect to post a bond in the amount of $25,000. Alternatively, Plaintiffs may elect to post a lower bond in the amount of $2,500 *provided that* they meet the following conditions as to each of their events. They are to:

- bring adequate trash receptacles to the events and ensure that all waste and receptacles are removed following the event;
- provide handwashing stations, hand sanitizer, or hand wipes to all attendees;
- avoid congregating on sidewalks and in the streets so as to block a sidewalk or street; and
- ensure that any food-handling member (who has not already taken the City's food safety training) attend the free, virtual training offered from 12-2 p.m. on the third Saturday of every month. The next one should be this Saturday, February 17, 2024.

The procedural criteria of that election are set out in the accompanying order of injunction.

## V. Conclusion

Having considered the parties' arguments and applicable law, the Court finds that Plaintiffs have sufficiently demonstrated that they are entitled to a preliminary injunction at this time. Accordingly, the Court hereby GRANTS Plaintiff's Motion (Doc. No. 4). The Court in a separate order will temporarily enjoin the City of Houston and its officers, employees, and agents from enforcing § 20-252 and § 20-257 of the Houston City Code against FNBH members and volunteers during the pendency of this litigation. While the City's efforts to unify and streamline an efficient end to homelessness and feed the hungry may make good policy sense, being sensible does not always equate to being constitutional, especially when the consequence of that policy is restricting the expressive conduct of those that are protesting government policy.

Signed at Houston, Texas, this 14th day of February, 2024.

Andrew S. Hanen
United States District Judge