## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

|  |  |  |
|---|---|---|
| Food Not Bombs Houston et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | Case No. 4:24-cv-338 |
| v. | ) | (Consolidated Case: No. 4:23-cv-1206) |
| | ) | |
| City of Houston, Texas, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

## PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT
## & PERMANENT INJUNCTION

## TABLE OF CONTENTS

TABLE OF CONTENTS ................................................................................................ i

TABLE OF AUTHORITIES ....................................................................................... ii

I.     INTRODUCTION ............................................................................................. 1

II.    FACTS ............................................................................................................... 2

      A.     Plaintiffs Share Food to Protest War, Poverty, and the City's Response to
           Homelessness. ........................................................................................ 2

      B.     The City Adopts the Ordinance. .......................................................... 4

      C.     The City Arbitrarily Restricts Charitable Feeding under the Ordinance. .............. 5

      D.     The City Restricts All Public Charitable Feeding to 61 Riesner. ......................... 7

      E.     The City Enforces the Ordinance Against FNBH and Its Members. ...................... 9

III.   STAGE OF THE PROCEEDING ........................................................................ 10

IV.    STATEMENT OF THE ISSUES AND STANDARD OF REVIEW ................................... 10

V.     ARGUMENT ...................................................................................................... 11

      A.     There Is No Dispute of Material Fact that the Ordinance Restricts First
           Amendment Activity on its Face and As Applied to Plaintiffs. .......................... 12

          1.     The Ordinance Facially Restricts Conduct Commonly Associated with
              Expression. ................................................................................ 13

          2.     The Ordinance Restricts Plaintiffs' Expressive Conduct As Applied. ................ 15

      B.     There Is No Dispute of Material Fact that the Ordinance Imposes an Invalid Prior
           Restraint. ............................................................................................. 19

          1.     The Ordinance Is a Prior Restraint. ........................................................... 19
          2.     The Ordinance Lacks Narrow, Objective, or Definite Standards. ....................... 20

      C.     There is No Dispute of Material Fact that the Ordinance Fails Intermediate
           Scrutiny. ............................................................................................. 24

          1.     The City Cannot Show the Ordinance Is Narrowly Tailored to a Significant
               Interest. .................................................................................... 25
          2.     The Ordinance Forecloses All Adequate Alternative Channels of Communication.
               .............................................................................................. 29

      D.     There is No Dispute of Material Fact that the Ordinance Unconstitutionally
           Restricts Plaintiffs' Expressive Association. .......................................... 32

      E.     The Court Should Grant Permanent Injunctive Relief. .......................... 34

VI.    CONCLUSION .................................................................................................. 35

CERTIFICATE OF SERVICE ...................................................................................... 36

## **TABLE OF AUTHORITIES**

**Cases**

*3570 E. Foothill Blvd., Inc. v. City of Pasadena*,
 912 F. Supp. 1268 (C.D. Cal. 1996) ......................................................................... 34

*Abood v. Detroit Bd. of Educ.*,
 431 U.S. 209 (1977) ................................................................................................. 32

*Ams. for Prosperity Found. v. Bonta*,
 594 U.S. 595 (2021) ................................................................................................. 32

*Anderson v. Liberty Lobby, Inc.*,
 477 U.S. 242 (1986) ................................................................................................. 11

*Bantam Books, Inc. v. Sullivan*,
 372 U.S. 58 (1963) ............................................................................................. 19, 20

*Bates v. City of Little Rock*,
 361 U.S. 516 (1960) ................................................................................................. 12

*Beckerman v. City of Tupelo*,
 664 F.2d 502 (5th Cir. 1981) ................................................................................... 19

*Big Hart Ministries Assoc., Inc. v. City of Dallas*,
 No. 3:07-CV-0216-P, 2013 WL 12304552 (N.D. Tex. Mar. 25, 2013) .............. 14, 30

*Boy Scouts of Am. v. Dale*,
 530 U.S. 640 (2000) ............................................................................................. 32, 33

*Chiu v. Plano Indep. Sch. Dist.*,
 339 F.3d 273 (5th Cir. 2003) ................................................................................... 19

*Chosen 300 Ministries, Inc. v. City of Philadelphia*,
 No. CIV.A. 12-3159, 2012 WL 3235317 (E.D. Pa. Aug. 9, 2012) .................... 14, 30

*City of Ladue v. Gilleo*,
 512 U.S. 43 (1994) ............................................................................................. 29, 31

*City of Lakewood v. Plain Dealer Publ'g Co.*,
 486 U.S. 750 (1988) ..................................................................................... 11, 13, 24

*Democratic Party of U.S. v. Wisconsin ex rel. La Follette*,
 450 U.S. 107 (1981) ................................................................................................. 33

*eBay Inc. v. MercExchange, L.L.C.*,
    547 U.S. 388 (2006) ............................................................................. 11, 34

*Elrod v. Burns*,
    427 U.S. 347 (1976) ..................................................................................... 34

*Forsyth Cty. v. Nationalist Movement*,
    505 U.S. 123 (1992) ................................................................. 11, 19, 20, 23

*Fort Lauderdale Food Not Bombs v. City of Fort Lauderdale*,
    11 F.4th 1266 (11th Cir. 2021) ............................................................... 15, 28

*Fort Lauderdale Food Not Bombs v. City of Fort Lauderdale*,
    901 F.3d 1235 (11th Cir. 2018) ............................................................. passim

*Gresham v. Peterson*,
    225 F.3d 899 (7th Cir. 2000) ...................................................................... 29

*Hague v. CIO*,
    307 U.S. 496 (1939) ..................................................................................... 17

*Hays Cty. Guardian v. Supple*,
    969 F.2d 111 (5th Cir. 1992) ....................................................................... 28

*Hines v. Pardue*,
    117 F.4th 769 (5th Cir. 2024) ................................................................. 24, 25

*Holloman ex rel. Holloman v. Harland*,
    370 F.3d 1252 (11th Cir. 2004) .................................................................... 13

*Hurley v. Irish-Am. Gay, Lesbian & Bisexual Grp. of Bos.*,
    515 U.S. 557 (1995) ................................................................................ passim

*Knowles v. City of Waco*,
    462 F.3d 430 (5th Cir. 2006) ....................................................................... 25

*Knox v. Serv. Emps. Int'l Union, Loc. 1000*,
    567 U.S. 298 (2012) ......................................................................... 11, 32, 33

*Loper v. New York City Police Dep't*,
    999 F.2d 699 (2d Cir. 1993) ................................................................... 14, 15

*McCullen v. Coakley*,
    573 U.S. 464 (2014) ................................................................................ passim

*McDonald v. Longley,*
  4 F.4th 229 (5th Cir. 2021) ................................................................ 32, 33

*Mote v. Walthall,*
  902 F.3d 500 (5th Cir. 2018) .............................................................. 32, 33

*N.A.A.C.P. v. State of Ala. ex rel. Patterson,*
  357 U.S. 449 (1958) ................................................................................ 32

*Nat'l Fed. of the Blind of Tex., Inc. v. City of Arlington,*
  109 F.4th 728 (5th Cir. 2024) ................................................................. 22

*Nken v. Holder,*
  556 U.S. 418 (2009) ................................................................................ 34

*Opulent Life Church v. City of Holly Springs,*
  697 F.3d 279 (5th Cir. 2012) ................................................................. 34

*Perry Educ. Ass'n v. Perry Loc. Educators' Ass'n,*
  460 U.S. 37 (1983) .................................................................................. 17

*Pro-Life Cougars v. Univ. of Houston,*
  259 F. Supp. 2d 575 (S.D. Tex. 2003) ................................................... 19

*Riley v. Nat'l Fed. of the Blind of N.C., Inc.,*
  487 U.S. 781 (1988) ................................................................................ 24

*Roberts v. U.S. Jaycees,*
  468 U.S. 609 (1984) .......................................................................... 32, 33

*Roman Catholic Diocese of Brooklyn v. Cuomo,*
  592 U.S. 14 (2020) .................................................................................. 34

*Santa Monica Food Not Bombs v. City of Santa Monica,*
  450 F.3d 1022 (9th Cir. 2006) ................................................................ 15

*Sarre v. City of New Orleans,*
  420 F. App'x 371 (5th Cir. 2011) ........................................................... 29

*Schneider v. State of New Jersey,*
  308 U.S. 147 (1939) .......................................................................... 28, 31

*Se. Promotions, Ltd. v. Conrad,*
  420 U.S. 546 (1975) ................................................................................ 19

*Shuttlesworth v. City of Birmingham*,
    394 U.S. 147 (1969) .................................................................................. 19

*Speet v. Schuette*,
    726 F.3d 867 (6th Cir. 2013) .................................................................. 15

*Spence v. Washington*,
    418 U.S. 405 (1974) ................................................................... 12, 16, 18

*Tex. A&M Queer Empowerment Council v. Mahomes*,
    No. 4:25-cv-00992, 2025 WL 895836 (S.D. Tex. Mar. 24, 2025) ........... 13

*Texans for Free Enter. v. Tex. Ethics Comm'n*,
    732 F.3d 535 (5th Cir. 2013) .................................................................. 35

*Texas v. Johnson*,
    491 U.S. 397 (1989) ............................................................................... 12

*United States v. Grace*,
    461 U.S. 171 (1983) .......................................................................... 26, 28

*United States v. Virginia*,
    518 U.S. 515 (1996) ............................................................................... 24

*Ward v. Rock Against Racism*,
    491 U.S. 781 (1989) ............................................................................... 24

**Statutes**
42 U.S.C. § 1983 ............................................................................................ 11
Tex. Health & Safety Code § 365.012 ............................................................ 28

**Other Authorities**
BLACK'S LAW DICTIONARY (6th ed. 1990) ................................................... 19
Hous. City Code § 28-19 ................................................................................ 28
Hous. City Code § 39-3 .................................................................................. 28
Mary Douglas, *"Deciphering a Meal," in Implicit Meanings: Selected Essays in Anthropology*
    (1975) .................................................................................................. 17

**Rules**
Fed. R. Civ. P. 56 .......................................................................................... 10

**Constitutional Provisions**
U.S. Const. amend. I. ..................................................................................... 12

Plaintiffs Food Not Bombs Houston and Brandon Walsh ("Plaintiffs") respectfully request this Court grant summary judgment and permanently enjoin Defendant City of Houston ("the City") and its officers, employees, and agents from enforcing sections 20-252 and 20-257 of the Houston City Code ("the Ordinance").

