# EXHIBIT 35

Jennifer Kennedy                                        February 11, 2025

```
 1                IN THE UNITED STATES DISTRICT COURT
              FOR THE SOUTHERN DISTRICT OF TEXAS
 2                       HOUSTON DIVISION

 3   FOOD NOT BOMBS HOUSTON      §
     ET AL.,                     §
 4                               §   Case No. 4-24-cv-338
                                 §
 5   PLAINTIFFS,                 §   (Consolidated Case No.
                                 §   4:23-cv-1206)
     v.                          §
 6                               §
     CITY OF HOUSTON, TEXAS,     §
 7   DEFENDANT.                  §

 8

 9                       ORAL DEPOSITION OF

10              CAPTAIN JENNIFER LYNN KENNEDY

11                      FEBRUARY 11, 2025

12

13

14

15        ORAL DEPOSITION OF CAPTAIN JENNIFER LYNN KENNEDY,

16   produced as a witness at the instance of the Plaintiffs

17   and duly sworn, was taken in the above styled and

18   numbered cause on Tuesday, February 11, 2025, from 9:09

19   a.m. to 3:51 p.m., before DONNA QUALLS, Notary Public in

20   and for the State of Texas, Notary ID No. 12161359,

21   reported by computerized stenotype machine, at the

22   offices of Houston City Hall Annex, 900 Bagby Street,

23   4th Floor, Houston, Texas, pursuant to the Federal Rules

24   of Civil Procedure, and any provisions stated on the

25   record or attached hereto.
```

Jennifer Kennedy                                        February 11, 2025
                                                                  Page 2

```
 1                    A P P E A R A N C E S

 2

     FOR THE PLAINTIFF, FOOD NOT BOMBS AND BRANDON WALSH:
 3        TRAVIS WALKER FIFE
          RANDALL HIROSHIGE
 4        CHRISTINA BEELER
          TEXAS CIVIL RIGHTS PROJECT
 5        1405 Montopolis
          Austin, Texas  78741
 6        (512) 474-5073
          travis@texascivilrightsproject.org
 7        randy@texascivilrightsproject.org
          christinab@texascivilrightsproject.org

 8

 9   FOR THE PLAINTIFF, PHILLIP PICONE:
          RANDALL L. KALLINEN
10        KALLINEN LAW FIRM
          511 Broadway Street
11        Houston, Texas  77012
          (713) 320-3785
12        attorneykallinen@aol.com

13

     FOR THE DEFENDANT, CITY OF HOUSTON:
14        LUCILLE ANDERSON
          KENNETH S. SOH
15        CITY OF HOUSTON LEGAL DEPARTMENT
          P.O. Box 368
16        Houston, Texas  77001-0368
          (832) 393-6491
17        mlucille.anderson@houstontx.gov
          kenneth.soh@houstontx.gov

18

19

     Also Present:
20        Natoya Inglis
          Anamaria Kheveli
21        Rihika Kumar

22

23

24

25
```



Jennifer Kennedy                                    February 11, 2025
                                                         Page 24

1      A.  Yes.

2      Q.  Correctly, sorry?

3      A.  Yes.

4      Q.  And so the keyword here is "conduct a food

5   service event without advanced written consent of the

6   public or private property owner."

7               And so could you look at 20-251,

8   definitions?

9      A.  Yes.

10     Q.  And so Section 20-251 defines food service

11  event as "each instance in which charitable food

12  services are provided to more than five individuals"; is

13  that right?

14     A.  Yes.

15     Q.  So why -- what interest does it serve to

16  criminalize serving five individuals versus six or seven

17  individuals?

18               MS. ANDERSON:  Objection; form.

19     Q.  (BY MR. FIFE)  Let me rephrase the question.

20               Why is the limit in this ordinance

21  providing charitable food services to more than five

22  individuals as opposed to some other number of

23  individuals?

24     A.  I don't know.

25     Q.  Okay.  So the next definition -- so food



1   service event restricts each instance in which

2   charitable food services are provided to more than five

3   individuals.

4              And then the definition right above food

5   service event defines charitable food services.  And it

6   says "Charitable food services provided means providing

7   food without charge, payment, or other compensation to

8   benefit those in need at an outdoor location not owned,

9   leased, or controlled by the individual or organization

10  providing food."

11             Did I read that right?

12  A.  Yes.

13  Q.  So the -- I have a couple of questions about

14  this definition.  So would this definition encompass

15  birthday parties?

16  A.  I guess, if you could explain that little kids

17  are in need of pizza, then possibly.  It might be a

18  stretch.

19  Q.  Well, I guess that's actually a good point.

20  Let me ask you -- within the meaning of this ordinance,

21  what does "those in need" mean?

22  A.  Well, if you look at one of the whereas

23  statements, the city council recognizes those who are

24  unable to provide food for themselves.  So my

25  interpretation is those in need would be those who are


MAGNA
LEGAL SERVICES

1   unable to provide food for themselves.

2        Q.  And you just read from the second whereas

3   paragraph on the first page, right?

4        A.  Correct.

5        Q.  So those in need means those unable to provide

6   food for themselves?

7             MS. ANDERSON:  Objection; form.

8        A.  That would be my interpretation.

9        Q.  (BY MR. FIFE)  Okay.  How is an officer

10  enforcing this ordinance supposed to determine whether a

11  person meets that definition of "in need"?

12       A.  We enforce whether or not those conducting the

13  events have permission from the property owner, not

14  whether or not they're serving people that are in need.

15  So we are not asking everybody that's in line if they're

16  able or unable to provide food for themselves.  I think

17  that would be...

18       Q.  But does the ordinance prohibit serving free

19  food to those who are not in need?

20       A.  I'm not sure.  I guess it depends on how you

21  interpret the definitions.

22       Q.  Okay.  Well -- so let's go back to the

23  definitions, then.  So Section 20-252, the use of

24  property without consent prohibited makes it unlawful

25  for any organization or individual to sponsor or conduct



Jennifer Kennedy                                              February 11, 2025
                                                             Page 27

 1   a food services event on public property without the

 2   advanced written consent of the public property owner,

 3   right?

 4        A.   Uh-huh.

 5        Q.   And then Section 20-251 defines a food service

 6   event as each instance in which charitable food services

 7   are provided to more than five individuals, right?

 8        A.   Right.

 9        Q.   And then charitable food services means

10   providing food without charge, payment, or other

11   compensation to benefit those in need at an outdoor

12   location."  And then it continues.

13             And so did I read the first part of that

14   definition right?

15        A.   Yes.

16        Q.   And so I guess my question is to violate

17   Section 20-252 the person needs to be conducting a food

18   service event which is defined as providing food without

19   charge, payment, or compensation to benefit those in

20   need.

21             Do you agree with that?

22        A.   Well, you just read the definition of

23   charitable food service event.  But I get where you're

24   getting at.  I would say that it is aimed more at the

25   intention of the food service provider that their



1   intention is to benefit those who they think may be in

2   need, not to -- not that we have to prove that everybody

3   in line is in need.  It's the intent of the food service

4   provider.

