# EXHIBIT 36

Renee Beckham                                          February 13, 2025

```
 1              IN THE UNITED STATES DISTRICT COURT
             FOR THE SOUTHERN DISTRICT OF TEXAS
 2                     HOUSTON DIVISION

 3   FOOD NOT BOMBS HOUSTON      §
     ET AL.,                     §
 4                               §
     Plaintiffs,                 §   Case No. 4:24-cv-338
 5                               §
     v.                          §   (Consolidated Case: No.
 6                               §   4:23-cv-1206)
     CITY OF HOUSTON, TEXAS,     §
 7                               §
     Defendant.                  §
 8

 9

10                    ORAL DEPOSITION OF

11                     RENEE BECKHAM

12                    FEBRUARY 13, 2025

13

14

15        ORAL DEPOSITION OF RENEE BECKHAM, produced as a

16   witness at the instance of the Plaintiffs and duly

17   sworn, was taken in the above styled and numbered cause

18   on Thursday, February 13, 2025, from 9:10 a.m. to

19   2:49 p.m., before DONNA QUALLS, Notary Public in and for

20   the State of Texas, Notary ID No. 12161359, reported by

21   computerized stenotype machine, at the offices of

22   Houston City Hall Annex, 900 Bagby Street, 4th Floor,

23   Houston, Texas, pursuant to the Federal Rules of Civil

24   Procedure, and any provisions stated on the record or

25   attached hereto.
```

Renee Beckham                                    February 13, 2025
                                                           Page 2

```
 1                    A P P E A R A N C E S

 2

 3   FOR THE PLAINTIFF, FOOD NOT BOMBS AND BRANDON WALSH:
          RANDALL HIROSHIGE
          CHRISTINA BEELER
 4        TEXAS CIVIL RIGHTS PROJECT
          1405 Montopolis
 5        Austin, Texas  78741
          (512) 474-5073
 6        randy@texascivilrightsproject.org
          christinab@texascivilrightsproject.org
 7

 8   FOR THE PLAINTIFF, PHILLIP PICONE:
          RANDALL L. KALLINEN
 9        KALLINEN LAW FIRM
          511 Broadway Street
10        Houston, Texas  77012
          (713) 320-3785
11        attorneykallinen@aol.com

12

13   FOR THE DEFENDANT, CITY OF HOUSTON:
          LUCILLE ANDERSON
          KENNETH S. SOH
14        CITY OF HOUSTON LEGAL DEPARTMENT
          P.O. Box 368
15        Houston, Texas  77001-0368
          (832) 393-6491
16        mlucille.anderson@houstontx.gov
          kenneth.soh@houstontx.gov
17

18
     Also Present:
19        Natoya Inglis
          Anamaria Kheveli
20        Rihika Kumar

21

22

23

24

25
```

Renee Beckham

February 13, 2025
Page 37

 1      A.  Yes.

 2      Q.  And underneath that it says "Agreeing to

 3   implement improvements to their food preparation,

 4   transportation, and service process as suggested by the

 5   health department."

 6      A.  Yes.

 7      Q.  And at the very end of this section, there is

 8   one sentence that -- at the end it says "An individual

 9   or organization providing charitable food services with

10   the consent of the property owner but without

11   participating in the program established by the article

12   shall not be deemed in violation of this article."

13           Do you see that?

14      A.  Yes.

15      Q.  And that just confirms what we've been saying,

16   that this voluntary recognized food service provider

17   program is not a mandatory step for charitable feeding

18   on public property?

19      A.  Right.  Not mandatory.

20      Q.  Now, can you turn with me to the next

21   Section 20-255, health department authorized.

22           Do you see that?

23      A.  Yes.

24      Q.  And it says "The health department is

25   authorized to" -- Section 1 says "Issue guidelines for

1    food preparation, food transportation, food storage, and

2    other food safety, sanitation, and public health-related

3    issues associated with conducting food service events."

4              Did I read that correctly?

5        A.  Yes.

6        Q.  And what process or procedures does the health

7    department use to issue guidelines under this section?

8        A.  That is done by our training, that food handler

9    training that they receive -- I'm sorry -- that

10   individuals or organizations receive if they wish to

11   feed the homeless.

12       Q.  Okay.  So the guidelines the health department

13   comes up with are shared during the two-hour food

14   handling training for charitable feedings?

15       A.  Yes.

16       Q.  Okay.  But that training is again a voluntary

17   step for individuals or groups who want to --

18       A.  Yes.

19       Q.  -- engage in charitable feedings; is that

20   right?

21       A.  Yes.

22       Q.  Okay.  So the guidelines issued by the health

23   department under this section, are -- are they suggested

24   best practices?

25       A.  They are the suggested best practices which

Renee Beckham                                           February 13, 2025
                                                        Page 39

 1  include food safety.  That is the priority item.
 2       Q.  Okay.  But the guidelines issued by the health
 3  department under this section, they're not mandatory for
 4  charitable feeding on public property?
 5                 MS. ANDERSON:  Objection; form.
 6                 You can answer.
 7                 MR. HIROSHIGE:  You can answer.
 8                 THE WITNESS:  Okay.
 9       A.  The guidelines remains -- and if you like at
10  this, the guidelines for food preparation -- it doesn't
11  matter whether -- what the intent is.  The guideline is
12  for food safety straight up.  So without those
13  guidelines there could be issues.
14       Q.  (BY MR. HIROSHIGE)  But the guidelines are --
15  they're just shared with the individuals or groups who
16  take the food handling course provided by the health
17  department, right?
18       A.  Yes.
19       Q.  Okay.  And under -- do you see
20  Section 3 under -- sorry -- Item No. 3 under
21  Section 20-255?
22       A.  Yes.
23       Q.  It says "Identify on an annual basis, beginning
24  one year from the effective date of Ordinance
25  No. 2012-269, those recognized charitable food service

Renee Beckham

February 13, 2025
Page 40

```
 1   providers which have abided by their pledge to provide

 2   charitable food services in conformance with

 3   Section 20-254 of this code."

 4             Did I read that correctly?

 5        A.  Yes.

 6        Q.  So the ordinance authorizes the health

 7   department to inspect whether the recognized charitable

 8   food service providers are complying with their pledge

 9   under Section 20-254?

10        A.  Yes.

11        Q.  Now, can you turn with me to the next page of

12   the ordinance?  Do you see Section 20-256,

13   identification and recognition?

14        A.  Yes.

15        Q.  And it says "The City shall maintain on the

16   city website a list identifying by name and address (and

17   if requested by the provider, other direct contact

18   information), those recognized charitable food service

19   providers which are in good standing under the program."

20             Did I read that correctly?

21        A.  Yes.

22        Q.  And what is the purpose of publishing this list

23   of recognized charitable food service providers on the

24   city website?

25        A.  I wasn't engaged a part of why this was put in.
```

Renee Beckham                                        February 13, 2025
                                                     Page 41

```
 1   This was added.  I understand that, when communicating
 2   with organizations, I think the web page was a way for
 3   organizations to really communicate with each other.
 4   That's how I taught -- when we taught class in person, I
 5   encouraged all of the folks in the room to, hey, if
 6   you're in the southwest side, y'all can split up the
 7   activities.  If you're in the southeast side, y'all
 8   can -- so that you don't have everybody running
 9   downtown.
10        Q.  And so the idea -- or at least it's your
11   understanding of the idea behind maintaining a list of
12   the charitable food service providers that are
13   recognized is so they can identify each other and see
14   where they're sharing food?
15        A.  That's my interpretation.
16        Q.  Okay.  And then they can coordinate with each
17   other?
18        A.  Right.
19        Q.  And so, for instance, there might not be any
20   people providing feed on the southwest side, and by
21   having a list of the providers, someone could recognize
22   that and decide to provide food there?
23        A.  Yes.
24        Q.  So the health department wants to ensure that
25   charitable feeding is distributed throughout the city
```

 1    based on need, right?

 2         A.  Yes.

 3         Q.  Okay.  Now, can you turn with me to the last

 4    section, Section 20-257, use of city parks and other

 5    city property for food service events?

 6              Do you see that?

 7         A.  Yes.

 8         Q.  Okay.  "And it says "The director of the parks

 9    department shall develop rules, regulations, and

10    criteria for the use of park properties for food service

11    events and shall maintain a list of park properties with

12    areas approved for food service events.  The director of

13    public health shall develop rules, regulations, and

14    criteria for the use of other city property for food

15    service events and shall maintain a list of such

16    properties with areas approved for food service events."

17              Did I read that correctly?

18         A.  Yes.

19         Q.  Now that we've had an opportunity to review the

20    ordinance, the ordinance itself doesn't contain any

21    criteria for selecting city properties for food service

22    events, right?

23         A.  No, I don't -- no.

24         Q.  That's correct, right?  It doesn't contain

25    any -- sorry.  Let me reask the question.

