# EXHIBIT E

```
           IN THE UNITED STATES DISTRICT COURT
           FOR THE SOUTHERN DISTRICT OF TEXAS
                    HOUSTON DIVISION

FOOD NOT BOMBS HOUSTON,     ]
BRANDON WALSH,              ]
     Plaintiffs,            ]
                            ]
v.                          ]  C.A. No. 4:24-CV-338
                            ]
THE CITY OF HOUSTON, TEXAS, ]
     Defendant.             ]
```
------------------------------------------------------------

ORAL AND VIDEOTAPED DEPOSITION OF

BRANDON WALSH

FEBRUARY 10, 2025

------------------------------------------------------------

ORAL DEPOSITION OF BRANDON WALSH, produced as a witness at the instance of the Defendant, and duly sworn, was taken in the above-styled and numbered cause on the 10th of February, 2025, from 9:12 a.m. to 11:33 a.m., before Shawn Kelley, CSR No. 3448 in and for the State of Texas, by machine shorthand and computer-aided transcription, at 900 Bagby, 4th Floor, Houston, Texas, pursuant to the Federal Rules of Civil Procedure and the provisions stated on the record or attached hereto.

Nell McCallum & Associates Inc. Houston (713) 861-0203

```
 1                       APPEARANCES
 2      For the Plaintiffs Food Not Bombs Houston and
 3      Brandon Walsh:
 4             Randall Hiroshige
 5             Travis Fife
 6             Attorney at Law
 7             Texas Civil Rights Project
 8             1405 Montropolis
 9             Austin, Texas  78741
10       For the Plaintiff Phillip Picone (by Zoom):
11             Randall Kallinen
12             Attorney at Law
13             Kallinen Law PLLC
14             511 Broadway Street
15             Houston, Texas  77012
16      For the Defendant:
17             Kenneth Soh
18             Senior Assistant City Attorney
19             Natoya Inglis
20             Assistant City Attorney
21             City of Houston
22             P.O. Box 368
23             Houston, Texas  77001-0368
24      Also Present:
25             Phil Gonzales, Videographer (713) 861-4700
```

**NELL McCALLUM & ASSOCIATES, INC.**

```
 1            Anamaria Kheveli
 2            Phillip Picone (by Zoom)
 3                 ------------
 4                     INDEX
 5
 6   EXAMINATION BY MR. SOH                              4
 7
 8   [Exhibit 10 marked, Declaration of Brandon        26
 9   Walsh]
10   [Exhibit 11 marked, Food Not Bombs FAQs]          38
11   [Exhibit 12 marked, photograph]                   63
12   [Exhibit 13 marked, four photographs]             66
13   [Exhibit 14 marked, Order]                        84
14
15
16
17
18
19
20
21
22
23
24
25
```

**Page 37**

1  A. Yes, sir, sorry, I'm very tired.
2  Q. Okay. If you want to take a break at any time,
3 just let me know. We can take a break?
4  A. I might need a five-minute, if that's okay. I
5 work nights.
6  Q. Sure. Take a break now?
7  A. Is that okay?
8     MR. HIROSHIGE: Sure.
9     MR. SOH: Yeah, sure.
10    THE WITNESS: Yeah?
11    VIDEOGRAPHER: Okay. The time is 9:44 a.m.
12 We're off the record.
13    [Recess]
14    VIDEOGRAPHER: The time is 10:04 a.m. We're now
15 back on the record.
16    MR. SOH:
17 Q. Mr. Walsh, as a -- as someone who is a member of
18 Food Not Bombs and instrumental in their social media
19 work, are you familiar with the Food Not Bombs Houston
20 website?
21 A. Uh-huh. Yes, sir.
22 Q. Did you -- do you upload content to that website?
23 A. No, sir.
24 Q. Okay. But you have some familiarity with it?
25 A. I know that we have a Houston-based website.

**Page 38**

1  Q. Have you ever seen that website?
2  A. One time at best.
3     [Exhibit 11 marked, Food Not Bombs FAQs]
4     MR. SOH:
5  Q. Okay. Let me hand you what's been marked -- I'm
6 going to mark as Exhibit 11. This is something off the
7 Food Not Bombs -- okay. What I'll represent to you is
8 that the first page is the Food Not Bombs Houston
9 website, and there is a link about FAQs, frequently
10 asked questions, and then we printed out the frequently
11 asked questions, which I believe are the Food Not Bombs
12 national link, a link to the frequently asked questions
13 of the Food Not Bombs national website. All right? Do
14 you see that?
15 A. This is the -- the big Food Not Bombs website,
16 like not just Houston.
17 Q. I believe page 1 is Houston. If you look at the
18 top --
19 A. Yeah.
20 Q. -- it's Houston Food Not Bombs, and there's --
21 there's a link to frequently asked questions, and we
22 printed out the frequently asked questions page, and I
23 believe that is Food Not Bombs national, the frequently
24 asked questions. I'm just representing that to you. If
25 you disagree with me, please let me know.

