# EXHIBIT E

```
              IN THE UNITED STATES DISTRICT COURT
              FOR THE SOUTHERN DISTRICT OF TEXAS
                       HOUSTON DIVISION

FOOD NOT BOMBS HOUSTON,      ]
BRANDON WALSH,               ]
     Plaintiffs,             ]
                             ]
v.                           ]  C.A. No. 4:24-CV-338
                             ]
THE CITY OF HOUSTON, TEXAS,  ]
     Defendant.              ]
```

---

ORAL AND VIDEOTAPED DEPOSITION OF

PHILLIP PICONE

FEBRUARY 18, 2025

---

ORAL DEPOSITION OF PHILLIP PICONE, produced as a witness at the instance of the Defendant, and duly sworn, was taken in the above-styled and numbered cause on the 18th of February, 2025, from 10:04 a.m. to 12:18 a.m., before Shawn Kelley, CSR No. 3448 in and for the State of Texas, by machine shorthand and computer-aided transcription, at 511 Broadway Street, Houston, Texas, pursuant to the Federal Rules of Civil Procedure and the provisions stated on the record or attached hereto.

Nell McCallum & Associates Inc. Houston (713) 861-0203

**Page 13**

1  Okay?
2  A.  Yes.
3  Q.  I'm going to show you -- what's the next exhibit?
4  Let's go -- mark this as Exhibit 49.
5
6       [Exhibit 49 marked, Plaintiffs' First Amended
7  Original Complaint]
8       MR. SOH:
9  Q.  All right.  I'm handing you what's marked
10 Exhibit 49.  That is a copy of -- it's the first amended
11 original complaint.  It's a lawsuit that you filed
12 against the City of Houston in 2019.  Do you see that?
13 A.  I do.
14 Q.  Okay.  Let me know when you have finished taking
15 a glance at it, Mr. Picone.
16 A.  I will.  February of '19.  I've seen this before.
17 Q.  Okay.  So I want to be clear, you filed a lawsuit
18 in 2019 against the City of Houston in part to overturn
19 the charitable feeding ordinance or what you called to
20 be the anti-food sharing ordinance.  Do you see that?
21 A.  I do.
22 Q.  Okay.  Let me just get a little more background
23 for you.  I believe in -- I don't remember where I read
24 this, but I believe somewhere either in that complaint
25 or your declaration or in the other complaint you talked

**Page 14**

1  about you started food sharing with Food Not Bombs
2  Houston in 2011.  Does that sound right to you?
3  A.  That sounds right.
4  Q.  Okay.  And that you mostly did your food sharing
5  with Food Not Bombs Houston on Fridays; is that correct?
6  A.  If we're going back to 2011, I would do it when I
7  was available, and 2011 I'm working.
8  Q.  Right.
9  A.  And my job at the time had me working weekends
10 every so many weeks.  So I didn't have a set date or day
11 at that time.  I would go when I was available.
12 Sometimes I'd be off on the weekends.  Sometimes I had
13 to cover the whole city on that weekend.  So I was -- I
14 was -- I was going, but I was going not on a set day.
15 Q.  Okay.  Back in 2011 when you started, about how
16 many times a week or a month did you food share with
17 Food Not Bombs Houston?
18 A.  Probably the -- the same, about once a week.
19 Q.  Okay.  And has that stayed consistent
20 through 2023?
21 A.  The once a week?
22 Q.  Yes.
23 A.  Yes.
24 Q.  Okay.  And do you generally -- now that you're
25 retired, do you generally food share on Fridays, or is

**Page 15**

1  there other day a week that you do that?
2  A.  Yeah, so around 2016, we'll go back to that date,
3  when I was no longer gainfully employed, I had -- I had
4  availability to me.  So that's when I decided on Fridays
5  I'm going to go do this.
6  Q.  Okay.
7  A.  I'm going to do this on Fridays.  And so from
8  2016 on, that's where you would find me just about every
9  Friday night.
10 Q.  Okay.  How did you first hear about Food Not
11 Bombs Houston?
12 A.  Okay.  2005 -- 2005 there was a group of people
13 that congregated in Crawford, Texas.  It was started by
14 a woman named Cindy Sheehan whose son had died in the
15 Iraq war, and she wanted to know why.  So she went down
16 to Crawford, because Bush was on vacation, and he had
17 lived in Crawford.  And she parked herself in a ditch.
18 There's no streets or anything like that.  There's just
19 a ditch and then the land.
20      And so next thing you know everybody from all
21 over the country starts going down there with her,
22 because all she wanted to know is what was the noble
23 cause.  Bush had said there was a noble cause for the
24 war.  Her son had died, and she wanted to know what the
25 noble cause was.

**Page 16**

1       And Bush would not meet with her.  He met with
2  other family members of people who had died, but he did
3  not meet with her.  So everybody from all over the
4  country was going down there, and I eventually made my
5  way down there.
6       And tied back into the food, I found myself very
7  comfortable down there in the kitchen cooking.  I would
8  cook breakfast in the morning.  And I had the pleasure
9  of having Joan Baez enjoy and compliment me on my food.
10      And -- and that -- I -- that -- that -- while we
11 were down there and while I'm doing the food, I'm just
12 doing the morning cooking, it was nice in that little
13 kitchen, there were people doing the afternoon and the
14 dinner cooking.  And one of the guys names was -- is
15 Keith, Mack.  He would call himself Mack.  He introduced
16 himself to me as Mack.  That's all I knew was Mack.
17      And I don't know where he got his food from, but
18 he would get his food, he'd bring it back, he'd start
19 cooking big batches of this food, and his wife was
20 there, and I would just help him cook whatever food he
21 was doing.  I didn't go get any food.  I didn't do
22 anything, didn't come up with any recipes, just helping
23 him cook the food.
24      Didn't know it at the time.  This is 2005.  I
25 didn't realize until maybe 2012 that the Mack that I met

