# EXHIBIT F

Jennifer Kennedy
February 11, 2025
Pages 46 to 49

Page 46
1    THE REPORTER: We are back on the record at
2 10:29.
3    Q. (BY MR. FIFE) Now, Captain Kennedy, before we
4 broke, we were discussing the third full paragraph of --
5 on page 4 of Exhibit 17, August 2nd, 2023 citation.
6        Could you review the second paragraph, so
7 just the next paragraph up. We're on page 4.
8    A. Yeah, I was just checking the date.
9    Q. Oh, sorry.
10   A. Yes.
11   Q. And -- so "Officers A. Chapa and F. Mata walked
12 to the corner of Smith and McKinney and observed
13 approximately eight people setting up to serve food to
14 the homeless." The report continues. "Officers
15 approached the listed suspect and advised the suspect"
16 of the signs -- "that signs were posted prohibiting a
17 'food service event' and provided them with a copy of
18 the written warnings."
19       Do you see that?
20   A. Yes.
21   Q. Mark this as Exhibit 18.
22       (Exhibit No. 18 was marked.)
23   Q. (BY MR. FIFE) So I'd like to turn to the
24 second page. This is a photo. What is this a photo of?
25   A. This is a perimeter gate around the Julia

Page 47
1 Ideson Building at the library, Central Library.
2    Q. And do you see the notice on the left side of
3 the page?
4    A. Yes.
5    Q. Is that a notice regarding the charitable food
6 service ordinance?
7    A. Yes.
8    Q. And is this the sign that the officers would
9 have been referring to in that line of the report we
10 just read?
11   A. Yes.
12   Q. So if you turn back to page 1 which is marked
13 COH 000001, this is the text of the sign. And about
14 halfway down there's a sentence that starts "If you want
15 to conduct charitable" -- do you see that sentence?
16   A. Yes, sir.
17   Q. If says "If you want to conduct charitable food
18 service on city property, you must do so at the nearby
19 downtown location of 61 Riesner Street, Houston, Texas
20 77002."
21   A. Yes.
22   Q. And if we can turn back to the report -- or
23 actually one more question on Exhibit 18, the signs.
24       So this notice that is in front of -- is
25 along the gate in front of the Julia Ideson Building

Page 48
1 informs individuals that to conduct a charitable food
2 service activity they must go to 61 Riesner Street,
3 Houston, Texas 77002?
4    A. Yes.
5    Q. And so now if we can turn back to Exhibit 17,
6 back in that same paragraph that we read from, the next
7 sentence says "Officers also advises the suspect that a
8 new proposed location of 61 Riesner is the preferred
9 location and offered to provide assistance with moving
10 if she wanted."
11       Did I read that right?
12   A. Yes, sir.
13   Q. Did you instruct officers to help groups
14 conducting charitable food service events at the Central
15 Library to provide assistance if they wanted to move to
16 Riesner Street?
17   A. Yes.
18   Q. And in this report when it says 61 Riesner
19 Street, that's referring to the same address that we
20 just read on Exhibit 18, the notice?
21   A. Yes.
22   Q. So if you or I say "61 Riesner Street"
23 throughout this rest of this deposition, we understand
24 we're talking about 61 Riesner Street, Houston, Texas
25 77002, correct?

Page 49
1    A. Correct.
2    Q. Which is a location near the old police station
3 and the municipal courthouse?
4    A. Yes, sir.
5    Q. And so would -- so if -- in order to accept the
6 officer's assistance with moving, would Food Not Bombs
7 had to have changed anything about their event?
8       MS. ANDERSON: Objection; form.
9    A. I don't believe so.
10   Q. (BY MR. FIFE) So what I mean by change the
11 event is serve different food, serve a different
12 constituency, take off their T-shirts?
13   A. No.
14   Q. Would the officers have provided assistance to
15 the people receiving food, for example, a shuttle to get
16 to 61 Riesner?
17   A. If any of them needed to, yes. If any of them
18 requested assistance in moving over there, we assist
19 them.
20   Q. They would have helped move 100 people?
21   A. Yeah.
22   Q. How would they have done that?
23   A. They would have taken several trips, but I
24 advise the officers out there, if anybody needed
25 assistance moving, we would provide it.



Jennifer Kennedy  
February 11, 2025  
Pages 50 to 53

Page 50
1  Q. Okay.
2  A. We also have access to the HOT team, as you
3  spoke about earlier, the homeless outreach team. They
4  have access to Sprinter vans, and those individuals
5  could get loaded up in a Sprinter van and driven to
6  61 Riesner.
7  Q. And just to be clear, if they had moved to
8  61 Riesner Street, they could have served the same food
9  that they had prepared for that night?
10  A. Correct.
11  Q. Now, zooming out a little bit, had the -- so
12  this was a citation given to Food Not Bombs for
13  allegedly conducting a charitable food service event,
14  right?
15      MS. ANDERSON: Objection; form.
16  A. It was a citation issued to James Foster, not
17  Food Not Bombs.
18  Q. (BY MR. FIFE) Good corrective. So this was a
19  citation issued to James Foster for his participation in
20  an alleged charitable food service event?
21      MS. ANDERSON: Objection; form.
22  A. It was a citation issued to James Foster for
23  violation of the ordinance.
24  Q. (BY MR. FIFE) Okay. Now, if the City had
25  given Mr. Foster permission to serve food at the