## I.    INTRODUCTION

For two decades, Food Not Bombs Houston ("FNBH") has provided free meals to unhoused and food insecure people outside the Houston Central Public Library ("Central Library") just across the street from Houston City Hall. FNBH is not a charity organization—it shares food as a form of protest to inspire the public to focus resources on solving problems like hunger, homelessness, and poverty while seeking an end to war and the destruction of the environment. By sharing and eating with food insecure neighbors in public, FNBH exhibits what a community based on mutual aid looks like.

Historically, FNBH and its members shared meals without being criminally cited or prosecuted. That changed in 2023 when the City began prosecuting FNBH's members under the Ordinance. First introduced in 2012, the Ordinance makes it illegal to conduct or sponsor a charitable food service event on City property without the City's consent. Over the last thirteen years, the City has arbitrarily diminished public spaces available for charitable feeding by weaponizing its unchecked authority under the Ordinance. From 2016 to the present, the City has made it a crime to feed more than five people in need in *any* public parks, and there is no way for anyone to get approval to share food in those traditional public forums.

In 2023, Houston inexplicably limited public charitable feeding to a *single* police station parking lot in the fourth most populous city in the United States, a city spanning over 600 square miles. It then posted notices criminalizing charitable feeding on any City property other than its sole designated location. Faced with the decision to either capitulate to the City's demand or

continue to spread its message at the Central Library, FNBH chose the latter. And they were punished for it. The City has now cited FNBH members nearly one hundred times for the crime of sharing food with more than five people in need outside the Central Library.

The City's enforcement of the Ordinance is unconscionable. While FNBH is the first group to be criminalized under the Ordinance, numerous groups and individuals have stopped sharing food with their neighbors across the City for fear of criminalization.

The Ordinance is also unconstitutional. First, the Ordinance is an unconstitutional prior restraint because it subjects charitable feeding in traditional public forums throughout the City to the standardless whims of City officials. Second, the Ordinance is an unconstitutional time, place, and manner restriction because its permission scheme is entirely divorced from the City's alleged interests in promoting food safety, resource linkage, and public health. Third, the Ordinance violates FNBH's right to expressive association by forcing the group to relocate to a location that would fundamentally alter its message. Finally, the remaining injunctive factors favor permanent injunctive relief that protects First Amendment freedoms and restores the ability of Houstonians to share food with neighbors in need.

Plaintiffs are therefore entitled to summary judgment, and this Court should permanently enjoin the City and its officers, agents, and employees from enforcing the Ordinance.

## II.    FACTS

### A. Plaintiffs Share Food to Protest War, Poverty, and the City's Response to Homelessness.

Since 1994, FNBH has served hot meals to Houstonians who cannot afford food. PX 2 (Decl. of Rebecca Lavergne) ¶¶ 4, 14 ("FNBH Decl."). FNBH is not a charity, but rather an association expressing a political message that government entities should divest money from war, policing, and weaponry, and instead redirect that money to meet basic human needs. *Id.* ¶ 5; PX

24 at 3 (FNBH About Page). FNBH believes the City disproportionately uses policing and criminalization to harm unhoused Houstonians rather than meeting their direct needs. PX 2 (FNBH Decl.) ¶ 6. By sharing food in public, FNBH expresses solidarity with homeless Houstonians and hopes to inspire the public to refocus resources on solving problems like hunger, homelessness, and poverty. *Id.* ¶ 7. The act of sharing food in public is indispensable to spreading this message because it shows what a community based on mutual aid can be. *Id.*

Today, as it has for the last twenty years, FNBH conducts its events on the sidewalk next to the Central Library and across the street from City Hall. *Id.* ¶¶ 4, 14; PX 3 (Decl. of Brandon Walsh) ¶¶ 4, 14, Exs. A, C ("Walsh Decl."). FNBH is run entirely by its members and volunteers, and hosts its food sharing events every week at 7:30 PM on Monday, Wednesday, Friday and Sunday, giving food to anyone who wants it. PX 2 (FNBH Decl.) ¶¶ 8–9, 32. Its events bring together some of Houston's most vulnerable residents with FNBH members and volunteers working to make Houston a more supportive community. *Id.* FNBH takes great pride in the sustainability of its events and serves vegan and vegetarian meals sourced from donated food. *Id.* ¶ 10. FNBH also brings trash bags to its events and does its best to leave the location as it found it. *Id.* ¶ 11.

FNBH has established its public recognition through years of consistent presence along with consistent messaging. At its events, FNBH members and volunteers wear "Food Not Bombs" t-shirts with the slogan "Poverty Isn't a Crime." *Id.* ¶ 17; PX 32 (Aug. 14, 2023 Photo). FNBH also frequently raises a large banner that similarly says "FOOD NOT BOMBS" and "POVERTY ISN'T A CRIME." PX 2 (FNBH Decl.) ¶ 17; PX 3 (Walsh Decl.) ¶ 4, Ex. A; PX 34 (Jan. 10, 2024 Video). As the City's representative put it: "They make sure that you know that they are Food Not Bombs." PX 35 (Capt. Jennifer Kennedy 30(b)(6) Dep. at 44:10–11) ("Kennedy 30(b)(6) Dep.").

**B. The City Adopts the Ordinance.**

The City first introduced the Ordinance in 2012. Despite significant public opposition, the City passed the Ordinance under Former Mayor Annise Parker. PX 1 (Ordinance) § 20-252; PX 2 (FNBH Decl.) ¶¶ 22, 23. Houston City Code section 20-252 makes it "unlawful for any organization or individual to sponsor or conduct a food service event on public or private property without the advance written consent of the public or private property owner." PX 1 (Ordinance) § 20-252. A food service event is defined as any time "charitable food services are provided to more than five individuals." *Id.* § 20-251. "Charitable food services" is defined as "providing food without charge, payment or other compensation to benefit those in need at an outdoor location not owned, leased or controlled by the individual or organization providing the food." *Id.* Thus, the Ordinance requires anyone seeking to serve food to more than five people in need on City property to obtain advance written consent from the City prior to serving food.

The Ordinance contains no criteria by which the City decides whether to grant or deny permission for charitable feedings. Instead, the Ordinance directs the Health and Parks Departments to develop rules, regulations, and criteria for the use of City properties for charitable feeding and publish lists of approved properties. *Id.* § 20-257. However, section 20-257 provides no standards to guide the Health and Parks Departments' authority to develop or promulgate these rules, allowing these departments to change the rules governing food sharing whenever they want without explanation. In any case, neither the Health Department nor the Parks Department has ever developed written guidance for selecting City properties for charitable food services. PX 35 (Kennedy 30(b)(6) Dep. at 78:2–9, 94:11–14); PX 36 (Chief Sanitarian Renee Beckham 30(b)(6) Dep. at 50:18–21, 55:8–12) ("Beckham 30(b)(6) Dep."). Instead, the Mayor became the final arbiter in deciding whether a city Property would be available for feeding. PX 36 (Beckham 30(b)(6) Dep. at 100:6–9, 143:8–24).

4

The Ordinance also created a Recognized Charitable Food Service Provider Program and directed the Health Department to develop a food handling course and guidelines for those who participate in the program. PX 1 (Ordinance) §§ 20-253, 20-254, 20-255; PX 36 (Beckham 30(b)(6) Dep. at 38:22–39:1, 39:14–18). However, participation in the program and food handling course is entirely optional for groups or individuals who want to engage in charitable feeding on public property. PX 8 at 5–6 (RFAs) #16, 18.

### C.  The City Arbitrarily Restricts Charitable Feeding under the Ordinance.

In September 2012, the City granted eight groups permission to use public property for charitable food service events. PX 11 at 2 (Sept. 5, 2012 CitizensNet). Former Mayor Parker specifically designated the Central Library as an approved location for FNBH's food sharing events. *Id.*; PX 2 (FNBH Decl.) ¶ 23. While the City continued to use its unbridled authority to restrict food sharing at most City-owned locations, between 2012 and 2016 it approved public parks such as Allen's Landing, Hermann Square, Peggy's Point Plaza, Little Tranquility Park, and Henderson Park for charitable feeding. PX 9 at 2 (May 12, 2016 Email). During this time, FNBH was one of many groups sharing meals with unhoused neighbors in need. PX 2 (FNBH Decl.) ¶ 22. By December 2015, nearly one hundred groups and individuals—including many churches and religious ministries—had registered to conduct charitable feedings on public property across Houston as part of the City's voluntary program. PX 18 at 2–4 (December 2015 Feeding Groups). In early 2016, these groups and individuals were regularly conducting feedings at City parks. PX 36 (Beckham 30(b)(6) Dep. at 75:5–12); PX 27 at 2–9 (May-June 2016 Parks Feeding Calendar).

But in July 2016, the City reversed course when former Mayor Sylvester Turner suspended all charitable feeding in City parks. PX 36 (Beckham 30(b)(6) Dep. at 79:20–80:1). He made this sweeping decision due to concerns about people using Kush, a synthetic marijuana product, in public parks. PX 35 (Kennedy 30(b)(6) Dep. at 83:5–13). To this day, the Mayor's office has never

developed a plan to resume charitable feedings at public parks, even though the City admits that Kush usage is no longer as prevalent. *Id.* at 89:16– 90:23. Instead, from 2016 to the present, charitable feeding has remained prohibited at *all* City parks. *Id.* at 36:24–37:1, 82:2–7. Between 2016 and 2022, the Health Department consistently told groups who previously used City parks for charitable feedings that no City properties were available for charitable feeding, and they had no choice but to use private property. *See, e.g.*, PX 19 at 2 (Sept. 13, 2016 Email) ("Currently, no city parks or other city owned properties are available for use as charitable feeding event sites."); PX 20 at 2 (Nov. 28, 2017 Email) (similar); PX 21 at 2 (Oct. 27, 2019 Email) (similar).