5        Q.  And that makes sense.  I think my question,

6   then, is how does an officer determine under this

7   ordinance the intent to benefit those in need of the

8   person or group providing charitable food services?

9        A.  You could look at -- you could speak with the

10  food service providers.  You could look at their online

11  websites that explain that their purpose is to help

12  people in need.  I think just generally it can be

13  assumed that, if a food service provider, an

14  organization, religious group is out providing food, the

15  intent is that they're trying to benefit those that are

16  in need.

17       Q.  That's interesting.  Can you say more about

18  that?  Why is it safe to assume that a person serving

19  food for free out in the public is doing so to benefit

20  those in need?

21       A.  I'm just thinking from, you know, personal

22  perspective.  I don't know that the organizations that

23  are going to spend the time to collect food, organize

24  volunteers to go help people that aren't in need.  You

25  know what I'm saying.



Jennifer Kennedy                                    February 11, 2025
Page 29

```
 1        Q.  Yeah.
 2        A.  Like just the word "help" kind of infers that
 3   you are helping those in need because people that are
 4   not in need doesn't necessarily need help.
 5        Q.  Yeah.  And it takes a lot of work to, like you
 6   said, assemble all the food and find a public place to
 7   distribute it.
 8                   Would you agree with that?
 9        A.  I've never personally done that.  I would
10   assume so.
11        Q.  Okay.  So the "to benefit those in need"
12   language in the charitable food service definition means
13   the person conducting the food event is trying to
14   benefit those in need, right?  I'm just trying to make
15   sure I understood what -- what you said.
16                   MS. ANDERSON:  Objection; form.
17        A.  Yeah, that's my interpretation.
18        Q.  (BY MR. FIFE)  Okay.
19        A.  I mean, we can read it as it is in the
20   definition.  Now, finding meanings behind specific words
21   within the definition is something that probably needs
22   to be answered by an attorney who wrote the definitions.
23        Q.  Yeah.  And so the next piece of this definition
24   I'm curious about is "without charge, payment, or other
25   compensation to benefit those in need."
```



1    property owner but without participating in the program

2    established by this article shall not be deemed in

3    violation of this article."

4              Did I read that right?

5        A.  Yes.

6        Q.  Do you agree that this means that participation

7    in the certification program outlined in Section 20-254

8    is not a prerequisite to conducting charitable food

9    service events?

10       A.  That's correct.  It's voluntary.

11       Q.  It's a voluntary program, right?

12       A.  Yes.

13       Q.  And so to conduct charitable food service

14   events, and organization is not required to undertake

15   the certification process that's outlined in 20-254?

16       A.  That's correct.

17       Q.  Okay.  Could you turn to page 5 of the

18   ordinance?  This is COH 024086.  I'd like to discuss

19   just briefly Section 20-257.  That's the use of city

20   parks and other city property for food service events.

21             So looking at the first sentence, it says

22   "The director of the parks and recreation department

23   shall develop rules, regulations, and criteria for the

24   use of properties for food service events and shall

25   maintain a list of park properties with areas approved



Jennifer Kennedy                                    February 11, 2025
Page 36

 1  for food service events."

 2                Did I read that right?

 3      A.  You left out the word "park."

 4      Q.  Oh, sorry.

 5      A.  But yes, in general you read it correctly.

 6      Q.  Okay.  But in essence, this first sentence

 7  gives a director of the parks and recreation department

 8  the authority to develop rules, regulations, and

 9  criteria for the use of park properties for charitable

10  feedings?

11      A.  Yes.

12      Q.  And does the parks department currently have

13  any approved parks for charitable feeding?

14      A.  No.

15      Q.  Okay.  And we'll get to that more in a second,

16  but does the director of parks and recreation have any

17  guidance, rules, regulations, or criteria for the use of

18  parks' property for charitable feeding?

19      A.  Likely so because in -- back in 2016 when we

20  used to use the parks, I've never seen them.  It says

21  they shall develop rules, regulations, and criteria.  So

22  I'm assuming at one point we did have those when we were

23  utilizing the parks.

24      Q.  But now no parks' property is approved for

25  charitable food service events?



Jennifer Kennedy                                    February 11, 2025
                                                          Page 37

1       A.   That's correct.

2       Q.   Okay.   And then the second sentence right after

3  the one I just read says "The director of health and

4  human services department shall develop rules,

5  regulations, and criteria for the use of other city

6  property for food service events and shall maintain a

7  list of such properties with areas approved for service

8  events."

9            Did I read that right?

10      A.   Yes.

11      Q.   So this is a similar provision.   It gives the

12 director of health and human services the authority to

13 develop rules, regulations, and criteria for the use of

14 other city property for food service events?

15      A.   That's correct.

16      Q.   So the director of the health department has

17 authority over all non-parks' properties?

18            MS. ANDERSON:   Objection; form.

19      A.   If it is city property.

20      Q.   (BY MR. FIFE)   Okay.

21      A.   Not all others but --

22      Q.   That's a good point.   So the health department

23 has authority over whether to authorize charitable

24 feedings at all non-parks city property?

25            MS. ANDERSON:   Objection; form.



Jennifer Kennedy                                    February 11, 2025
                                                              Page 38

```
 1        A.  They maintain a list.
 2        Q.  (BY MR. FIFE)  And that's the list on the
 3   health department's charitable feeding website?
 4        A.  I believe there's a list on the website.
 5        Q.  Okay.  I just have one other question about
 6   Section 20-257.  So does the mayor fit into this
 7   approval process at all?  Like, say, for example, the
 8   parks department wanted to approve a park.  Could the
 9   mayor tell them to reverse course and not approve the
10   location?
11        A.  I would say that's probably within the mayor's
12   scope of authority, yes.
13        Q.  Okay.  Now, we've talked thus far about the
14   meaning of the ordinance, but I wanted to discuss these
15   terms in context of a particular police report.  And I
16   will mark this as Exhibit 17.
17             (Exhibit No. 17 was marked.)
18        Q.  (BY MR. FIFE)  Captain Kennedy, do you
19   recognize this document?
20        A.  No.
21        Q.  So it says at the -- so this is a Houston
22   Police Department -- is this a police report?
23        A.  Yes.
24        Q.  And if you look at the top, it says "Offense
25   Report Title.  Feeding homeless without" -- well "w/o
```



 1   differential response team that handles those quality of

 2   life or civility complaints.

 3        Q.  And was the differential response team one of

 4   the teams that you directed as lieutenant in the

 5   Downtown Division?

 6        A.  Yes.

 7        Q.  And so did you direct which officers of the DRT

 8   team would patrol Food Not Bombs events?

 9        A.  No.  I never specifically addressed anything

10   Food Not Bombs.  It was if we had charitable food

11   service events that were being conducted that violated

12   the ordinance.

13        Q.  And -- okay.  But -- so you then personally

14   were directing officers to go to charitable food service

15   events at the Central Library?

16        A.  Yes.

17        Q.  And was it routinely the same officers, or

18   how -- how was that team staffed?

19        A.  So we developed basically a schedule of who

20   would work because it was in the evenings after these

21   officers' regular shift.  So it would be officers from

22   the differential response team, some officers from

23   patrol, some officers from the crime suppression team.