Renee Beckham                                        February 13, 2025
                                                            Page 43

 1        A.   Okay.

 2        Q.   The ordinance itself does not contain any

 3   criteria for selecting city properties for food services

 4   events, right?

 5        A.   Right.

 6        Q.   And it delegates the authority to make that

 7   criteria for selecting properties to the parks and

 8   health department?

 9             MS. ANDERSON:   Objection; form.

10        Q.   (BY MR. HIROSHIGE)   Is that --

11             MS. ANDERSON:   You can answer if you know.

12             THE WITNESS:   Oh, okay.

13        A.   It directs -- the 20-57 [sic] directs the

14   director of the health department and director of parks

15   and recreation to determine those locations, those

16   sites.

17        Q.   (BY MR. HIROSHIGE)   Okay.   And the ordinance

18   itself does not lay out a process for getting a city

19   property approved for charitable feeding, right?

20        A.   No.   There's nothing there.

21        Q.   Sorry.   I -- the ordinance does not lay out a

22   process for getting a city property approved for

23   charitable feeding; is that right?

24        A.   That's correct.

25        Q.   Okay.   Sorry.   So the -- as you mentioned, the

Renee Beckham                                          February 13, 2025
                                                                Page 44

 1 | ordinance charged the parks department with developing
 2 | rules and criteria for the use of park properties for
 3 | food service events?
 4 |     A.  Yes.
 5 |     Q.  And by parks department, we're talking about
 6 | the parks and recreation department of the City of
 7 | Houston, right?
 8 |     A.  Yes.
 9 |     Q.  And likewise, the ordinance charged the health
10 | department for developing rules and criteria for the use
11 | of other city properties for food service events?
12 |     A.  Yes.
13 |     Q.  And again, the health department is the health
14 | department of the City of Houston, right?
15 |     A.  Yes.
16 |     Q.  And Section 20-257 of the ordinance doesn't
17 | specify any standards for how the parks department is
18 | supposed to develop its criteria for the use of park
19 | properties for food service events; is that right?
20 |             MS. ANDERSON:  Objection; form.
21 |             MR. HIROSHIGE:  You can answer.
22 |     A.  No, it does not.
23 |     Q.  (BY MR. HIROSHIGE)  Okay.  So it -- the
24 | ordinance gives the parks department discretion to
25 | develop rules, regulation, and criteria for the use of

Renee Beckham                                          February 13, 2025
                                                              Page 48

```
 1        A.   Yes.

 2        Q.   And if you turn with me to the -- to the last

 3   page where it says in the bottom right corner City of

 4   Houston 000016.

 5        A.   16.  Okay.

 6        Q.   Do you see that?

 7        A.   Uh-huh.

 8        Q.   In the very end it says page last reviewed

 9   March 30, 2023.

10        A.   Yes, sir.

11        Q.   So this is a copy of the Houston Health

12   Department's charitable feeding web page sometime after

13   March 30th, 2023?

14        A.   Right.

15        Q.   Okay.  And can you turn with me back to the

16   first page?

17             And underneath the charitable -- underneath

18   charitable feeding it says "The recognized charitable

19   food service provider program is a voluntary program

20   whose goal is to provide coordination of operations to

21   organizations that serve homeless individuals?"

22             Did I read that correctly?

23        A.   Yes.

24        Q.   Again, this is referring to the voluntary

25   recognized charitable food service provider program
```

Renee Beckham                                          February 13, 2025
                                                              Page 49

```
 1   under Section 20-253?

 2       A.  Okay.

 3       Q.  And underneath that it says "The program

 4   consists of four basic steps."

 5                    Do you see that?

 6       A.  Uh-huh.

 7       Q.  And can you just take a moment to review these

 8   four steps?

 9       A.  (Witness complies.)

10                    Okay.

11       Q.  And so these are the four steps to participate

12   in the voluntary charitable food service provider

13   program, right?

14       A.  I'm sorry.  Can you please repeat?

15       Q.  These are the four steps to participate in the

16   voluntary charitable food service provider program; is

17   that right?

18       A.  Yes, uh-huh.

19       Q.  Okay.  And for nonregistered individuals or

20   groups, the only mandatory step under the ordinance is

21   Step 3, get property owner consent?

22       A.  Yes.

23       Q.  So unregistered groups do not have to follow

24   Steps 1, 2, and 4?

25                    MS. ANDERSON:  Objection; form.
```

Renee Beckham

February 13, 2025
Page 50

1      Q.  (BY MR. HIROSHIGE)  Is that right?

2      A.  That's correct.

3      Q.  We can set that exhibit aside for now.  We're

4   going to come back to it later; so just put it somewhere

5   handy.

6           As we discussed earlier in reviewing the

7   ordinance, it went into effect in July of 2012, right?

8      A.  Yes.

9      Q.  And in 2012, did the parks department develop

10  criteria for the selection of park properties as sites

11  for charitable food service events?

12     A.  I don't know how they did that.

13     Q.  Okay.  So you don't know if they developed that

14  criteria?

15     A.  I don't know how they did that.

16     Q.  Okay.

17     A.  How they developed the criteria.

18     Q.  Have you ever seen any written guidance from

19  the parks department that shows the criteria for the

20  selection of city properties?

21     A.  No.

22     Q.  Now, in 2012, did the parks department select

23  certain city parks to serve as approved charitable

24  feeding sites?

25     A.  There was a list of parks.

Renee Beckham                                        February 13, 2025
                                                            Page 51

 1        Q.  Do you remember what any of those parks were?

 2        A.  Hennessey, Peggy's Point, Tranquility -- those

 3   are the main three that I remember.  Tranquility -- it

 4   might have been eight altogether.

 5        Q.  But you don't know how the parks department

 6   selected those --

 7        A.  No, sir.

 8        Q.  -- parks?

 9             Okay.  Now, in 2012 after the ordinance

10   went into effect, did the health department develop

11   rules or criteria for the selection of other city

12   properties as sites for charitable food service events?

13        A.  Now, the city -- not that I'm aware of that the

14   City said you can use Block 1 versus Block 2, if that's

15   your question.

16        Q.  My question is a step back from the sites

17   themselves.  Do you remember how under Section 20-257 it

18   directed the health department to develop rules,

19   regulation, criteria for use of other city properties

20   for use of food service events?

21             Do you remember that?

22        A.  Right, I remember that.

23        Q.  Okay.  And did the health department develop

24   rules, criteria, or regulations for the selection of

25   other city properties as sites for charitable food

 1  service events in 2012?

 2       A.  Well, that's pretty much covered in the

 3  ordinance.  When you're asking me if the health

 4  department developed what properties, then I can't

 5  answer that question.  The health department goes by the

 6  ordinance and says, hey, parks or city property.

 7  Maybe -- is that what you're asking me?

 8       Q.  I guess how did -- did the health department

 9  select any other city properties as approved charitable

10  feeding sites in 2012?

11       A.  Not that I'm aware of.

12       Q.  And do you know how they would have decided to

13  approve or disapprove of other city properties for food

14  service events in 2012?

15       A.  No, sir.

16       Q.  Okay.  Now, in 2012, did the parks department

17  maintain a list of parks that were available for food

18  service events?

19       A.  I don't know what the parks department

20  maintained.  I know what we maintained.

21       Q.  Okay.  So in 2012, did the health department

22  maintain a list of city properties that were available

23  for food service events?

24       A.  They maintained a list of city parks.  I'm

25  going to go with the word "parks" because, when you say

Renee Beckham                                           February 13, 2025
                                                        Page 54

 1   not parks.  Do you understand?

 2        A.  Yes.

 3        Q.  And that could include city-owned parking lots,

 4   right?

 5        A.  Yes.

 6        Q.  It could include city-owned sidewalks; is that

 7   right?

 8        A.  Yes.

 9        Q.  Let's see -- can you think of other city-owned

10   properties that are not parks?

11        A.  Yeah.  There was -- oh, God, what was this

12   place at?  There was a city property somewhere off of

13   St. Emanuel because I -- the reason I remember it is

14   because our AD had to go and unlock the gate on

15   weekends.  There's a key that -- I remember he had to go

16   open that property up for people to feed the homeless

17   there.

18        Q.  What kind of property was that?

19        A.  I think it was a parking lot but -- not sure.

20   I've not been there.

21        Q.  Okay.  And so back to my question, in 2012

22   after this ordinance went into effect, did the health

23   department develop rules, regulations, and criteria for

24   the use of other city properties for food service

25   events?

 1       A.  Yes.

 2       Q.  And what were those criteria?

 3       A.  It would be the same criteria that's listed in

 4  the entire ordinance.

 5       Q.  Okay.  So the health department didn't come up

 6  with any criteria that's not listed in this ordinance?

 7       A.  Not that I'm aware of.

 8       Q.  Okay.  Do -- have you ever seen any written

 9  guidance developed by the health department containing

10  its rules and criteria for the selection of other city

11  properties for food service events?