**Page 39**

1  A. I just wanted to understand.
2  Q. Yeah.
3  A. Thank you for clarifying.
4  Q. My questions are going to be on frequently asked
5 question 1, --
6  A. Uh-huh.
7  Q. -- when you get a second.
8  A. I'm ready when you are.
9  Q. Okay. It says: Does Food Not Bombs get its food
10 from dumpsters? To be clear, it says: Food Not Bombs
11 does not get food out of dumpsters.
12    But if you go down further, about four lines,
13 okay, it says in some cities the groceries and bakeries
14 are not willing to help, and we may seek some of our
15 food from dumpsters, but this is not generally the case.
16 Do you see that?
17 A. Yes, sir.
18 Q. Okay. No. 1, has Food Not Bombs Houston ever
19 gotten any food out of dumpsters?
20 A. No, sir, the groceries stores work with us.
21 It's --
22 Q. Okay.
23 A. -- very wonderful.
24 Q. Would you agree with me that getting food out of
25 dumpsters is not a good idea?

**Page 40**

1  A. I personally would not eat food out of a
2 dumpster, sir.
3  Q. And it would be a -- it would -- it would
4 probably be not a good idea to serve food out of
5 dumpsters to an at-risk, homeless population, correct?
6     MR. HIROSHIGE: Objection, form.
7  A. Again, I've never prepared food out of a
8 dumpster. I imagine that it would probably not be the
9 best choice.
10    MR. SOH:
11 Q. It would probably not be a good idea to serve
12 that to your constituents who feed at -- at Food Not
13 Bombs Houston events, correct?
14 A. Thankfully the grocery stores work with us.
15 Q. But you agree with me that that's --
16 A. Yes, sir.
17 Q. -- it's not a good idea?
18 A. Yeah.
19 Q. Okay. Have you ever heard of any Food Not Bombs
20 city serving food that they got out of dumpsters?
21 A. I only work with Food Not Bombs Houston. I'm not
22 aware of any.
23 Q. Okay. Has anyone ever told you had that they got
24 bread or other products out of a dumpster at a Food Not
25 Bombs Houston event?

```
 1    A.  No, sir.
 2    Q.  Okay.  Let's go back to your declaration, sir.
 3  We were at paragraph 7, right?  And I read you some
 4  sentences that were in that declaration before we took a
 5  break.  Do you remember that?
 6    A.  Yes, sir.
 7    Q.  What is -- what is the basis of your protest
 8  against the City's treatment of unhoused people?
 9    A.  That food is a human right, sir.
10    Q.  Okay.  But have -- have -- has the City somehow
11  improperly treated unhoused people?
12    A.  Can you rephrase the question?
13    Q.  I'm just using your -- I'm just using -- we're
14  going to the first sentence here.
15    A.  Uh-huh.
16    Q.  Food Not Bombs Houston events and my
17  participation in them are a protest against the City's
18  treatment of unhoused people.
19        Are you with me?
20    A.  Yes, sir.
21    Q.  What did you mean by the City's treatment of
22  unhoused people in that sentence?
23    A.  I guess it would be the ordinance at that point.
24    Q.  Okay.  So -- so did the -- when you wrote that,
25  then, your participation is, in essence, a protest
                                                    Page 41
```

```
 1  against the charitable feeding ordinance that's at issue
 2  in this lawsuit, correct?
 3    A.  That would be one of the reasons, yeah.
 4    Q.  What are the other reasons?
 5    A.  I mean, just in general there is -- sorry, can I
 6  get the question one more time?  I want to make sure I'm
 7  on the same page.
 8    Q.  Sure.  You said that your participation in Food
 9  Not Bombs Houston events -- okay?  Is a protest against
10  the City's treatment of unhoused people.  And I would
11  like to get an understanding of what City -- what
12  specific City treatment of unhoused people that you are
13  protesting against.
14    A.  Oh, okay.  Cool.  In this example, then, yeah, I
15  would be agreeing that we would be speaking on the --
16  the current suit of the charitable food service issue.
17    Q.  Okay.  The charitable feeding ordinance at issue
18  in this lawsuit?
19    A.  Yes, sir.
20    Q.  Are there any other City of Houston -- or any
21  other City treatment of unhoused people that you are
22  protesting against?
23        MR. HIROSHIGE:  Objection, form, ambiguous.
24    A.  It is a bit ambiguous.  I mean, there are plenty
25  of things that I imagine that I would protest against if
                                                    Page 42
```

```
 1  I were to see it.  In this example, I know for sure it's
 2  this ordinance.
 3        MR. SOH:
 4    Q.  Anything else that come to mind besides the
 5  ordinance?
 6    A.  Like in general with the City or --
 7    Q.  These are your words, sir.  I'm just trying to
 8  get clarification of them.  Okay?  So what are you
 9  protesting -- what are you protesting about specifically
10  the City's treatment of unhoused people?
11        MR. HIROSHIGE:  Objection, form, vague.
12    A.  I mean we're essentially just protesting that we
13  feel that food is a human right and that we have the
14  right as citizens to feed fellow Houstonians if they're
15  hungry.
16        MR. SOH:
17    Q.  Okay.  Anything else?
18    A.  Right now that is the current bit.
19    Q.  Okay.  Then the -- in another two sentences down
20  you say:  The City perpetuates the very violence that
21  puts unhoused people in their disadvantaged situation.
22  Okay?
23    A.  This is on the end of 7?
24    Q.  It's further down on 7.
25    A.  On this third page or --
                                                    Page 43
```

```
 1    Q.  Yeah, bottom of page 2.
 2    A.  Okay.
 3    Q.  The last full sentence.  Meanwhile, the City
 4  perpetuates the very violence that puts unhoused people
 5  in their disadvantaged situation.
 6    A.  Uh-huh.
 7    Q.  Do you see that?
 8    A.  Yes, sir.
 9    Q.  What do you mean by very violence?
10    A.  The violence of homelessness.  Is there a better
11  way that I could --
12    Q.  No, I didn't understand what you meant by that.
13  So that's what I'm seeking clarification from you.
14    A.  Yeah, I mean the violence of somebody's on the
15  street, and we don't have any programs to get them off
16  the street.  Being on the street in harm's conditions is
17  very violent, sir.
18    Q.  Okay.  But you're not talking about a beating or
19  anything along those lines that you have personally
20  witnessed, correct?
21    A.  No, sir.
22    Q.  Okay.  So the -- the act of individuals being
23  homeless in harsh conditions, that's what you're
24  referring to as violence?
25    A.  The act of inaction is the violence.
                                                    Page 44
```