Page 49

```
 1  bricks to keep their place in line that you've seen?
 2     A.  I can't recall anything like that.
 3         MR. SOH:  Okay.  Let's take a quick break, and
 4  then we're going to go -- we're going to go start on
 5  that document I gave you earlier.
 6         THE WITNESS:  Okay.
 7         VIDEOGRAPHER:  Off the record, 11 o'clock.
 8         [Recess]
 9         VIDEOGRAPHER:  We're back on the record at 11:06.
10         [Exhibit 50 marked, Plaintiff's First Amended
11  Original Complaint]
12         MR. SOH:
13     Q.  Mr. Picone, I've also handed you Exhibit 50,
14  which is the First Amended Original Complaint in the
15  current lawsuit that was filed in 2023 where you sued
16  the City of Houston about the charitable feeding
17  ordinance.  Do you see that?
18     A.  I do see it.
19     Q.  All right.  If you want to take a second, feel
20  free to look through it if you'd like to.  I'm going to
21  ask you questions about both of those lawsuits that are
22  in front of you whenever you're ready.
23         Okay.  Mr. Picone, just as a threshold thing, let
24  me just demonstrate something to you real quick.  I'm
25  going to circle that.  When I talk about the 2023
```

Page 50

```
 1  lawsuit, I'm -- that's where you -- that's how we
 2  know -- that's how we lawyers know that it was filed in
 3  2023.  And when I talk about the 2019 lawsuit, okay,
 4  that's how we lawyers know it was filed in 2019.  Do you
 5  see that?
 6     A.  I do.
 7     Q.  So when I ask -- when I refer you to one of
 8  those, the 2019 lawsuit or the 2023 lawsuit, that's how
 9  you know which one I'm talking about, just from --
10     A.  Okay.
11     Q.  -- those papers in front of you.  Do you
12  understand that?
13     A.  I do.
14     Q.  All right.  So in these lawsuits I believe the
15  lawsuits call it the anti-food sharing law, and in the
16  course of this deposition I've been calling it the
17  charitable feeding ordinance.  Do we understand that
18  we're talking about the same ordinances that are at
19  issue in the lawsuit, but we're just calling it two
20  different terms?  Do you --
21     A.  Okay.
22     Q.  -- understand that?
23     A.  I do.
24     Q.  Okay.  So in the 2019 lawsuit, if you'd go to
25  page 17, which is under prayer for relief -- do you see
```

Page 51

```
 1  that?
 2     A.  I do.
 3     Q.  The second line says that you wish to declare the
 4  anti-sharing food ordinance unconstitutional and
 5  unconstitutional as applied.  Do you see that?
 6     A.  I do.
 7     Q.  And that in -- if you go down a little bit
 8  further, it says you wish to declare the anti-sharing
 9  food ordinance or portions thereof unconstitutional.  Do
10  you see that?
11     A.  Right, yes.
12     Q.  Okay.  And if we go to the 2023 lawsuit, if we go
13  to page 17 -- okay?  Under the same -- that's the same
14  prayer section, and it says -- if you go to section H,
15  you say that you want to declare the anti-food sharing
16  law unconstitutional.  Do you see that?
17     A.  I do.
18     Q.  So in both the 2019 and 2023 lawsuits that you
19  filed against the City of Houston, you wanted to declare
20  the anti-food sharing law or the charitable feeding
21  ordinance unconstitutional; is that correct?
22         MR. KALLINEN:  Objection, --
23     A.  That's correct.
24         MR. KALLINEN:  -- document speaks for itself.
25         MR. SOH:
```

Page 52

```
 1     Q.  All right.
 2     A.  It does.
 3     Q.  And there are some similarities in the lawsuits,
 4  and I just want to go through some of those similarities
 5  if you get a chance.  Let's go to the 2019 lawsuit.  If
 6  you go to page -- if you go to page 4 you talk about the
 7  Food Not Bombs website having agreements, a vision and a
 8  mission statement that you have cited in your 2019
 9  lawsuit.  Do you see that?
10     A.  I do.
11     Q.  And if you go to your 2023 lawsuit, on page 5 and
12  6, the same agreements, vision and mission statement are
13  included in your 2023 lawsuit, correct?
14     A.  Okay.  Yes.
15     Q.  Do you see that?
16     A.  I do.
17     Q.  Okay.  And I'm correct, that they're the same
18  Food Not Bombs mission statements, agreements and vision
19  are included in both lawsuits, correct?
20         MR. KALLINEN:  Objection, the document speaks for
21  itself.
22     A.  Yeah, they do.
23         MR. SOH:
24     Q.  Okay.
25     A.  They speak for themselves.
```

Page 53:

```
 1   Q.  But --
 2   A.  I mean, it's here.
 3   Q.  Yeah.
 4   A.  It obvious.  It's here.
 5   Q.  And then, similarly, you quote scripture in
 6  both -- both lawsuits quote scripture.  If we go to the
 7  2019 lawsuit, the first two passages that are quoted
 8  from the Holy Bible are Matthew 25:35 and Isaiah 58:10.
 9  Do you see that on page 6?
10   A.  Yes, I do.
11   Q.  All right.  Matthew 25:35 says for I was hungry,
12  and you gave me food.  I was thirsty, and you gave me
13  drink.  I was a stranger, and you welcomed me.
14       Isaiah 58:10 says if you pour yourself out for
15  the hungry and satisfy the desire of the afflicted
16  then -- then shall your light rise in the darkness and
17  your gloom be as the --
18   A.  A noonday.
19   Q.  -- a noonday.
20       All right.  And if you go to the 2023 lawsuit, if
21  you go to page 4, Isaiah 58:10 and Matthew 25:34, 36,
22  which includes Matthew 25:35, they're both also quoted
23  in both lawsuits, correct?
24   A.  Yes.
25   Q.  Now, to be fair, there is a slight difference
```