Page 51
1  location of the citation, would this alleged conduct
2  violate the ordinance?
3      MS. ANDERSON: Objection; form.
4  Q. (BY MR. FIFE) I can rephrase.
5  A. Yes, please.
6  Q. So if James Foster or -- yeah, if Mr. Foster
7  had advanced written consent from the City of Houston to
8  serve -- to conduct a charitable food service event at
9  the location of the citation, would that have violated
10  the ordinance?
11  A. Based on the wording of the ordinance, no.
12  Q. And so if we turn back to -- now, could a group
13  registered with the registered charitable food service
14  program conduct a charitable food service event at the
15  location of this citation -- scratch that. Let me
16  rephrase.
17      At the time of this citation at issue,
18  could a registered charitable food service group conduct
19  a food service event near the public library without
20  advanced written consent of the City of Houston?
21  A. No.
22  Q. Okay. Now I wanted to turn back just really
23  quickly to what we discussed earlier in terms of getting
24  to 61 Riesner Street. So you testified that, had Food
25  Not Bombs and Mr. Foster been willing to move to

Page 52
1  61 Riesner Street, that the officers on-site would have
2  provided assistance to individuals receiving food from
3  the event?
4  A. Yes.
5  Q. Now, for groups at 61 Riesner, does the City
6  currently provide transportation to help individuals
7  seeking food get to 61 Riesner Street?
8      MS. ANDERSON: Objection; form?
9      MR. FIFE: You can answer.
10  A. I don't believe that there is like a organized
11  transportation to get to 61 Riesner. I know they have
12  access to zTrips, to METROLift, METRO shuttles. So
13  those are city operated so I'm not...
14  Q. (BY MR. FIFE) And I guess my question is just
15  those are city services that you can use regardless of
16  your participation in a charitable food service event?
17  A. Right.
18  Q. Now, last thing on this police report, so on --
19  you mentioned that the officers on the DRT team that
20  conducted enforcement actions at charitable food service
21  events near the library did so after their regular
22  shift?
23  A. Yes.
24  Q. And so you created a schedule of officers
25  assigned to conduct enforcement actions for alleged

Page 53
1  violations of the charitable feeding ordinance?
2  A. My DRT sergeant created the schedule. I
3  advised him to create it.
4  Q. Okay. And so were those officers paid overtime
5  for being paid at charitable food service events?
6  A. They were paid overtime for working, correct.
7  Q. Okay. How much would you estimate the officers
8  as part of the DRT -- scratch that.
9      How much would you estimate it cost the
10  City to have those officers conduct enforcement actions
11  for alleged violations of the charitable food service
12  ordinance?
13      MS. ANDERSON: Objection; form.
14      MR. FIFE: You can answer.
15  A. I would need paper, pen, and a calculator to
16  give you some sort of an accurate estimate. But during
17  those times when the different response teams were out
18  there, they were not only enforcing the charitable
19  feeding ordinance. So they were also addressing other
20  civility issues such as issues outside The Beacon,
21  issues along Main Street, issues behind some of the
22  METRO stops along Capital. So it wasn't solely
23  dedicated to charitable feeding. They addressed other
24  issues as well during that overtime slot.
25  Q. (BY MR. FIFE) Well, let me put it this way.



MAGNA LEGAL SERVICES

Page 78

1  are listed.  But outside of that, I don't know.
2      Q.  So were you aware of any criteria that the City
3  applied to all of these locations from 2012 to 2016?
4      A.  No.
5      Q.  Are you aware of any written guidance from 2012
6  to 2016 identifying what criteria the City would use to
7  approve or disapprove public property for charitable
8  food service events?
9      A.  No.
10     Q.  Now, we were -- so the category we were just
11 discussing was City-owned property locations approved
12 from 2012 to 2016, right?
13     A.  Yes.
14     Q.  Now, the next list or -- sorry.  The next
15 category in these responses was food and housing
16 programs from 2019 to 2022, right?
17     A.  Yes.
18     Q.  So what were -- were any public property
19 locations approved for charitable food service events
20 from 2016 to 2019?
21     A.  I don't know.
22     Q.  Do you see any listed in the City's
23 interrogatory responses?
24     A.  No.
25     Q.  Could you name a location that was approved

Page 79

1  for charitable food service events -- a public property
2  location that was approved for charitable food service
3  events from 2016 to '19?
4      A.  No.
5      Q.  And I just want to confirm you also said you
6  were unaware of -- let me put the question this way.
7          Were any locations approved from 2016 to
8  '19 for charitable food service events?
9      A.  Not that I know of.
10     Q.  Do you know if the City made a decision to not
11 approve any locations from 2016 to '19?
12     A.  No, I don't know that.  I don't believe there
13 was any enforcement between 2016 to 2019 of the
14 ordinance.
15          MR. FIFE:  Could we take a five-minute
16 break?
17          THE REPORTER:  Off the record at 11:28.
18          (Recess from 11:28 a.m. to 12:30 p.m.)
19          THE REPORTER:  Back on the record at 12:30.
20     Q.  (BY MR. FIFE)  So, Captain Kennedy, before we
21 left for lunch, we were discussing what locations, if
22 any, the City had approved for charitable food service
23 events from 2015 to '19.  And that's page 4 of this
24 City's answers and objections to our interrogatories.
25 We agreed before the break that there were no locations