Confusingly, despite telling some groups that no City properties were available, employees within the Mayor's Office continued to tell City police officers that the Central Library Plaza and surrounding sidewalks remained an authorized location for charitable feedings, including for FNBH. PX 22 at 2 (Mar. 31, 2020 Email). Accordingly, FNBH conducted its feedings outside the Central Library without incident until February 2023. PX 2 (FNBH Decl.) ¶¶ 24–25.

For the twenty years that FNBH has served meals at the Central Library, the City has not received a single complaint about the safety of the food FNBH serves. PX 36 (Beckham 30(b)(6) Dep. at 171:23–172:8). The only complaint the Health Department has ever received about FNBH's activities pertained to the area where FNBH serves food and social distancing related to the COVID pandemic in April 2020. *Id.* at 150:6–15, 171:23–172:8. At times, the Houston Public Library even included FNBH in the list of resources it provided to homeless patrons seeking food. PX 23 at 2, 5 (HPL 2017 Homeless Resources). From the Ordinance's adoption in 2012 until February 2023, FNBH expressed its message by sharing tens of thousands of meals at the Central Library citation-free. PX 2 (FNBH Decl.) ¶¶ 24–25.

### D. The City Restricts All Public Charitable Feeding to 61 Riesner.

That changed in February 2023, when former Mayor Turner restricted all charitable feeding to a single police station parking lot located at 61 Riesner Street, Houston TX 77002 ("61 Riesner"). PX 36 (Beckham 30(b)(6) Dep. at 113:10–24). In February 2023, the City began posting notices declaring that "[i]f you want to conduct charitable food service on City property, you *must* do so at the nearby downtown location of 61 Riesner." PX 25 at 2 (Charitable Feeding Notice) (emphasis added). And City employees instructed individuals inquiring about charitable feeding that their only options were to utilize 61 Riesner or private property. PX 33 at 2 (Feb. 23, 2023 Email). The restriction of charitable feeding to 61 Riesner coincided with the City's Dinner to Home program where the City paid a non-profit called Bread of Life $187,200 to serve meals at 61 Riesner on the same nights and times that FNBH served food at the Central Library. PX 26 at 2 (Dinner to Home Ordinance). From February 2023 to the present, 61 Riesner has remained the only approved charitable feeding location on City property, but the City has never identified the standards by which it made the decision to select 61 Riesner Street or to approve only a single location in the entire City. PX 35 (Kennedy 30(b)(6) Dep. at 128:1–9, 133:10–25, 136:8–20).

After Mayor Turner selected 61 Riesner, the Health Department was instructed to adopt a set of special requirements for charitable food service locations on City property in February 2023. PX 36 (Beckham 30(b)(6) Dep. at 118:10–16). The special requirements state that each approved charitable food service location on City property must have adequate parking, sufficient trash receptacles, and portable restrooms and handwashing stations that are available 24/7. PX 12 at 4 (Charitable Feeding Webpage). Prior to this, the Health Department had never adopted any special requirements for charitable food service locations. PX 36 (Beckham 30(b)(6) Dep. at 123:2–6). However, meeting these special requirements does not guarantee that the City will approve the location for charitable feeding. To the contrary, even if a City park meets these requirements, the

7

City will not allow charitable feeding there because the Mayor has maintained the ban on charitable feeding in all City parks. *Id.* at 131:19–24. And the City itself has proclaimed that it will not allow charitable feeding at any City-owned location besides 61 Riesner, regardless of whether the location meets the requirements. PX 25 at 2 (Charitable Feeding Notice).

61 Riesner is the former HPD Central Patrol Division building next to the municipal courthouse, and City employees continue to use it to this day. PX 35 (Kennedy 30(b)(6) Dep. at 143:20–144:20). HPD officers manage and oversee feedings at 61 Riesner, and they are the only City employees who regularly attend. PX 36 (Beckham 30(b)(6) Dep. at 129:16–130:10); *see also* PX 4 (Rivera Decl.) ¶ 7 & Ex. G (photo of feeding at 61 Riesner). By limiting all public charitable feeding to 61 Riesner, the City continues to prohibit the groups and individuals who used to serve in City parks located in Downtown, Midtown, Eastwood, and Near Northside from reaching the homeless individuals in these areas. *Cf.* PX 9 at 2 (May 12, 2016 Email); PX 27 at 2–9 (May-June 2016 Feeding Calendar). Likewise, many of the people who have attended FNBH events at the Central Library either do not feel comfortable at the 61 Riesner location or cannot get to it. PX 2 (FNBH Decl.) ¶¶ 38–40. Some people who receive food from FNBH have physical disabilities that prevent them from making the trek to 61 Riesner Street. *Id.* ¶ 38; PX 6 (Decl. of David Ferguson) ¶¶ 5–7 ("Ferguson Decl."). Others feel the 61 Riesner location is stigmatizing since food services there occur under intense police supervision. PX 5 (Decl. of Lynn Marie Meade) ¶¶ 6–7 ("Meade Decl."); PX 7 (Decl. of Christopher Tull) ¶¶ 4–7 ("Tull Decl.").

The 61 Riesner location also drastically limits public visibility for groups like FNBH who want to publicly express their message through charitable feeding. PX 2 (FNBH Decl.) ¶ 41. The City admitted it did not consider public visibility as a factor in selecting 61 Riesner for charitable feeding. PX 35 (Kennedy 30(b)(6) Dep. at 139:15–25). In fact, while the Mayor's Office noted

that the 61 Riesner location would be perceived as out of sight, it maintained that "[b]eing out of sight should not be a determinate of an appropriate location." PX 28 at 2 (Aug. 12, 2021 Email).

Finally, FNBH's events are more than just a food service—they are a protest against what Plaintiffs perceive as the City's and other governments' overinvestment in policing and militarization at the expense of those most in need of help. PX 2 (FNBH Decl.) ¶ 41; PX 3 (Walsh Decl.) ¶ 16. Forcing FNBH, its members, and its volunteers to go to 61 Riesner would distort their message beyond recognition and make it appear like they are collaborating with institutions with which they vehemently disagree. *Id.*

### E. The City Enforces the Ordinance Against FNBH and Its Members.

Faced with the untenable choice of undermining their message at 61 Riesner or risking criminalization at the Central Library, Plaintiffs continued to share meals with people in need outside the Central Library. PX 2 (FNBH Decl.) ¶ 27. Despite FNBH's long history of service to the Houston community, the City began criminally citing FNBH's members for its food sharing events in March of 2023. *Id.* ¶¶ 28–29. Between March of 2023 and February 2024, FNBH's members and volunteers received over ninety citations under the Ordinance. PX 29 at 2–4 (Citation List). As a result, some longstanding volunteers stopped volunteering all together. PX 2 (FNBH Decl.) ¶ 33. Others stopped attending FNBH events, preferring to help cook or pick up supplies rather than risk a citation. *Id.* Like many other members and volunteers, Plaintiff Brandon Walsh fears he will receive a ticket by participating in FNBH's events. PX 3 (Walsh Decl.) ¶ 11. Nevertheless, FNBH has continued to hold its food sharing events outside the Central Library to spread its message by sharing hundreds of meals with hungry Houstonians each week. PX 2 (FNBH Decl.) ¶¶ 31, 44.

### III.    STAGE OF THE PROCEEDING

Plaintiffs filed this case on January 30, 2024. Dkt. 1. Plaintiffs allege that the Ordinance violates the First Amendment as: 1) an improper prior restraint (facial and as applied), *Id.* ¶¶ 80–84; 2) an unconstitutional time, place, and manner restriction (facial and as applied), *Id.* ¶¶ 68–79; and 3) an unconstitutional burden on their right to expressive association (as applied). *Id.* ¶¶ 85–92.

Plaintiffs moved for a temporary restraining order and preliminary injunction on their as-applied claims. Dkt. 4. On February 12, 2024, this Court heard testimony from witnesses and arguments from counsel on Plaintiffs' motion for preliminary injunction. Dkt. 11. That very night, the City yet again cited a FNBH member under the Ordinance. PX 29 at 4 (Citation List). On February 14, 2024, this Court granted Plaintiffs' motion for a preliminary injunction. Dkt. 15. It concluded that Plaintiffs were substantially likely to succeed on their as-applied prior restraint and time, place, and manner claims and would be irreparably harmed absent an injunction. *Id.* at 10, 12, 13.

After denying the City's Motion to Dismiss, Dkt. 28, this Court consolidated *Picone v. City of Houston* (No. 4:23-cv-1206) with this case, Dkt. 29.

Now, after the completion of discovery, the record indisputably confirms this Court's factual findings and legal conclusions at the preliminary injunction stage with respect to Plaintiffs' as-applied challenges, as well as the factual and legal bases of their facial challenges. Thus, the Court should grant summary judgment to Plaintiffs.

### IV.    STATEMENT OF THE ISSUES AND STANDARD OF REVIEW

Summary judgment is warranted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for

the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A fact is material if it could affect the outcome, so "[f]actual disputes that are irrelevant or unnecessary will not be counted." *Id.* Summary judgment is proper, then, if "there can be but one reasonable conclusion as to the verdict." *Id.* at 250.

In this First Amendment case under 42 U.S.C. § 1983, Plaintiffs challenge the Ordinance as an unconstitutional prior restraint (Count II – facial and as applied), an unconstitutional time, place, and manner restriction (Count I – facial and as applied), and an unconstitutional restriction on Plaintiffs' right to expressive association (Count III – as applied).