24        Q.  Okay.  Now, the listed suspect on -- if you

25   turn to page 4, it says "The listed suspect James Foster



1    and the organization Food Not Bombs conducted a food

2    service event by serving individuals on property without

3    consent."

4              Do you see that first sentence of the third

5    full paragraph?

6        A.  Yes.

7        Q.  So how did the officer know that it was Food

8    Not Bombs?

9        A.  They generally wear shirts, and they have

10   banners.  They make sure that you know that they are

11   Food Not Bombs.

12       Q.  Okay.  And then how did the officers determine

13   who to cite among the Food Not Bombs individuals?

14       A.  So they would ask those feeding who would be

15   receiving the citation.  And then the organization or

16   those volunteers would get together and decide who would

17   receive that citation.  Generally, that is how it

18   happened.

19       Q.  And then the next sentence after the one we

20   just read said "We observed the listed suspect standing

21   at the end of the line, handing out approximately

22   100 meals to the homeless."

23              Did I read that right?

24       A.  Yes.

25       Q.  So how did the officer determine whether the



1    individuals were homeless?

2        A.  These officers with the differential response

3    team, they know just about every single person who is

4    homeless in downtown.  They interact with them on a

5    daily basis, and so they know very well who the homeless

6    population is.

7        Q.  Is the DRT team the one -- the officers who

8    drive around and help people with identification?

9        A.  No.

10       Q.  What unit is that?

11       A.  That's the HOT unit, the homeless outreach

12   team.  So the HOT unit is more of an outreach unit.  And

13   the differential response team is more of an enforcement

14   side.  Differential response team, downtown every day,

15   goes to the different encampments and other areas to

16   enforce civility ordinances.

17       Q.  And so DRT then also does encampment like, if

18   there's a homeless encampment, that they will remove the

19   encampment from the public or private property?

20       A.  They are involved in that, yes.

21       Q.  Okay.  And --

22               MS. ANDERSON:  Is this a good time to take

23   a break?

24               MR. FIFE:  Yeah, actually.

25               (Recess from 10:15 a.m. to 10:29 a.m.)



 1  can tell you Allen's Landing definitely does not.  It's

 2  basically just a park underneath a bridge along the

 3  bayou.  There are no restrooms there.

 4       Q.  So I want to clear that up, then.  So earlier

 5  when you were describing how the City selected these

 6  locations in 2012 through 2016, you mentioned bathrooms,

 7  parking, and handwashing, right?

 8       A.  Right, yeah.

 9       Q.  But what you were referring to were the more

10  recent regulations enacted by the health department?

11       A.  Yes, that's correct.

12       Q.  And do you know when those were enacted?

13       A.  I don't know.

14       Q.  Would sometime late 2022, early 2023 sound

15  right?

16       A.  I don't know.

17       Q.  Okay.  And so at the time of this list, which

18  was 2012 to 2016, do you know if the parks department

19  had comparable regulations to what you described in

20  terms of bathrooms, parking, and handwashing?

21       A.  Some of those.  But like as I said, Allen's

22  Landing, there's no bathrooms, there's no handwashing

23  stations.  So I don't know.  I'd have to go through and

24  look at each park specifically.  I know city parks all

25  have a set of standard rules that must be followed that



Jennifer Kennedy                                    February 11, 2025

```
1   are listed.  But outside of that, I don't know.
2        Q.  So were you aware of any criteria that the City
3   applied to all of these locations from 2012 to 2016?
4        A.  No.
5        Q.  Are you aware of any written guidance from 2012
6   to 2016 identifying what criteria the City would use to
7   approve or disapprove public property for charitable
8   food service events?
9        A.  No.
10       Q.  Now, we were -- so the category we were just
11  discussing was City-owned property locations approved
12  from 2012 to 2016, right?
13       A.  Yes.
14       Q.  Now, the next list or -- sorry.  The next
15  category in these responses was food and housing
16  programs from 2019 to 2022, right?
17       A.  Yes.
18       Q.  So what were -- were any public property
19  locations approved for charitable food service events
20  from 2016 to 2019?
21       A.  I don't know.
22       Q.  Do you see any listed in the City's
23  interrogatory responses?
24       A.  No.
25       Q.  Could you name a location that was approved
```



 1    for charitable food service events -- a public property

 2    location that was approved for charitable food service

 3    events from 2016 to '19?

 4         A.   No.

 5         Q.   And I just want to confirm you also said you

 6    were unaware of -- let me put the question this way.

 7              Were any locations approved from 2016 to

 8    '19 for charitable food service events?

 9         A.   Not that I know of.

10         Q.   Do you know if the City made a decision to not

11    approve any locations from 2016 to '19?

12         A.   No, I don't know that.  I don't believe there

13    was any enforcement between 2016 to 2019 of the

14    ordinance.

15              MR. FIFE:  Could we take a five-minute

16    break?

17              THE REPORTER:  Off the record at 11:28.

18              (Recess from 11:28 a.m. to 12:30 p.m.)

19              THE REPORTER:  Back on the record at 12:30.

20         Q.   (BY MR. FIFE)  So, Captain Kennedy, before we

21    left for lunch, we were discussing what locations, if

22    any, the City had approved for charitable food service

23    events from 2015 to '19.  And that's page 4 of this

24    City's answers and objections to our interrogatories.

25    We agreed before the break that there were no locations



Jennifer Kennedy                                        February 11, 2025
                                                        Page 81

 1   know what his role was at the time of this e-mail?
 2        A.   No.
 3        Q.   But safe to say he was an employee of the parks
 4   and rec department?
 5        A.   Yes.
 6        Q.   Based on the PRD next to his e-mail?
 7        A.   Correct.
 8        Q.   Okay.  Now, looking at the message,
 9   Ms. Longoria writes "I understand that all charitable
10   feedings have been canceled until further notice."
11             Do you see that?
12        A.   I do.
13        Q.   Okay.  Do you know or does the City know
14   whether Ms. Longoria was correct that as of July 8th,
15   2016, all charitable feedings had been canceled until
16   further notice?
17        A.   I do know that the feedings that were taking
18   place at the parks in 2016 -- I don't know the exact
19   date.  I do know those feedings at the park were
20   canceled.  There was serious safety concerns.  There was
21   a huge increase in the kush among the homeless
22   population that was creating a lot of issues for the
23   parks.  And I believe the City felt like it was no
24   longer safe to host these -- or to allow these events to
25   be hosted on the park property.  And so they were



Jennifer Kennedy                                    February 11, 2025
                                                            Page 82

1   canceled.

2       Q.  So -- so in 2016, the parks and recreation

3   department decided to suspend all charitable feeding

4   activities on parks' property due to the kush and issues

5   that kush was causing in the parks?

6       A.  I don't know if it was parks and recs

7   department that decided that, but the City decided that.

8       Q.  Okay.

9       A.  Yes.

10      Q.  And so -- and you can just see here for

11  completeness, Mr. Joe Turner echoes what you had said

12  that -- and he writes "They have all been temporary

13  suspended while the mayor works through the kush issue

14  first in our parks and public areas.  And then second,

15  we be working to set up discussions with the faith-based

16  organizations on how to best provide services to those

17  in need, not just feedings."