12       A.  No, sir.

13       Q.  And I'm going to ask you to turn to an exhibit

14  that's been previously marked as Exhibit 26 during the

15  30(b)(6) deposition of Captain Kennedy.

16             MS. ANDERSON:  Which exhibit is this?

17             MR. HIROSHIGE:  26.

18             MS. ANDERSON:  26.

19             THE WITNESS:  Okay.

20       Q.  (BY MR. HIROSHIGE)  And are you looking at the

21  page where it says CitizensNet?

22       A.  Yes.

23       Q.  Okay.  And CitizensNet is a newsletter that's

24  put out by the City of Houston, right?

25       A.  Yes.

Renee Beckham                                    February 13, 2025
                                                 Page 56

 1        Q.  Are you familiar with CitizensNet?

 2        A.  I've seen it.

 3        Q.  And the picture there is Annise Parker.  Do you

 4   see that?

 5        A.  Yes.

 6        Q.  And she used to be the mayor of the City of

 7   Houston?

 8        A.  Yes.

 9        Q.  And have -- I'll give you a moment to just

10   review this.  And once you had a moment to review it, my

11   question for you is have you seen this document before?

12        A.  Yes.

13        Q.  Okay.  You have seen this document before.

14   When did you see this document before?

15        A.  I guess sometime in 2012.

16        Q.  Okay.  And it does -- you see listed there it

17   says September 5th, 2012, at the top?

18        A.  Yes.

19        Q.  And that's when this newsletter was published,

20   right?

21        A.  Yes.

22        Q.  Okay.  And do you see in the top left of this

23   document where it says 1-17-24 in the very top left?

24             MS. ANDERSON:  The tiny print?

25             MR. HIROSHIGE:  In the tiny print, yes.

 1  down from the city's website for any reason?

 2      A.  No, I do not.

 3      Q.  Okay.  Now, can you -- underneath in the

 4  section that says "Introduction" a few lines down from

 5  that, there's a section that says "The program consists

 6  of four basic steps."

 7              Do you see that?

 8      A.  Right.  Uh-huh.

 9      Q.  And can you just take a moment to review the

10  four steps that it lists?

11      A.  (Witness complies.)

12              Okay.  Yes.

13      Q.  And these -- again, this newsletter is from

14  2012.  These four steps are describing the four steps

15  for groups and individuals who want to participate in

16  the voluntary program; is that right?

17      A.  Yes.

18      Q.  And they're pretty similar to the four steps

19  that are currently available on the health department's

20  charitable feeding website, right?

21      A.  Yes.

22      Q.  Okay.  Again, at the time in 2012, the only

23  mandatory step was obtaining property owner consent, the

24  third step?

25      A.  Yes.

Renee Beckham

 1       Q.  Now, do you see -- can you turn -- look with me
 2   at the bottom of the page.
 3       A.  Okay.
 4       Q.  And it says "In addition, Mayor Annise Parker
 5   has designated the Central Houston Public Library Plaza,
 6   500 McKinney Houston, 77002 as an approved charitable
 7   food services location for Food Not Bombs."
 8            Did I read that correctly?
 9       A.  Yes.
10       Q.  So in 2012, Mayor Parker designated the Central
11   Library Plaza as an approved charitable food service
12   location, right?
13       A.  Yes.
14       Q.  And the mayor has the authority to decide
15   whether to designate city properties as approved
16   charitable food locations, right?
17       A.  Yes.
18       Q.  Okay.  Do you know why Mayor Parker decided to
19   designate the Central Library Plaza as an approved
20   charitable feeding site?
21       A.  No.
22       Q.  You don't know why?
23       A.  No.
24       Q.  Okay.  Do you have any guess as to why Mayor
25   Parker designated the Central Library Plaza as an

 1  approved charitable feeding site?

 2      A.  No.

 3              MS. ANDERSON:  Objection; form.

 4              You may answer if you can.

 5      A.  No, I don't know why.

 6      Q.  (BY MR. HIROSHIGE)  Okay.  And you can take a

 7  moment -- let me finish my question.

 8      A.  Okay.

 9      Q.  And you can take a brief pause too so that I

10  can get the question across.

11              Now, was the health department involved in

12  the decision to approve the Central Library Plaza as an

13  approved charitable feeding location in 2012?

14      A.  Not that I'm aware of.

15      Q.  Okay.  Do you know if the health department

16  agreed with Mayor Parker's decision to designate the

17  Central Library Plaza as an approved charitable feeding

18  site in 2012?

19              MS. ANDERSON:  Objection; form.

20      A.  If the mayor designated that as a charitable

21  feeding site, they're just part of the list of

22  charitable feeding sites.

23      Q.  (BY MR. HIROSHIGE)  Okay.  So the mayor can --

24  in certain situations, the mayor can have the final word

25  of designating a property as a charitable feeding site?

 1                    Okay.  So -- and this -- a part of this
 2    entry, they were registered for five different dates at
 3    Peggy's Point Plaza in June of 2016; is that right?
 4        A.  Yes, sir.
 5        Q.  And so I guess, aside from this, was Truc Lam
 6    Meditation Center frequently conducting charitable
 7    feedings at city parks?
 8        A.  According to the schedule, it looks like yes.
 9        Q.  Okay.  But do you remember, you know, aside
10    from what you're looking at now, whether this group was
11    frequently conducting charitable feedings at city parks?
12        A.  Other than just this list, that's the only way
13    I know.
14        Q.  Now, can you turn with me to the next page, and
15    there's -- in the second entry, do you see the event
16    Breakfast Club Ministry Charitable Feeding?
17        A.  Yes.
18        Q.  Are you familiar with the group Breakfast Club
19    Ministry?
20        A.  No, sir.
21        Q.  Okay.  And it lists the center as Peggy's Point
22    Plaza Park, right?
23        A.  Yes.
24        Q.  The date as June 2016, right?
25        A.  Yes.

 1        Q.  So it appears that this group registered to

 2   conduct a charitable feeding at Peggy's Point Plaza on

 3   June 4th, 2016?

 4        A.  Yes.

 5        Q.  And so there were charitable feedings happening

 6   frequently at City of Houston parks in May and June

 7   of 2016, right?

 8        A.  Yes.

 9        Q.  Okay.  And putting this calendar to the side,

10   like, there were charitable feedings happening at City

11   of Houston parks frequently in early 2016, right?

12        A.  Yes.

13        Q.  And Peggy's Point was a particularly popular

14   approved charitable feeding site, right?

15        A.  Yes.

16        Q.  Okay.  And aside from this list, are you

17   familiar with any of the other groups that would conduct

18   charitable food service events at Peggy's Point?

19        A.  No.  Other than just what's on this list.

20        Q.  Okay.  So you -- off the top of your head,

21   there's not --- you don't remember any other groups that

22   were there frequently?

23        A.  No.

24        Q.  Okay.  But as we read in Ms. Gray's e-mail

25   earlier, there were other city parks that were approved

 1   charitable feeding sites as well, right?

 2       A.  Yes.

 3       Q.  For instance, if we look at the permit list

 4   still on City of Houston 000185 in that first entry,

 5   there's -- this feeding was scheduled to take place at

 6   Tranquility Park, right?

 7       A.  Yes.

 8       Q.  And that was another one of the approved city

 9   parks in early 2016?

10       A.  Yes, sir.

11       Q.  Okay.  I'm going to pass you what we've marked

12   as Exhibit No. 34.

13                   (Exhibit No. 34 was marked.)

14       Q.  (BY MR. HIROSHIGE)  And on the first page of

15   this e-mail, can you look with me at the bottom of this

16   page where it says "On Tuesday, July 5, 2016, McCoy,

17   slash [sic], David."

18                   Do you see that?

19       A.  Yes.

20       Q.  Okay.  So this was an e-mail sent by David

21   McCoy on July 5th, 2016?

22       A.  Yes.

23       Q.  And at the time he was the chief sanitarian in

24   charge of charitable feeding?

25       A.  Yes.

1   concerned with the area where it was.  You know where

2   Sears used to be, and that's Peggy's Point Plaza.  And

3   so you have a lot of homeless people in that area.  And

4   you have people that have other intentions.  So there

5   were concerns with safety.  So I just kind of gave them

6   a little direction on looking out, contact HPD or parks

7   and recreation and police if they had any problems with

8   anyone.

9        Q.  Okay.  What do you mean by people with certain

10  intentions at Peggy's Point?

11       A.  Well, everyone -- just because a person is

12  homeless, there's -- when I say "other intentions," you

13  have people out there doing drugs.

14       Q.  Okay.

15       A.  That's what I meant.

16       Q.  So the City was recognizing that there was some

17  drug issues at Peggy's Point Plaza among the homeless

18  people there?

19       A.  Based on what I recognized the day I was out

20  there.  And I guess at some point the City decided, hey,

21  it's a risk.