Page 49

```
 1        MR. HIROSHIGE:  -- you're asking my client about
 2   members whose identities have not been publicly
 3   disclosed, then --
 4        THE WITNESS:  Yeah.
 5        MR. HIROSHIGE:  -- I would instruct my client not
 6   to answer.  But to the extent you're asking about
 7   members who have been publicly disclosed, my client can
 8   answer.
 9        A.   One of the representatives that I've actually
10   seen firsthand is Rebecca.  She's gone and helped
11   mothers who have been in domestic violence situations.
12   I think last year there was one that was in -- like it
13   was in the cold area, and she had a lot of kids, and the
14   mother tried, you know, following what you're talking
15   about, getting no success, but Rebecca was able to
16   create a connection, from my understanding.
17        Q.   Sure.  Is there any formal programs that Food Not
18   Bombs Houston has to have -- that help homeless people
19   find housing?
20        A.   I'm not currently aware.
21        Q.   Okay.
22        A.   I imagine there's a possibility, but as far as my
23   volunteerness with Food Not Bombs, it does not include
24   that topic.
25        Q.   Okay.  So -- and you mentioned Rebecca and having
```

Page 50

```
 1   sort of an individualized assistance; is that correct?
 2        MR. HIROSHIGE:  Objection, mischaracterizes
 3   testimony.
 4        MR. SOH:
 5        Q.   Any other examples besides the Rebecca one that
 6   you gave earlier?
 7        A.   No, sir.
 8        Q.   And you're not aware presently of any formal Food
 9   Not Bombs Houston programs to provide housing assistance
10   to homeless people, correct?
11        A.   I am at least not involved with them, if there
12   are any.
13        Q.   Okay.  But you don't know?
14        A.   Yes, sir.
15        Q.   Okay.  Are there any formal programs at Food Not
16   Bombs Houston to assist people to get Medicare or
17   Medicaid or any other assistance through the Federal
18   government?
19        A.   Again, sir, I only know what I know.
20        Q.   Right.
21        A.   And it's not that topic currently, sir.
22        Q.   All right.  But you don't -- you're not aware of
23   any?
24        A.   Yes, sir.
25        Q.   Okay.
```

Page 51

```
 1        A.   I am not aware of any.
 2        Q.   All right.  Are you aware of any people -- does
 3   Food Not Bombs Houston have any services to provide
 4   mental health assistance to the -- to the homeless
 5   population?
 6        A.   I think we're getting confused on what Food Not
 7   Bombs does.
 8        Q.   Okay.
 9        A.   Food Not Bombs serves food to people.
10        Q.   I understand.  I want -- but I want to know -- I
11   don't want to -- I'm not fussing with you.  I'm just
12   trying to -- you're saying that the City doesn't do
13   enough in your declaration, and I just want to know
14   if -- you can have that opinion.  I'm not going to hold
15   it to you.  I also -- but if you're going to have that,
16   I want to know what Food Not Bombs does or doesn't do.
17        A.   Food Not Bombs does the best to what they are
18   capable of, which is --
19        Q.   Okay.
20        A.   -- feeding people.
21        Q.   Right.  But I just want to make it clear that
22   they don't have resources -- other resources.  Do you
23   see where I'm going with this?
24        A.   Yes, sir.
25        Q.   Okay.  Does Food Not Bombs have any specific
```