Page 54:

```
 1  in -- in scriptures that are quoted in both lawsuits,
 2  but at least those two portions of the Bible are copied
 3  in both lawsuits, correct?
 4   A.  There are different versions of the Bible that --
 5   Q.  Right.
 6   A.  -- might word things a little differently, but
 7  the concept comes through the same.
 8   Q.  But both the 2019 and 2023 lawsuits have the --
 9  in essence, the same -- at least the same two Bible
10  verses quoted?
11   A.  Apparently they do.
12   Q.  Okay.  Fair enough.  All right.  So in 2019, when
13  you filed the first lawsuit against the City -- oh, by
14  the way, have you filed any other lawsuits against any
15  other parties in your life?
16   A.  Never.
17   Q.  Okay.  So the only two lawsuits -- and I don't
18  care about divorces or anything like that, but the only
19  two lawsuits that you have been a part of were the two
20  lawsuits that are currently in front of you marked as
21  Exhibit 49 and 50, correct?
22   A.  Yeah, Exhibit 49 would be the first lawsuit I've
23  ever filed.
24   Q.  And Exhibit 50 is --
25   A.  Or been a part of.
```

Page 55:

```
 1   Q.  And Exhibit 50 is the second?
 2   A.  The second one.
 3   Q.  And only?
 4   A.  That's it.
 5   Q.  Okay.  So back to your 2019 lawsuit, can you
 6  explain to me just in your own words why you wanted
 7  the -- the charitable feeding ordinance declared
 8  unconstitutional?
 9       MS. GILBERT:  Objection, the document speaks for
10  itself.
11       MR. SOH:  Okay.
12   A.  Yeah, I think this whole paper kind of
13  explains --
14       MR. SOH:
15   Q.  And the reason why -- the reason why I'm asking
16  you that is I do not want to get into -- I'm sure your
17  lawyer's told you I do not want to get into discussions
18  and conversations that you had with your lawyer at any
19  point in time in this deposition.
20       What I'm just getting from you is in your own
21  words, in 2019 when you filed this lawsuit, why did you
22  want to declare the charitable feeding ordinance
23  unconstitutional?
24   A.  It's fair to say I probably wanted it to be
25  declared unconstitutional when it was voted on in April
```

Page 56:

```
 1  of 2012 and began to be enforced in June of 2012, but at
 2  that time, without any input from Food Not Bombs, Annise
 3  Parker, who wrote it or at least was mayor at the time
 4  and it had her blessings, she exempted Food Not Bombs
 5  from the ordinance.
 6       She actually put out something on her letterhead
 7  and sent us a piece of paper saying that -- that we were
 8  exempt and that we could serve on that property.  She
 9  actually wrote down the address of 500 McKinney, that we
10  had permission to be there.
11       That made it a little hard for us to want to
12  fight something, because we were still able to feed.
13  You know, at that time we're looking at it like that,
14  you know, we're still able to share our food.  You know,
15  but it had a chilling effect on other organizations that
16  were feeding, as well, whether they were, you know,
17  places where immigrants could go, you know, for -- you
18  know, for safety or whether they were churches that were
19  sharing food in their community or just other volunteers
20  organizations.  And it had a -- that had a chilling
21  effect on them.  And the way I know that is because when
22  that ordinance went into effect, suddenly the numbers
23  that -- of the people coming to Food Not Bombs increased
24  dramatically because of those other places closing down.
25       And so, you know, but, like I said, you know, we
```

Page 57

1 were given an exemption, and that kind of took a little
2 bit of our argument away, because we weren't being
3 stopped from doing anything, but that changed.  That
4 changed.
5    Q.  Okay.  So --
6    A.  That changed.
7    Q.  -- you gave a long answer, and I'm trying to see
8 if I understand it.  In 2019 at least one of the reasons
9 why you wanted to file a lawsuit to declare the
10 charitable feeding ordinance unconstitutional was that
11 it had a chilling effect on other charitable feeding
12 groups; is that correct?
13    A.  I think --
14        MR. KALLINEN:  Objection, misstates prior
15 testimony.  The document speaks for itself.
16    A.  Yeah.  If we go to 2019 --
17        MR. SOH:
18    Q.  Right.
19    A.  If we go to 2019, this is long after 2012.
20    Q.  Right.
21    A.  We go to 2019, the reason was a little bit
22 different.
23    Q.  Okay.
24    A.  The reason is because it was in 2019, right
25 around this time, that there was a decision made in

Page 58

1 Florida where a man was also ticketed for feeding the
2 homeless and just happened to be with Food Not Bombs, as
3 well.  He happened to be a pastor, just, you know, just
4 happened.  And his case took a number of years to get
5 through, but by the time just before this had happened,
6 the district -- is it district 11 down there?
7        MR. KALLINEN:  You mean Circuit Court of --
8        THE WITNESS:  Circuit court.
9        MR. KALLINEN:  -- Appeals No. 11?
10    A.  Yeah.  They had decided that -- that -- that it
11 was unconstitutional.  We felt that already, but they
12 decided it was unconstitutional.  So with that case from
13 that district court with that decision, it seemed maybe
14 to -- it seemed maybe that the door might be open for us
15 to do something like this.
16        MR. SOH:
17    Q.  Okay.  Let me -- let me see if I -- let me ask
18 you these questions.  In 2012, when the charitable
19 feeding ordinance was passed, did you believe that it
20 was unconstitutional?
21    A.  Absolutely.
22    Q.  In 2019 when you filed the first lawsuit against
23 the City, did you believe that the charitable feeding
24 ordinance was unconstitutional?
25    A.  Absolutely.

Page 59

1    Q.  And in 2023 when you filed the second lawsuit
2 against the City of Houston, did you believe the
3 charitable feeding ordinance was unconstitutional?
4    A.  Yes.
5    Q.  Okay.  All right.  So let's go to the 2023
6 lawsuit, which I believe is Exhibit 51.  No, Exhibit 50,
7 sorry, Exhibit 50.  I just have a couple of questions
8 about that as we go through it.  I'm trying to remember
9 your prior testimony.  I think you believe that Mayor
10 Parker -- did you say exempted Food Not Bombs from the
11 charitable feeding ordinance for charitable feedings at
12 the library?  Was that your word?
13    A.  To that effect.
14    Q.  Okay.  Do you believe that Food Not Bombs Houston
15 had permission from the City of Houston to feed at the
16 Houston Public Library in 2023?
17    A.  2023?  When I got my ticket, when I was given the
18 ticket, do I believe that?  I believe that her exemption
19 had not been rescinded at --
20    Q.  Okay.
21    A.  -- that time.
22    Q.  Do you believe that -- and you believe that a
23 property owner, whether it be public property or private
24 property, can certainly give permission for a charitable
25 feeding on its property and then subsequently can change