Page 80

1  listed as approved from 2016 to '19; is that right?
2      A.  Yes.
3      Q.  Okay.  I'm going to mark this next document as
4  Exhibit 22.
5          (Exhibit No. 22 was marked.)
6      Q.  (BY MR. FIFE)  It is a short e-mail thread
7  between Ms. Rubi Longoria and Mr. Joe Turner.  And,
8  Captain Kennedy, do you see that there are two e-mails
9  in the middle of the document in the original message?
10 There's that line that says original message is an
11 e-mail from Ms. Rubi Longoria to Joe Turner on July 8th,
12 2016.
13         Do you see that, that first e-mail?
14     A.  Yes.
15     Q.  Do you know who Rubi Longoria is?
16     A.  I do not.
17     Q.  And so you don't know what role she is or what
18 role she had in 2016 with the City?
19     A.  Based on her e-mail address, she worked for
20 parks and rec department.  But as far as her exact role,
21 I don't know.
22     Q.  And you're saying the PRD stands for parks and
23 rec department?
24     A.  Yes.
25     Q.  Okay.  Same question for Joe Turner -- do you

Page 81

1  know what his role was at the time of this e-mail?
2      A.  No.
3      Q.  But safe to say he was an employee of the parks
4  and rec department?
5      A.  Yes.
6      Q.  Based on the PRD next to his e-mail?
7      A.  Correct.
8      Q.  Okay.  Now, looking at the message,
9  Ms. Longoria writes "I understand that all charitable
10 feedings have been canceled until further notice."
11         Do you see that?
12     A.  I do.
13     Q.  Okay.  Do you know or does the City know
14 whether Ms. Longoria was correct that as of July 8th,
15 2016, all charitable feedings had been canceled until
16 further notice?
17     A.  I do know that the feedings that were taking
18 place at the parks in 2016 -- I don't know the exact
19 date.  I do know those feedings at the park were
20 canceled.  There was serious safety concerns.  There was
21 a huge increase in the kush among the homeless
22 population that was creating a lot of issues for the
23 parks.  And I believe the City felt like it was no
24 longer safe to host these -- or to allow these events to
25 be hosted on the park property.  And so they were

Jennifer Kennedy

February 11, 2025
Pages 82 to 85

Page 82
1  canceled.
2      Q.  So -- so in 2016, the parks and recreation
3  department decided to suspend all charitable feeding
4  activities on parks' property due to the kush and issues
5  that kush was causing in the parks?
6      A.  I don't know if it was parks and recs
7  department that decided that, but the City decided that.
8      Q.  Okay.
9      A.  Yes.
10     Q.  And so -- and you can just see here for
11 completeness, Mr. Joe Turner echoes what you had said
12 that -- and he writes "They have all been temporary
13 suspended while the mayor works through the kush issue
14 first in our parks and public areas.  And then second,
15 we be working to set up discussions with the faith-based
16 organizations on how to best provide services to those
17 in need, not just feedings."
18         Do you see that?
19     A.  Yes.
20     Q.  So you discussed the first part in your answer
21 which was issues related to kush.  But at the time, was
22 the City also trying to work with faith-based
23 organizations on how to best provide services to those
24 in need?
25     A.  I believe so.  And right around this time also

Page 83
1  in 2016 is when Rapid Rehousing Program began.  And so
2  it was likely an effort to collaborate with the
3  organizations that were conducting the feedings to offer
4  those, like, housing services along with the feedings.
5      Q.  Uh-huh.  And was that desire to work with
6  faith-based organizations on how to collaboratively
7  implement the Rapid Rehousing Program, was that also a
8  basis for suspending charitable food activities in the
9  parks?
10     A.  No.  I believe that the primary basis was just
11 safety concerns.
12     Q.  Safety concerns related to kush?
13     A.  Right.
14     Q.  Okay.  So at the time of this e-mail, all
15 charitable food service activities in public parks had
16 been suspended, right?
17     A.  I believe so, yes.
18     Q.  Was there a plan or criteria in place at which
19 point the city parks could be reauthorized as locations
20 for charitable food service activities?
21     A.  Not when it was canceled.  I don't think they
22 had a plan in place to reopen.  When it was canceled, it
23 was canceled for safety issues.  Then I'm assuming as it
24 says here the mayor was going to work with the
25 organizations to kind of move forward.

Page 84
1      Q.  So at the time of this e-mail, the -- the City
2  had suspended charitable food activities on public
3  parks, but at the time there was not a plan to
4  reauthorize those charitable food service activities?
5      A.  I believe so.
6      Q.  Now, what is kush?
7      A.  It's synthetic marijuana.
8      Q.  At the time, was it illegal?
9      A.  Yes.  So there was -- I don't know -- have the
10 exact dates as far as legislation.  The issue with kush
11 and synthetic marijuana is there are several different
12 chemical formulations, right?  And so their court system
13 was having a difficult time keeping up with the
14 different chemical formulations and having legislation
15 to list all chemical formulations as controlled
16 substances that is illegal.
17     Q.  And was legislation prohibiting these various
18 chemical iterations eventually passed?
19     A.  Yes.  Now, there are -- this is somewhat out of
20 my scope as I'm not a narcotics officer or, you know, a
21 scientist.  However, synthetic marijuana -- I mean, it
22 is illegal, but there are different -- I mean you can
23 come up with different formulations that would then need
24 to be introduced into legislation.
25     Q.  So is kush just -- and again, I appreciate that