This Motion presents the following issues for the Court to decide:

A. Whether the Ordinance restricts expressive conduct or conduct commonly associated with expression? *Hurley v. Irish-Am. Gay, Lesbian & Bisexual Grp. of Bos.*, 515 U.S. 557, 569 (1995); *City of Lakewood v. Plain Dealer Publ'g Co.*, 486 U.S. 750, 751 (1988).

B. Whether the Ordinance is an unconstitutional prior restraint that lacks "narrow, objective, and definite standards to guide the licensing authority"? *Forsyth Cty. v. Nationalist Movement*, 505 U.S. 123, 131 (1992).

C. Whether the City has met its burden under intermediate scrutiny by showing the Ordinance is "narrowly tailored to serve a significant government interest" and "leave[s] open ample alternative channels of communication"? *McCullen v. Coakley*, 573 U.S. 464, 477 (2014) (quotation omitted).

D. Whether the Ordinance significantly burdens Plaintiffs' First Amendment right to expressive association and whether it serves a "compelling state interest[] . . . that cannot be achieved through means significantly less restrictive of associational freedoms"? *Knox v. Serv. Emps. Int'l Union, Loc. 1000*, 567 U.S. 298, 310 (2012) (quotation omitted).

E. Whether the remaining equitable factors favor permanent injunctive relief? *eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391 (2006).

## V.    <u>ARGUMENT</u>

The City cannot meet its First Amendment burden, and the Court should grant Plaintiffs' Motion. There is no dispute of material fact that: A) the Ordinance restricts expressive conduct

and conduct commonly associated with expression, subjecting it to First Amendment scrutiny both on its face and as applied to Plaintiffs; B) the Ordinance is an unconstitutional prior restraint; C) the City cannot meet its burden under intermediate scrutiny because the Ordinance is not narrowly tailored to the City's purported interests and fails to leave open adequate alternative channels for communication; D) the Ordinance impairs Plaintiffs' right to expressive association and the City cannot meet its burden under exacting scrutiny; and E) Plaintiffs are entitled to permanent injunctive relief to vindicate their and countless others' First Amendment rights.

**A. There Is No Dispute of Material Fact that the Ordinance Restricts First Amendment Activity on its Face and As Applied to Plaintiffs.**

The First Amendment prohibits laws "abridging the freedom of speech . . . or the right of the people to peaceably assemble." U.S. Const. amend. I. These rights lie at "the foundation of a government based upon the consent of an informed citizenry." *Bates v. City of Little Rock*, 361 U.S. 516, 522–23 (1960). As such, the Constitution protects First Amendment freedoms "not only against heavy-handed frontal attack, but also from being stifled by more subtle governmental interference." *Id*. at 523 (collecting cases).

The Supreme Court has "long recognized that [the First Amendment's] protection does not end at the spoken or written word." *Texas v. Johnson*, 491 U.S. 397, 403 (1989). In *Spence v. Washington*, 418 U.S. 405 (1974), the Supreme Court held conduct receives First Amendment protection where "[a]n intent to convey a particularized message [is] present, and in the surrounding circumstances the likelihood [is] great that the message would be understood by those who viewed it." *Id*. 410–11. However, in subsequent cases, the Supreme Court relaxed its "particularized message" language by holding protected expressive conduct need not convey "a narrow, succinctly articulable message." *Hurley*, 515 U.S. at 569. Therefore, to receive First Amendment protection, expressive conduct need not "isolate an exact message as the exclusive

subject matter of the speech." *Id.* at 569–70; *Fort Lauderdale Food Not Bombs v. City of Fort Lauderdale*, 901 F.3d 1235, 1240 (11th Cir. 2018) ("*FLFNB I*") (noting that the expressive conduct analysis asks "whether the reasonable person would interpret it as *some* sort of message, not whether an observer would necessarily infer a *specific* message" (quoting *Holloman ex rel. Holloman v. Harland*, 370 F.3d 1252, 1270 (11th Cir. 2004)); *Tex. A&M Queer Empowerment Council v. Mahomes*, No. 4:25-cv-00992, 2025 WL 895836, at *5 (S.D. Tex. Mar. 24, 2025) (Rosenthal, J.) (same). Finally, facial First Amendment challenges are available when a regulation has "a close enough nexus to expression, or to conduct commonly associated with expression, to pose a real and substantial threat" of censorship. *City of Lakewood*, 486 U.S. at 759.

Because the Ordinance burdens expressive conduct and conduct commonly associated with expression, it is subject to First Amendment scrutiny both on its face and as applied to Plaintiffs.

### 1.  The Ordinance Facially Restricts Conduct Commonly Associated with Expression.

On its face, the Ordinance targets all groups or individuals who share food with the purpose of benefiting those in need, *See* PX 1 (Ordinance) § 20-251, so it bears "a close enough nexus to expression, or to conduct commonly associated with expression," *City of Lakewood*, 486 U.S. at 759. The Ordinance is therefore susceptible to a facial challenge because it "pose[s] a real and substantial threat" of suppressing protected expression. *Id.*

By its terms, the Ordinance only criminalizes providing free food *with the intent* to benefit those in need. **First**, "in need" means people who appear unable to provide for themselves. *See* PX 1 (Ordinance) § 20-251; PX 35 (Kennedy 30(b)(6) Dep. at 25:19–26:8) ("in need" means being unable to provide food for oneself.). Under the Ordinance, HPD officers identify recipients of food as "in need" by looking for visual markers of homelessness. *See, e.g.*, PX 30 at 5 (Aug. 2, 2023 HPD Report) ("Officers arrived in the 500 Block of McKinney and observed a line of homeless

people . . . waiting to receive food."). The act of providing food to someone who visibly cannot provide food for themselves is closely related to protected expression. As the Second Circuit has explained, "[e]ven without particularized speech,[] the presence of an unkempt and disheveled person holding out his or her hand or a cup to receive a donation itself conveys a message of need for support and assistance." *Loper v. New York City Police Dep't*, 999 F.2d 699, 704 (2d Cir. 1993). This is particularly true of charitable food services as "the significance of sharing meals with others dates back millennia." *FLFNB I*, 901 F.3d at 1243. Thus, the Ordinance targets conduct with a close relationship to expression rather than "relatives or friends simply eating together in the park." *Id.* at 1242.

**Second**, the Ordinance requires police officers to identify whether the food provider *intends* to benefit those in need. *See* PX 35 (Kennedy 30(b)(6) Dep. at 27:16–28:16). The City's Representative explained that HPD officers can make this determination by speaking with providers or reviewing their websites to find their purpose for sharing food. *Id*. at 28:5–12. Providing food with the intent to benefit those in in need is closely tied with religious expression, as is evidenced by the dozens of churches, ministries, and religious groups who have registered with the City to feed on public property. PX 18 at 2–4 (December 2015 Feeding Groups); *see also* PX 31 (Decl. of Phillip Picone) ¶¶ 7–9. As numerous courts have recognized, such activity is the manifestation of sincere religious commitments protected by the First Amendment. *See Big Hart Ministries Assoc., Inc. v. City of Dallas*, No. 3:07-CV-0216-P, 2013 WL 12304552, at *11 (N.D. Tex. Mar. 25, 2013) (plaintiff provided "evidence that its members were primarily church groups of different Christian denominations—but with the unified purpose of fulfilling Christ's command to feed the needy/homeless."); *Chosen 300 Ministries, Inc. v. City of Philadelphia*, No. CIV.A. 12-3159, 2012 WL 3235317, at *4 (E.D. Pa. Aug. 9, 2012) ("Chosen 300 Ministries practices the

Christian idea of fellowship by sharing a meal with the homeless and hungry."). The Ordinance therefore only criminalizes groups or individuals who intend to convey support for "an unkempt and disheveled person holding out his or her hand . . . to receive a [meal]." *Loper*, 999 F.2d at 704.

These features of the City's Ordinance distinguish it from other cases where courts refused facial challenges to restrictions on food distribution. In *Santa Monica Food Not Bombs v. City of Santa Monica*, for example, the Ninth Circuit concluded that "[w]hether food distribution can be expressive activity protected by the First Amendment under particular circumstances is a question to be decided in an as-applied challenge." 450 F.3d 1022, 1032 (9th Cir. 2006). However, the restriction there regulated sharing or distributing food in public parks to anyone—not just those in need—for any purpose, whether commercial or non-commercial. *Id.* at 1029. Similarly, in *Fort Lauderdale Food Not Bombs v. City of Fort Lauderdale*, the Eleventh Circuit rejected Plaintiffs' facial challenge because the challenged ordinance's restriction against using parks "for business or social service purposes" regulated a broad array of conduct beyond food sharing, "most of which ha[d] no expressive component at all." 11 F.4th 1266, 1292 (11th Cir. 2021) ("*FLFNB II*"). By contrast, the Ordinance here directly targets activity commonly associated with expression by criminalizing only providing "food without charge … to benefit those in in need." PX 1 (Ordinance) § 20-251. Thus, the Ordinance "make[s] sustaining the facial challenge in this case[] appropriate because the risk exists that, if left on the books, the [Ordinance] would chill a substantial amount of activity protected by the First Amendment." *Speet v. Schuette*, 726 F.3d 867, 878 (6th Cir. 2013).

### 2. The Ordinance Restricts Plaintiffs' Expressive Conduct As Applied.

The Ordinance also restricts Plaintiffs' protected expression as applied. It is indisputable that Plaintiffs intend to convey a message by sharing food. *See Hurley*, 515 U.S. at 569–70. FNBH conducts its food sharing events to convey its message that government entities should divest

money from war and weaponry and instead redirect that money to meet basic human needs. PX 2 (FNBH Decl.) ¶¶ 4–7; PX 3 (Walsh Decl.) ¶¶ 4–5, 7 & Exs. A–C; PX 24 at 3 (FNBH About Page). It also conducts food sharing to explicitly proclaim that "Poverty isn't a Crime," express solidarity with homeless Houstonians, and protest the City's criminalization of homeless people. *Id*. There can be no doubt that Plaintiffs engage in food sharing with the intent to protest the criminalization of poverty and overinvestment in war and policing at the expense of the hungry.