18           Do you see that?

19      A.  Yes.

20      Q.  So you discussed the first part in your answer

21  which was issues related to kush.  But at the time, was

22  the City also trying to work with faith-based

23  organizations on how to best provide services to those

24  in need?

25      A.  I believe so.  And right around this time also



Jennifer Kennedy                                    February 11, 2025
                                                         Page 83

1    in 2016 is when Rapid Rehousing Program began.  And so

2    it was likely an effort to collaborate with the

3    organizations that were conducting the feedings to offer

4    those, like, housing services along with the feedings.

5         Q.   Uh-huh.  And was that desire to work with

6    faith-based organizations on how to collaboratively

7    implement the Rapid Rehousing Program, was that also a

8    basis for suspending charitable food activities in the

9    parks?

10        A.   No.  I believe that the primary basis was just

11   safety concerns.

12        Q.   Safety concerns related to kush?

13        A.   Right.

14        Q.   Okay.  So at the time of this e-mail, all

15   charitable food service activities in public parks had

16   been suspended, right?

17        A.   I believe so, yes.

18        Q.   Was there a plan or criteria in place at which

19   point the city parks could be reauthorized as locations

20   for charitable food service activities?

21        A.   Not when it was canceled.  I don't think they

22   had a plan in place to reopen.  When it was canceled, it

23   was canceled for safety issues.  Then I'm assuming as it

24   says here the mayor was going to work with the

25   organizations to kind of move forward.



Jennifer Kennedy                                February 11, 2025
                                                     Page 84

1      Q.  So at the time of this e-mail, the -- the City

2   had suspended charitable food activities on public

3   parks, but at the time there was not a plan to

4   reauthorize those charitable food service activities?

5      A.  I believe so.

6      Q.  Now, what is kush?

7      A.  It's synthetic marijuana.

8      Q.  At the time, was it illegal?

9      A.  Yes.  So there was -- I don't know -- have the

10  exact dates as far as legislation.  The issue with kush

11  and synthetic marijuana is there are several different

12  chemical formulations, right?  And so their court system

13  was having a difficult time keeping up with the

14  different chemical formulations and having legislation

15  to list all chemical formulations as controlled

16  substances that is illegal.

17     Q.  And was legislation prohibiting these various

18  chemical iterations eventually passed?

19     A.  Yes.  Now, there are -- this is somewhat out of

20  my scope as I'm not a narcotics officer or, you know, a

21  scientist.  However, synthetic marijuana -- I mean, it

22  is illegal, but there are different -- I mean you can

23  come up with different formulations that would then need

24  to be introduced into legislation.

25     Q.  So is kush just -- and again, I appreciate that



Jennifer Kennedy                                      February 11, 2025
                                                              Page 88

1   or what was fear of having people who just smoked kush

2   attend charitable food service events?

3       A.  I think the fear is that the City, you know,

4   allowing this to happen on public property.  But now

5   that we have this increase in kush that often leads to

6   violent incidents, we don't have the police officers

7   available to then staff all these parks to ensure that

8   everybody that's has taken part in these feeding events

9   are safe.

10          So I think it was more of a matter of

11  ensuring that people are safe.  And if the City did not

12  have the resources available to have police officers at

13  every single park during every single feeding, it's not

14  safe.

15      Q.  Yeah.  So at the time, you said it was hard to

16  determine whether -- the courts were having a hard time

17  determining whether the kush was composed of chemicals

18  that were at the time illegal.  Is that a correct

19  understanding of your testimony?

20          MS. ANDERSON:  Objection; form.

21      A.  So the courts had a hard time keeping up --

22      Q.  (BY MR. FIFE)  Okay.

23      A.  -- with the legislation to make all of the

24  different types or all of the different formulations

25  illegal and within that controlled substance.



1    Q.  So when HPD found someone who was on drugs

2    acting aggressively, how did they respond?

3              MS. ANDERSON:   Objection; form.

4    A.  It really depends on the situation.

5    Q.  (BY MR. FIFE)  Well, let me put it this way.

6    What did the Houston Police Department do, or what did

7    the City do in response to the presence of kush beyond

8    suspending charitable food service activities?

9    A.  So we -- I, mean several arrests were made for

10   individuals with possession of synthetic marijuana.

11   That would get tested at the drug lab.  A lot of times,

12   we responded to disturbances involving the homeless

13   population and found that somebody was in possession of

14   kush or under the influence of kush.  And so it really

15   just depended on the situation as to how we handled it.

16   Q.  Yeah.  And in -- and so is kush currently a --

17   as big of a problem now as it was in 2016?

18   A.  No, it does not seem like it's as big as a

19   problem?

20   Q.  And why is that?

21   A.  I don't know the exact reasoning.  Probably a

22   combination of enforcement, legislation, ease of access.

23   Used to you could get some of this synthetic marijuana

24   formulations from gas stations, things like that.  But

25   there's been a lot more enforcement, I think in that



1   area to where it's not as easily accessible.  In the

2   beginning, it was very easily accessible, and I think

3   that's what caused such a dangerous situation.

4        Q.  And so at the time in 2016 when there were

5   charitable food service events, were there officers at

6   those events on a regular basis in the parks?

7        A.  No, I don't believe so.

8        Q.  Okay.  And I just want to make sure I

9   understood this that you -- that the City did not have

10  evidence at the time that organizations sponsoring

11  charitable food service events were distributing kush?

12              MS. ANDERSON:  Objection; form.

13       Q.  (BY MR. FIFE)  The charitable food service

14  groups weren't the ones who are supplying kush?

15       A.  I don't believe the City thought that.

16       Q.  Are there any plans to reauthorize charitable

17  food service activities in public parks today?

18       A.  I don't know if that conversation is happening

19  at the mayor's office or not.  But as far as I know, no.

20       Q.  And you do -- and testified earlier that

21  currently no public parks are authorized for charitable

22  food service activities?

23       A.  Correct.

24       Q.  Okay.  Is there any criteria in place that

25  could allow someone to conduct a charitable food service



```
 1   activity at a public park?
 2        A.  No, there's no locations at public parks that
 3   are authorized right now.  So any criteria wouldn't
 4   matter if it's not an authorized location.
 5                  Did I answer that?
 6        Q.  Yeah.  And I think you said that there are no
 7   criteria in place right now because no public parks are
 8   authorized as charitable food service locations?
 9        A.  Yes.
10        Q.  Does the mayor's office have the authority to
11   reauthorize city parks as locations for charitable food
12   service activities?
13        A.  I would assume so.
14        Q.  And can you turn back with me to Exhibit 21.
15   And could you look at page 4?  That's the second half to
16   the City's answers, to Interrogatory No. 25.  It says
17   food -- the next category it lists are food and housing
18   programs from 2019 to 2022.
19                  Do you see that?
20        A.  Yes.
21        Q.  And it lists the temporary Navigation center
22   and navigation center at 2903.
23                  Do you see that?
24        A.  Yes.
25        Q.  From 2019 to 2022, were any other City of
```



1    Houston-owned properties approved for charitable food

2    service activities?