22       Q.  And did the City identify similar drug and

23  safety issues with other city parks at the time in 2016?

24       A.  I only heard something on the news about an

25  incident at -- was it Hermann Park?

Renee Beckham                                February 13, 2025
                                                     Page 79

1          Q.   Okay.

2          A.   Hermann Park.

3          Q.   And it appears that David McCoy is referencing

4     that incident in this e-mail, right?

5                    MS. ANDERSON:   Objection; form.

6          Q.   (BY MR. HIROSHIGE)   David McCoy is referencing

7     an incident at Hermann Park related to purple kush use

8     in this e-mail, right?

9          A.   Yes.

10         Q.   And do you know if that's the same incident

11    that you remember seeing on the news?

12         A.   He makes reference to Hermann Park in his

13    e-mail.

14         Q.   And so aside from Hermann Park and Peggy's

15    Point Plaza, are you aware of any drug and safety issues

16    with other city parks at the time in 2016?

17         A.   No.

18         Q.   Now, in 2016, the parks department -- or let me

19    scratch that.

20              In 2016, the City suspended charitable

21    feeding at all city parks, right?

22         A.   Yes.

23         Q.   And the decision to suspend charitable feeding

24    at all city parks, did that come from the mayor's

25    office?

1      A.  Yes.

2      Q.  Okay.  And why did the -- why did the mayor

3  decide to suspend charitable feedings at all city parks?

4      A.  I can't --

5              MS. ANDERSON:  Objection; form.

6      A.  I can't specifically say why he decided to

7  suspend it.

8      Q.  (BY MR. HIROSHIGE)  Do you know why the mayor

9  decided to suspend charitable feeding at all city parks

10  in 2016?

11      A.  Based on this e-mail, safety reasons as

12  indicated by Mr. McCoy.

13      Q.  Okay.

14      A.  Safety and drugs.

15      Q.  And do you know what criteria the mayor used to

16  suspend all charitable feedings at city parks in 2016?

17      A.  No, I do not.

18      Q.  Okay.  And then if we go to the next e-mail up

19  in the thread, so in the middle of the page, we're just

20  looking at where it says "From:  Breakfast Club

21  Ministry."

22              Do you see that?

23      A.  Yes.

24      Q.  And Breakfast Club Ministry was one of the

25  groups conducting feedings at Peggy's Point that we were

 1   just looking at, right?

 2       A.  Yes.

 3       Q.  Okay.  And in this e-mail it -- it's -- it says

 4   "Hello, David.  We would like to know if you have any

 5   updates on the feeding events.  We are dedicated to our

 6   community and specifically with our homeless

 7   populations.  We are very anxious about getting back

 8   into the parks and serving our community."

 9           Did I read that correctly?

10       A.  Yes.

11       Q.  Okay.  And this e-mail was sent to David McCoy

12   on September 13th, 2016?

13       A.  Yes.

14       Q.  And so this was about two months after the

15   e-mail he sent in July of 2016, right?

16       A.  Right.

17       Q.  And -- so in -- in September of 2016, the --

18   or -- sorry.  Let's go up to the top of this page.

19           Do you see this e-mail from David McCoy on

20   September 13th, 2016?

21       A.  Yes.

22       Q.  Okay.  And in his e-mail he writes "Currently,

23   no city parks or other city-owned properties are

24   available for use as charitable feeding event sites.

25   Also, the health department does not have a list of

 1   parks prior to the suspension of parks in July of 2016?

 2       A.  No.

 3       Q.  Okay.  And the health department at the time in

 4   September of 2016 would tell individuals or groups that

 5   wanted to conduct charitable food service events that no

 6   city properties were available?

 7                   MS. ANDERSON:  Objection; form.

 8       A.  Would you repeat your question again?

 9       Q.  (BY MR. HIROSHIGE)  Yeah.  So the -- for groups

10   or individuals that wanted to conduct charitable food

11   services events in September of 2016 -- let me rephrase.

12                   For groups of individuals that wanted to

13   conduct charitable food service events on city property

14   in September of 2016, the health department would tell

15   them that no city properties are available, right?

16       A.  If they called, more than likely they would

17   have told them no.

18       Q.  Okay.  So they would be told that no city

19   properties were available?

20       A.  Right.

21       Q.  Okay.  Now, did the mayor's office develop a

22   plan for charitable feeding at city parks to resume?

23       A.  Not that I'm aware of.

24       Q.  Okay.  Did the parks department develop a plan

25   for charitable feeding at city parks to resume?

 1        A.  Not that I'm aware of.

 2        Q.  Now, let's move to the -- to the following

 3   year, 2017.  In 2017, did the City offer any alternative

 4   locations to the groups who previously provided

 5   charitable feedings at city parks before they were

 6   suspended?

 7        A.  Not that I'm aware of.

 8        Q.  Now, was the City concerned that charitable

 9   feedings in the city would decrease because there were

10   no city-owned properties available for charitable

11   feedings?

12        A.  Not that I've been made aware of.

13        Q.  Okay.  But you testified earlier that the

14   health department wanted to make sure that charitable

15   feedings were geographically distributed based on need

16   throughout the city, right?

17        A.  Right.

18        Q.  And so was the health department concerned that

19   there were no city-owned properties available for

20   charitable feeding in 2017?

21        A.  I can't --

22             MS. ANDERSON:  Objection; form.

23             MR. HIROSHIGE:  You can answer.

24             MS. ANDERSON:  You can answer if you know.

25        A.  There was a concern by teaching the class -- I

Renee Beckham                                        February 13, 2025
                                                           Page 85

 1  will put it to you that way.  There was a concern where

 2  can we feed, and so I just directed them to private

 3  property.

 4      Q.  (BY MR. HIROSHIGE)  Okay.  So individuals or

 5  groups who took the class would ask are there any city

 6  properties available for feeding?

 7      A.  Right.

 8      Q.  And you would tell them that they have to use

 9  private property?

10      A.  Yes.

11      Q.  Okay.  Now, I'm going to hand you what we

12  marked as Exhibit No. 35.

13              (Exhibit No. 35 was marked.)

14      Q.  (BY MR. HIROSHIGE)  If you'll look with me at

15  the bottom of the first page, do you see an e-mail from

16  Wendy Baimbridge?

17      A.  Yes.

18      Q.  And this e-mail was sent on August 8th, 2018;

19  is that right?

20      A.  Yes.

21      Q.  And it was sent to Patrick Key?

22      A.  Yes.

23      Q.  And you mentioned this earlier, but what was

24  Patrick Key's role in the health department in August of

25  2018?

Renee Beckham                                          February 13, 2025
                                                             Page 99

 1                    Do you see that?

 2        A.   Yes.

 3        Q.   Do you know who James Koski is?

 4        A.   No, sir.

 5        Q.   Okay.  But at least according to the domain of

 6   his e-mail address, he was with the mayor's office; is

 7   that right?

 8        A.   Yes.  Okay.

 9        Q.   Okay.  And in this e-mail he addresses it to

10   Chief Finner.

11                    Do you see that?

12        A.   Yes, sir.

13        Q.   And Troy Finner was the chief of police at the

14   time in 2020, right?

15        A.   Yes.

16        Q.   And in this e-mail Mr. Koski writes "Thank you

17   for the updates about the unauthorized feedings at

18   Hermann Square.  Any feeding requires the property

19   owner's permission.  The City does not authorize

20   feedings at Hermann Square."

21                    Did I read that correctly?

22        A.   Yes.

23        Q.   So Director Williams in the e-mail we just read

24   told Commander Conn to let Food Not Bombs feed at

25   Hermann Square during the pandemic; is that right?

Renee Beckham                                    February 13, 2025
                                                 Page 100

 1       A.  Yes.

 2       Q.  But James Koski from the mayor's office said

 3  that the City does not authorize feedings at Hermann

 4  Square, right?

 5       A.  Right.

 6       Q.  And so the mayor's office has the final word of

 7  whether a city property is allowed for charitable

 8  feeding, right?

 9       A.  Yes.

10       Q.  Okay.  And did the mayor's office speak with

11  Director Williams or anyone else at the Houston Health

12  Department about feedings at Hermann Square at the time?

13       A.  Not that I'm aware of.

14       Q.  Okay.  And underneath that, Mr. Koski writes

15  "For years, the City has authorized feedings at the

16  Central Library Plaza and adjacent sidewalks along Lamar

17  Street.  That continues to be an authorized area, and

18  that's where Food Not Bombs or other organizations

19  should be directed to go, which is consistent with where

20  they have provided feedings for years."

21            Did I read that correctly?

22       A.  Yes.

23       Q.  So in March of 2020, the City had authorized

24  feedings at the Central Library Plaza and adjacent

25  sidewalks for years; is that right?