Page 52

```
 1   programs designed to assist homeless people with mental
 2   health issues or mental health disabilities?
 3        A.   I can't speak for the group on that.  I'm not
 4   sure.  We might.  I don't know.
 5        Q.   You're not aware of any?
 6        A.   No, sir, I'm not aware of any.
 7        Q.   Okay.  Fair enough.  Are you aware of any other
 8   programs, formal programs, that Food Not Bombs Houston
 9   has that would assist homeless people other than
10   feeding?
11        MR. HIROSHIGE:  Objection, form, vague.
12        A.   Again, I'm not aware, sir.
13        MR. SOH:
14        Q.   Okay.  Fair enough.  In the last sentence you
15   write:  By distributing food and raising awareness of
16   the violent treatment of unhoused people, Food Not Bombs
17   Houston protests the conditions that make unhoused
18   people live in such destitute conditions without
19   sufficient government support.
20        Do you see that?
21        A.   Yes, sir.
22        Q.   Okay.  What do you mean by sufficient government
23   support?
24        A.   I mean if someone has a health issue, it's very
25   rare that they're actually seen.  You know, I feel that
```

sufficient support would be in the terms of, let's say, somebody got injured, they would then get help. They wouldn't have to wait and suffer.

Q. Has Food Not -- are you aware of Food Not Bombs Houston doing anything to bridge this gap of a lack of government support that you perceive?

MR. HIROSHIGE: Objection, form, vague.

A. Not currently aware, sir.

MR. SOH:

Q. All right. Paragraph 9, you said: Because of my commitment to Food Not Bombs Houston's message, I intend to engage in similar activities in the future.

You see that?

A. Yes, sir.

Q. My question to you is, is that if the Court were to uphold the charitable feeding ordinance that's at issue in this lawsuit, will you still feed at the library?

A. Me personally?

Q. Yes.

A. In my future?

Q. Yes.

A. Only the future can tell, I suppose. If there's a reason for why I might feed somewhere else in the future, then there's that, but you're -- you're talking

Page 53

about the future.

Q. Right. I mean, my question to you is that if the charitable feeding ordinance is upheld, do you intend on engaging in, let's say, civil disobedience and continuing to feed at the library?

A. I'm not certain, sir.

Q. You don't know one way or the other?

A. No, sir.

Q. Okay. I'm going to show you what's been previously marked as Exhibit 6. I'm sorry, I don't have -- I don't have a specific copy of that. It's the sign.

A. Oh, did they change the sign?

Q. I don't know. There's only one iteration of it, as far as I know.

A. Is this at 61 Riesner, or is this at the library?

Q. Library. It's the same sign. So let me ask you this. Exhibit 6, have you seen that before, sir?

A. They had a different one, I think. It was blue.

Q. Okay.

A. But, I mean, this is the -- the food ordinance one, right?

Q. Let me ask you that. Do you know what that is? Do you know what Exhibit 6 is?

A. It's -- it appears to be a health department sign

Page 54

stating to comply with the regulation and -- for food service, right?

Q. Did you see that before -- did you see that -- have you ever seen that sign before?

A. I don't think I've seen this specific sign. I think they had a different sign at one point.

Q. Have you had a sign that said the same --

A. It is.

Q. Do you recall seeing a sign that --

A. Similar --

Q. -- had a similar message?

A. Yeah, similar message.

Q. Okay. And where was that sign that you saw?

A. I think that it's on one of the gates of the library near --

Q. All right. And what is that sign giving you notice of, sir?

MR. HIROSHIGE: Objection, calls for a legal conclusion.

A. I mean, from my understanding the sign is -- is just stating what the ordinance is.

MR. SOH:

Q. Right. I mean, you see the top, it says notice, right?

A. Uh-huh.

Page 55

Q. Is that correct?

A. Uh-huh.

Q. Is that a yes?

A. Yes, sir.

Q. Okay. All right. And it gives you the identity of the ordinance, correct?

A. Yes, sir.

Q. All right. And that -- and it says if you do not comply with the rules and regulations beyond 7 p.m. on Friday, February 24th, 2023, you run the risk of violating the law.

Do you see that?

A. I do see it, sir, yes.

Q. And so you saw this sign or something similar to that when you were at the library, correct?

A. Which time?

Q. Any time before February 24th, 2023?

A. I haven't seen that specific sign before that time. Like I said, I think it was a different sign.

Q. Okay. You saw -- fair to say you saw a sign giving you notice about the charitable feeding ordinance?

MR. HIROSHIGE: Objection, calls for a legal conclusion.