Page 60

1 their mind and rescind that permission, correct?
2        MR. KALLINEN:  Objection, that's a legal
3 question.
4    A.  Yeah, I --
5        MR. KALLINEN:  Calls for speculation.
6    A.  Yeah, I -- I'm -- I'm not sure how to answer that
7 question in the sense of I'm -- I'm not -- I'm not
8 versed on property laws to be able to -- to answer that.
9        MR. SOH:
10    Q.  Simple question.  Can a property owner change its
11 mind about giving permission to a group to perform a
12 charitable feeding on their property?
13    A.  If they gave -- if somebody gave permission to do
14 something, can they take their permission back?
15    Q.  Yes.
16    A.  I think in -- in -- in most circumstances or some
17 circumstances, as long as it's not contractual or
18 something.  I -- I could see how that could happen.
19    Q.  And you believe that the City of Houston did
20 not -- did not revoke its permission to Food Not Bombs
21 to feed at the downtown public library, correct?
22    A.  Yeah, I believe Annise -- Annise Parker's -- it
23 was still on the website on the date that I was given my
24 ticket.  Annise Parker's exemption was still available.
25    Q.  Okay.  I just want to make it clear.

```
 1       MR. SOH:  Okay.  All right.
 2       MR. KALLINEN:  Well, you're incorrect.
 3       THE WITNESS:  Okay.
 4       MR. KALLINEN:  Just to let you know.
 5       MR. SOH:  Do you want to --
 6       THE WITNESS:  Am I?
 7       MR. SOH:  Do you want me --
 8       THE WITNESS:  Okay.
 9       MR. KALLINEN:  -- to clean it up, or do you want
10  me to ask some --
11       THE WITNESS:  Correct me.
12       MR. SOH:  -- follow-ups.
13       THE WITNESS:  I don't know.
14       MR. KALLINEN:  It's been so long maybe you forgot
15  you signed an agreement.
16       THE WITNESS:  I did?
17       MR. KALLINEN:  Sure, you did.
18       THE WITNESS:  Oh, okay.  I didn't know that.
19  Okay.
20       MR. SOH:
21  Q.  All right.  Let me ask you this.
22       MR. KALLINEN:  It is --
23       THE WITNESS:  Well, that's -- that's --
24       MR. KALLINEN:  -- over two years old, yeah.
25       THE WITNESS:  That --
                                                    Page 65
```

```
 1       MR. SOH:
 2  Q.  Okay.  Let me ask you this question.  Are you
 3  paying Mr. Kallinen by the --
 4       THE WITNESS:  Oh, this one?
 5       MR. KALLINEN:  What's that?
 6       THE WITNESS:  On this one, the 2019.
 7       MR. KALLINEN:  No, this most recent one.
 8       THE WITNESS:  Oh, okay.
 9       MR. SOH:
10  Q.  I think I know the answer, but I'm going to just
11  ask it to just to get the record filled up.  Are you
12  paying Mr. Kallinen by the hour?
13  A.  **I'm not paying him anything.**
14  Q.  Okay.
15       MR. KALLINEN:  Objection, not relevant.
16       MR. SOH:
17  Q.  Are you familiar with the term contingency fee?
18  A.  **Is that like a down payment?**
19  Q.  No.
20       MR. KALLINEN:  Objection, --
21       MR. SOH:
22  Q.  All right.
23       MR. KALLINEN:  -- not relevant.
24       MR. SOH:
25  Q.  Let me ask you this.  Are you -- are you -- are
                                                    Page 66
```

```
 1  you -- does Mr. Kallinen have a right to receive payment
 2  if he were to recover something as a result of your
 3  lawsuit against the City?
 4       MR. KALLINEN:  Objection, that would ask for a
 5  legal -- a legal conclusion, because there's a whole
 6  bunch of different legal theories regarding collection
 7  of attorney's fees and expenses for clients.
 8       MR. SOH:
 9  Q.  Let me ask you this.  Do you have any idea what's
10  in the contract that you signed with Mr. Kallinen as you
11  sit here today?
12  A.  **Well, obviously, I signed something that I don't
13  even remember signing.  So --**
14  Q.  That's all, yeah.
15  A.  **So whatever -- whatever I signed is -- is -- read
16  that, and that's what I --**
17  Q.  That's all --
18  A.  **-- agreed to.**
19  Q.  -- I need to know.
20       [Exhibit 51 marked, Order]
21       MR. SOH:
22  Q.  All right, sir.  Let me ask you this.  Let me
23  hand you what's been marked as Exhibit 51, if you want
24  to take a look at that very quickly.  And I will just
25  tell you that Exhibit 51 is the order signed by the
                                                    Page 67
```

```
 1  Court in your 2019 lawsuit in essence dismissing the
 2  lawsuit.  And just whenever you get a chance to look at
 3  it, just let me know.
 4  A.  **Okay.**
 5  Q.  All right.  Have you ever seen that -- Exhibit 51
 6  is the order dismissing your 2019 lawsuit where you
 7  sought to find the charitable feeding ordinance
 8  unconstitutional.  Have you ever seen that before?
 9       MR. KALLINEN:  Objection, not relevant.
10  A.  **I don't recall ever seeing this before.**
11       MR. SOH:
12  Q.  Were you aware that your 2019 lawsuit where you
13  sought to have the charitable feeding ordinance held as
14  unconstitutional, were you aware that that lawsuit was
15  dismissed?
16  A.  **Yes.**
17  Q.  And were you aware that that lawsuit was
18  dismissed in 2020?
19       MR. KALLINEN:  Objection, not relevant.
20  A.  **I'm not sure of the -- of -- of when, but I do
21  know that it was dismissed.**
22       MR. SOH:
23  Q.  Okay.  Will you go to the last page of
24  Exhibit 51, please?  After IV it says:  For the
25  foregoing reasons, it is hereby ordered that defendant's
                                                    Page 68
```

```
 1  motion to dismiss is granted, and it's signed on
 2  February 10th, 2020.  Do you see that?
 3       A.  I do.
 4       Q.  All right.
 5            MR. KALLINEN:  Objection, document speaks for
 6  itself.
 7            MR. SOH:
 8       Q.  On or about February 10, 2020, do you recall that
 9  your 2019 lawsuit against the City was dismissed?
10            MR. KALLINEN:  Objection, not relevant.
11       A.  I don't know when.
12            MR. SOH:
13       Q.  Okay.
14       A.  I know when this was signed.  I don't know when I
15  realized that -- that this case was dismissed.
16       Q.  Okay.  But you knew it was dismissed at some
17  point in time?
18       A.  I knew it was dismissed.
19       Q.  All right.  You can put those away, sir.  Let's
20  go to -- I'm going to hand you what's marked as
21  Exhibit 52.
22            MR. SOH:  Mr. Court Reporter, I have color and
23  black and white.  Do you care if the witness gets color
24  or black and white.
25            REPORTER:  I don't care.
                                                    Page 69
```

```
 1       [Exhibit 52 marked, 03/03/2023 HPD Report]
 2            MR. SOH:  Okay.  Mr. Picone, take a second to
 3  look at this citation and let me know when you're done
 4  looking at it.
 5       A.  Yes.  Yes, I'm done.
 6            MR. SOH:
 7       Q.  You're done?  Okay.
 8       A.  Yeah.
 9       Q.  What is Exhibit 52?
10       A.  This looks like a summation of the citation, the
11  ticket that I was given with -- you know, with some
12  further details that were not on the actual citation.
13       Q.  Okay.  And you were given this citation or you
14  were cited by the Houston Police Department for a
15  violation of the charitable feeding ordinance on, looks
16  like, March 3rd, 2023; is that correct?
17       A.  That is correct.
18       Q.  And does that jibe with your recollection of --
19  of the date you received your citation?
20       A.  Yeah.
21       Q.  Okay.  A couple of quick questions about this.  I
22  guess Officer Ancira wrote you the ticket?
23       A.  Yes, he did.
24       Q.  Can you tell me about your interactions with
25  Officer Ancira that evening?
                                                    Page 70
```

```
 1       A.  Well, I show up.  It's a Friday, of course,
 2  right?  And I show up with the food, and he's standing
 3  there.  This was the second day that, you know, law
 4  enforcement was out there to give tickets.  The first
 5  one was two days prior to this, on March 1st, which was
 6  a Wednesday.  But this is day two.
 7            I'm -- I don't know what to expect, because
 8  there's nothing to go by except one previous encounter
 9  two days earlier.  I did ask Officer Ancira if -- if --
10  if -- if this was going to be handled the way it was
11  Wednesday.  Are you going to handle the way it was
12  Wednesday?  His reply was he doesn't know how it was
13  handled Wednesday.  He wasn't there.
14            So that, you know, a little bit of anxiety there,
15  because, yeah, we could be given a ticket.  We could
16  also be arrested.  That was always a possibility.  And
17  he never took that off the table.
18       Q.  Just to clarify, what happened two days earlier
19  on March the 1st?
20       A.  A ticket was given out.  That was the first
21  ticket for -- for -- for sharing food was given out on
22  March 1st.  It was another officer there whose name I
23  don't recall, but he was not -- he was not very
24  comfortable -- he was not comfortable with what he did,
25  and it made the whole situation feel uncomfortable for a
                                                    Page 71
```

```
 1  lot of people there that night.
 2       Q.  Just to clarify, who was not comfortable?
 3       A.  That officer, --
 4       Q.  On --
 5       A.  -- he was exhibiting, you know, behavior that
 6  made -- made -- made it look like he was a little
 7  stressed or uncomfortable.  And the last thing you want
 8  is an officer to be uncomfortable.
 9       Q.  Was that, you meant, on March the 1st?
10       A.  Yes.
11       Q.  Okay.  On -- to clarify your testimony, on March
12  the 1st you said that the officer who wrote a citation
13  to someone for violating the charitable food ordinance
14  was acting uncomfortable; is that correct?
15       A.  He was acting a little not sure of himself.
16       Q.  Okay.
17       A.  You know, not -- didn't have a plan and -- you
18  know what I mean?  He was just a little uncomfortable
19  with what was going on.
20       Q.  Was there anything else you recall on that March
21  the 1st incident?
22       A.  There was a lot of people down there, more than
23  we've ever seen before.  People came out.  City of
24  Houston people came out to support what we were doing.
25  So the crowd was tremendous down there.  I remember
                                                    Page 72
```