Page 85
1  you're not a narcotics officer, but just is kush one
2  type of synthetic marijuana among other types of
3  marijuana or is kush an umbrella term for all synthetic
4  marijuana?
5      A.  It's an umbrella term.
6      Q.  Okay.
7      A.  So kush is an umbrella term.  So there's
8  marijuana, right, just your standard marijuana with THC.
9  And then there is synthetic marijuana that has all of
10 these other different substances in it that are supposed
11 to emulate the effects of actual marijuana.  But in
12 reality, they had significantly different effects on a
13 lot of people.  I personally have had probably well over
14 100 interactions with individuals that are high on kush.
15 And it is -- it is a scary situation.
16     Q.  So in 2016, in -- as of July 8th, 2016, the
17 time of this e-mail, were other drugs besides kush a
18 problem in the City of Houston?
19     A.  Yes.
20     Q.  So the reason I ask that is just to set up the
21 next question which is what made kush unique?
22     A.  So kush was almost like when PCP became popular
23 in that a lot of people began using it without
24 understanding the effects.  And it caused major behavior
25 changes in individuals, a lot of violent outbursts.



MAGNA
LEGAL SERVICES

Jennifer Kennedy  
February 11, 2025  
Pages 126 to 129

Page 126

1  Central Houston Public Library Plaza, 500 McKinney,
2  Houston, 77002, as an approved charitable food service
3  location for Food Not Bombs."
4      Do you see that?
5   A. Yes.
6   Q. So as of September 5th, 2012, was the Central
7  Houston Public Library an approved charitable food
8  service event location for Food Not Bombs?
9   A. According to this newsletter.
10  Q. Well, I guess just as a first question, did
11 Mayor Parker have authority to give Food Not Bombs
12 permission to serve food at the Central Library?
13  A. That would be as a mayor within her scope of
14 authority.
15  Q. Okay. But we discussed last time that the
16 ordinance says the parks and health department directors
17 can also approve locations, rules, criteria to
18 administer charitable food service events, right?
19      MR. SOH: Objection; form.
20      Go ahead and answer if you can.
21  A. Yes. In the ordinance?
22  Q. (BY MR. FIFE) Yes.
23  A. Yes.
24  Q. So in addition to those departments, the mayor
25 can also give permission? As Mayor Parker did in 2012?

Page 127

1   A. I'm assuming that was in coordination with the
2  health department.
3   Q. And have you ever seen this response -- or had
4  you ever seen this statement that Mayor Parker gave Food
5  Not Bombs Houston permission to use the Central Library?
6   A. No.
7   Q. And you said earlier that currently Food Not
8  Bombs does not have authorization from the city to
9  conduct charitable food service events at the Central
10 Library?
11  A. Correct.
12  Q. So when was the permission revoked?
13  A. Well, I would say that it was in February of
14 2023 when they received warning that they were no longer
15 going to be able to feed there and that they have to
16 feed at 61 Riesner, so before any sort of enforcement
17 action took place.
18  Q. Okay. Do you know -- based on what you said, I
19 think I know this answer. But are you aware when this
20 newsletter was taken down off of the City of Houston web
21 page?
22  A. No.
23  Q. And then in February of 2023 when Food Not
24 Bombs permission was revoked, do you know who made that
25 decision?

Page 128

1   A. No, not specifically. I know -- it's not that
2  their permission was revoked. It's the only approved
3  location was going to be 61 Riesner. So there was never
4  a -- here your permission is hereby revoked. It's as of
5  this date, this is going to be the only approved
6  location.
7   Q. And the only approved location was 61 Riesner
8  Street, right?
9   A. Correct.
10  Q. So was there a reason why the Central Library
11 was no longer going to be allowed -- let me put that
12 differently.
13      Why was the Central Library no longer going
14 to be authorized as a charitable food service event
15 location?
16  A. There were significant issues and safety
17 concerns coming from the Central Library. And the City
18 also found that a coordination of efforts among those
19 that participate in the food service events would be
20 mutually beneficial to not only those who provide the
21 food but those who receive the food as well as the
22 property where the feeding occurs.
23  Q. So if Food Not Bombs at the time wanted to use
24 another location for its charitable food service events,
25 were there any criteria by which they could select a

Page 129

1  different public property location?
2   A. No.
3   Q. It was just 61 Riesner Street, right?
4   A. Correct.
5   Q. And before you mentioned that, in February of
6  2023, the health department issued guidelines outlining
7  sufficient trash reciprocals, handwashing stations, and
8  24/7 porta potty access as requirements for any public
9  property where charitable feeding would occur?
10  A. Well, it's -- yes. So it's access during a
11 food service event and available 24/7. That does not
12 mean that bathrooms have to be unlocked 24/7. It means
13 that they have to be available for use 24/7. And then,
14 basically open during a food service event. If you read
15 the ordinance, it's clear in there. But yes. So right.
16  Q. Okay. So to -- so it's handwashing stations,
17 sufficient trash reciprocals, and porta potties for use
18 during food service?
19  A. And parking.
20  Q. And parking?
21  A. Yes.
22  Q. Now, if Food Not Bombs had identified another
23 location, another publicly owned location that met those
24 four criteria, could they have used it for a charitable
25 food service event?