Further, "in the surrounding circumstances the likelihood [is] great that [Plaintiffs'] message[s] would be understood by those who view[] it." *Spence*, 418 U.S. at 411. Courts evaluate this prong by looking at "the nature of [the] activity, combined with the factual context and environment in which it was undertaken." *Id.* at 409–410.

As this Court previously explained, "the political message of feeding the hungry, eating with them, and doing so on public property, would be understood by an onlooker." Dkt. 15 at 7. This Court's previous conclusion is reinforced by the Eleventh Circuit's holding that Fort Lauderdale's Food Not Bombs ("FLFNB") chapter engaged in protected First Amendment activity when it shared food each week at a park located in downtown Fort Lauderdale. *FLFNB I*, 901 F.3d at 1243. The Eleventh Circuit justified this holding on (1) the presence of signage, (2) the public nature of the events, (3) the public forum status of parks, (4) homelessness being an issue of public concern, and (5) the inherently expressive nature of food sharing. *See id.* at 1242–43. Applying these five factors here, any person walking by FNBH's events would recognize that FNBH opposes war, and believes food is a human right and poverty is not a crime.

**First**, the Eleventh Circuit noted that "FLFNB sets up tables and banners (including one with its logo) and distributes literature at its events" and that these aspects distinguish their sharing of food from "simply eating together in the park." *Id*. at 1242. Likewise, many FNBH members

16

wear "Food Not Bombs" t-shirts that say, "Poverty isn't a Crime" while they hand food out, and FNBH also hangs a large banner at their food sharing events that says "FOOD NOT BOMBS" and "POVERTY ISN'T A CRIME." PX 2 (FNBH Decl.) ¶ 17; PX 3 (Walsh Decl.) Exs. A–C; PX 32 (Aug. 14, 2023 Photo); PX 34 (Jan. 10, 2024 Video). The City's Representative confirmed this fact, explaining that "[FNBH members] generally wear shirts, and they have banners. They make sure that you know that they are Food Not Bombs." PX 35 (Kennedy 30(b)(6) Dep. at 44:9–11).

**Second**, like FLFNB's events, FNBH's "food sharing events are open to everyone," which itself has "social implications." *FLFNB I*, 901 F.3d at 1242 (citing Mary Douglas, *"Deciphering a Meal," in Implicit Meanings: Selected Essays in Anthropology* 231 (1975)); PX 2 (FNBH Decl.) ¶¶ 7, 9.

**Third**, FNBH's events take place in a "traditional public forum" and "near city government buildings." *FLFNB I*, 901 F.3d at 1242. The events occur on the sidewalk at the 500 Block of McKinney near the Central Library and directly across from City Hall. PX 2 (FNBH Decl.) ¶ 8; PX 3 (Walsh Decl.) Exs. A, C. Such places have "immemorially been held in trust for the use of the public, and . . . have been used for purposes of assembly, communicating thoughts between citizens, and discussing public questions." *Perry Educ. Ass'n v. Perry Loc. Educators' Ass'n*, 460 U.S. 37, 45 (1983) (quoting *Hague v. CIO*, 307 U.S. 496, 515 (1939)). In the words of the Central Library's Director, the library is a "bastion of democracy where people from all walks of life are welcome." PX 37 (Central Library Dir. Saima Kadir Dep. at 24:10–11).

**Fourth**, "the treatment of the City's homeless population is an issue of concern in the community," which "adds to the likelihood that the reasonable observer would understand that [FNBH]'s food sharing sought to convey some message." *FLFNB I*, 901 F.3d at 1242. Homelessness is indisputably an issue of public concern for Houston, as the City itself has

17

departments and committees dedicated to homelessness and regularly hosts public meetings regarding homelessness. PX 14 (Mayor's Office for Homeless Initiatives); PX 15 (Housing and Community Affairs Committee); PX 16 (Aug. 16, 2012 CitizensNet); PX 10 (Decl. of LaToya Lane) ¶ 1 ("Lane Decl."). Mayor Whitmire himself recently explained that one of the City's priorities is "the homeless issue," PX 13 at 6 (Whitmire Inauguration Speech), and many Houstonians share this concern, PX 17 at 9 (Kinder Election 2023 Report); PX 10 (Lane Decl.) ¶ 1. This extensive local concern regarding Houston's response to homelessness "provides background for [FNBH]'s events, particularly in light of the undisputed fact that many of the participants are homeless." *FLFNB I*, 901 F.3d at 1243.

**Fifth**, just like FLFNB, the fact that Plaintiffs share food to spread their message gives additional context "because the history of a particular symbol or type of conduct is instructive in determining whether the reasonable observer may infer some message." *Id*. As the Eleventh Circuit observed, "the significance of sharing meals with others dates back millennia," ranging from "Jesus shar[ing] meals with tax collectors and sinners" to "President Abraham Lincoln establish[ing] Thanksgiving as a national holiday." *Id*. By engaging in the historically significant conduct of food sharing, Plaintiffs make it clear that they stand in solidarity with their unhoused neighbors and oppose the criminalization of poverty. PX 2 (FNBH Decl.) ¶ 7.

Plaintiffs intend to convey their protest of war, poverty, and the City's treatment of homeless people through their food sharing events and, given the surrounding circumstances, a reasonable observer would understand Plaintiffs' messages. *See Spence*, 418 U.S. at 410–411; *Hurley*, 515 U.S. at 569. Therefore, the Ordinance restricts activity the First Amendment protects.

**B. There Is No Dispute of Material Fact that the Ordinance Imposes an Invalid Prior Restraint.**

The Ordinance requires prior permission from the City to engage in protected expression on all public property without any standards or procedures to guide official discretion, which makes it an unconstitutional prior restraint both on its face and as applied. "It has long been held that ordinances regulating speech contingent on the will of an official—such as the requirement of a license or permit . . . are unconstitutional burdens on speech classified as prior restraints." *Chiu v. Plano Indep. Sch. Dist.*, 339 F.3d 273, 280 (5th Cir. 2003). "Any system of prior restraints of expression comes . . . bearing a heavy presumption against its constitutional validity." *Bantam Books, Inc. v. Sullivan*, 372 U.S. 58, 70 (1963) (collecting cases). A prior restraint must be "related to [a] legitimate government interest" and "precisely and narrowly drawn to prevent discretionary decision-making." *Beckerman v. City of Tupelo*, 664 F.2d 502, 509 (5th Cir. 1981) (citing *Shuttlesworth v. City of Birmingham*, 394 U.S. 147, 153 (1969)). This requires "narrow, objective, and definite standards to guide the licensing authority." *Forsyth Cty*, 505 U.S. at 131 (quoting *Shuttlesworth*, 394 U.S. at 150–51).

**1. The Ordinance Is a Prior Restraint.**

The Ordinance operates as a prior restraint because it "g[ives] public officials the power to deny use of a forum in advance of actual expression." *Se. Promotions, Ltd. v. Conrad*, 420 U.S. 546, 553 (1975); *see also Pro-Life Cougars v. Univ. of Houston*, 259 F. Supp. 2d 575, 583 (S.D. Tex. 2003) (Werlein, J.) (defining prior restraint as "any scheme which gives public officials the power to deny use of a forum in advance of its actual expression." (quoting BLACK'S LAW DICTIONARY 1194 (6th ed. 1990))). The Ordinance requires Plaintiffs and similar groups to seek the City's written permission prior to their protected expression or face criminal consequences. *See id.*; PX 1 (Ordinance) § 20-252; PX 8 at 7 (RFAs) #23; PX 36 (Beckham 30(b)(6) Dep. at

49:19–22). In fact, the *only* thing the Ordinance requires prior to engaging in protected expression on City Property is the City's prior written permission. PX 35 (Kennedy 30(b)(6) Dep. at 148:11–24). Thus, the Ordinance imposes a prior restraint and "bear[s] a heavy presumption against its constitutional validity." *Bantam Books, Inc.*, 372 U.S. at 70.

### 2.    The Ordinance Lacks Narrow, Objective, or Definite Standards.

The Ordinance's text and enforcement by the City demonstrate it lacks the "narrow, objective, and definite standards" the Constitution requires. *Forsyth Cty.*, 505 U.S. at 131. In *Forsyth County*, the Supreme Court found unconstitutional an ordinance that required a "permit and a fee before authorizing public speaking, parades, or assemblies." *Id.* at 130. In affirming the judgment of the Eleventh Circuit, the Supreme Court found that the challenged ordinance's fee scheme unconstitutionally granted a county administrator too much discretion in "how much to charge for police protection or administrative time—or even whether to charge at all." *Id.* at 133. In addition to lacking "articulated standards either in the ordinance or in the county's established practice," the law did not require the administrator to provide "any explanation for [the fee decision] and [their] decision [was] unreviewable." *Id.* As this Court previously recognized, Dkt. 15 at 9–10, the Ordinance mirrors the law the Supreme Court invalidated in *Forsyth County*.

**First**, the Ordinance's text delegates unbounded authority to grant or deny permission for charitable feedings to the Parks Department (for park properties) and the Health Department (for non-park properties). But the Ordinance fails to identify *any* standards by which those departments are supposed to make that decision. PX 1 (Ordinance) § 20-257; PX 36 (Beckham 30(b)(6) Dep. at 43:2–5). In fact, from 2012 through 2022, the City granted or denied permission without any standards at all. PX 35 (Kennedy 30(b)(6) Dep. at 78:2–9, 94:11–14); PX 36 (Beckham 30(b)(6) Dep. at 50:18–21, 55:8–12).

**Second**, while the Ordinance charges the Parks Department and Health Department with determining which City properties are available for charitable feeding, the Mayor has the final word over whether a city property is available for charitable feeding. PX 36 (Beckham 30(b)(6) Dep. at 100:6–9 ("Q. And so the mayor's office has the final word of whether a city property is allowed for charitable feeding, right? A. Yes.")). And the Mayor has frequently exercised this final decision-making authority without consulting with the Parks or Health Departments. *Id.* at 100:10–13, 113:10–114:17.