3         A.   No.   And these were not referring to charitable

4    food service activities.   These are just City of

5    Houston-sponsored programs like City of Houston

6    locations where feeding was occurring.   So these were

7    not food service events as described in the ordinance

8    that are outdoors by charitable food service providers.

9              Do you understand?

10        Q.   I think so.   Let me make sure.   So when it says

11   "food and housing program location," it's not referring

12   to locations for charitable food service activities

13   within the meaning of the ordinance.   It's referring to

14   locations where people in need can get food?

15        A.   Correct.

16        Q.   Okay.   And so -- are the navigation centers

17   public property?

18        A.   Yes, I believe so.

19        Q.   Okay.   And so as we've discussed, I represent

20   Food Not Bombs, right?

21        A.   Yes.

22        Q.   Could Food Not Bombs have -- Food Not Bombs

23   Houston, could they have conducted a charitable food

24   service activity at one of these navigation centers?

25        A.   No.



Jennifer Kennedy                                    February 11, 2025
                                                    Page 93

1        Q.  And so beyond these navigation centers, were
2    there any other publicly-owned locations approved for
3    charitable food service events?
4        A.  When?
5        Q.  From 2019 to 2022?
6        A.  Not that I know of.
7        Q.  And so we have -- I apologize.  I seem to have
8    lost my copy.
9            So we discussed before lunch that there
10   were no locations listed here from 2016 to 2019, right?
11       A.  Correct.
12       Q.  And I think you said you weren't aware of any?
13       A.  Right.
14       Q.  And then the next piece of the answer -- or the
15   next category -- do you want to take a second and look?
16       A.  No, you're good.
17       Q.  And the next category, 2019 to 2022, you
18   testified that these navigation centers were not
19   locations for charitable food service activities within
20   the meaning of the ordinance, right?
21       A.  Correct.
22       Q.  So from 2016 to 2022, were you -- are you aware
23   of any public property in which a group could sponsor or
24   conduct a charitable food service event?
25       A.  No.



Jennifer Kennedy                                        February 11, 2025
                                                                Page 94

1        Q.  Do you know why that was the case?

2        A.  No.

3        Q.  Do you know of any criteria in which the City

4   made that decision to not have any approved locations

5   from 2016 to 2022?

6        A.  I think the -- I don't know if you're referring

7   to the criteria to ending the ones in 2016, like we

8   discussed, at the parks for safety reasons.

9        Q.  Are there any other criteria you're aware of?

10       A.  No.

11       Q.  And are you -- and -- so from 2016 to 2022,

12  were there any criteria by which charitable food service

13  activities could resume at publicly owned locations?

14       A.  No.

15       Q.  So thus far we've been discussing approval via

16  the charitable feeding ordinance, the ordinance

17  challenged in this case.  But the City also has

18  ordinances that regulate special events and street

19  functions and parades, right?

20       A.  Yes.

21       Q.  So if someone wanted to sponsor a parade or a

22  5K, they would go to the mayor's office of special

23  events and apply those ordinances, right?

24       A.  Yes.

25       Q.  So could a group that wanted to conduct



Jennifer Kennedy                                                February 11, 2025
                                                                Page 95

```
 1   charitable food service activities instead of going

 2   through the ordinance challenge in this case, could they

 3   just apply for a special event permit?

 4        A.  I don't believe so if it violates the

 5   ordinance.

 6        Q.  Okay.  I'll mark this as Exhibit 23.

 7             (Exhibit No. 23 was marked.)

 8        Q.  (BY MR. FIFE)  And -- so this is at the bottom

 9   half of the page.  This is an e-mail from Mr. Ricardo

10   Magdaleno sent on August 1st, 2023.  And the subject of

11   the e-mail is homeless feedings.

12             Do you see that?

13        A.  I do.

14        Q.  Now, Mr. Magdaleno just in essence writes

15   exactly what you just said which is -- he said "I was

16   walking by the library plaza and saw this sign on the

17   fence.  The sign posted by HPD is clear-cut and specific

18   on all events with the intent of feeding the homeless."

19             Do you see those first two sentences?

20        A.  Yes.

21        Q.  And the last sentence says "If you have a

22   producer that insists on a special event permit, we must

23   deny the event and ask them to follow the instructions

24   stated per the policy in place."

25             Did I read that right?
```



MAGNA
LEGAL SERVICES

```
 1        A.   I'm assuming that was in coordination with the
 2   health department.
 3        Q.   And have you ever seen this response -- or had
 4   you ever seen this statement that Mayor Parker gave Food
 5   Not Bombs Houston permission to use the Central Library?
 6        A.   No.
 7        Q.   And you said earlier that currently Food Not
 8   Bombs does not have authorization from the city to
 9   conduct charitable food service events at the Central
10   Library?
11        A.   Correct.
12        Q.   So when was the permission revoked?
13        A.   Well, I would say that it was in February of
14   2023 when they received warning that they were no longer
15   going to be able to feed there and that they have to
16   feed at 61 Riesner, so before any sort of enforcement
17   action took place.
18        Q.   Okay.  Do you know -- based on what you said, I
19   think I know this answer.  But are you aware when this
20   newsletter was taken down off of the City of Houston web
21   page?
22        A.   No.
23        Q.   And then in February of 2023 when Food Not
24   Bombs permission was revoked, do you know who made that
25   decision?
```



Jennifer Kennedy                                February 11, 2025
                                                Page 128

 1      A.  No, not specifically.  I know -- it's not that

 2   their permission was revoked.  It's the only approved

 3   location was going to be 61 Riesner.  So there was never

 4   a -- here your permission is hereby revoked.  It's as of

 5   this date, this is going to be the only approved

 6   location.

 7      Q.  And the only approved location was 61 Riesner

 8   Street, right?

 9      A.  Correct.

10      Q.  So was there a reason why the Central Library

11   was no longer going to be allowed -- let me put that

12   differently.

13           Why was the Central Library no longer going

14   to be authorized as a charitable food service event

15   location?

16      A.  There were significant issues and safety

17   concerns coming from the Central Library.  And the City

18   also found that a coordination of efforts among those

19   that participate in the food service events would be

20   mutually beneficial to not only those who provide the

21   food but those who receive the food as well as the

22   property where the feeding occurs.

23      Q.  So if Food Not Bombs at the time wanted to use

24   another location for its charitable food service events,

25   were there any criteria by which they could select a



Jennifer Kennedy                                    February 11, 2025
                                                    Page 129

 1    different public property location?

 2         A.   No.

 3         Q.   It was just 61 Riesner Street, right?

 4         A.   Correct.

 5         Q.   And before you mentioned that, in February of

 6    2023, the health department issued guidelines outlining

 7    sufficient trash reciprocals, handwashing stations, and

 8    24/7 porta potty access as requirements for any public

 9    property where charitable feeding would occur?

10         A.   Well, it's -- yes.  So it's access during a

11    food service event and available 24/7.  That does not

12    mean that bathrooms have to be unlocked 24/7.  It means

13    that they have to be available for use 24/7.  And then,

14    basically open during a food service event.  If you read

15    the ordinance, it's clear in there.  But yes.  So right.