1      A.   Yes.

2      Q.   Do you know what years those were?

3      A.   That the City authorized the library?

4      Q.   Yes.

5      A.   They would have started in 2012.

6      Q.   Okay.  So they were -- the Central Library was

7  an authorized location from 2012 to 2020 when Mr. Koski

8  wrote this?

9      A.   The plaza.

10     Q.   Okay.  Okay.  But Mr. Koski also refers to the

11 adjacent sidewalks along Lamar Street, right?

12     A.   Okay.

13     Q.   And those were also an approved site for

14 charitable feeding in 2020?

15     A.   According to him, yes.  According to this, yes.

16     Q.   Okay.  But in 2018 and 2019, the health

17 department did not tell individuals inquiring about

18 feeding on city property that the Central Library wasn't

19 an available site, right?

20     A.   I interpreted that as all of the properties.

21 Not just the parks but all the properties.

22     Q.   So in other words, in 2018 and 2019, the health

23 department would say there were no city properties

24 available for charitable feeding?

25     A.   Right.

 1         A.   In environmental services, we have what we call

 2    a FOG group, and they deal with fats, oils, and grease.

 3    So they're part of the consumer health services bureau

 4    umbrella.

 5         Q.   Okay.  I guess my question is are there other

 6    bureau chiefs at the Houston Health Department other

 7    than Christopher Sparks' role?

 8         A.   Yes.  There are bureau chiefs in different --

 9    other divisions within the health department.

10         Q.   Okay.  And then who does Christopher Sparks

11    report to in the health department?

12         A.   Our assistant director Roger Sealy.

13         Q.   Okay.  And how do you spell Roger Sealy's last

14    name?

15         A.   S-E-A-L-Y.

16         Q.   And what is Roger Sealy the assistant director

17    of?

18         A.   The assistant director -- he would be

19    responsible for all programs or division bureaus under

20    his chain of command, if you want to call it that.

21         Q.   Okay.  So turning back this e-mail that -- the

22    subject line -- do you see it says "Addition to CHS

23    Charitable Feeding Web Page."

24         A.   Yes.  Uh-huh.

25         Q.   Okay.  And in your e-mail you wrote "Good

```
 1   morning, David.  Please add the sentence below to the
 2   Charitable Feeding web page under the section:  The
 3   Program Consists of Four Basic Steps.  Lists of City of
 4   Houston Properties Approved for Charitable Food Service
 5   Events:  61 Riesner Street, Houston, TX 77002.
 6               "The mayor's office needs this information
 7   placed on the page today as soon as possible."
 8               Did I read that correctly?
 9        A.  Yes.
10        Q.  Okay.  So the -- the mayor -- did the mayor's
11   office decide to designate 61 Riesner Street, Houston,
12   TX 77002 as an approved charitable feeding location?
13        A.  I would say yes.  Well -- I would say yes.
14        Q.  Okay.  And why would you say yes?  I guess --
15   you had some hesitation.
16        A.  Well, I know that I couldn't do it.
17        Q.  Huh?
18        A.  I know I couldn't do it.
19        Q.  Okay.  So it was the --
20        A.  Right.
21        Q.  That decision rested in the mayor's office --
22        A.  In the mayor's office, yes.
23        Q.  In the mayor's office?
24        A.  Yes.
25        Q.  Do you know if that decision came from the
```

1    mayor himself or someone else in the mayor's office?

2        A.  Our -- Mr. Sparks and I got an e-mail.  I don't

3    remember what -- exactly who it was.  But it was

4    notifying us that, hey, 61 Riesner is going to be the

5    location where charitable feeding is going to be done.

6        Q.  So that decision was made outside of the health

7    department?

8        A.  Yes.

9        Q.  And then -- but then you at the health

10   department were notified that that decision was made and

11   61 Riesner was approved?

12       A.  Yes.

13       Q.  Yes.  Okay.  And did the -- did the -- did the

14   mayor -- scratch that.

15            Did the mayor's office explain why they

16   wanted to limit charitable feeding to 61 Riesner?

17       A.  We weren't provided that information.  We were

18   just instructed to the one -- when they fix your web

19   page, include that address.  I think we also received a

20   copy of the HPD notification signs.  And so it was kind

21   of harsh.  So I just kind of made our instructions a

22   little bit softer.  You know, hey, report to 61 Riesner.

23   It's available, you know.

24       Q.  Okay.  So the -- but the mayor's office

25   provided both the instruction that 61 Riesner was going

Renee Beckham                                        February 13, 2025
                                                     Page 115

 1   to -- or let me -- let me ask one question at a time.

 2              The mayor's office provided the instruction

 3   that 61 Riesner was going to be the only approved City

 4   of Houston property for charitable feeding?

 5        A.   That's 42 -- well, according to the information

 6   that I had gotten.

 7        Q.   Okay.  And then who sent you the notices that

 8   you are talking about?

 9        A.   I mean, the e-mail isn't here -- listed in

10   this.  I don't remember if it came from HPD or -- I

11   forgot what -- which department it came from.

12        Q.   Okay.

13        A.   Maybe a different department or --

14        Q.   Okay.  But those notices weren't drafted by the

15   health department?

16        A.   No.

17        Q.   Okay.  Now if we turn now to City of Houston

18   110288, and then do you see around the top of the page

19   there is an e-mail from Christopher Sparks?

20        A.   Right.

21        Q.   And it was sent on Thursday, February 9th,

22   2023?

23        A.   Yes.

24        Q.   Okay.  So this is two days after the e-mail we

25   were just reviewing, right?

Renee Beckham                                          February 13, 2025
                                                              Page 117

1      Q.  So under -- do you see in the bold --

2      A.  Yes.

3      Q.  -- this first -- okay.

4              And this list of three requirements, these

5  are the health department's special requirements for

6  approved charitable food service locations on City of

7  Houston property, right?

8      A.  This is the requirements listed on the

9  notification that we received based upon the police

10 signage.

11     Q.  Okay.  So these -- so some -- someone outside

12 of the health department developed these special

13 requirements?

14     A.  Yes.

15             MS. ANDERSON:  Objection; form.

16     Q.  (BY MR. HIROSHIGE)  And then the next set, it

17 says "Each charitable food service provider on City of

18 Houston property must have the following"?

19     A.  Yes.

20     Q.  And these are the special requirements for

21 approved charitable food service providers that the

22 health department adopted in 2003; is that right?

23     A.  Yes.

24     Q.  Okay.  And underneath -- in Christopher Sparks'

25 e-mail, he goes on.  "If possible, may I request this be

1    handled as expeditiously as possible as it is a request

2    from the mayor's office.  Thank you."

3                    So did the mayor's office come up with

4    these special requirements governing approved charitable

5    food services locations on City of Houston property?

6                    MS. ANDERSON:  Objection; form.

7                    MR. HIROSHIGE:  You can answer.

8        A.  I was not advised who -- whether it came from

9    the mayor's office or not.

10       Q.  (BY MR. HIROSHIGE)  Okay.  But the health

11   department did not come up with these special

12   requirements for approved charitable food service

13   locations on City of Houston property?

14                   MS. ANDERSON:  Objection; form.

15       A.  No.  We just followed what was -- the verbiage

16   that was already provided.

17       Q.  (BY MR. HIROSHIGE)  Okay.  And so the verbiage

18   was provided by some city officials or departments

19   outside of the Houston Health Department?

20       A.  Right.

21                   MS. ANDERSON:  Objection; form.

22       A.  I'm sorry.

23       Q.  (BY MR. HIROSHIGE)  And when the health

24   department adopted these special requirements in

25   February of 2023, did it have to seek approval by the

Renee Beckham                                          February 13, 2025
                                                       Page 119

 1  mayor's office before adopting these requirements?

 2       A.  Not understanding your question.

 3       Q.  Okay.  When -- in the -- so did -- did the --

 4  let me ask it this way.

 5                The health department ultimately adopted

 6  these special requirements in February of 2023, right?

 7       A.  I would say as -- as to add this to our web

 8  page and information about feeding the homeless at --

 9  specifically for 61 Riesner.

10       Q.  So the health department was just -- was asked

11  to add these special requirements?

12       A.  Right.  I don't remember the verbiage of what

13  was -- we were actually sent.  But like I said, when I

14  read it, it was -- felt a little harsh.  So I just took

15  it and just softened it up because, you know, you want

16  people to go out there and still do the feeding.  I

17  think the verbiage might be about arrest.  So I wanted

18  to like -- let's just give them the good part of it and

19  go to 61 Riesner.

20       Q.  Okay.  Okay.  And did the health department

21  alter any of these special requirements before adopting

22  them?

23       A.  I think we were asked to include especially the

24  bottom part because, the top part, this (indicating), we

25  had nothing to do with this.

 1       A.   Exhibit 31?

 2       Q.   Exhibit 31.

 3              MS. ANDERSON:  It's not going to be in your

 4  book.  It's going to be in your stack.  It was the first

 5  one we labeled today.  It looks like this.