A. Yes, sir. Is this the same one that Annise

Page 56

Case 4:24-cv-00338   Document 59   Filed on 04/30/25 in TXSD   Page 9 of 14

15 (57 - 60)

## Page 57

1  Parker put in?
2      MR. SOH:
3  Q.  No.
4  A.  Okay.  The ordinance, I mean.
5  Q.  Let's -- I -- let's -- let me just go refocus you
6  on this question.
7  A.  Yeah, sorry.
8  Q.  Okay.
9  A.  I needed to be on the same --
10 Q.  No, no.  Okay.
11 A.  -- page with you.
12 Q.  Sure.  No, do you remember seeing this sign or a
13 sign similar to that in February of 2023?
14 A.  I mean, they've had signs up, I imagine.  I
15 haven't seen this specific sign, --
16 Q.  Okay.
17 A.  -- but I imagine.
18 Q.  Do you recall ever seeing a sign warning you that
19 you may be in violation of law if you don't comply with
20 the charitable feeding ordinance?
21 A.  I believe so, sir, yes.
22 Q.  Okay.  Fair enough.  All right.  Let's go back to
23 your declaration.  Okay?  Paragraph 11:  I fear that I
24 will be criminalized under the anti-food sharing
25 ordinance because I participate in Food Not Bombs

## Page 58

1  Houston events where we serve food to more than five --
2  where we serve food to more than five unhoused people.
3      Do you see that, paragraph 11?
4  A.  Yes, sir, I do.
5  Q.  Have you ever received a citation under the
6  anti-food sharing ordinance?
7  A.  No, sir, I have not.
8  Q.  Okay.  Have you ever been arrested?
9  A.  No, sir, I --
10 Q.  Okay.
11 A.  -- have not.
12 Q.  All right.  Have you witnessed other members of
13 Food Not Bombs Houston being cited?
14 A.  For the ordinance?
15 Q.  Yes.
16 A.  Yes, sir, I have.
17 Q.  Okay.  How many?
18 A.  Different or in general?
19 Q.  How many different people?
20 A.  I'm not sure on different people.
21 Q.  How many times have you seen someone receive a
22 citation?
23 A.  Quite a few.  At least 20 to 30.
24 Q.  Okay.  But you never received one?
25 A.  No, sir, I have --

## Page 59

1  Q.  Okay.
2  A.  -- never received one.
3  Q.  Paragraph 12, the second sentence:  As explained,
4  the core message I communicate as a Food Not Bombs
5  Houston member is that the City is not doing enough to
6  care for unhoused people and that our communities can do
7  more to meet their needs through direct mutual aid.
8      Do you see that?
9  A.  Yes, sir, I do.
10 Q.  What do you mean by direct mutual aid?
11 A.  I guess an example would be when we were talking
12 about the Medicare stuff or Medicaid.  I can't remember
13 which one you said was for --
14 Q.  Sure.
15 A.  -- everyone, but you said it met a certain level
16 of, you know, steps.  Direct mutual aid wouldn't need a
17 certain metal of steps.  If someone was in pain, hunger
18 or trouble, we would just help them.
19 Q.  And so who would provide the mutual aid?  That's
20 what I'm confused about.
21 A.  The mutual aid groups.
22 Q.  Such as?
23 A.  Food Not Bombs is a mutual aid group.
24 Q.  Okay.  Okay.  So when you write this, you're
25 saying that the City is not doing enough for unhoused