Page 73

1  that.
2  Q.  And so why were you down there on -- on -- I
3  thought you -- you were normally down there on Fridays,
4  correct?
5  A.  Normally down on Friday.
6  Q.  Was there any reason you were down there on a
7  Wednesday?
8  A.  This was the first ticket that was ever going to
9  be given out, the first time ever, after all these years
10 of serving and all these years of us being down there
11 and all the threats that we have gotten from the City,
12 which, by the way, were quite a few.  Even Turner had
13 threatened us before, as well.  But this is the furthest
14 it had ever gone, actually telling us we're going to get
15 a ticket.  So, yeah, I was going to be there that day.
16 Q.  Okay.  You pointed at Exhibit 52 when you said
17 this ticket, and I want to make it clear that Exhibit 52
18 is the ticket you received on March the 3rd, --
19 A.  That's correct.
20 Q.  -- not the ticket that was -- that was given to
21 someone else on March the 1st; is that clear?
22 A.  That is clear.
23 Q.  Okay.
24 A.  You're right about that.
25 Q.  So I just want to clear it up since it's videoed

Page 74

1  and --
2  A.  I mean these tickets.
3  Q.  These tickets.
4  A.  These tickets.
5  Q.  Okay.
6  A.  This is the first time tickets were actually
7  going to happen.  And Turner had threatened us before
8  with tickets, and then it never happened.  So when this
9  day comes, he's threatened us again, and he made it
10 really clear it was going to happen.  So it was a big
11 day.  It was a big day.
12 Q.  Is there anything else -- is there anything else
13 you --
14 A.  That was March 1st.
15 Q.  Yes.
16 A.  I'm sorry.
17 Q.  On the March 1st ticket, do you recall anything
18 else that happened with respect to the issuance of the
19 ticket?
20 A.  The ticket was issued.  There were questions of
21 why.  The ticket was accepted.  I guess it's fair to say
22 it went without incident, although, you know, this was a
23 precedent that was being set in Houston on that day, but
24 the police department accomplished their goal of giving
25 out a ticket, and -- and it went without incident.