Jennifer Kennedy  
February 11, 2025  
Pages 130 to 133

Page 130

1   A. If they received permission from the public or
2   private owner. But if it was a public property, then
3   that would be something that had to be approved, you
4   know, by the City. So if it was a private place then,
5   yes, absolutely.
6       Q. But in terms public property, a location with
7   those four criteria we discussed would not necessarily
8   be approved for the charitable food service event. They
9   would still need to ask the City for permission?
10      A. Correct.
11      Q. If a location had those four elements that we
12  discussed -- the porta potty, handwashing, parking, and
13  trash reciprocals -- would the City approve that
14  location, or would they still just say 61 Riesner
15  Street?
16          MR. SOH: Objection; form.
17          MR. FIFE: You can answer.
18      A. I think that could be a possibility. But it
19  would also have to be, you know, something where the
20  City looks at the safety in providing, having, you know,
21  resources as far as being able to provide officers for
22  security so.
23      Q. (BY MR. FIFE) Now, so previously we discussed
24  61 Riesner Street as an approved -- or actually we were
25  just discussing 61 Riesner Street as an approved public

Page 131

1   property for charitable feeding events. That was
2   approved in 2022?
3       A. 2023, I believe.
4       Q. Okay. So February of 2023 is when the City
5   started issuing notices that --
6       A. Yes.
7       Q. Sorry. They started issuing notices in 2023,
8   right?
9       A. Correct.
10      Q. And the notices said that all charitable food
11  service events had to take place at 61 Riesner Street?
12      A. Yes. Excuse me. If it was on public property.
13      Q. Yes, yes. So in February of 2023, the only
14  approved property for charitable food service events was
15  61 Riesner Street, right?
16      A. Yes.
17      Q. And that means there were no parks approved,
18  right?
19      A. Correct.
20      Q. And no other public sidewalks or public streets
21  were available as charitable food service locations?
22          MR. SOH: Objection; form.
23      A. Yes.
24      Q. (BY MR. FIFE) Why did the City choose
25  61 Riesner Street?

Page 132

1       A. There were several reasons -- its close
2   proximity to the library where people were already being
3   fed. It's a half a mile walk. It's well lit. The
4   sidewalks are actually brand new from McKinney and all
5   along Bagby until you get to Capital. There's no
6   mobility issues with any of the sidewalks, no safety
7   concerns.
8           There's one intersection that would have to
9   be crossed as a protected intersection that's frequented
10  all the time especially by individuals going to the
11  Hobby Center. It's in very close proximity to the Bayou
12  Place which is a location where we know that many of the
13  individuals that are participating in the feeding.
14  That's where they sleep at night as well, close to the
15  Beacon which is another major homeless provider
16  downtown.
17          We also had the ability there to provide
18  not only the minimum of ten parking spots, trash can
19  receptacles, porta potties, and handwashing stations,
20  but we have electrical outlets available for people. We
21  have portable lighting that was available. And we have
22  police nearby. And then also police that would be
23  on-site. So it's a safe location.
24      Q. Who was involved in that decision?
25      A. I remember having a conversation with Chief

Page 133

1   Satterwhite about considering 61 Riesner as a location.
2   I believe he was involved, heavily involved, in that
3   decision. He asked my opinion at one point. That's why
4   we spoke about it. I thought that was a great location.
5   I'm not sure who made the final decision as for it being
6   61 Riesner.
7       Q. Did Chief Satterwhite speak with the mayor
8   about 61 Riesner Street?
9       A. I believe so.
10      Q. Okay. And you mentioned the quality of the
11  sidewalks, how close it is to the Central Library,
12  lighting, proximity to locations where homeless
13  individuals spend a lot of time, and safety of
14  61 Riesner Street. Were those -- who came up with those
15  criteria or factors?
16      A. Those weren't criteria or factors. They were
17  just benefits of that location.
18      Q. So were there any written criteria or factors
19  that the City had to consider?
20      A. No. Nothing outside of what the health
21  department had already created -- basically the parking
22  restrictions, you know, minimum of ten parking spaces,
23  sufficient trash reciprocals, portable restrooms, and
24  handwashing stations available during a food service
25  event and available 24/7.



Jennifer Kennedy

February 11, 2025
Pages 134 to 137

Page 134
1    Q.  And so I understand the benefits of -- the
2  benefits of -- that you've described for 61 Riesner
3  Street, but I want to know why the City decided to have
4  only one approved location as opposed to having multiple
5  properties, public properties that could be used for
6  charitable food service events.
7    A.  Well, as of now, there was a huge group of
8  individuals that were receiving food downtown.  So we
9  knew that it needed to be local to downtown for the
10 groups that were receiving food could easily get to,
11 right?
12       And as far as ensuring officers for safety
13 and allocating resources, I think it was the initial
14 ideas.  Let's start with this one location because we
15 already know it's going to be successful in feeding the
16 same amount of people that were already being fed at the
17 library.
18   Q.  Has this, since 61 Riesner became the sole
19 location in 2023, has the City created or authorized
20 charitable food service events at more public
21 properties?
22   A.  No.
23   Q.  And so I'm not sure what you just said answered
24 my original question which is why did the City decide to
25 create one location as the exclusive place for

Page 135
1  charitable food service events instead of how it had in
2  2012 through 2016 approved multiple locations throughout
3  Houston?
4    A.  Well, the City does not have the resources to
5  staff every single park to conduct charitable food
6  events in a safe manner.
7    Q.  What other locations did the City consider --
8  or let me put that differently.
9        So in authorizing and creating an exclusive
10 location for charitable food service events on city
11 property, were there other locations that the city
12 considered besides 61 Riesner Street?
13   A.  I'm not sure.
14   Q.  I will mark this as Exhibit 27.
15       (Exhibit No. 27 was marked.)
16       MR. SOH:  So I assume we're done with 26.
17       MR. FIFE:  Yes.
18   Q.  (BY MR. FIFE)  This is an e-mail thread
19 between -- well, several members of the mayor's staff.
20 And do you know what HCD means?
21   A.  Where is that at?
22   Q.  It's next to Mr. Marc Eichenbaum's e-mail.
23   A.  I know he was assigned to the homeless
24 initiatives, so maybe.
25   Q.  It's okay.