**Third**, the City's prior practice demonstrates its arbitrary and standardless authority to grant or deny permission in advance of expression. For example:

- In 2012, shortly after the Ordinance's adoption, the City granted eight groups permission to use public property for charitable food service events. PX 11 at 2 (Sept. 5, 2012 CitizensNet). Former Mayor Parker designated the Central Library Plaza as an approved charitable feeding location for FNBH. *Id.*; PX 36 (Beckham 30(b)(6) Dep. at 59:4–21).

- From 2012 to 2016, the City authorized charitable food service events on at least fourteen public property locations, PX 9 at 2 (May 12, 2016 Email); PX 18 at 2–4 (December 2015 Feeding Groups), but the City's corporate representatives could not identify any unifying standards as to why those locations, but not others, were approved for charitable food service events, PX 35 (Kennedy 30(b)(6) Dep. at 78:2–9); PX 36 (Beckham 30(b)(6) Dep. at 50:13–51:7, 55:5–12).

- In 2016, former Mayor Turner suspended all charitable food service events at City parks. PX 36 (Beckham 30(b)(6) Dep. at 79:20–80:1). From 2016 through the present, charitable feeding has remained prohibited at *all* City parks. PX 35 (Kennedy 30(b)(6) Dep. at 36:24–37:1, 82:2–7). Originally, in 2016, the City made this decision due to concerns about Kush, a synthetic marijuana product, in public parks. *Id.* at 83:5–13. Today, though, the City admits that Kush is no longer as prevalent, but nonetheless still prohibits charitable food service events in *all* public parks. *Id.* at 89:16– 90:23. There are no criteria by which a person or group could receive permission to conduct a charitable feeding in a public park. *Id.* at 90:24–91:4. Only the Mayor can decide whether the City will allow charitable feeding at City parks again. PX 36 (Beckham 30(b)(6) Dep. at 132:24–133:5).

- From 2016 to 2022, the City's representative could not identify a *single* public location in which it authorized charitable food service events, nor could that representative identify the standards by which the City decided to suspend all charitable food service events on public property. PX 35 (Kennedy 30(b)(6) Dep.

at 93:22–94:14). During that time, City employees instructed individuals inquiring about charitable feeding that City property was not available and their only option was to utilize private property. PX 21 at 2 (Oct. 27, 2019 Email).

- In 2023, the Mayor designated 61 Riesner as the only approved City property for charitable feeding. PX 36 (Beckham 30(b)(6) Dep. at 113:10–24). From 2023 to the present, 61 Riesner has remained the only approved charitable feeding location, but the City has not, and cannot, identify the standards by which it made the decision to select 61 Riesner Street or to approve only a single location in the entire City. PX 35 (Kennedy 30(b)(6) Dep. at 133:7–25, 136:8–20).

- At no point since 2012 has the City provided criteria by which an administrator must approve a location for charitable feeding. *See id.* at 78:2–9, 128:23–129:2. Nor has the City established any process by which a person seeking to engage in charitable feeding could seek review of an administrator's denial of permission. *Id.* at 75:11–18. City employees now instruct individuals inquiring about charitable feeding that their only options are to utilize 61 Riesner or private property. PX 33 at 2 (Feb. 23, 2023 Email). The Ordinance thus lacks any of the procedures courts have required when approving prior restraints. *Cf. Nat'l Fed. of the Blind of Tex., Inc. v. City of Arlington*, 109 F.4th 728, 741 (5th Cir. 2024) (approving prior restraint that "require[d] Arlington to notify the applicant in writing of the reason for denial or revocation and [] provide[d] an appeal process for such actions") *cert. pet. denied*, No. 24-756, 2025 WL 663711 (U.S. Mar. 3, 2025).

As this history makes abundantly clear, for nearly thirteen years, the City has arbitrarily granted or denied permission to use public property without applying any narrow, objective, or definite standards. Instead, the decision of whether to grant permission "is left to the whims of the Mayor's office, whose discretion appears to be unbridled and whose decision is not reviewable." Dkt. 15 at 10.

**Fourth**, the City's 2023 special requirements for charitable food service locations do not provide constitutionally adequate standards. In its preliminary injunction opinion, this Court recognized that the 2023 regulations—which require adequate parking, sufficient trash receptacles, hand cleaning stations, and 24/7 bathroom access for any approved locations—are necessary but not sufficient conditions for approval. Dkt. 15 at 9. "[T]hat is, there is no guarantee that if a location meets these requirements, it may become an approved location." *Id.* Similarly, "[t]he rules do *not*

provide a mechanism for how to apply to get a location approved, what standards will be applied when reviewing an application for a new location, and whether a location will actually be approved." *Id.*

During discovery, the City admitted that the 2023 regulations function exactly how the Court described in its earlier order. PX 36 (Beckham 30(b)(6) Dep. at 131:19–24). Even if a City park meets the above requirements, the City will not allow charitable feeding there because the Mayor has maintained the ban on charitable feeding in all City parks. *Id.* The regulations are not even *necessary* conditions during the selection process, as the City admitted that the trash receptacles, hand cleaning stations, and bathrooms were only added to the 61 Riesner location *after it was selected and approved*. *Id.* at 127:17–24, 128:8–15. When asked whether there were any criteria FNBH could have met to conduct its events somewhere other than 61 Riesner, the City's representative stated flatly, "No." PX 35 (Kennedy 30(b)(6) Dep. at 128:23–129:2). The City thus "leaves the decision of whether to grant consent to the whims of city officials." Dkt. 15 at 9.

**Fifth**, and lastly, the requirement that prior restraints have sufficiently "narrow, objective, and definite standards" prevents the prior restraint from "becoming a means of suppressing a particular point of view." *Forsyth Cty.*, 505 U.S. at 130–31 (quotations omitted). But that is exactly how the City has weaponized the Ordinance against FNBH. After limiting all charitable feeding to 61 Riesner, the City agreed to pay a different charitable food service provider nearly $200,000 to serve food at the same times and days FNBH conducted its charitable food service events, PX 26 at 2 (Dinner to Home Ordinance), even though there was only one place any group had permission to serve, PX 35 (Kennedy 30(b)(6) Dep. at 134:17–21). Meanwhile, during the same

period, the City cited FNBH members and volunteers nearly one hundred times for sharing food outside the Central Library. PX 29 at 2–4 (Citation List).

The Ordinance is a prior restraint without any narrow, objective, or definite standards to guide City decision making. In practice, this has resulted in an arbitrary and increasingly restrictive patchwork of where and when charitable feedings can occur. The Ordinance also lacks any procedural safeguards, which only compounds the unconstitutionality of the standardless prior restraint. Since this unbridled permission scheme bears a close enough nexus to conduct commonly associated with expression, *supra* § V.A.1, it creates "identifiable risks to free expression that can be effectively alleviated only through a facial challenge." *City of Lakewood*, 486 U.S. at 757. This scheme is a textbook First Amendment violation both on its face and as applied to Plaintiffs, and the Court should grant summary judgment on Count II.

**C.  There is No Dispute of Material Fact that the Ordinance Fails Intermediate Scrutiny.**

The Ordinance fails intermediate scrutiny and is thus an unconstitutional restriction on the time, place, and manner in which expressive conduct occurs. To overcome summary judgment on Count I, the City must demonstrate the Ordinance (1) is narrowly tailored to serve a significant government interest; and (2) leaves open ample alternative channels of communication. *See Ward v. Rock Against Racism*, 491 U.S. 781, 791 (1989). "[T]he burden of justification is demanding and it rests *entirely* on the [City]." *Hines v. Pardue*, 117 F.4th 769, 779 (5th Cir. 2024) (quoting *United States v. Virginia*, 518 U.S. 515, 533 (1996)).

To satisfy narrow tailoring, the City must show the Ordinance does not "burden substantially more speech than is necessary to further the government's legitimate interests." *McCullen*, 573 U.S. at 486 (quotation omitted). This analysis "demand[s] a close fit between ends and means" to "prevent[] the government from too readily 'sacrifici[ing] speech for efficiency.'" *Id.* at 486 (quoting *Riley v. Nat'l Fed. of the Blind of N.C., Inc.*, 487 U.S. 781, 795 (1988)). "A

regulation 'is narrowly tailored if it targets and eliminates no more than the exact source of the 'evil' it seeks to remedy.'" *Knowles v. City of Waco*, 462 F.3d 430, 434 (5th Cir. 2006) (quotation omitted). However, a regulation is invalid where "a substantial portion of the burden on speech does not serve to advance its goals." *McCullen*, 573 U.S. at 486 (quotation omitted). Additionally, a valid time, place, and manner restriction must leave open ample adequate alternative channels of communication for reaching the speaker's intended audience. *See McCullen*, 573 U.S. at 477. In sum, "intermediate scrutiny is no gimme for the government: '[I]ntermediate scrutiny is still tough scrutiny, not a judicial rubber stamp.'" *Hines*, 117 F.4th at 779 (quotation omitted).

The City contends that the Ordinance serves its asserted interests in food safety, connecting the unhoused with service providers, and reducing the public health effects of charitable feeding on public and private property. PX 12 at 4–5 (Charitable Feeding Webpage); *see also* Dkt. 18 at 15–16, ¶¶ 12, 13. The City cannot meet its burden under intermediate scrutiny because the Ordinance is not narrowly tailored to the City's asserted interests, and the City has numerous less restrictive alternatives to address these issues. The Ordinance also fails to leave open adequate alternatives for protected expression.