16         Q.   Okay.  So to -- so it's handwashing stations,

17    sufficient trash reciprocals, and porta potties for use

18    during food service?

19         A.   And parking.

20         Q.   And parking?

21         A.   Yes.

22         Q.   Now, if Food Not Bombs had identified another

23    location, another publicly owned location that met those

24    four criteria, could they have used it for a charitable

25    food service event?



Jennifer Kennedy                                February 11, 2025
                                                Page 130

```
 1        A.  If they received permission from the public or
 2   private owner.  But if it was a public property, then
 3   that would be something that had to be approved, you
 4   know, by the City.  So if it was a private place then,
 5   yes, absolutely.
 6        Q.  But in terms public property, a location with
 7   those four criteria we discussed would not necessarily
 8   be approved for the charitable food service event.  They
 9   would still need to ask the City for permission?
10        A.  Correct.
11        Q.  If a location had those four elements that we
12   discussed -- the porta potty, handwashing, parking, and
13   trash reciprocals -- would the City approve that
14   location, or would they still just say 61 Riesner
15   Street?
16             MR. SOH:  Objection; form.
17             MR. FIFE:  You can answer.
18        A.  I think that could be a possibility.  But it
19   would also have to be, you know, something where the
20   City looks at the safety in providing, having, you know,
21   resources as far as being able to provide officers for
22   security so.
23        Q.  (BY MR. FIFE)  Now, so previously we discussed
24   61 Riesner Street as an approved -- or actually we were
25   just discussing 61 Riesner Street as an approved public
```



Jennifer Kennedy                                    February 11, 2025
                                                    Page 132

1          A.   There were several reasons -- its close

2    proximity to the library where people were already being

3    fed.  It's a half a mile walk.  It's well lit.  The

4    sidewalks are actually brand new from McKinney and all

5    along Bagby until you get to Capital.  There's no

6    mobility issues with any of the sidewalks, no safety

7    concerns.

8               There's one intersection that would have to

9    be crossed as a protected intersection that's frequented

10   all the time especially by individuals going to the

11   Hobby Center.  It's in very close proximity to the Bayou

12   Place which is a location where we know that many of the

13   individuals that are participating in the feeding.

14   That's where they sleep at night as well, close to the

15   Beacon which is another major homeless provider

16   downtown.

17              We also had the ability there to provide

18   not only the minimum of ten parking spots, trash can

19   receptacles, porta potties, and handwashing stations,

20   but we have electrical outlets available for people.  We

21   have portable lighting that was available.  And we have

22   police nearby.  And then also police that would be

23   on-site.  So it's a safe location.

24         Q.   Who was involved in that decision?

25         A.   I remember having a conversation with Chief



Jennifer Kennedy                                February 11, 2025
                                                Page 133

1   Satterwhite about considering 61 Riesner as a location.

2   I believe he was involved, heavily involved, in that

3   decision.  He asked my opinion at one point.  That's why

4   we spoke about it.  I thought that was a great location.

5   I'm not sure who made the final decision as for it being

6   61 Riesner.

7        Q.  Did Chief Satterwhite speak with the mayor

8   about 61 Riesner Street?

9        A.  I believe so.

10       Q.  Okay.  And you mentioned the quality of the

11  sidewalks, how close it is to the Central Library,

12  lighting, proximity to locations where homeless

13  individuals spend a lot of time, and safety of

14  61 Riesner Street.  Were those -- who came up with those

15  criteria or factors?

16       A.  Those weren't criteria or factors.  They were

17  just benefits of that location.

18       Q.  So were there any written criteria or factors

19  that the City had to consider?

20       A.  No.  Nothing outside of what the health

21  department had already created -- basically the parking

22  restrictions, you know, minimum of ten parking spaces,

23  sufficient trash reciprocals, portable restrooms, and

24  handwashing stations available during a food service

25  event and available 24/7.



1    Q.  And so I understand the benefits of -- the

2    benefits of -- that you've described for 61 Riesner

3    Street, but I want to know why the City decided to have

4    only one approved location as opposed to having multiple

5    properties, public properties that could be used for

6    charitable food service events.

7    A.  Well, as of now, there was a huge group of

8    individuals that were receiving food downtown.  So we

9    knew that it needed to be local to downtown for the

10   groups that were receiving food could easily get to,

11   right?

12           And as far as ensuring officers for safety

13   and allocating resources, I think it was the initial

14   ideas.  Let's start with this one location because we

15   already know it's going to be successful in feeding the

16   same amount of people that were already being fed at the

17   library.

18   Q.  Has this, since 61 Riesner became the sole

19   location in 2023, has the City created or authorized

20   charitable food service events at more public

21   properties?

22   A.  No.

23   Q.  And so I'm not sure what you just said answered

24   my original question which is why did the City decide to

25   create one location as the exclusive place for



Jennifer Kennedy                                        February 11, 2025
                                                        Page 135

1    charitable food service events instead of how it had in

2    2012 through 2016 approved multiple locations throughout

3    Houston?

4        A.   Well, the City does not have the resources to

5    staff every single park to conduct charitable food

6    events in a safe manner.

7        Q.   What other locations did the City consider --

8    or let me put that differently.

9              So in authorizing and creating an exclusive

10   location for charitable food service events on city

11   property, were there other locations that the city

12   considered besides 61 Riesner Street?

13       A.   I'm not sure.

14       Q.   I will mark this as Exhibit 27.

15             (Exhibit No. 27 was marked.)

16             MR. SOH:  So I assume we're done with 26.

17             MR. FIFE:  Yes.

18       Q.   (BY MR. FIFE)  This is an e-mail thread

19   between -- well, several members of the mayor's staff.

20   And do you know what HCD means?

21       A.   Where is that at?

22       Q.   It's next to Mr. Marc Eichenbaum's e-mail.

23       A.   I know he was assigned to the homeless

24   initiatives, so maybe.

25       Q.   It's okay.



Jennifer Kennedy                                    February 11, 2025
                                                    Page 136

 1          A.  I'm not sure.

 2          Q.  Yeah.  So can you turn to the back page which

 3     is COH-084927.  In the middle of the page, there's an

 4     e-mail that's from Andy Icken to Mayor Turner,

 5     Marvalette Hunter, Marc Eichenbaum, and James Koski.

 6                  Do you see that?

 7          A.  I do.

 8          Q.  And this e-mail was sent on August 11th, 2021.

 9     It says "Mayor, after our call this afternoon, James"

10     and I -- "James, Marc, and I got together to be sure we

11     focus on possible feeding sites that met the criteria we

12     discussed."

13                  Do you know what criteria they discussed?

14          A.  I do not.

15          Q.  Is the criteria they discussed written

16     anywhere?

17          A.  I do not know.

18          Q.  But sitting here today, you don't know what

19     criteria Mr. Icken was referring to?

20          A.  No.

21          Q.  And then he continues "We plan on focusing on

22     three different sites that potentially meet the needs:

23                  1.  St. John's/ Pastor Rudy."