 6              THE WITNESS:  Oh, okay.

 7              MS. ANDERSON:  So go back to the first one

 8  in the stack.

 9              THE WITNESS:  I got it.

10              MS. ANDERSON:  They're in order.

11              THE WITNESS:  Okay.

12       Q.  (BY MR. HIROSHIGE)  Are you able to --

13              MS. ANDERSON:  She's at 38 -- okay.  You

14  got 31 -- yeah.

15              MR. HIROSHIGE:  Okay.

16       Q.  (BY MR. HIROSHIGE)  And can you turn with me to

17  City of Houston 000014?

18       A.   Okay.

19       Q.   And do you see on this page "Special

20  Requirements" in bold?

21       A.   Yes.

22       Q.   And so these -- again, these regulations were

23  adopted by the health department in February of 2023?

24       A.   Right.

25       Q.   Right?  Sorry.  Is that right?

Renee Beckham                                    February 13, 2025
                                                        Page 123

 1        A.   That's right.

 2        Q.   And prior to these regulations, the health

 3   department did not have any special requirements for

 4   each approved charitable food service location on city

 5   property, right?

 6        A.   Right.

 7        Q.   Okay.  And are these special requirements still

 8   in effect as we sit here today?

 9        A.   Yes.

10        Q.   Okay.  Let me ask you this.  Do you know if

11   these special requirements are -- if you want to take a

12   look around, I -- are these special requirements still

13   posted on the health department's charitable feeding web

14   page today?

15        A.   Yes.

16        Q.   Okay.  And let's take a look first at the "Each

17   approved charitable food service location on City of

18   Houston property must have the following."

19             Do you see that?

20        A.   Uh-huh.

21        Q.   And the first requirement listed here is

22   "Adequate parking for the personnel conducting the food

23   service event.  The minimum number of parking spaces

24   shall be ten dedicated spaces during charitable food

25   service events."

Renee Beckham                                                    February 13, 2025
                                                                Page 124

 1              Did I read that correctly?

 2         A.  Yes.

 3         Q.  And what does it mean for a parking space to be

 4   a dedicated parking space under this requirement?

 5         A.  I wasn't the author.  I don't know.

 6         Q.  Okay.  Does -- do you know if the parking has

 7   to be free of charge in order to qualify under this

 8   requirement?

 9         A.  It -- no, I don't know.

10         Q.  Okay.  And do you know if the parking spots are

11   marked in any way to show that they're dedicated for

12   charitable food service events?

13         A.  Let me be specific.  Are you talking about

14   61 Riesner?

15         Q.  Let's go there.  Sure.  So at 61 Riesner, do

16   you know if the parking spots for charitable food

17   service events are marked in any way?

18         A.  They're -- the way that the lot is laid out,

19   there's -- it's like a triangle.  So there's parking

20   spaces there.  Then if you go across the street, now

21   you're in the municipal court paid parking lot.  So

22   that's where they don't go.

23         Q.  Okay.

24         A.  So the free parking -- they've assigned it

25   right in that triangle.

Renee Beckham                                          February 13, 2025
                                                       Page 126

 1        A.  I observed vehicles parked in that triangle,
 2   yes.
 3        Q.  Okay.  And those vehicles belong to charitable
 4   food service providers?
 5        A.  I'm going to assume they belong to charitable
 6   food service providers.
 7        Q.  Okay.  And I guess -- so looping back to my
 8   question, were those -- were the parking spots that you
 9   saw being used marked for charitable food service
10   providers in any way?
11        A.  No, there's no marking.
12        Q.  Okay.  But that parking lot belongs to the City
13   of Houston, right?
14        A.  Yes.
15        Q.  Okay.  So the City can dedicate its own parking
16   spaces in order to fill this parking requirement?
17        A.  If the author intended that, yes.
18        Q.  Okay.  Now, the next -- so the -- I guess
19   the -- or one more question on the parking.  So this --
20   again, this adequate parking, that is -- strike that.
21   Let me ask this.
22             So the City provides the adequate parking
23   spaces after a site is approved for charitable feedings;
24   is that right?
25        A.  That's what it appears, yes.

Renee Beckham                                    February 13, 2025
                                                 Page 127

 1      Q.  Okay.  And then the next thing listed is

 2  "Adequate trash containment to contain all trash,

 3  refuse, and litter on the site of the food service

 4  event."

 5            And so let's -- let's go back to 61 Riesner

 6  for this requirement.  So before 61 Riesner was approved

 7  as a charitable feeding site, was there a dumpster in

 8  that parking lot?

 9      A.  In that lot?

10      Q.  Yes.

11      A.  Not that I'm aware of.

12      Q.  Okay.

13      A.  And I was going to say there was construction

14  going on; so there could have been a dumpster there for

15  construction that might have been going on at

16  61 Riesner.

17      Q.  And do you know if the dumpster was added to

18  the 61 Riesner parking lot after it was approved for

19  charitable feeding?

20      A.  It was -- yes.  It was added, yes.

21      Q.  So the City provides the adequate trash

22  containment after a site is approved for charitable

23  feeding, right?

24      A.  Yes.

25      Q.  Okay.  And the last requirement here says "Two

Renee Beckham                                    February 13, 2025
                                                        Page 128

 1   portable restrooms with handwashing stations available

 2   during food service events and available 24 hours per

 3   day, seven days per week."

 4                Did I read that correctly?

 5       A.  Yes.

 6       Q.  And again, the at -- at the 61 Riesner site

 7   they're -- let me ask it this way.

 8                The City provided portable restrooms at

 9   61 Riesner site after it was approved for charitable

10   feeding; is that right?

11       A.  Yes.

12       Q.  And the City provided handwashing stations at

13   the 61 Riesner site after it was approved for charitable

14   feeding?

15       A.  Yes.

16       Q.  Okay.  And are -- are those -- are the portable

17   restrooms at 61 Riesner unlocked 24/7?

18       A.  I do know that they are always available when

19   there's an event going on.  When there's an event there,

20   they would be opened, unlocked.

21       Q.  But there are locks on both of the portable

22   restrooms at the 61 Riesner location, right?

23       A.  They have the ability to be locked.

24       Q.  Okay.  And so does -- which -- which feedings

25   does the City unlock the portable restrooms for at

Renee Beckham                                    February 13, 2025
                                                 Page 129

 1    61 Riesner?

 2         A.   I would say anyone that probably has either

 3    made an arrangement or the City has -- who is that --

 4    Bread of Life who did probably the majority of the

 5    feeding, they had access to the restrooms, dumpsters,

 6    shipping container.

 7         Q.   Okay.  So was there a lock on the shipping

 8    container as well at the 61 Riesner?

 9         A.   It appears that it could be locked because all

10    the tables and things like that and chairs were placed

11    in there.

12         Q.   Okay.  And then Bread of Life had the ability

13    to unlock the storage container and the portable

14    restrooms?

15         A.   Yes.

16         Q.   And then who -- do any City employees have the

17    ability to unlock the storage container and the portable

18    restrooms?

19         A.   Possibly the police officers that work there.

20         Q.   Okay.  So the police officers -- were there

21    certain police officers that were routinely at

22    61 Riesner feedings?

23         A.   All I know is there were police officers there.

24    When you say were there certain police officers, don't

25    know if they were the same ones all the time.

Renee Beckham                                    February 13, 2025
                                                 Page 130

```
 1        Q.  Okay.  And I guess, aside from the Houston
 2   Police Department officers, would any other city
 3   employees regularly attend feedings at 61 Riesner?
 4        A.  No, sir.
 5        Q.  Okay.  So that -- the 61 Riesner site was
 6   managed by the Houston Police Department while a feeding
 7   was happening; is that right?
 8        A.  I thought they managed both crowd control
 9   and -- actually there's two, the dumpster or the
10   restrooms.
11        Q.  Okay.  And do you know if meal tickets are
12   handed out to people who are coming to receive free food
13   at the 61 Riesner site?
14        A.  The time that I observed, they were not.  It
15   was not organized that way.
16        Q.  Okay.  And how many times have you personally
17   been to the 61 Riesner site during a feeding?
18        A.  Probably three times.
19        Q.  Okay.  And when -- when did you visit?
20        A.  Maybe not too long after operating.  It was at
21   night.  I just drove, you know, drove by -- drove
22   through there to kind of get an idea what the layout
23   looked like.  So when I'm teaching a class, I can
24   describe what's there and how things are set up.
25             Another time there was a complaint that
```

1  someone had filed about, you know, oh, it's disorganized

2  and they ran out of water and just different --

3  disorganization.  So I drove by, and it was a long line

4  of people.  I mean they were in line.  There was also

5  tables and chairs for people to sit and have their meal.

6             The feeding was down in a mobile unit, a

7  big truck, a big kitchen on wheels.  And then they have

8  additional tables out there.  And they have chips and

9  stuff like that on one table, other items and things

10  like that.