## Page 60

1  peoples -- for our unhoused people, right?  We've gone
2  over that previously, correct?
3  A.  Uh-huh.
4  Q.  Correct?  Yes?
5  A.  Yes, sir.
6  Q.  And it says that our communities can do more to
7  meet their needs through direct mutual aid.  So you're
8  saying that organizations such as Food Not Bombs could
9  do more --
10     MR. HIROSHIGE:  Objection, mischaracterizes --
11     MR. SOH:
12 Q.  -- to fill --
13     MR. HIROSHIGE:  -- testimony.
14     MR. SOH:
15 Q.  -- the void that the City is not doing?  Is that
16 what -- is that what you're --
17     MR. HIROSHIGE:  Objection, --
18     MR. SOH:
19 Q.  -- what this sentence is?
20     MR. HIROSHIGE:  -- mischaracterizes testimony.
21 A.  Can I get your question again --
22     MR. SOH:
23 Q.  Sure.
24 A.  -- so I can understand --
25 Q.  I guess -- I mean, you know, we've gone over your

```
 1    Q.  Okay.  Have you seen -- at the conclusion of a
 2  Food Not Bombs event, have you seen garbage collected
 3  like this in areas near the library?
 4    A.  Define that question better, sir, I'm sorry.
 5    Q.  Sure.  In the Food Not Bomb events that you've
 6  participated in --
 7    A.  Uh-huh.
 8    Q.  -- have you seen garbage on the streets or the
 9  sidewalk in a manner similarly depicted to Exhibit 12?
10  Have you ever seen that?
11    A.  Not recently in my time, sir, I'm sorry.
12    Q.  Ever?
13    A.  I'm not certain of ever.
14    Q.  Okay.
15    A.  Do you know when this was taken?
16    Q.  I think it was 2023.  I can get the date later.
17  But have you -- my question is have you ever seen --
18  have you ever seen trash left after a Food Not Bombs
19  Houston feeding at the library?
20    A.  Not -- not me personally, sir, I'm sorry.
21    Q.  Is that acceptable to you, that -- the situation
22  depicted in Exhibit 12, is that acceptable to you?
23    A.  I would personally, you know, strive for better,
24  for sure.
25    Q.  Okay.  And you would agree that it's not a good
                                                        Page 65
```

```
 1  idea to leave -- would you agree with me that it's not a
 2  good idea to leave garbage and food out on a city
 3  sidewalk after a feeding event?
 4    A.  Like as pictured?
 5    Q.  Yes.
 6    A.  I suppose so, yes, sir.
 7    Q.  Okay.  Fair enough.  Go to paragraph 17.  It
 8  says:  Further, many of the people we share food with
 9  live near the library and use wheelchairs, canes and
10  other mobility assistance devices.
11       Do you see that?
12    A.  Yes, sir.
13       [Exhibit 13 marked, four photographs]
14       MR. SOH:
15    Q.  All right.  I'm going to hand you a series of
16  pictures marked as Exhibit 13.  Okay?
17       MR. HIROSHIGE:  Ken, would it be possible to mark
18  each photo separately just so we know which one or that
19  you could just say the Bates number so we know which
20  pictures you're referring to?
21       MR. SOH:  Sure.
22    Q.  Exhibit 13 will be Bates numbers FNB 10422,
23  10547, 10553 and 10623.  So as a Food Not Bombs Houston
24  member, you are sensitive to individuals that use
25  wheelchairs, walkers, canes and other mobility
                                                        Page 66
```

```
 1  assistance devices, correct?  You serve that population?
 2    A.  Yes, sir.
 3    Q.  All right.  Let me hand you what's marked as
 4  Exhibit 13.  All right.  In these group of pictures, I
 5  mean, you are portrayed in some of these pictures,
 6  correct?
 7    A.  Yes, sir, I am.
 8    Q.  I see your -- the distinctive -- your hair.  I
 9  can -- I recognize you from your hair.  All right.  You
10  see these pictures, sir?
11    A.  Yes, sir.
12    Q.  They appear to be from Food Not Bombs Houston
13  feedings, correct?
14    A.  Uh-huh.  Yes, sir.
15    Q.  And they -- they -- they look like -- you're
16  in -- you're in several of these, and there's a decent
17  amount of daylight.  So I'm guessing they're in the
18  summer at some point in time.  Do you agree with that?
19    A.  Do you know the exact date?
20    Q.  I can look that up, but I don't have it in front
21  of me.
22    A.  Okay.
23    Q.  But daylight summer, given the time that -- when
24  you feed, correct?
25    A.  I could say daylight confidently.
                                                        Page 67
```

```
 1    Q.  Okay.
 2    A.  I couldn't say season.
 3    Q.  All right.  Do you believe that the -- that the
 4  judge's order in this case allowing you to feed at the
 5  library allows Food Not Bombs Houston to block the
 6  wheelchair handicap ramp that's depicted in those some
 7  of those photos?
 8       MR. HIROSHIGE:  Objection, calls for a legal
 9  conclusion, and objection, calls for speculation.
10    A.  Can I get the question again?
11       MR. SOH:
12    Q.  Yeah.
13    A.  I'm sorry.
14    Q.  Do you believe that the order signed by the judge
15  in this case allowing feedings at the Houston public
16  library allows Food Not Bombs Houston to block the
17  wheelchair ramp that's depicted in some of those photos?
18       MR. HIROSHIGE:  Object, calls for a legal
19  conclusion, calls for speculation.
20    A.  What is the ramp used for?
21       MR. SOH:
22    Q.  It's the wheelchair handicap accessibility
23  entrance to the library.
24       MR. HIROSHIGE:  Objection, form.  It's not a
25  question.
                                                        Page 68
```

Page 81

```
 1   Q.  Let -- do you believe that the Julia -- that
 2  the -- do you believe that the handicap ramp for the
 3  Julia Ideson Building should be kept clear at all times,
 4  including a Food Not Bombs feeding?
 5       MR. HIROSHIGE:  Objection, form, vague.
 6  Objection, calls for a legal conclusion.
 7   A.  Maybe not at all times, because, you know, they
 8  close the library --
 9       MR. SOH:
10   Q.  Uh-huh.
11   A.  -- and then they have events.
12   Q.  Okay.  Do you believe that the -- that the ramp
13  should be kept clear whenever there is an event at the
14  Julia Ideson Building --
15       MR. HIROSHIGE:  Objection, calls for --
16       MR. SOH:
17   Q.  -- during a Food Not Bombs feeding?
18       MR. HIROSHIGE:  Objection, calls for a legal
19  conclusion.
20   A.  I believe it's the duty of members of Food Not
21  Bombs to make the ramp accessible to those who need it.
22   Q.  Fair enough.  That's all I'm asking.
23   A.  Yeah.
24   Q.  All right.
25       MR. HIROSHIGE:  Can we --
```