Page 75

1  Q.  Sure.
2  A.  I remember that.  I remember it went without
3  incident.
4  Q.  On the March the 1st ticket that you witnessed,
5  do you recall anyone yelling at the police officer
6  something like shame on you?
7  A.  Yeah, I think there was some -- some of that.
8  The crowd was yelling that.
9  Q.  Okay.
10 A.  You know, and who was in the crowd?  Just people
11 from all over Houston.
12     MR. KALLINEN:  Objection, not relevant.
13     MR. SOH:
14 Q.  All right.  Okay.  So let's focus back on the
15 ticket you received on March the 3rd.  Okay?  Is there
16 any -- do you recall Officer Ancira writing you the
17 ticket?
18 A.  [Witness moving head up and down]
19 Q.  Is there -- was this the only ticket you've
20 received for violating the charitable food ordinance?
21 A.  Yes.
22 Q.  In the prior -- previous to March the 3rd had you
23 ever received any written or verbal warnings from the
24 police about violating the charitable food ordinance?
25 A.  Prior to this?

Page 76

1  Q.  Yes.
2  A.  Well, there was a sign that was posted where we
3  serve.  So I guess that serves as notice.  I can
4  understand that.  But, again, from my point of view, I
5  felt that this is kind of a cruel thing and
6  unconstitutional.
7  Q.  Right, but did -- but I want to be clear, did you
8  receive a -- a -- you know how you get a -- when you get
9  pulled over for a traffic stop the officer has a -- can
10 write you a speeding ticket or a -- give you a warning,
11 right?
12 A.  Uh-huh.
13 Q.  Were you ever given any warnings, a written
14 warning prior to your March 3rd ticket for violating the
15 charitable food ordinance?
16 A.  So when I went down there that evening on
17 March 3rd, asked him if it was going to go down like it
18 went down Wednesday, he said he couldn't -- he wasn't --
19 he then handed me a piece of paper which was like a copy
20 of what was stuck on the fence.  I believe --
21 Q.  Okay.
22 A.  -- you have a copy of that there.
23 Q.  Sure.
24 A.  He handed -- he showed me -- it was just a xerox
25 copy paper.  He showed that to me and says:  Are you

Page 77

1  aware of this?  And I read it, and it's the same thing
2  that's on -- on the metal fence behind us.  That's the
3  only thing he handed me, and he handed it to me at that
4  time.
5      Q.  Okay.  I'm going to show you what's previously
6  been marked as Exhibit 6 in this lawsuit.  And that's a
7  picture of a notice on a sign.  Is that the notice or
8  the sign that you referred to in your previous answers?
9      A.  It looks like it.
10     Q.  Okay.  And you're saying that before you received
11 the ticket on March the 3rd, the officer gave you a
12 piece of paper that had that or similar language to it,
13 correct?
14     A.  Right, right, just handing me, you know, a copy
15 of what that thing said, this --
16     Q.  Okay.
17     A.  -- thing said.
18     Q.  And -- and is that an accurate -- okay.  So just
19 going back to the -- did you ever receive any verbal
20 warnings from any police officer or any -- prior to
21 March the 3rd about violating the charitable food
22 ordinance?
23     A.  No.
24     Q.  Okay.
25     A.  No.

Page 78

1      Q.  So let's go through the -- the citation briefly
2  here.  If you go to the last page, these are some
3  questions I have for you.  Under the -- the long
4  paragraph under officer's actions at the top, do you see
5  that?
6      A.  Uh-huh.  Under it?
7      Q.  Yeah.
8      A.  Disposition?
9      Q.  Yes.  Can you read that paragraph?  Or have you
10 already read that paragraph?
11     A.  It says affiant issued --
12     Q.  No, no, I mean just read it to yourself.  Excuse
13 me.
14     A.  Oh, okay.  I got you.
15     Q.  Yeah.
16     A.  Okay.
17     Q.  Okay.  If you go halfway down, it says:
18 Mr. Picone indicated that he was aware of the notice and
19 that he received one the other day and that he will be
20 the one feeding the homeless.
21         Do you see that?
22     A.  I do.
23     Q.  Okay.  And so when you -- when you -- when that
24 ticket is talking about the notice, are you talking
25 about the sign and then the language that copies the

Page 79

1  sign that was handed to you prior to receiving the
2  ticket that you testified previously about?
3      A.  Restate that again.
4      Q.  Sure.
5      A.  What's the question?
6      Q.  Let me ask you this way.  Where it says you're
7  aware of the notice --
8      A.  Right.
9      Q.  -- in your citation, --
10     A.  Right.
11     Q.  -- what notice was he talking about, do you know?
12     A.  Well, the notice -- well, I don't know what he
13 was talking about, but the notice that I was aware of
14 was the one that was pinned to the -- to the steel
15 gates.
16     Q.  Which is -- which you previously identified as
17 Exhibit 6, right?
18     A.  Right.
19     Q.  And that same language was also on the piece of
20 paper that Officer Ancira handed you immediately before
21 issuing the citation?
22     A.  I would assume so.
23     Q.  All right.
24     A.  I would assume it was a duplicate.
25     Q.  And you say -- it says you received one the other