Page 136
1    A.  I'm not sure.
2    Q.  Yeah.  So can you turn to the back page which
3  is COH-084927.  In the middle of the page, there's an
4  e-mail that's from Andy Icken to Mayor Turner,
5  Marvalette Hunter, Marc Eichenbaum, and James Koski.
6        Do you see that?
7    A.  I do.
8    Q.  And this e-mail was sent on August 11th, 2021.
9  It says "Mayor, after our call this afternoon, James"
10 and I -- "James, Marc, and I got together to be sure we
11 focus on possible feeding sites that met the criteria we
12 discussed."
13       Do you know what criteria they discussed?
14   A.  I do not.
15   Q.  Is the criteria they discussed written
16 anywhere?
17   A.  I do not know.
18   Q.  But sitting here today, you don't know what
19 criteria Mr. Icken was referring to?
20   A.  No.
21   Q.  And then he continues "We plan on focusing on
22 three different sites that potentially meet the needs:
23       1.  St. John's/ Pastor Rudy."
24       Who is Pastor Rudy?
25   A.  I do not know him.

Page 137
1    Q.  Does he run or direct the Bread of Life
2  organization?
3    A.  That sounds familiar.  Quite possibly, but I do
4  not know for sure.
5    Q.  Where is St. John/Pastor Rudy's facilities?
6    A.  Based on this e-mail, I would say the southeast
7  quadrant of central business district just south of the
8  Pierce Elevated.
9    Q.  So the next is municipal courthouse area.  And
10 then there is a -- and then -- so the municipal
11 courthouse area is -- would include 61 Riesner Street?
12   A.  Yes -- sorry.
13   Q.  61 Riesner Street is in the municipal
14 courthouse area?
15   A.  Yes.
16   Q.  And if you can look at the last sentence, it
17 says "The challenge will be the perception it is 'out of
18 sight.'"
19       Did I read that correctly?
20   A.  Yes.
21   Q.  So can you turn back to the first page?  This
22 is -- and then at the bottom of the first page, there is
23 an e-mail from Marvalette Hunter.
24       Do you see that, that she sent on
25 October 12, 2021?



MAGNA LEGAL SERVICES

Jennifer Kennedy  
February 11, 2025  
Pages 138 to 141

Page 138
1  A. I do.
2  Q. Ms. Hunter writes "My recommendation is the
3  Municipal Courthouse Area No. 2. It has already been
4  assessed and is functionally appropriate. Being out of
5  sight should not be a determinate of an appropriate
6  location."
7       Do you see that?
8  A. I do.
9  Q. Does the City agree that in approving
10 charitable food service events it does not take into
11 account whether a location is "out of sight"?
12      MR. SOH: Objection; form.
13      Go ahead and answer if you can.
14      MR. FIFE: Yeah, let me restart that
15 actually.
16  Q. (BY MR. FIFE) Here, Ms. Marvalette says that a
17 location "being out of sight should not be a determinate
18 of an appropriate location" in reference to charitable
19 food service events, right?
20      Right?
21  A. Yes.
22  Q. And here, being out of sight, would mean away
23 from public view?
24      MR. SOH: Objection; form.
25  Q. (BY MR. FIFE) What does being out of sight

Page 139
1  mean to you?
2  A. Well, I'm not sure because I work in this
3  complex and it's not out of sight. So I'm not exactly
4  sure what they're referring to. I mean, you've got the
5  courthouse next door that's open until 10:00 p.m.
6  You've got I-45 that runs right next to it. And if
7  you're on it anytime between 3:00 and 6:00 p.m., you're
8  going 20 miles an hour and you can look over into the
9  parking lot and see the feeding occurring.
10      MR. SOH: I would object that 20 miles an
11 hour is a gross exaggeration of the speed limit of the
12 Pierce Elevated at 4:00 o'clock in the afternoon.
13  A. I'm just not sure what they're getting at as
14 far as it being out of sight.
15  Q. (BY MR. FIFE) Okay. Yeah, so I think the core
16 of what I'm trying to get at is just in deciding whether
17 to approve a location for charitable food service
18 activities. Does the City consider whether it is -- it
19 will be viewed by the public?
20  A. Apparently not. I don't think it's something
21 where it's -- either way where location is determined
22 because it is -- you know, there is people that are
23 going to see it versus a location where a lot of people
24 will see it. So I think either way that is not used as
25 a determinate to identify a location.

Page 140
1  Q. Yeah, whether a lot of people will see it or
2  not --
3  A. Correct.
4  Q. -- does not matter to whether the City will
5  approve the location?
6  A. Right. Because I don't think that affects the
7  ability of an organization to provide food if other
8  people can see it or not or the number of people who can
9  see it.
10  Q. So we've discussed previously that the City
11 began posting notices about 61 Riesner in February
12 of 2023?
13  A. Yes.
14  Q. How -- and you said earlier that you talked
15 Sergeant Simon about the posting of the signs?
16  A. Yes.
17  Q. What did you ask him?
18  A. I asked him if he knew who posted them. He
19 didn't know. I have an e-mail -- I saw an e-mail at one
20 point from Andy Icken saying that the signs would be
21 posted February 20th. I'm assuming it's just the City's
22 general service department that posted them because they
23 are the ones that are responsible for that type of
24 activity. I was just curious if he knew, you know, who
25 posted them.