**1. The City Cannot Show the Ordinance Is Narrowly Tailored to a Significant Interest.**

The City cannot show the Ordinance is narrowly tailored to its purported interests in regulating food safety, homelessness resource linkage, and public health. In *McCullen*, the Supreme Court invalidated on First Amendment grounds a Massachusetts statute that made it a crime to "knowingly stand on a 'public way or sidewalk' within 35 feet of an entrance or driveway to any place, other than a hospital, where abortions are performed." 573 U.S. at 469 (quotation omitted). The *McCullen* Court reasoned that: (1) the law applied far more broadly than the state's evidence supported, *id.* at 494–95; (2) the state "ha[d] too readily forgone options that could serve its interests just as well, without substantially burdening the kind of speech in which petitioners

wish to engage," *id.* at 490; and (3) the state could not justify the statute by saying the challenged law "would 'make our job so much easier'" because "the prime objective of the First Amendment is not efficiency," *id.* (quoting police captain's testimony).

The City cannot meet its burden here because the Ordinance's sweeping grant of discretion to deny use of a public forum bears no relation to its asserted interests, and the City has numerous less speech-restrictive alternatives to address its purported interests.

       *i.*   *The Ordinance's Permission Structure Is Not Narrowly Tailored.*

The Ordinance is not narrowly tailored because its sole restriction—consent of the property owner—lacks a sufficient nexus to the City's stated public health and food safety concerns. In *United States v. Grace*, the Supreme Court invalidated a statute restricting flags, banners or devices on public sidewalks surrounding the Supreme Court, explaining that it "cannot be justified as a reasonable place restriction primarily because it has an insufficient nexus with any of the public interests that may be thought to undergird [it]." *United States v. Grace*, 461 U.S. 171, 181 (1983).

The same is true here. This Court has already recognized that "[w]hile the City undoubtedly has, and should have, an interest in public health and safety, the requirements of the Ordinance are divorced from this justification." Dkt. 15 at 11. This Court reached that conclusion because (1) the City's food safety training is optional, (2) the City's 61 Riesner location has no inherent food safety assurances associated with it, and people can serve expired or contaminated food there, and (3) the City's interest in minimizing vermin and coordinating efforts to solve homelessness are not related to the requirement of obtaining the City's consent. *See id.* at 11. This Court's findings have now been confirmed by the record developed in this case.

**First**, the City has admitted that participation in the City's food handling course is optional for groups or individuals who want to engage in charitable feeding on public property. PX 8 at 6 (RFAs) #18. The Ordinance's Recognized Charitable Provider Program is also entirely optional

for groups or individuals who want to engage in charitable feeding on City property. *Id.* #16. And the guidelines developed by the Health Department under the Ordinance are optional best practices that it only shares with individuals or groups who participate in the optional food handling course. PX 36 (Beckham 30(b)(6) Dep. at 38:22–39:1, 39:14–18).

**Second**, the City has presented no evidence that the locations it selects have any food safety benefits or health and safety protocols. "The City may impose restrictions on the conduct of individuals with regard to health and safety, but it cannot limit that conduct to certain locations in the name of health and safety when there are no actual health and safety protocols tied to those locations." Dkt. 15 at 11. For one, anyone can serve food at the City's 61 Riesner location regardless of whether they have taken the food handling course or registered with the City's Voluntary Recognized Charitable Feeding Program. PX 36 (Beckham 30(b)(6) Dep. at 156:21–24); PX 35 (Kennedy 30(b)(6) Dep. at 148:11–24). The only City employees present during the feedings are HPD officers, and no City employees regularly inspect the food. PX 35 (Kennedy 30(b)(6) Dep. at 147:17–24); PX 36 (Beckham 30(b)(6) Dep. at 130:1–4). In fact, aside from the Bread of Life—the non-profit organization that contracted with the City to provide meals at 61 Riesner—the Health Department has never observed or investigated the sources of food, food handling practices, food storage, or food temperature of *any* individuals or groups that serve food at 61 Riesner. PX 36 (Beckham 30(b)(6) Dep. at 170:15–171:10).

**Third**, the Health Department's updated special requirements for charitable food service locations on City property have no relation to the Mayor's process of selecting properties for charitable feeding. The City admitted that 61 Riesner did not have the required infrastructure prior to being selected as a charitable feeding location. *Id.* at 127:17–24, 128:8–15. Even if a City park meets the Health Department's special requirements, the City will not allow charitable feeding

there because the Mayor has maintained the ban on charitable feeding in all City parks. *Id.* at 131:19–24, 132:17–20. Therefore, whether a site has this infrastructure is not a consideration in the Mayor's selection process.

Since there is no nexus between the City's purported public health and food safety concerns and the Ordinance's prohibitions, the City cannot meet its narrow tailoring burden. *See Grace*, 461 U.S. at 181; *see also FLFNB II*, 11 F.4th at 1297 (reasoning that Fort Lauderdale's food sharing ordinance's "grant of standardless discretion to the City's permitting officials causes it to fail time, place, and manner scrutiny.").

> ii.    *The City Cannot Show that Less Restrictive Alternatives Would Fail to Achieve Its Interests.*

The City also has not presented evidence that it "seriously undertook to address the problem with less intrusive tools readily available to it." *McCullen*, 573 U.S. at 494. In *McCullen*, the state failed to meet its burden because it had not shown that the enforcement of its existing criminal laws was insufficient or that it had considered more targeted methods "that other jurisdictions have found effective." *Id.* at 494–95. The same is true here with respect to the City's public health concerns. The Supreme Court and Fifth Circuit have consistently recognized that cities cannot restrict the distribution of materials protected by the First Amendment to prevent the indirect consequence of unclean streets. *See Schneider v. State of New Jersey*, 308 U.S. 147, 162 (1939) ("There are obvious methods of preventing littering. Amongst these is the punishment of those who actually throw papers on the streets."); *Hays Cty. Guardian v. Supple*, 969 F.2d 111, 119 (5th Cir. 1992) ("If the University wishes to prevent litter, it should prohibit littering.") (citing *Schneider*, 308 U.S. at 162). Both the Houston City Code and state law prohibit littering. *See* Tex. Health & Safety Code § 365.012(a); Hous. City Code § 39-3. Likewise, the City has Ordinances prohibiting public urination and defecation. *See* Hous. City Code § 28-19. The City "has available

to it a variety of approaches that appear capable of serving its interests, without excluding individuals from areas historically open for speech and debate," and it has not shown that these alternatives would fail to achieve its interests. *McCullen*, 573 U.S. at 494. Because the City cannot make this showing, the Ordinance fails intermediate scrutiny.

### 2.   The Ordinance Forecloses All Adequate Alternative Channels of Communication.

The Ordinance fails intermediate scrutiny for yet another reason: it does not "leave open ample alternative channels for communication of the information." *McCullen*, 573 U.S. at 477 (quotation omitted). "[A]n alternative forum is not sufficient if it 'foreclose[s] a speaker's ability to reach one audience even if it allows the speaker to reach other groups.'" *Sarre v. City of New Orleans*, 420 F. App'x 371, 376 (5th Cir. 2011) (quoting *Gresham v. Peterson*, 225 F.3d 899, 907 (7th Cir. 2000)). As the Supreme Court has explained, alternative avenues of communication are only adequate if they allow an individual to effectively communicate with their intended audience. *See, e.g.*, *City of Ladue v. Gilleo*, 512 U.S. 43, 57 (1994) ("[A] person who puts up a sign at her residence often intends to reach *neighbors,* an audience that could not be reached nearly as well by other means.").

**First**, the City has consistently enforced the Ordinance in ways that restrict the ability of charitable groups and individuals to reach homeless individuals throughout the City. Time and again, groups or individuals sought permission to share food in public parks where they had previously served only to be told they could no longer serve their communities in these locations. *See, e.g.*, PX 20 at 2 (Nov. 28, 2017 Email) (denying use of Peggy's Plaza); PX 21 at 2 (Oct. 27, 2019 Email) (instructing requestor they "will need to utilize private property"); PX 19 at 2 (Sept. 13, 2016 Email) ("We are very anxious about getting back into the parks and serving our community."). While the Health Department claims it wants to ensure that charitable feeding is distributed throughout the City based on need, the City did not offer any alternative locations for

these groups. PX 36 (Beckham 30(b)(6) Dep. 41:24–42:2, 84:2–12). In fact, from 2016 to 2022, the City apparently did not approve any locations at all. *See supra* § V.B.2; Dkt. 15 at 9 ("[T]he City could withdraw all consent as to any public forum.").

Now, the City has inexplicably limited public charitable feeding to *a single police station parking lot* in a city spanning over 600 square miles. This severe restriction continues to prohibit groups and individuals from reaching the unhoused people they used to serve in City parks located in Downtown, Midtown, and Near Northside. *Cf.* PX 9 at 2 (May 12, 2016 Email); PX 27 (May-June 2016 Feeding Calendar). It would also restrict FNBH from reaching people they have shared food with for years who cannot get to 61 Riesner or choose not to because of the police presence. *See* PX 2 (FNBH Decl.) ¶¶ 38–39.

For example, one person who regularly attends FNBH events has suffered several strokes that make walking incredibly difficult. PX 6 (Ferguson Decl.) ¶¶ 5–7. In a case challenging a Dallas restriction on food sharing, that court noted that "[t]he City's suggestion that Plaintiffs join with another organization to feed the homeless . . . fails to take into account the fact that Plaintiffs' mission is to reach out to the homeless at their locations to make their lives easier." *Big Hart Ministries Assoc., Inc.*, 2013 WL 12304552, at *12. Likewise, FNBH aims to reach out to the homeless at a central location that makes their lives easier.

Other people served by FNBH feel that the police presence at 61 Riesner stigmatizes them and, in the words of one person, makes them feel like "animal[s] in the zoo." PX 7 (Tull Decl.) ¶¶ 5–7; *see also* PX 5 (Meade Decl.) ¶¶ 6–7. The Eastern District of Pennsylvania invalidated a similar ordinance to the one at issue here because, in part, "many homeless are afraid of government officials and police officers." *Chosen 300 Ministries, Inc.*, 2012 WL 3235317, at *20.

Since the Ordinance restricts the ability of numerous charitable groups to reach the communities they aim to serve, it does not leave open ample alternatives.