24                  Who is Pastor Rudy?

25          A.  I do not know him.



Jennifer Kennedy                                    February 11, 2025
                                                    Page 137

1      Q.   Does he run or direct the Bread of Life

2  organization?

3      A.   That sounds familiar.  Quite possibly, but I do

4  not know for sure.

5      Q.   Where is St. John/Pastor Rudy's facilities?

6      A.   Based on this e-mail, I would say the southeast

7  quadrant of central business district just south of the

8  Pierce Elevated.

9      Q.   So the next is municipal courthouse area.  And

10 then there is a -- and then -- so the municipal

11 courthouse area is -- would include 61 Riesner Street?

12     A.   Yes -- sorry.

13     Q.   61 Riesner Street is in the municipal

14 courthouse area?

15     A.   Yes.

16     Q.   And if you can look at the last sentence, it

17 says "The challenge will be the perception it is 'out of

18 sight.'"

19          Did I read that correctly?

20     A.   Yes.

21     Q.   So can you turn back to the first page?  This

22 is -- and then at the bottom of the first page, there is

23 an e-mail from Marvalette Hunter.

24          Do you see that, that she sent on

25 October 12, 2021?



Jennifer Kennedy                                    February 11, 2025
                                                    Page 138

```
 1        A.   I do.
 2        Q.   Ms. Hunter writes "My recommendation is the
 3   Municipal Courthouse Area No. 2.  It has already been
 4   assessed and is functionally appropriate.  Being out of
 5   sight should not be a determinate of an appropriate
 6   location."
 7             Do you see that?
 8        A.   I do.
 9        Q.   Does the City agree that in approving
10   charitable food service events it does not take into
11   account whether a location is "out of sight"?
12             MR. SOH:  Objection; form.
13             Go ahead and answer if you can.
14             MR. FIFE:  Yeah, let me restart that
15   actually.
16        Q.  (BY MR. FIFE)  Here, Ms. Marvalette says that a
17   location "being out of sight should not be a determinate
18   of an appropriate location" in reference to charitable
19   food service events, right?
20             Right?
21        A.   Yes.
22        Q.   And here, being out of sight, would mean away
23   from public view?
24             MR. SOH:  Objection; form.
25        Q.  (BY MR. FIFE)  What does being out of sight
```



Jennifer Kennedy                                    February 11, 2025
                                                    Page 139

1   mean to you?

2       A.  Well, I'm not sure because I work in this

3   complex and it's not out of sight.  So I'm not exactly

4   sure what they're referring to.  I mean, you've got the

5   courthouse next door that's open until 10:00 p.m.

6   You've got I-45 that runs right next to it.  And if

7   you're on it anytime between 3:00 and 6:00 p.m., you're

8   going 20 miles an hour and you can look over into the

9   parking lot and see the feeding occurring.

10              MR. SOH:  I would object that 20 miles an

11  hour is a gross exaggeration of the speed limit of the

12  Pierce Elevated at 4:00 o'clock in the afternoon.

13      A.  I'm just not sure what they're getting at as

14  far as it being out of sight.

15      Q.  (BY MR. FIFE)  Okay.  Yeah, so I think the core

16  of what I'm trying to get at is just in deciding whether

17  to approve a location for charitable food service

18  activities.  Does the City consider whether it is -- it

19  will be viewed by the public?

20      A.  Apparently not.  I don't think it's something

21  where it's -- either way where location is determined

22  because it is -- you know, there is people that are

23  going to see it versus a location where a lot of people

24  will see it.  So I think either way that is not used as

25  a determinate to identify a location.



1    Q.  Yeah, whether a lot of people will see it or

2   not --

3    A.  Correct.

4    Q.  -- does not matter to whether the City will

5   approve the location?

6    A.  Right.  Because I don't think that affects the

7   ability of an organization to provide food if other

8   people can see it or not or the number of people who can

9   see it.

10   Q.  So we've discussed previously that the City

11  began posting notices about 61 Riesner in February

12  of 2023?

13   A.  Yes.

14   Q.  How -- and you said earlier that you talked

15  Sergeant Simon about the posting of the signs?

16   A.  Yes.

17   Q.  What did you ask him?

18   A.  I asked him if he knew who posted them.  He

19  didn't know.  I have an e-mail -- I saw an e-mail at one

20  point from Andy Icken saying that the signs would be

21  posted February 20th.  I'm assuming it's just the City's

22  general service department that posted them because they

23  are the ones that are responsible for that type of

24  activity.  I was just curious if he knew, you know, who

25  posted them.



Jennifer Kennedy                                          February 11, 2025
                                                               Page 142

 1         Q.  But then February of 2023 is when the City made
 2    a concerted effort to move all Central Library feedings
 3    to 61 Riesner?
 4         A.  Yes.
 5         Q.  Okay.
 6         A.  Well, March 1st.
 7         Q.  March 1st was when the citations began?
 8         A.  March 1st is when the enforcement began.
 9         Q.  Yeah.  That was when the first citation was
10    issued?
11         A.  Yes.
12         Q.  Okay.
13              MR. FIFE:  Should we break for ten minutes?
14              MR. SOH:  Sure.
15              (Recess from 2:22 p.m. to 2:35 p.m.)
16              THE REPORTER:  Back on the record at 2:35.
17         Q.  (BY MR. FIFE)  So we were just discussing
18    61 Riesner Street, and I'm going to mark this as
19    Exhibit 28.
20              (Exhibit No. 28 was marked.)
21         Q.  (BY MR. FIFE)  This is a -- appears to be a
22    Google Maps image produced to us during discovery and
23    is -- has Bates stamp COH_067224.  Now, would you say
24    that this is a fair and accurate depiction of the
25    municipal court area?



1     A.   Minus several trees that have since died.

2     Q.   Okay.  So currently there are fewer trees?

3     A.   Currently there are fewer trees, but everything

4  else looks accurate.

5     Q.   Okay.  And it's a little hard to read.  But do

6  you see in red on the lower right-hand -- or lower right

7  side of the page it says "Homeless feeding area" in red

8  font?

9     A.   Yes.

10    Q.   And it appears to -- the homeless feeding area

11  prepares -- appears to begin at the intersection of

12  Lubbock Street and Artesian Place?

13    A.   So the feeding actually takes place in this

14  small parking lot that is really sandwiched between

15  Lubbock, Riesner, and Artesian.

16    Q.   Could you mark that on your map with a star?

17  So that's slightly to the left of the red font, homeless

18  feeding area?

19    A.   Correct.

20    Q.   What is that building adjacent to Lubbock

21  Street directly in front of the homeless feeding area?

22    A.   61 Riesner.

23    Q.   And that building is a Houston Police

24  Department building, right?

25    A.   It is not occupied by the police department



1  anymore.  It is -- it used to be the Central Patrol

2  Division building.  I believe after it got flooded from

3  Harvey, we -- is when we discontinued using it.  There

4  is a general services department group that uses part of

5  that building.  But I think it's more on the north end

6  that is utilized.

7       Q.  Outside -- and general services, is that

8  general services for HPD or --

9       A.  City of Houston.

10       Q.  City of Houston?  Okay.

11       A.  Yes.

12       Q.  Are there any other city functions or

13  departments that operate out of 61 Riesner Street?