11     Q.  Okay.  And the tables and chairs, those are

12  placed back in the storage container when the feeding is

13  done?

14     A.  Yes.

15     Q.  Okay.  Now, as we discussed earlier, the City

16  still doesn't allow charitable feedings at city parks,

17  right?

18     A.  Right, they still don't.  That's correct.

19     Q.  And -- so even if a city park has more than ten

20  spaces, public restrooms, and adequate trash

21  containment, it'll still not be approved as a charitable

22  feeding site at this time?

23     A.  Right.  According to the ordinance, it would

24  not be approved.

25     Q.  Okay.  And that's because the --

```
 1          A.   I'm sorry.
 2          Q.   Yeah.  And that's because the City has
 3   suspended charitable feedings --
 4          A.   Right, it's suspended.
 5          Q.   Okay.  And so just like -- even if a property
 6   has the ability to meet these special requirements, that
 7   doesn't necessarily mean it will be approved for
 8   charitable feeding, right?
 9          A.   If they probably have these things, we more
10   than likely will approve them.  I'm sorry.  Private
11   property or -- a park, we -- it's been suspended.
12          Q.   Okay.
13          A.   But if a person has a parking lot and says,
14   hey, I want to feed the homeless and I'm going to have
15   these things out there for them, we would not -- we
16   would not disapprove of it.
17          Q.   Okay.  But if a city park met these three
18   requirements, feeding would still not be allowed there
19   because feeding is not allowed at city parks?
20          A.   Only if the mayor allowed it.
21          Q.   Okay.
22          A.   So he would have to be the one to say, hey,
23   we're going to duplicate 61 Riesner at XYZ Park.
24          Q.   Okay.  So it's ultimately up to the mayor
25   again, whether a feeding is going to be allowed at the
```

Renee Beckham                                    February 13, 2025
                                                      Page 133

 1  city park again?

 2       A.  Yes.

 3       Q.  But currently the mayor is still not allowing

 4  general feedings at city parks?

 5       A.  Right.

 6       Q.  Now, the next set of requirements -- you see

 7  where it says "Each approved charitable" -- let me make

 8  sure you're with me.  We're on City of Houston 000014?

 9       A.  Yes.

10       Q.  And in the middle of the page, it says "Each

11  charitable food service provider on City of Houston

12  property must have the following."

13            Did I read that correctly?

14       A.  Yes.

15       Q.  Okay.  And then the first -- and again, these

16  requirements are only about groups or individuals in the

17  voluntary recognized program; is that right?

18       A.  Yes.

19       Q.  Okay.  And so the first requirement says

20  "Adequate personnel to conduct the food service event

21  and restore the site at the conclusion of the" event.

22  Sorry.  Let me re-read that.  "Adequate personnel to

23  conduct the food service event and restore the site at

24  the conclusion of the food service event."

25            Did I read that correctly?

Renee Beckham                                              February 13, 2025
                                                          Page 134

 1        A.  Yes.

 2        Q.  And let's say -- let's say a group or

 3   individual wants to feed 100 people.  How many -- how

 4   many people are necessary to conduct that feeding?

 5        A.  Depends on how they are doing the feeding.  Are

 6   they giving out sandwiches and just handing them out in

 7   bags, or are we buffet style?

 8        Q.  Okay.  So if it's someone just handing out

 9   premade sandwiches, they could do it on their own,

10   right?

11        A.  They could probably do it in about 30 minutes

12   or an hour.

13        Q.  Okay.  But if there's a line of multiple

14   different food options, they would need more

15   personnel --

16        A.  Yes.

17        Q.  -- to conduct the feeding?

18        A.  Yes.

19        Q.  Okay.  And then the second requirement says

20   adequate trash receptacles, trash containment, and

21   removal measures to contain all trash refuse and litter

22   on the site of a food service event and to properly

23   dispose of all trash, refuse, litter, and remove unused

24   food from the site at the conclusion of the food service

25   event."

Renee Beckham                                         February 13, 2025
                                                             Page 142

```
 1        A.  Yes.
 2        Q.  So is it your understanding that John Moss is
 3   the chief of staff for council member Julian Ramirez?
 4        A.  Okay.  Yes.
 5        Q.  Do you know John Moss?
 6        A.  No, I do not.
 7        Q.  Now let's go back to the first page.  So the --
 8   John -- Pascale Mondesir told John Moss that no public
 9   property is available for charitable food service events
10   in May of 2024; is that right?
11        A.  Yes.
12        Q.  Okay.  But -- so was 61 Riesner not available
13   in May of 2024?
14        A.  It was available in May of 2024.
15        Q.  So Pascale Mondesir just got this wrong?
16        A.  Yes.
17        Q.  So there was one public property available, and
18   it was 61 Riesner?
19        A.  (Nonverbal response.)
20        Q.  Okay.
21             THE REPORTER:  Is that a "yes"?
22        Q.  (BY MR. HIROSHIGE)  Sorry.  Is that a "yes"?
23        A.  Yes.
24        Q.  Okay.  Now, like -- we can set that one aside.
25             So as we sit here today, does the parks
```

1    department have authority to grant or request to engage

2    in charitable feeding at Hermann Square Park in front of

3    city hall?

4         A.  Not aware if they have that authority.

5         Q.  Okay.  So who decides whether charitable

6    feeding will be allowed there?

7         A.  I would imagine the mayor's office.

8         Q.  Okay.  And as we sit here today, does the parks

9    department have the authority to grant requests to

10   engage in charitable feeding at Peggy's Point Plaza?

11        A.  No.  It was rescinded by the mayor.  So I'm

12   going to...

13        Q.  Okay.  So the mayor will decide if charitable

14   feeding can resume at Peggy's Point Plaza?

15        A.  Right.

16        Q.  And as we sit here today, if someone requested

17   to engage in charitable feeding on the sidewalks outside

18   the Central Library, would the health department have

19   the authority to grant that request?

20        A.  No.

21        Q.  Okay.  And that's because the mayor has decided

22   that the Central Library is not available for charitable

23   feeding?

24        A.  Right.

25        Q.  Okay.  Now --

```
 1              MR. HIROSHIGE:  Let's go ahead and take a

 2    break.

 3              (Recess from 1:46 p.m. to 1:53 p.m.)

 4              THE REPORTER:  Back on the record at 1:53.

 5        Q.  (BY MR. HIROSHIGE)  Ms. Beckham, as we

 6    discussed earlier today, the ordinance authorizes the

 7    health department to inspect the food handling, food

 8    transportation, and food service events of charitable

 9    food service providers, right?

10        A.  Yes.

11        Q.  So has the health department ever inspected the

12    food preparations of a registered charitable food

13    service provider?

14        A.  A couple of times, yes.

15        Q.  Okay.  And when was that?

16        A.  Oh, God.  Well, I know it was before COVID.  It

17    might have been around 2018 -- something like that.

18        Q.  Okay.  So the last time the health department

19    inspected the food preparation of a charitable food

20    service provider was around 2018?

21        A.  Probably around about that time.

22        Q.  Okay.  And do you remember who the health

23    department investigated at that time?

24        A.  I did a couple of them myself.

25        Q.  Okay.  And who were you investigating?
```

1        A.   Right.

2        Q.   So it's not covered by the ordinance?

3        A.   It's covered by Chapter 20, yes, because it's a

4    permitted kitchen.

5        Q.   Okay.

6        A.   Right.

7        Q.   But it's not covered by the charitable feeding

8    ordinance because they're doing the feeding on their own

9    property?

10       A.   Right.

11       Q.   Okay.  Now -- okay.  So now we have three.

12   There's the 2018 complaint across the street from

13   Loaves & Fishes, the 2020 complaint outside the Central

14   Library --

15       A.   Right.

16       Q.   -- and then the ongoing complaint about another

17   group serving feed in Loaves & Fishes' patio.

18       A.   Yes.

19       Q.   Aside from those complaints, are there any

20   other current complaints about the food safety or

21   sanitation for charitable feeding?

22       A.   There could be.  And the reason I'm saying this

23   is because they're going to be listed, it depends on how

24   the person describes the complaint to us.  So anyone

25   that doesn't have a permit, we're going to call it an

Renee Beckham                                    February 13, 2025
                                                 Page 156

 1   illegal food establishment.  So I would have to go

 2   through the database and look by the address whether

 3   they're referring to someone feeding the homeless or

 4   not.  See what I'm saying?

 5        Q.  Okay.  So -- but aside from the three

 6   complaints -- the 2018, the 2020 -- the 2018 across the

 7   street from Loaves & Fishes, 2020 outside the Central

 8   Library, and the current issue at Loaves & Fishes -- are

 9   you aware or have you seen any other food safety

10   complaints arising out of charitable feeding?

11        A.  No.  Just those that, like I say, that I'm

12   aware of.