Page 82

```
 1       MR. SOH:  You want to take a break.
 2       MR. HIROSHIGE:  -- take a break?
 3       MR. SOH:  Yeah, sure, take break.  I don't
 4  have -- I've got maybe another hour.
 5       MR. HIROSHIGE:  I don't want to break --
 6       MR. SOH:  No.
 7       MR. HIROSHIGE:  -- if it --
 8       MR. SOH:  We're off.
 9       VIDEOGRAPHER:  The time is -- the time is
10  10:49 a.m.  We're off the record.
11       [Recess]
12       VIDEOGRAPHER:  The time is 11:07 a.m.  We're now
13  back on the record.
14       MR. SOH:
15   Q.  All right, Mr. Walsh, I only have about 15 or 20
16  more minutes of questions for you.  So we'll be out of
17  here well before lunch.  A couple quick questions.  Have
18  you ever seen -- have you ever witnessed a fight during
19  a Food Not Bombs feeding event?
20   A.  Like a physical altercation?
21   Q.  Whatever you want to use, fight, whatever you
22  describe as a fight.
23   A.  Sure, yes, sir.
24   Q.  Okay.  How many times?
25   A.  Maybe once or twice.
```

Page 83

```
 1   Q.  Okay.  Did the police come in and separate the
 2  people who are engaging in the fight?
 3   A.  No, sir.
 4   Q.  Okay.  What happened?
 5   A.  Well, the people that we serve are our friends,
 6  and we usually know these people, and the right people
 7  will talk to them and, you know, dissolve the fight,
 8  usually.
 9   Q.  Okay.  Have you ever seen anyone at a Food Not
10  Bombs Houston event at the library urinate in public?
11   A.  No, sir.
12   Q.  Okay.  Have you ever seen anyone in a Food Not
13  Bombs Houston event defecate during or after the event?
14   A.  Not to my witness, sir.
15   Q.  Okay.  Have you ever -- have you seen Food Not --
16  the people who Food Not Bombs Houston serves grab bricks
17  or rocks off of the sidewalk and put them in line to
18  save their spot in line?
19   A.  No, sir.
20   Q.  Okay.  How do people at Food Not Bombs Houston's
21  feeding events save their place in line?
22   A.  We do a numbering system, sir.
23   Q.  Okay.  How?  Explain that to me.
24   A.  We'll have a bunch of premade numbers, one to
25  whatever, and they would then get their number on a
```