Page 80

1  day.  Did you receive a copy of that notice previous to
2  March the 3rd?
3      A.  No, no, no, no, no.
4      Q.  Okay.
5      A.  There was nobody -- nobody gave me or anybody any
6  notice.  The only notice that was handed out other than
7  that sign, Exhibit 6, was -- was to the person on
8  March 1st who was getting the ticket.
9      Q.  Did you agree to accept the citation on March the
10 3rd in essence on behalf of Food Not Bombs Houston?
11     A.  No.
12     Q.  Okay.  You didn't volunteer to accept the -- the
13 citation?
14     A.  No.
15     Q.  Okay.  Mister -- Officer Ancira just selected you
16 amongst the other Food Not Bombs volunteers to receive
17 the ticket?
18     A.  He wanted -- he wanted to know -- you know, he
19 wanted to know who would be, in his words, very
20 loosely -- I believe there's a video of us.  So we can
21 go to that video to know exactly what was said, but he
22 wanted to know who was going to be leading or conducting
23 or who's going to be the head person of this.
24         And -- and then he said that, you know, you know,
25 would you be accepting the -- would you be accepting the

```
 1  citation, or would you be accepting the ticket?  And
 2  I -- the video will say it.  I was like I'm not
 3  accepting the ticket.  I'm just going to continue to do
 4  what I've done all these other Fridays.  I'm going to
 5  continue to do that today, being Friday.  And I believe
 6  I have a constitutional right to do so.  That was my
 7  response to him.
 8       It was not an acceptance of taking a ticket.
 9  That's his job, to give me a ticket.  I was not there to
10  take a ticket.  I was there to do what I did every
11  Friday for the number of years I've been doing that.
12  And he was going to do what he was going to do.
13       It turned out that he gives me a ticket, but at
14  that point it remained to be seen.
15    Q.  Okay.  Did you -- did you tell Officer Ancira
16  that you were conducting a feeding or that you were in
17  charge of the feeding?
18    A.  No, I couldn't do that, because no one's in
19  charge at Food Not Bombs.  I think you -- you might be
20  familiar, it's a -- it's an organization that is -- has
21  no hierarchy, so to speak.  So nobody's in charge.  And
22  in order to conduct, you have to be in charge.  So I'm
23  not conduct -- I'm not conducting anything.  I'm just
24  one of many people who just showed up, you know, for a
25  cause.
                                                    Page 81
```

```
 1    Q.  Go down to where it says suspect statements.  It
 2  says:  Mr. Picone indicated that he was aware of the
 3  violation and that he already had obtained a copy of the
 4  City of Houston ordinance.
 5       Do you see that?
 6    A.  I do.
 7    Q.  When did you obtain a copy of the City of Houston
 8  charitable feeding ordinance?
 9    A.  The original ordinance?
10    Q.  Any -- any copy of the ordinance.  Any version of
11  the ordinance, excuse me.
12    A.  When -- when the -- when the ordinance first came
13  out in 2012, I went online and read it then.
14    Q.  Okay.
15    A.  And -- and I visited it since.  The numbers are
16  kind of ingrained in my head.  It's kind of like 20.251
17  in the City of Houston -- and 252 in the City of
18  Houston.  I've read it a few times.  But that would be
19  the first time.
20    Q.  When was the last time you reviewed it prior to
21  your arrest?  No, no, I'm sorry, when was the last time
22  you reviewed the charitable feeding ordinance prior to
23  you receiving the citation?
24    A.  I couldn't say when was the last time.
25    Q.  Okay.
                                                    Page 82
```

```
 1    A.  I wouldn't know that.
 2    Q.  I want to just clarify, you were not arrested on
 3  March the 3rd, 2023; is that correct?
 4    A.  That is correct.
 5       MR. KALLINEN:  Objection, calls for a legal
 6  question.
 7       MR. SOH:
 8    Q.  You were not placed in handcuffs?
 9    A.  No.
10    Q.  You were not placed in handcuffs on March the
11  3rd, 2023?
12    A.  No, I was not placed in handcuffs.
13    Q.  And you were not taken to a police station or a
14  jail on March the 3rd, 2023, correct?
15    A.  Right, that's correct.
16    Q.  And the reason I'm asking, I just want to clarify
17  for the record, you were just given a written citation
18  and left alone, basically, by Officer Ancira, correct?
19    A.  Well, again -- again, to --
20       MR. KALLINEN:  Objection, --
21    A.  -- go back --
22       MR. KALLINEN:  -- vague.
23    A.  -- to clarify, --
24       MR. SOH:
25    Q.  Yeah.
                                                    Page 83
```

```
 1    A.  -- at the time, you know, I confronted him to ask
 2  him how this was going to go down, --
 3    Q.  Right.
 4    A.  -- just given one prior issuance of tickets two
 5  days earlier, and he didn't know how it happened two
 6  days earlier.  So I had no idea what was going to happen
 7  that night, and that included the possibility of arrest.
 8    Q.  All right.  But you were not arrested, correct?
 9       MR. KALLINEN:  Objection, calls for a legal
10  conclusion.
11    A.  At the end of that you know that, but going into
12  it I had no idea.  So the anxiety and the stress level
13  is there at that point.  I have no -- I'm serving food,
14  and all I know is at the end of this thing something's
15  going to happen.
16       MR. SOH:
17    Q.  Fair enough.  Let's see, you can put that down.
18  What did you -- what happened to the -- what was the
19  ultimate resolution of the ticket that you received on
20  March the 3rd, 2023?
21    A.  We had a jury trial, and the jurors came back
22  unanimous for -- is it non-guilty or is it --
23    Q.  You were found not guilty?
24    A.  I was found not guilty by the jury on a unanimous
25  decision.
                                                    Page 84
```

**Page 89**

1    So, yeah, he was -- he was trying to tell us not
2 to serve where we were serving.  Would that be
3 infringing on my speech?
4         MR. SOH:  I'm going to object as nonresponsive.
5    Q.  But, I mean, I guess let me rephrase the
6 question.  Okay?
7    A.  Okay.
8    Q.  From 2011 through the present, did any City of
9 Houston police officer or employee ever tell you or did
10 you ever witness a City of Houston police officer or a
11 City of Houston employee telling another member of Food
12 Not Bombs hey, you can't post that sign, you can't say
13 that, or you can't wear that T-shirt?
14         MR. KALLINEN:  Objection, compound, asked and
15 answered.
16    A.  How about you can't serve here, would that
17 qualify?
18         MR. SOH:
19    Q.  No, that's a different thing altogether.  I'm
20 just talking --
21    A.  Okay.
22    Q.  -- about the -- the --
23    A.  Okay.  Well, the -- the things that you just
24 listed, --
25    Q.  Right.