Page 141
1  Q. And so you still don't know because
2  Sergeant Simon didn't know either?
3  A. Right.
4  Q. But whoever did post the signs, they were doing
5  so at the direction of city officials who decided that
6  61 Riesner Street would be the new location for
7  charitable feeding and we need to warn the folks serving
8  food at the library?
9  A. Yes.
10  Q. So in -- from -- so the e-mail that we just
11 reviewed from Mr. -- how did you say his name?
12  A. Icken.
13  Q. Icken -- was in August of 2021. And then the
14 signs were posted in February of 2023?
15  A. Uh-huh.
16  Q. Were individuals conducting charitable food
17 service events at 61 Riesner between August 2021 to
18 February of '23?
19  A. Yes.
20  Q. Do you know what groups were doing so?
21  A. There were several different groups. Some of
22 them were just individuals. Some were churches,
23 religious organization. I believe Faizi's and Hussain's
24 Table were out there. But there's several different
25 organizations.



MAGNA  
LEGAL SERVICES

Jennifer Kennedy  
February 11, 2025  
Pages 142 to 145

Page 142
1  Q. But then February of 2023 is when the City made
2  a concerted effort to move all Central Library feedings
3  to 61 Riesner?
4  A. Yes.
5  Q. Okay.
6  A. Well, March 1st.
7  Q. March 1st was when the citations began?
8  A. March 1st is when the enforcement began.
9  Q. Yeah. That was when the first citation was
10 issued?
11  A. Yes.
12  Q. Okay.
13      MR. FIFE: Should we break for ten minutes?
14      MR. SOH: Sure.
15      (Recess from 2:22 p.m. to 2:35 p.m.)
16      THE REPORTER: Back on the record at 2:35.
17  Q. (BY MR. FIFE) So we were just discussing
18 61 Riesner Street, and I'm going to mark this as
19 Exhibit 28.
20      (Exhibit No. 28 was marked.)
21  Q. (BY MR. FIFE) This is a -- appears to be a
22 Google Maps image produced to us during discovery and
23 is -- has Bates stamp COH_067224. Now, would you say
24 that this is a fair and accurate depiction of the
25 municipal court area?

Page 143
1  A. Minus several trees that have since died.
2  Q. Okay. So currently there are fewer trees?
3  A. Currently there are fewer trees, but everything
4  else looks accurate.
5  Q. Okay. And it's a little hard to read. But do
6  you see in red on the lower right-hand -- or lower right
7  side of the page it says "Homeless feeding area" in red
8  font?
9  A. Yes.
10  Q. And it appears to -- the homeless feeding area
11 prepares -- appears to begin at the intersection of
12 Lubbock Street and Artesian Place?
13  A. So the feeding actually takes place in this
14 small parking lot that is really sandwiched between
15 Lubbock, Riesner, and Artesian.
16  Q. Could you mark that on your map with a star?
17 So that's slightly to the left of the red font, homeless
18 feeding area?
19  A. Correct.
20  Q. What is that building adjacent to Lubbock
21 Street directly in front of the homeless feeding area?
22  A. 61 Riesner.
23  Q. And that building is a Houston Police
24 Department building, right?
25  A. It is not occupied by the police department

Page 144
1  anymore. It is -- it used to be the Central Patrol
2  Division building. I believe after it got flooded from
3  Harvey, we -- is when we discontinued using it. There
4  is a general services department group that uses part of
5  that building. But I think it's more on the north end
6  that is utilized.
7  Q. Outside -- and general services, is that
8  general services for HPD or --
9  A. City of Houston.
10  Q. City of Houston? Okay.
11  A. Yes.
12  Q. Are there any other city functions or
13 departments that operate out of 61 Riesner Street?
14  A. I don't believe so.
15  Q. It was the old Central Patrol Division
16 building?
17  A. Yes.
18  Q. And then to the left of that building, there's
19 a municipal courthouse?
20  A. Yes.
21  Q. And that is the municipal courthouse where Food
22 Not Bombs volunteers would go to take care of their
23 tickets or contest there citations for violating the
24 charitable food service ordinance?
25  A. If that's where their court was. There's

Page 145
1  several different municipal courts across the city.
2  This is the central courthouse; so I'm not sure where
3  their docket was.
4  Q. Yeah. And on Exhibit 28 itself at the top, it
5  says 60- -- the 61 Riesner Street in (HPD headquarters).
6  It sounds like you would disagree with that
7  characterization?
8  A. Yes. HPD headquarters is 1200 Travis.
9  Q. Okay. And was it ever HPD headquarters?
10  A. Not since I've been on the department for the
11 past 17 years. Now, before that, I'm not sure.
12  Q. Okay. Prior to the City designating 61 Riesner
13 Street as an authorized location for charitable food
14 service events, so before it was approved for charitable
15 feedings, did 61 Riesner Street have porta potties?
16  A. No.
17  Q. Did it have free parking?
18  A. No.
19  Q. Did it have a shipping container for storage?
20  A. Not for this use but --
21  Q. Not for charitable food service events?
22  A. It did not.
23  Q. Did it have tables designed for individuals to
24 eat food off of?
25  A. No.