**Second**, 61 Riesner restricts the public visibility of food sharing events for groups like FNBH who want to share their message with the wider public. *See Schneider*, 308 U.S. at 163 ("[O]ne is not to have the exercise of his liberty of expression in appropriate places abridged on the plea that it may be exercised in some other place."). The City's representative admitted that the City does not consider public visibility as a factor in selecting locations for charitable feeding. PX 35 (Kennedy 30(b)(6) Dep. at 139:15–25). Further, after recognizing that 61 Riesner would be perceived as out of sight, the Mayor's Office maintained that "[b]eing out of sight should not be a determinate of an appropriate location." PX 28 at 2 (Aug. 12, 2021 Email). Unlike the sidewalk near the Central Library and City Hall, the City's sole sanctioned location is in a police station parking lot in a less prominent and politically important area of Houston.

Finally, serving food at 61 Riesner would alter the character of FNBH's message. *See, e.g.*, *City of Ladue*, 512 U.S. at 56 ("Displaying a sign from one's own residence often carries a message quite distinct from placing the same sign someplace else."). As explained, Plaintiffs serve food as a form of protest to inspire the public and governments to divert resources away from war, policing, and environmental destruction and towards meeting people's direct material needs. *Supra* § V.A.2. Forcing them to engage in that protected expression at a City police station neutralizes their message by making it seem as though they are working with the City rather than criticizing the City. PX 2 (FNBH Decl.) ¶ 41; PX 3 (Walsh Decl.) ¶¶ 7, 16.

This Court should grant summary judgment on Plaintiffs' time, place, and manner claim and declare the Ordinance unconstitutional on its face and as applied to Plaintiffs.

**D. There is No Dispute of Material Fact that the Ordinance Unconstitutionally Restricts Plaintiffs' Expressive Association.**

In Count III, Plaintiff FNBH challenges the Ordinance as a violation of its right to expressive association as applied to their food sharing events. The Supreme Court "has 'long understood as implicit in the right to engage in activities protected by the First Amendment a corresponding right to associate with others.'" *Ams. for Prosperity Found. v. Bonta*, 594 U.S. 595, 606 (2021) (quoting *Roberts v. U.S. Jaycees*, 468 U.S. 609, 622 (1984)). "[S]tate action which may have the effect of curtailing the freedom to associate is subject to the closest scrutiny." *N.A.A.C.P. v. State of Ala. ex rel. Patterson*, 357 U.S. 449, 460–61 (1958).

When evaluating claims of expressive association, courts "first 'determine whether the group engages in expressive association,'" meaning the group "associate[s] together . . . to 'advanc[e] beliefs and ideas.'" *Mote v. Walthall*, 902 F.3d 500, 506–07 (5th Cir. 2018) (first quoting *Boy Scouts of Am. v. Dale*, 530 U.S. 640, 648 (2000); then quoting *Abood v. Detroit Bd. of Educ.*, 431 U.S. 209, 233–34 (1977)). Then, the court must determine whether the restriction "significantly burden[s]" the group's ability to express its message. See *Dale*, 530 U.S. at 653. If it does, the City must justify the restriction under exacting scrutiny, meaning the restriction must serve a "compelling state interes[t] . . . that cannot be achieved through means significantly less restrictive of associational freedoms." *McDonald v. Longley,* 4 F.4th 229, 246 (5th Cir. 2021) (quoting *Knox*, 567 U.S. at 310). Applying these principles, the Ordinance violates Plaintiffs' right of expressive association.

**First,** FNHB engages in expressive association warranting full First Amendment protection. FNBH brings together members, volunteers, and people needing food to share a meal in protest of the misallocation of resources it views as inherent in policies supporting violence such as militarism and the criminalization of homeless people. *Supra* § V.A.2. Plaintiffs therefore

"associate together in [a] group[] to 'advanc[e] beliefs and ideas,'" *Mote*, 902 F.3d at 507 (quotation omitted), and constitute an expressive association under the First Amendment.

**Second,** the Ordinance imposes a significant burden on Plaintiffs' right to expressive association. Freedom of association is burdened "when the State interferes with individuals' selection of those with whom they wish to join in a common endeavor[.]" *Roberts*, 468 U.S. at 618. Courts "give deference to an association's view of what would impair its expression." *Dale*, 530 U.S. at 653 (citing *Democratic Party of U.S. v. Wisconsin ex rel. La Follette*, 450 U.S. 107, 123–24 (1981))). Plaintiffs come together and share food to protest the City's treatment of economically vulnerable residents, including protesting the criminalization of homelessness. The Ordinance's limitation of food sharing to a single police station parking lot indisputably burdens this association by forcing the group to share food at a police station parking lot heavily monitored by the Houston Police Department. PX 36 (Beckham 30(b)(6) Dep. at 129:16–130:10); PX 2 (FNBH Decl.) ¶ 41; PX 3 (Walsh Decl.) ¶¶ 7, 16. Sharing food at a police station surrounded by police officers would irreparably alter Plaintiffs' expressive interests by making it seem as though the group supports the City's homeless initiatives and is collaborating with the Houston Police Department—the very agency that has patrolled FNBH's food sharing events and criminalized its members for the last year. Forcing FNBH to relocate to 61 Riesner is antithetical to the group's purpose and burdens their rights to expressive association.

**Third,** the Ordinance fails exacting scrutiny because the City's interest could be achieved "through means significantly less restrictive of associational freedoms." *McDonald*, 4 F.4th at 246 (quoting *Knox*, 567 U.S. at 310). Since the City cannot show that the Ordinance passes intermediate scrutiny, *supra* § V.C, it also fails exacting scrutiny and is an unconstitutional restriction on Plaintiffs' expressive association.

### E.  The Court Should Grant Permanent Injunctive Relief.

If Plaintiffs are entitled to summary judgment on any of their claims, then the Court should permanently enjoin the City and its officers, employees, and agents from enforcing the Ordinance because Plaintiffs also prevail on the remaining injunction factors: irreparable harm, the balance of hardships between the Parties, and the public interest. *See eBay Inc.*, 547 U.S. at 391. The hardships and public interest "factors merge when the Government is the opposing party." *Nken v. Holder*, 556 U.S. 418, 435 (2009).

"The loss of First Amendment freedoms for even minimal periods of time unquestionably constitutes irreparable injury." *Opulent Life Church v. City of Holly Springs*, 697 F.3d 279, 295 (5th Cir. 2012) (quoting *Elrod v. Burns*, 427 U.S. 347, 373 (1976)). This is true whether the "First Amendment interests [are] either threatened or in fact being impaired at the time relief [is] sought." *Elrod*, 427 U.S. at 373. "There can be no question that the challenged restrictions, if enforced, will cause irreparable harm." *Roman Catholic Diocese of Brooklyn v. Cuomo*, 592 U.S. 14, 19 (2020). Before this Court granted Plaintiffs' preliminary injunction, FNBH's members had already received over eighty-nine criminal citations under the Ordinance, and other FNBH volunteers had ceased attending FNBH events. PX 2 (FNBH Decl.) ¶¶ 29, 33–35. Even after this Court granted the injunction, the Ordinance has continued to have a chilling effect on countless others outside of FNBH because it remains in effect with respect to all other individuals and groups who want to provide food to those in need on City property. *See 3570 E. Foothill Blvd., Inc. v. City of Pasadena*, 912 F. Supp. 1268, 1278 (C.D. Cal. 1996) ("Either a person is punished for speaking, or refrains from speaking for fear of punishment. This harm continues until the statute is either repealed or invalidated.").

A permanent injunction is warranted because "injunctions protecting First Amendment freedoms are always in the public interest." *Texans for Free Enter. v. Tex. Ethics Comm'n*, 732

F.3d 535, 539 (5th Cir. 2013) (quotation omitted). Further, the Ordinance restricts the ability of groups like FNBH to provide free meals to unhoused and food insecure people throughout Houston. If allowed to continue criminalizing charitable feeding, the City will stifle the ability of FNBH and others to express support for the least well off and meet the needs of their neighbors. Thus, in addition to violating the First Amendment rights of FNBH and others, allowing this enforcement to continue may increase hunger and food insecurity in Houston.

## VI.    CONCLUSION

Plaintiffs respectfully request this Court grant summary judgment and permanently enjoin Defendant and its officers, employees, and agents from enforcing sections 20-252 and 20-257 of the Houston City Code.

Dated: March 28, 2025

Respectfully submitted,

*/s/Randall Hiroshige*
Randall Hiroshige
Texas Bar No. 24124299
Southern District No. 3708688
randy@texascivilrightsproject.org
Travis Walker Fife
Texas Bar No. 24126956
Southern District No. 3734502
travis@texascivilrightsproject.org
Christina Beeler
Texas Bar No. 24096124
Southern District No. 3695627
christinab@texascivilrightsproject.org
Molly Petchenik
Texas Bar No. 24134321
Southern District No 3854546
molly@texascivilrightsproject.org
Texas Civil Rights Project
1405 Montopolis Drive
Austin, Texas 78741
Tel. 512-474-5073

Remington Alessi
Texas Bar No. 24120245
Southern District No. 3596602
Remington@TexasChainsawLawyer.com
Alessi Legal PLLC
PO Box 230381
Houston, Texas 77223
Tel. 281-438-3733
Fax. 713-583-7973

Caitlyn Silhan
Texas State Bar No. 24072879
Southern District No. 1465633
csilhan@waterskraus.com
Waters Kraus Paul
3141 Hood Street, Suite 200
Dallas, Texas 75219
Tel. 214-357-6244
Fax. 214-357-7252

**ATTORNEYS FOR PLAINTIFFS FOOD NOT BOMBS HOUSTON AND
BRANDON WALSH (4:24-cv-338)**

## CERTIFICATE OF SERVICE

I certify that on March 28, 2025, a true and correct copy of this document was properly served on all counsel of record via electronic filing.

/s/*Randall Hiroshige*
Randall Hiroshige