14       A.  I don't believe so.

15       Q.  It was the old Central Patrol Division

16  building?

17       A.  Yes.

18       Q.  And then to the left of that building, there's

19  a municipal courthouse?

20       A.  Yes.

21       Q.  And that is the municipal courthouse where Food

22  Not Bombs volunteers would go to take care of their

23  tickets or contest there citations for violating the

24  charitable food service ordinance?

25       A.  If that's where their court was.  There's



1    several different municipal courts across the city.

2    This is the central courthouse; so I'm not sure where

3    their docket was.

4         Q.  Yeah.  And on Exhibit 28 itself at the top, it

5    says 60- -- the 61 Riesner Street in (HPD headquarters).

6    It sounds like you would disagree with that

7    characterization?

8         A.  Yes.  HPD headquarters is 1200 Travis.

9         Q.  Okay.  And was it ever HPD headquarters?

10        A.  Not since I've been on the department for the

11   past 17 years.  Now, before that, I'm not sure.

12        Q.  Okay.  Prior to the City designating 61 Riesner

13   Street as an authorized location for charitable food

14   service events, so before it was approved for charitable

15   feedings, did 61 Riesner Street have porta potties?

16        A.  No.

17        Q.  Did it have free parking?

18        A.  No.

19        Q.  Did it have a shipping container for storage?

20        A.  Not for this use but --

21        Q.  Not for charitable food service events?

22        A.  It did not.

23        Q.  Did it have tables designed for individuals to

24   eat food off of?

25        A.  No.



Jennifer Kennedy                                    February 11, 2025
                                                    Page 146

1          Q.  Did it have dumpsters designed for charitable

2    food service providers to discard waste?

3          A.  No.  We had dumpsters.  But obviously before

4    the feeding was there, it wasn't purposed for feeding.

5          Q.  Yeah, it was for whatever was happening inside

6    the building, right?

7          A.  Correct.

8          Q.  So the City added all those elements to

9    61 Riesner once it decided to designate it as the

10   exclusive charitable food service location?

11         A.  Yes.

12         Q.  So after March 1st, 2023, through the present,

13   do you know how many groups signed up to serve food at

14   61 Riesner?

15         A.  I don't know how any groups have signed up.  I

16   know that the list of recognized charitable food

17   providers, I believe, is at 199.

18         Q.  Could groups serve at -- or can -- actually,

19   let me ask you this question.

20              Is 61 Riesner Street still approved for

21   charitable food service events?

22         A.  Yes.

23         Q.  And so from March 1st, 2023, until now, can

24   groups sign up to serve food at the same time?

25         A.  Yes.



Jennifer Kennedy                                        February 11, 2025
                                                       Page 147

 1        Q.   Practically, how does that work?  Do they work
 2   together to prepare food together or?
 3        A.   So ideally, they would choose a date that is --
 4   somebody is not already feeding on in order to maximize
 5   our ability to feed throughout the entire week.  But we
 6   are not going to say no to an organization.
 7             So if an organization says I would like to
 8   feed at this day on this time, we look at the calendar,
 9   and if there's already somebody else for that date and
10   that time, then we just let them know they have to
11   coordinate, you know.
12        Q.   Yeah.
13        A.   So you're both going to be out there feeding.
14        Q.   And has the City received complaints from
15   groups who were scheduled at the same time?
16        A.   Not that I'm aware of.
17        Q.   And when a charitable food service event is
18   happening at 61 Riesner, are there always uniformed
19   police officers there?
20        A.   Yes, if they let us know about it.
21        Q.   Okay.  And so when a group conducts a food
22   service event at 61 Riesner Street, do they -- is there
23   a sanitation person on-site who's inspecting the food?
24        A.   No.
25        Q.   And so the officers aren't inspecting the food?



Jennifer Kennedy                                    February 11, 2025
                                                    Page 148

 1        A.   No.   I mean, the officers are empowered to

 2   enforce anything from the health and safety code.   So if

 3   they see some sort of egregious violation, you know,

 4   then they're empowered to address it.   I'm not aware of

 5   any instance where that's occurred.

 6        Q.   And, yeah, that makes sense.   I think my

 7   question is a little bit more simpler than that.   There

 8   is no city employees at 61 Riesner food service events

 9   proactively checking the food?

10        A.   Correct.

11        Q.   To serve food at 61 Riesner Street, does a

12   group have to be a registered charitable food service

13   provider?

14        A.   No.

15        Q.   And that's because the recognized provider

16   program is voluntary?

17        A.   Correct.

18        Q.   So a group could serve food at 61 Riesner

19   without taking the food safety course?

20        A.   Correct.

21        Q.   And they could serve food at 61 Riesner Street

22   without having a certificate from the City saying

23   they're a recognized charitable food service provider?

24        A.   Correct.

25        Q.   So does the City -- so let's just say across



1  the last six months, on most days, is there someone

2  providing food at 61 Riesner Street?

3      A.  Of the majority of the days, yes.  I believe

4  there's at least four days that are generally covered.

5  I'd have to look at the schedule to confirm.

6      Q.  Well, so I guess I'm glad you brought that up

7  which is -- are you familiar with the City's Dinner to

8  Home Program?

9      A.  Yes.

10     Q.  And that was a contract awarded to Bread of

11 Life where the City was paying Bread of Life to provide

12 charitable food services at 61 Riesner Street?

13     A.  Yes.

14     Q.  And do you know when the City's contract with

15 Bread of Life began?

16     A.  I believe it was November of -- I want to say

17 2022.

18     Q.  And so under that -- did Bread of Life serve

19 food at 61 Riesner Street before the City was paying --

20 had a contract with Bread of Life?

21     A.  I'm not sure as far as the timeline.  I know

22 that they were the vendor who won the bidding process to

23 be awarded the HRPA funds for the Dinner to Home

24 Program.

25     Q.  And do you know what days they were asked to



Jennifer Kennedy                                February 11, 2025
                                                Page 187

```
 1    COUNTY OF HARRIS )

 2    STATE  OF  TEXAS )

 3

 4                    REPORTER'S CERTIFICATION

 5

 6        I, Donna Qualls, Notary Public in and for the State

 7    of Texas, Notary ID No. 12161359, hereby certify that

 8    this transcript is a true record of the testimony given

 9    and that the witness was duly sworn by the notary.

10        I further certify that I am neither attorney nor

11    counsel for, related to, nor employed by any of the

12    parties to the action in which this testimony was taken.

13        Further, I am not a relative or employee of any

14    attorney of record in this cause, nor do I have a

15    financial interest in the action.

16        Subscribed and sworn to on this the 26th day of

17    February, 2025.

18

19

20                    _____
                      DONNA QUALLS
21                    Notary Public in and for
                      The State of Texas, Notary ID 12161359
                      My Commission expires 11/06/2026
22
                      Magna Legal Services
23                    Firm Registration No. 633
                      16414 San Pedro, Suite 900
24                    San Antonio, Texas 78232
                      (210) 697-3400
25
```