13        Q.  Okay.  Now, do employees from the health

14   department regularly attend feedings at 61 Riesner?

15        A.  No, they don't.  It's not a regular, routine

16   site that they would visit.

17        Q.  Okay.  And earlier you mentioned that you

18   maintain a calendar of the groups and individuals who

19   are feeding at 61 Riesner; is that right?

20        A.  Yes.

21        Q.  And do people have to schedule a charitable

22   feeding on the calendar to feed there, or can they just

23   show up and provide food?

24        A.  They could just show up.

25        Q.  Okay.

Renee Beckham                                    February 13, 2025
                                                 Page 157

1        A.  Yeah, I would say, yes, they can just show up.

2        Q.  Okay.  So it's an optional step to get in

3   contact with the health department to schedule it and

4   put it on the calendar?

5        A.  Right.

6        Q.  Okay.  I'm going to hand you what I've marked

7   as Exhibit 46.

8               (Exhibit No. 46 was marked.)

9        Q.  (BY MR. HIROSHIGE)  Take a moment to review

10  these pages.

11       A.  (Witness complies.)

12              Okay.

13       Q.  And so this is the calendar for charitable food

14  service events on the health department's web page,

15  right?

16       A.  Yes.

17       Q.  And it lists some of the individuals and groups

18  providing food at 61 Riesner?

19       A.  Yes.

20       Q.  Okay.  Now, on this first page -- and so do you

21  see on the top where it says January 2025?

22       A.  Yes.

23       Q.  Okay.  So it appears that someone named

24  Elizabeth Tannery scheduled a charitable feeding at

25  Riesner on January 1st, 2025?

Renee Beckham                                    February 13, 2025
                                                     Page 169

 1  understand MADD to be referring to Mothers Against Drunk

 2  Driving?

 3       A.  Uh-huh.  Yes.

 4       Q.  Okay.  And again, the investigator of this

 5  complaint was Robert Stine?

 6       A.  Yes.

 7       Q.  And again, he explained to the complainant

 8  or -- again he sent an e-mail to the complainant that

 9  the activity does not require a permit since it is not a

10  public event?

11       A.  Yes.

12       Q.  Okay.  So is this complaint also about the MADD

13  group providing food to people at 61 Riesner who were

14  working the night shift?

15       A.  Yes.

16       Q.  And again, those city employees are not people

17  in need -- in the -- as regulated by the Charitable

18  Feeding Ordinance?

19       A.  Correct.

20       Q.  Okay.  So the Charitable Feeding Ordinance does

21  not regulate this -- the activity referred to in this

22  complaint?

23       A.  No, sir.

24       Q.  Okay.  And so let me -- let me -- and in

25  these -- these complaints -- did -- did Robert Stine

Renee Beckham                                    February 13, 2025
                                                 Page 170

 1   investigate the food preparation practices of Mothers

 2   Against Drunk Driving?

 3        A.  It looks as though he just -- really didn't do

 4   any kind of thing as far as -- like there's no

 5   indication of what foods there were or anything like

 6   that.

 7        Q.  Okay.  So to your knowledge -- let me just

 8   reask these questions just so we're clear.  Has the

 9   health department ever investigated the source of food

10   for a group or individual that provided food at the

11   61 Riesner location?

12        A.  Just the ones that -- the organization --

13        Q.  Just Bread of Life?

14        A.  Right.  Just Bread of Life.

15        Q.  Sorry.  Yeah, forgot to -- and so aside from

16   Bread of Life, the health department has never

17   investigated the source of food for a group or

18   individual providing food at 61 Riesner?

19        A.  No, sir.

20        Q.  Okay.  And has the health department -- scratch

21   that.

22               Aside from Bread of Life, has the health

23   department ever investigated the food handling practices

24   for a group or individual that provided food at the

25   61 Riesner?

 1        A.   Just Bread of Life, yeah.

 2        Q.   Okay.  And aside from Bread of Life, has the

 3   health department ever investigated the food storage

 4   practices for a group or individual providing food at

 5   the 61 Riesner location?

 6        A.   No, sir.

 7        Q.   Aside from Bread of Life, has the health

 8   department investigated the temperature of food provided

 9   by a group or individual at 61 Riesner?

10        A.   No, sir.

11        Q.   Okay.  Now, in -- we were just looking at

12   Exhibit 45 which was the complaint about the feeding

13   outside the Central Library in 2020.  And so my question

14   is, aside from this complaint in 2020, has the health

15   department ever received any food safety or sanitation

16   complaints about charitable food services provided

17   outside the Central Library or Julia Ideson Building?

18        A.   Just the organizations near -- across from

19   The Beacon.

20        Q.   Okay.  But -- so I'm focusing on the Central

21   Library and Julia Ideson.

22        A.   I'm sorry.

23        Q.   Yeah.  So my question is, aside from this 2020

24   complaint, has the health department ever received a

25   food safety or sanitation-related complaint about

```
 1   charitable food services provided outside the Central

 2   Library or Julia Ideson Building?

 3       A.  No, sir.

 4       Q.  Okay.  And aside from this -- this 2020

 5   complaint, has the health department ever received a

 6   sanitation-related complaint about foods -- about a

 7   charitable food service on city property?

 8       A.  No, sir, not that I'm aware of.

 9       Q.  Okay.  Now, I want to focus on Food Not Bombs

10   feedings outside the Central Library.  Are you aware of

11   the group Food Not Bombs?

12       A.  I've heard of Food Not Bombs.

13       Q.  Okay.  Have you ever been to one of their

14   feedings outside the library?

15       A.  No, sir.

16       Q.  Okay.  Do you know how long they've conducted

17   feeding outside the Central Library?

18       A.  No, sir.

19       Q.  Okay.  And when -- when did the -- when did the

20   City first learn of the Food Not Bombs feedings outside

21   the Central Library?

22       A.  I can't answer that.

23       Q.  Okay.

24       A.  I don't know when they were starting to feed.

25       Q.  Okay.  And do you know if there were other
```

 1  groups who were conducting charitable food services

 2  outside the Central Library prior to 2023?

 3       A.  Only when I was accompanying one of the police

 4  officers one night.  We was -- kind of like drove around

 5  different parts of the city, and there was nothing going

 6  around the library because it was like 10:30,

 7  11:00 o'clock at night.

 8       Q.  Okay.  Now, aside from this 2020 complaint, has

 9  the City received any other complaints about Food Not

10  Bombs' feedings outside the Central Library?

11       A.  Not reported to the health department.

12       Q.  Okay.  Have any other city -- but to your

13  knowledge, has the City received complaints about Food

14  Not Bombs' feedings outside the Central Library?

15       A.  Not to the health department.

16       Q.  Okay.  Now, the Central Library is located in a

17  busy place in downtown Houston, right?

18       A.  Yes.

19       Q.  And there's a lot of foot traffic in that area

20  during the day?

21       A.  Yes, sir.

22       Q.  And a lot of pedestrian activity can result in

23  trash and litter; is that right?

24       A.  Yes.

25       Q.  And for city-owned public spaces -- so

Renee Beckham                                    February 13, 2025
                                                 Page 182

```
 1                    REPORTER'S CERTIFICATION
                      ORAL DEPOSITION OF
 2                         RENEE BECKHAM
                      TAKEN FEBRUARY 13, 2025
 3

 4

 5            I, DONNA QUALLS, Shorthand Reporter and Notary

 6    Public in and for the State of Texas, Notary ID

 7    No. 12161359, hereby certify to the following:

 8            That the witness, RENEE BECKHAM, was duly

 9    sworn by the officer and that the transcript of the oral

10    deposition is a true record of the testimony given by

11    the witness;

12            That the original deposition was delivered to

13    RANDALL HIROSHIGE;

14            That a copy of this certificate was served on

15    all parties and/or the witness shown herein on

16    _____.

17            I further certify that pursuant to FRCP No.

18    30(f)(i) that the signature of the deponent was

19    requested by the deponent or a party before the

20    completion of the deposition and that the signature is

21    to be returned within 30 days from date of receipt of

22    the transcript.  If returned, the attached Changes and

23    Signature Page contains any changes and the reasons

24    therefor.

25            I further certify that I am neither counsel
```

Renee Beckham                                    February 13, 2025
                                                         Page 183

1    for, related to, nor employed by any of the parties in

2    the action in which this proceeding was taken, and

3    further that I am not financially or otherwise

4    interested in the outcome of the action.

5            Certified to by me this 28th day of February,

6     2025.

7

8

9    _____

     DONNA QUALLS
10   Notary Public in and for
     The State of Texas, Notary ID 12161359
11   My Commission expires 11/06/2026

12   Magna Legal Services
     Firm Registration No. 633
13   16414 San Pedro, Suite 900
     San Antonio, Texas 78232
14   (210) 697-3400

15

16

17

18

19

20

21

22

23

24

25