Page 84

```
 1  first come first serve basis.  That holds their place in
 2  line and ensures that if they -- you know, let's say
 3  they need to sit down or want to -- maybe they've got a
 4  later number, they're just going to relax until their
 5  number gets called.
 6       [Exhibit 14 marked, Order]
 7       MR. SOH:
 8   Q.  Okay.  I'm going to hand you what's marked
 9  Exhibit 17.  Judge Hanen's order isn't already in this
10  binder, is it?
11   A.  Did we go past 14?
12   Q.  No, wait, 14, sorry.  I looked at the wrong --
13  lifted the wrong label.
14   A.  Sorry.
15       MR. HIROSHIGE:  I -- I don't believe it was.
16       MR. SOH:
17   Q.  Okay.  Let me show you --
18   A.  What was the question?
19   Q.  No, no, no question.
20       MR. HIROSHIGE:  You're good, you're good.  We're
21  just --
22       MR. SOH:  All right.
23       MR. HIROSHIGE:  -- figuring out numbers.
24       MR. SOH:
25   Q.  We're just figuring it out.
```

```
 1    A.  Appreciate it.
 2    Q.  Handing you Exhibit 14, which I'll represent to
 3  you is the order signed by Judge Hanen on February 14th,
 4  2024.  Okay?
 5    A.  Uh-huh.  Yes, sir.
 6    Q.  Have you ever seen this before?
 7    A.  I've not physically held it, but I -- I'm aware
 8  of it.
 9    Q.  Okay.  Someone told you about it?
10    A.  Yes, sir.
11    Q.  Okay.  My questions are going to be on page 14
12  and 15.  So if you'd take a chance to look.  Just read
13  it over when you get a chance.  Okay?
14    A.  The whole thing or 14 and --
15    Q.  14 --
16    A.  -- 15?
17    Q.  -- and 15.
18    A.  Yes, sir.
19    Q.  After IV where it says bond all the way through
20  the judge's signature.  Take a -- take a second to read
21  it.
22    A.  Yes, sir.
23    Q.  Okay.  We had a -- I asked you some previous
24  questions about the bond.  So you're aware that there
25  was a bond that Food Not Bombs Houston had to pay,
```
Page 85

```
 1  correct?
 2    A.  Yes, sir.
 3    Q.  So let me ask you this question.  The first
 4  bullet point on page 15, it says Food Not Bombs Houston
 5  are to and it says bring adequate trash receptacles to
 6  the event, ensure that all waste and receptacles are
 7  removed following the event.
 8        Do you see that?
 9    A.  Yes, sir, I do.
10    Q.  Do you have any problem with that, with doing
11  that?
12        MR. HIROSHIGE:  Objection, form, vague.
13    A.  For the $2500 condition?
14        MR. SOH:
15    Q.  Yeah.
16    A.  I suppose not, sir.
17    Q.  Is it -- is it a -- don't you think it's a good
18  idea if you're going to have a charitable feeding event
19  to bring trash receptacles and ensure that all waste and
20  receptacles are removed after the event?
21    A.  I think that's a reasonable thing, sir, yeah.
22    Q.  Okay.  How about providing hand washing stations,
23  hand sanitizer and hand wipes to all attendees, is that
24  a reasonable condition for a charitable feeding event?
25    A.  I think cleanliness is important, sir, and I
```
Page 86

```
 1  think that would be reasonable.
 2    Q.  Okay.  You think it's reasonable to have people
 3  avoid congregating on sidewalks and streets so as to
 4  block a sidewalk and a street?  Is that reasonable for a
 5  charitable feeding event?
 6    A.  Within reason, sir, yeah.
 7    Q.  Okay.  And do you think it's reasonable that all
 8  food handling members attend a free virtual training on
 9  food safety?
10    A.  Sure, yes, sir.
11    Q.  Have you ever attended the food safety training?
12    A.  Not the free one, sir.
13    Q.  Okay.  You did some videos about going to 61
14  Riesner --
15    A.  Yes, sir.
16    Q.  -- and testing the porta potties.  Do you
17  remember those?
18    A.  Yes, sir, I do.
19    Q.  Okay.  We can play them for you if you'd like to,
20  but do you have a pretty good recollection of those
21  videos?
22    A.  Yes, sir, I do.
23    Q.  Okay.  Is it -- is it your belief that those
24  porta potties should be open 24/7?
25        MR. HIROSHIGE:  Objection, calls for a legal --
```
Page 87

```
 1        MR. SOH:  Let me --
 2        MR. HIROSHIGE:  -- conclusion.
 3        MR. SOH:  -- rephrase that question.
 4    Q.  Is it your -- in the series of videos that you
 5  did where you went to 61 Riesner and examined the porta
 6  potties, is it your belief that the porta potties should
 7  be open 24 hours a day, seven days a week?
 8        MR. HIROSHIGE:  Objection, calls for a legal
 9  conclusion.
10    A.  Based on the requirements, not this bond
11  requirement, but the requirements of what the City was
12  proposing, I was challenging if they followed their own
13  rules.
14        MR. SOH:
15    Q.  Okay.  No, I understand that.  And we can play it
16  if you want to.  If you want to be refreshed, I could
17  play it for you if you want to see it again or if you
18  are --
19    A.  I remember it.
20    Q.  Okay.  My -- my point is that do you believe that
21  those porta potties at 61 Riesner need to be open
22  24 hours a day seven days a week?
23        MR. HIROSHIGE:  Objection, calls for a legal
24  conclusion.
25    A.  Based on the representative of, you know, the
```
Page 88

```
                IN THE UNITED STATES DISTRICT COURT
                 FOR THE SOUTHERN DISTRICT OF TEXAS
                           HOUSTON DIVISION

FOOD NOT BOMBS HOUSTON,        ]
BRANDON WALSH,                 ]
         Plaintiffs,           ]
                               ]
v.                             ]   C.A. No. 4:24-CV-338
                               ]
THE CITY OF HOUSTON, TEXAS,    ]
         Defendant.            ]
```

                    REPORTER'S CERTIFICATION

                  DEPOSITION OF BRANDON WALSH

                        FEBRUARY 10, 2025

     I, Shawn Kelley, Certified Shorthand Reporter No. 3448 in and for the State of Texas, hereby certify to the following:

     That the witness, BRANDON WALSH, was duly sworn by the officer and that the transcript of the oral deposition is a true record of the testimony given by the witness;

     That the deposition transcript was submitted on February 18th, 2025, to Randall Hiroshige, attorney for Plaintiffs, for examination, signature, and return to the offices of Nell McCallum & Associates, Inc., by March 18th, 2025.

     That the amount of time used by each party at the deposition is as follows:

**NELL McCALLUM & ASSOCIATES, INC.**

1     Kenneth Soh - (1 hour, 32 minutes)

2     That pursuant to information given to the
3  deposition officer at the time said testimony was taken,
4  the following includes all parties of record:

5     Randall Hiroshige and Travis Fife, Attorneys for
6  the Plaintiffs Food Not Bombs Houston and Brandon Walsh

7     Randall Kallinen, Attorney for the Plaintiff
8  Phillip Picone

9     Kenneth Soh and Natoya Inglis, Attorneys for the
10 Defendant

11    I further certify that I am neither counsel for,
12 related to, nor employed by any of the parties in the
13 action in which this proceeding was taken, and further
14 that I am not financially or otherwise interested in the
15 outcome of the action.

16    Certified to by me this 7th day of March,
17 2025.

18
19                                _____
20                                Shawn Kelley, Texas CSR No. 3448
                                  Expiration Date: 1/31/24
21                                Nell McCallum & Associates
                                  Firm Registration No. 10095
22                                Expiration Date: 1/31/25
                                  718 Westcott
23                                Houston, Texas  77007
                                  (713) 861-0203
24
25

**NELL McCALLUM & ASSOCIATES, INC.**