**Page 90**

1    A.  -- I would say I hadn't heard that.
2    Q.  Okay.  Fair enough.  Let's go back to your
3 declaration here, Exhibit 53.  Okay?  Some just quick
4 questions about it.  Paragraph 5 you talked about you
5 attended St. Thomas -- I'll say St. Thomas University.
6 You were a business major; is that correct?
7    A.  Yeah.
8    Q.  Okay.
9    A.  I was going for accounting.
10    Q.  Okay.  Let's go to page 2.  And, generally, your
11 declaration includes a lot of the same information that
12 was included in your 2019 and 2023 complaints, including
13 scripture citations, Isaiah and Matthew, as well as the
14 agreements and mission statement and vision of Food Not
15 Bombs Houston; is that correct?
16    A.  Right.
17    Q.  Okay.
18    A.  It is.
19    Q.  Paragraph 8 you talk about you share food in
20 north Houston and Spring Branch?
21    A.  Yes.
22    Q.  We talked about that previously, and I wanted to
23 get some clarification on that.  When you say north
24 Houston and Spring Branch, are you talking about your
25 previous testimony about helping to feed homeless people

**Page 91**

1 along Highway 290?
2    A.  Yes.
3    Q.  Okay.  And that you will feed there different
4 times of the day and different days of the week,
5 correct?
6    A.  Right.
7    Q.  Can you estimate to me -- can you estimate how
8 many times a week you would do charitable feeding along
9 Highway 290?
10    A.  Could be two times a week.
11    Q.  Okay.
12    A.  And the day -- there was a lot more flexibility
13 involved with that.  I'm -- I'm bringing it to them, as
14 opposed to, say, the Food Not Bombs food sharing going
15 on at the library a specific day and time and they come
16 to us.  I'm bringing it to them.  It was a little bit
17 more flexible.
18    Q.  I meant -- I forgot to ask this follow-up
19 question to your earlier testimony, and I wanted to
20 clarify.  I believe you said that you would get donated
21 food on Fridays and then prepare food for the Food Not
22 Bombs Houston feeding?
23    A.  Yes.
24    Q.  Is that accurate?
25    A.  That's accurate.

**Page 92**

1    Q.  Where would you get these donated foods?
2    A.  Whole Food Market had us as part of a program
3 that they were involved in where, you know, we were one
4 of a number of groups that would go by and pick up the
5 food that they were willing to donate to us and to this
6 cause.
7    Q.  Okay.  Any other -- any other places where you
8 would get donations for your Friday Food Not Bombs
9 Houston --
10    A.  That was the only place that I picked them up.
11    Q.  Is that the Whole Foods on -- on Voss?
12    A.  The Whole Food on Kirby.
13    Q.  Kirby.  Okay.
14    A.  But I think it might be important to point out
15 that the food that was picked up that Friday, was the
16 food that was served that Friday, as well, considering
17 we were talking earlier about food handling and -- and
18 things like that.
19    Q.  All right.  Let's go off the record.  I think I
20 may be done.  I just want to check with -- and then --
21 Randy, are you going to have any questions?
22         MR. HIROSHIGE:  No, no questions from counsel for
23 Food Not Bombs Houston and Brandon Walsh.
24         MR. SOH:  Give me a minute, and then we'll go
25 back on and I'll pass the witness.  Okay?

```
 1                IN THE UNITED STATES DISTRICT COURT
                  FOR THE SOUTHERN DISTRICT OF TEXAS
 2                         HOUSTON DIVISION

 3   FOOD NOT BOMBS HOUSTON,       ]
     BRANDON WALSH,                ]
 4        Plaintiffs,              ]
                                   ]
 5   v.                            ]  C.A. No. 4:24-CV-338
                                   ]
 6   THE CITY OF HOUSTON, TEXAS,   ]
          Defendant.               ]
 7   -----------------------------------------------------------

 8

 9                      REPORTER'S CERTIFICATION

10                   DEPOSITION OF PHILLIP PICONE

11                        FEBRUARY 18, 2025

12        I, Shawn Kelley, Certified Shorthand Reporter

13   No. 3448 in and for the State of Texas, hereby certify

14   to the following:

15        That the witness, PHILLIP PICONE, was duly sworn

16   by the officer and that the transcript of the oral

17   deposition is a true record of the testimony given by

18   the witness;

19        That the deposition transcript was submitted on

20   _____, 2025, to Randall Kallinen,

21   attorney for Plaintiff Phillip Picone, for examination,

22   signature, and return to the offices of Nell McCallum &

23   Associates, Inc., by _____, 2025.

24        That the amount of time used by each party at the

25   deposition is as follows:
```

**NELL McCALLUM & ASSOCIATES, INC.**

```
 1        Kenneth Soh - (1 hour, 50 minutes)
 2        That pursuant to information given to the
 3   deposition officer at the time said testimony was taken,
 4   the following includes all parties of record:
 5        Randall Hiroshige, Attorney for the Plaintiffs
 6   Foot Not Bombs Houston and Brandon Walsh
 7        Randall Kallinen, Attorney for the Plaintiff
 8   Phillip Picone
 9        Kenneth Soh and Natoya Inglis, Attorneys for the
10   Defendant The City of Houston, Texas
11        I further certify that I am neither counsel for,
12   related to, nor employed by any of the parties in the
13   action in which this proceeding was taken, and further
14   that I am not financially or otherwise interested in the
15   outcome of the action.
16        Certified to by me this _____ day of _____,
17   2025.
18
19                       _____
20                       Shawn Kelley, Texas CSR No. 3448
                         Expiration Date:  1/31/24
21                       Nell McCallum & Associates
                         Firm Registration No. 10095
22                       Expiration Date:  1/31/25
                         718 Westcott
23                       Houston, Texas  77007
                         (713) 861-0203
24
25
```

**NELL McCALLUM & ASSOCIATES, INC.**