Jennifer Kennedy  
February 11, 2025  
Pages 174 to 177

Page 174
1  A. I'm unsure if there is proof or not so.
2  Q. Now, isn't it true that, if a person was not at
3  a Food Not Bombs feeding event such as the people who
4  were there, isn't it true they could be elsewhere in the
5  city and possibly litter?
6     MR. SOH: Objection; form.
7  A. That was very confusing. Do you mind
8  rephrasing that question?
9     MR. KALLINEN: It's so obvious. That's why
10  it's confusing.
11  Q. (BY MR. KALLINEN) If a person is not at Food
12  Not Bombs getting fed by the Food Not Bombs people,
13  isn't it true they could be on another part of the city
14  and then commit litter?
15  A. That is --
16     MR. SOH: Objection; form.
17  A. I don't...
18  Q. (BY MR. KALLINEN) You don't know if a person
19  can litter in another part of the city? That's how
20  obvious this question is. It seems so obvious that
21  maybe you don't feel like you want to answer it.
22     Can somebody else litter in another part of
23  the city other than by the library?
24     MR. SOH: Objection to the predicate.
25     Go ahead and answer, Captain.

Page 175
1  A. Sure.
2  Q. (BY MR. KALLINEN) So if these people did not
3  litter at Food Not Bombs on occasion, they could be
4  littering in other parts of the city at the same time as
5  they were not at Food Not Bombs, correct?
6  A. They could. Sure.
7  Q. So Food Not Bombs is not -- is not causing
8  anybody to litter more than they would normally litter,
9  correct?
10  A. I wouldn't agree with that statement. I don't
11  really...
12  Q. Well, if they didn't get food at Food Not
13  Bombs, isn't it true they could get food at a convenient
14  store or somebody could hand them some food at another
15  place and they could litter there too?
16  A. If you're asking if a person can litter
17  anywhere, then, yes, a person can litter anywhere.
18  Q. Okay. It's all about getting into arguments.
19  If a person was not at a Food Not Bombs event, isn't it
20  possible they could just be at another part of the city
21  and get into an argument?
22  A. Yes.
23  Q. Now, was the person who you mentioned had
24  gotten in some argument with Sheri Dore, was he high or
25  something? Did you suspect that?

Page 176
1  A. No.
2  Q. Okay. And if he didn't get into an argument
3  with Sheri Dore, isn't it possible that, whatever mood
4  he was in, he could have just gotten into an argument in
5  another part of the city?
6  A. Sure.
7  Q. So in other words, there wasn't necessarily any
8  more officer time used because of the Food Not Bombs
9  event because, whatever those people were doing at Food
10  Not Bombs which caused the police to be there, they
11  could have just been elsewhere causing the same problem,
12  and the police would have been going to wherever they
13  were causing those problems, correct?
14     MR. SOH: Objection; form.
15  A. So, yes, crime could be committed anywhere in
16  the city. But if we know that there are certain
17  locations where we're having consistent complaints and
18  consistent issues, then that's generally part of our
19  policy. That's where we're going to allocate resources
20  and try to address those quality of life issues, not
21  where they could other possibly be committing those
22  issues but where those crimes are actually being
23  committed.
24  Q. (BY MR. KALLINEN) But isn't it true, when
25  people gather, you know, anywhere, there could be

Page 177
1  issues?
2  A. Yes, sir.
3  Q. So what is special, though, about Food Not
4  Bombs where that causes -- that you believe causes some
5  more -- more police work than if these people were just
6  spread out elsewhere in the city?
7  A. I wouldn't say that there's anything about Food
8  Not Bombs that creates that. Our issue is that,
9  whenever there are large concentrations of individuals
10  who in the past and we've had frequent complaints from,
11  you know, then we're going to allocate our resources to
12  that area.
13  Q. Now, wouldn't that be true like at a Texans
14  game, for example, there's a lot of people; so you
15  should go out there because there's a lot of people
16  there and there could be more problems because there's a
17  lot of people?
18  A. We have plenty of police officers that work
19  Texans games, sir.
20  Q. Yes, exactly. If a child is at a birthday
21  party outside the City of Houston and they're hungry,
22  are they in need?
23     MR. SOH: Objection; form.
24     Go ahead and answer, Captain.
25  A. In need of what?


MAGNA LEGAL SERVICES

```
 1   COUNTY OF HARRIS )

 2   STATE  OF  TEXAS )

 3

 4                    REPORTER'S CERTIFICATION

 5

 6        I, Donna Qualls, Notary Public in and for the State

 7   of Texas, Notary ID No. 12161359, hereby certify that

 8   this transcript is a true record of the testimony given

 9   and that the witness was duly sworn by the notary.

10        I further certify that I am neither attorney nor

11   counsel for, related to, nor employed by any of the

12   parties to the action in which this testimony was taken.

13        Further, I am not a relative or employee of any

14   attorney of record in this cause, nor do I have a

15   financial interest in the action.

16        Subscribed and sworn to on this the 26th day of

17   February, 2025.

18

19
                    _____
20                  DONNA QUALLS
                    Notary Public in and for
21                  The State of Texas, Notary ID 12161359
                    My Commission expires 11/06/2026
22
                    Magna Legal Services
23                  Firm Registration No. 633
                    16414 San Pedro, Suite 900
24                  San Antonio, Texas 78232
                    (210) 697-3400
25
```

