United States District Court
Southern District of Texas
**ENTERED**
November 03, 2026
Nathan Ochsner, Clerk

**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | | |
|---|---|---|
| FOOD NOT BOMBS, ET AL., | § | |
| | § | |
| *Plaintiffs*, | § | |
| VS. | § | CIVIL ACTION NO. 4:24-cv-338 |
| | § | |
| CITY OF HOUSTON, | § | |
| | § | |
| *Defendant*. | § | |
| | § | |
| | § | |

**ORDER**

Pending before this Court are: (1) Plaintiffs Food Not Bombs Houston ("FNBH") and Brandon Walsh's ("Walsh") Motion for Summary Judgment (Doc. No. 44); (2) Consolidated Plaintiff Phillip Picone's ("Picone") Motion for Summary Judgment (Doc. No. 47); and (3) Defendant City of Houston's Motion for Summary Judgment (Doc. No. 46). After close consideration of the motions, relevant legal standards, and admissible summary judgment evidence, this Court **GRANTS IN PART** Plaintiffs FNBH and Walsh's Motion for Summary Judgment (Doc. No. 44), **GRANTS IN PART** Plaintiff Phillip Picone's Motion for Summary Judgment (Doc. No. 47), and **DENIES** Defendant City of Houston's Motion for Summary Judgment (Doc. No. 46).

This Court turns first to the motion filed by FNBH and Walsh, as Plaintiff Picone is a member of FNBH and much of the analysis is also applicable to him as such. This Court then turns to the arguments in the City's motion directed specifically at FNBH and Walsh. Finally, the Court considers any remaining unaddressed issues pertaining to Plaintiff Picone.

## I. Plaintiffs Food Not Bombs and Walsh

## BACKGROUND

This dispute concerns the constitutionality of sections 20-252 and 20-257 of the Houston City Code (collectively referred to as "Charitable Food Services Ordinance" or "the Ordinance"). (Doc. No. 44).

The Ordinance was first passed in 2012. Section 20-252 creates a permission requirement for all "food service events." HOU., TX, CODE OF ORDINANCES ch. 20, art. V, § 20-252. "Food service events" are defined in Section 20-251 as "each instance in which charitable food services are provided to more than five individuals." § 20-251. The permission scheme, as laid out in § 20-252, requires that any group or individual seeking to conduct such food service events on public or private property first obtain the written consent of the owner. § 20-252. Further, Section 20-257 provides that the parks director shall develop regulations and criteria for the use of park properties for food service events, and that the public health director shall do the same for other city property. § 20-257; *see also* § 20-255. Other features of the Ordinance include the establishment of a voluntary "Food Service Provider Program" intended to provide training and education to those engaging in these activities. §§ 20-253, 20-254.

The Plaintiffs in this suit are FNBH and Brandon Walsh. Further, FNBH member Phillip Picone filed a separate lawsuit that this Court consolidated with the instant suit in June of 2024. (Doc. No. 29). Plaintiff Picone has also filed a Motion for Summary Judgment, (Doc. No. 47), which is addressed below.

FNBH is a political organization that provides free meals to individuals experiencing homelessness and food insecurity. (Lavergne Decl. ¶¶ 5, 7). Walsh is a FNBH member. (Walsh. Decl. ¶ 2). FNBH contends that their food-sharing activities are a form of protest—in the words

of one of the organization's volunteers, "we continue to do our food sharing events to shed light on the ways that our City is failing to meet the material needs of some of its most vulnerable residents." (*Id.* at ¶ 19).

Prior to early 2023, FNBH hosted food-sharing events outside the Downtown Central Library across from City Hall. In February of 2023, the City posted notices that the City no longer consented to FNBH's food-sharing activities on the library premises. (Doc. No. 46 at 19); (Doc. No. 46-8). Instead, the City indicated that all such activities must occur at 61 Riesner, a site with much less visibility as it is just outside the central business district. (Doc. No. 46-8). When FNBH refused to discontinue its activities outside the library, its volunteers began receiving citations for violating the Ordinance. (Doc. No. 46 at 21–22). The withdrawal of consent and subsequent enforcement actions spurred Plaintiffs FNBH and Walsh to challenge the Ordinance before this Court. (Doc. No. 1 at 4–5).

In their Complaint, Plaintiffs brought a 42 U.S.C. § 1983 challenge to the constitutionality of the Ordinance, arguing that the Ordinance violates the First Amendment of the U.S. Constitution (as incorporated against state and local governments via the Fourteenth Amendment). (Doc. No. 1 at 19–25). In specific, Plaintiffs claim that (1) the Ordinance restricts protected expressive activity, subjecting it to First Amendment scrutiny; (2) the Ordinance constitutes an invalid time, place, and manner restriction, both on its face and as applied; (3) the Ordinance is an invalid prior restraint, both on its face and as applied; and (4) the Ordinance violates Plaintiffs' rights to expressive association, as applied. (*Id.*). Plaintiffs seek injunctive and declaratory relief, in addition to attorneys' fees. (*Id.* at 25–26). The City obviously denies these contentions.

In early 2024, this Court considered and granted Plaintiffs' Motion for Preliminary Injunction, temporarily enjoining the City from enforcing the Ordinance against FNBH members

until the litigation concluded. (Doc. No. 15). The motion seeking preliminary relief only asserted Plaintiffs' as-applied claims of unconstitutionality: that the Ordinance is an invalid time, place, and manner restriction; an invalid prior restraint; and a violation of Plaintiffs' expressive association rights (Doc. No. 4). This Court granted the preliminary injunction based on the likelihood of success as to the first two as-applied challenges but did not reach the merits of the expressive association challenge. (Doc. No. 15 at 8–12). This Court also considered and denied Defendant's Partial Motion to Dismiss and Motion for More Definite Statement. (Doc. No. 28). Both Plaintiffs (Doc. No. 44) and Defendant have since filed Motions for Summary Judgment (Doc. No. 46). The parties have responded and replied, and the motions are ripe for resolution.

## LEGAL STANDARD

Summary judgment is warranted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). "The movant bears the burden of identifying those portions of the record it believes demonstrate the absence of a genuine issue of material fact." *Triple Tee Golf, Inc. v. Nike, Inc.*, 485 F.3d 253, 261 (5th Cir. 2007) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–25 (1986)). Once a movant submits a properly supported motion, the burden shifts to the non-movant to show that the court should not grant the motion. *Celotex*, 477 U.S. at 321–25. The non-movant then must provide specific facts showing that there is a genuine dispute. *Id.* at 324; *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). It is the responsibility of the parties to specifically point the Court to the pertinent evidence, and its location, in the record that the party thinks are relevant. *Malacara v. Garber*, 353 F.3d 393, 405 (5th Cir. 2003). It is not the duty of the Court to search the record for evidence that might establish an issue of material fact. *Id.* (citations omitted).

A dispute about a material fact is genuine if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The court must draw all reasonable inferences in the light most favorable to the nonmoving party in deciding a summary judgment motion. *Id.* at 255. The key question on summary judgment is whether there is evidence raising an issue of material fact upon which a hypothetical, reasonable factfinder could find in favor of the nonmoving party. *Id.* at 248.

In their motion, Plaintiffs FNBH and Walsh seek summary judgment as to the constitutionality of the City's Charitable Food Services Ordinance. Specifically, Plaintiffs seek summary judgment on the following issues: (1) the Ordinance restricts expressive conduct protected by the First Amendment, both on its face and as applied; (2) the Ordinance is an invalid prior restraint, both on its face and as applied; (3) the Ordinance is an invalid time, place, and manner restriction, both on its face and as applied, (4) the Ordinance violates Plaintiffs' right to expressive association, as applied; and (5) that Plaintiffs are entitled to permanent injunctive relief. (Doc. No. 44 at 16–18). This Court concludes that the Ordinance is an unconstitutional restriction on Plaintiffs' expressive conduct as applied, and **GRANTS IN PART** Plaintiffs' Motion for Summary Judgment and **DENIES** Defendant's Motion for Summary Judgment. In a separate order, and after the Parties submit their proposed injunction language discussed below, the Court will consider and issue the appropriate relief and issue a final judgment.

## Analysis

Before addressing the merits of the Parties' arguments, the Court first turns to preliminary arguments raised by the City in their Motion for Summary Judgment. (Doc. No. 46).

## I. Preliminary Challenges

### *a. Standing*

The first preliminary argument raised by the City in their Motion for Summary Judgment is that FNBH has failed to establish the elements of associational standing. (Doc. No. 46 at 30–31). The three elements required to prove associational standing are: (1) members of the association independently meet Article III standing requirements; (2) the interests at issue relate to the purpose of the organization; and (3) neither the claim asserted nor the relief requested requires individual member participation (thereby making it appropriate for the claim to have been brought by the organization). *Texas Democratic Party v. Benkiser*, 459 F.3d 582, 587 (5th Cir. 2006). In its motion, Defendant claims that FNBH fails to allege the third prong. (Doc. No. 46 at 31). Plaintiffs respond that their constitutional claim, and their request for equitable relief, do not require the participation of individual members to adjudicate these claims. (Doc. No. 53 at 13–14). They also argue that they have organizational standing (standing in their own right). (Doc. No. 53 at 12–13). Defendant's reply only addresses Plaintiffs' alternative theory of organizational standing. (Doc. No. 58 at 4–5).[1]

The Court starts with whether FNBH members independently meet Article III requirements, which simultaneously addresses the separate argument raised by the City disputing Plaintiff Walsh's standing.[2] (Doc. No. 51 at 37). Article III standing requires: (1) injury-in-fact; (2) causation; and (3) redressability. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992). Members

---

[1] In addition to reiterating its challenges to FNBH's associational standing, the Court notes also that Defendant raises in its response a challenge to FNBH's standing to bring a facial challenge based on vagueness. (Doc. No. 51 at 35–37). As the Court does not reach any facial challenges (and is unaware of a vagueness challenge brought by FNBH), it declines to address this argument.

[2] The Court acknowledges that the argument regarding Plaintiff Walsh's standing was raised, not in the City's Motion for Summary Judgment, but rather in the City's response to Plaintiffs' motion. (Doc. No. 51 at 37). Since standing is an issue that must be addressed, this Court considers the City's challenge. In any event, the City's only evidence fails to address the legal theory under which Walsh alleges standing. This Court concludes that Plaintiffs have established Walsh's standing as a matter of law.

of FNBH, including Walsh, have established Article III standing. Plaintiffs have put forth competent summary judgment evidence that members of their organization were cited under the Ordinance, but they need not even go that far. (Lavergne Decl. ¶ 29); (Picone Decl. ¶ 13). Under First Amendment jurisprudence, plaintiffs can satisfy the injury-in-fact requirement by showing that they (1) intend to engage in a course of conduct that arguably concerns a constitutional interest; (2) conduct is arguably affected by state action in question; and (3) the threat of future enforcement is substantial. *Inst. for Free Speech v. Johnson,* 148 F.4th 318, 327–31 (5th Cir. 2025) (citing *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 157–67 (2014)).

Walsh has submitted a declaration stating that he has engaged in and intends to engage in similar FNBH protest activities in the future, which includes activities prohibited by the Ordinance, and that he fears criminalization under the Ordinance. (Walsh Decl. ¶¶ 3, 9–11).[3] The fact that other members of his organization have been cited for the same activity Walsh intends to engage in further supports Walsh's claim that he fears future enforcement. *Fort Lauderdale Food Not Bombs v. City of Fort Lauderdale*, 11 F.4th 1266, 1286–87 (11th Cir. 2021) (concluding that plaintiffs had standing under a "threat of enforcement" theory, reasoning that arrests and citations of their co-volunteers supported credibility of fear). Absent an order from this Court, the City has made no indication that they will stop enforcing the Ordinance. The only argument the City raises is that Walsh cannot establish standing without first being cited. (Doc. No. 51 at 37). The lack of a citation does not undermine Walsh's standing argument based on a threat of enforcement theory. Causation and redressability are easily met: Members challenge the constitutionality of the

[3] In his deposition, Walsh was asked whether, if this Court held the Ordinance constitutional, he would continue his activities at the library, to which Walsh replied that he was uncertain. (Walsh Dep. 53:15–25, 54:1–6). This does not specifically pertain to Walsh's intention to engage in the conduct absent any word from this Court. The pre-enforcement standing inquiry asks whether Plaintiff intends to engage in *arguably constitutionally protected* conduct, which would no longer be the case if this Court upheld the Ordinance. *See Inst. for Free Speech v. Johnson*, 148 F.4th 318, 328 (5th Cir. 2025). Therefore, this line of questioning does not directly address Walsh's intentions to engage in arguably protected conduct and therefore does not affect his theory of standing.

Ordinance as applied to their conduct, and granting an injunction to Plaintiffs on this basis will redress the threat of enforcement injury. As members of Food Not Bombs have Article III standing, FNBH has established the first prong of associational standing.[4]

The dispute as to Plaintiffs' associational standing centers on the third prong: Whether the claim asserted or the relief requested requires individual participation. In *Ass'n of Am. Physicians & Surgeons, Inc. v. Texas Med. Bd.*, the Fifth Circuit considered a constitutional challenge brought by an association on behalf of its individual members seeking declaratory and injunctive relief. 627 F.3d 547, 549 (5th Cir. 2010). Albeit in a motion to dismiss posture, the Fifth Circuit's reasoning is instructive. The Fifth Circuit describes the third prong as "prudential" in nature, suggesting that dismissal on its basis may be appropriate where claims were "wholly fact-specific as to the individual members." *Id.* at 551, 551 n.3. The Fifth Circuit specifically emphasized that where abuses were less individualized and "applied equally" against organization members, in addition to only equitable relief being sought, this prong of associational standing is likely to be satisfied. *Id.* at 552–53.

The City's own motion indicates that the application of the restriction to FNBH members is uniform: no individual or entity is permitted to use the Houston Public Library, or any public property, for food services without permission. (Doc. No. 46 at 20, 35). The claims brought by FNBH on behalf of their members fundamentally ask whether the permission requirement, as applied to the conduct of FNBH members, is constitutionally permissible. If the Court concludes

---

[4] The City has not raised a challenge to the second prong of associational standing (that the interests that are the subject of litigation are germane to the organization's purpose) but this Court addresses it to independently underscore FNBH's standing. The predominant purpose of FNBH as an organization is to engage in food sharing to send a message about the failures of the government to meet individual basic needs. (Lavergne Decl. ¶ 5). As the Ordinance directly pertains to food-sharing conduct and has the effect of limiting Plaintiffs' ability to share its message to a wider audience, Plaintiffs easily meet this requirement. § 20-252. *See also Ass'n of Am. Physicians & Surgeons, Inc. v. Texas Med.* Bd, 627 F.3d 547, 550 n.2 (5th Cir. 2010) ("the germaneness requirement is 'undemanding' and requires 'mere pertinence' between the litigation at issue and the organization's purpose" (quotations omitted)).

that the permission scheme is unconstitutional in its application to the uniform activities of FNBH members, the Court can determine the appropriate equitable relief as to all members. *Ass'n of Am. Physicians & Surgeons, Inc.*, 627 F.3d 547 at 552 (describing features of cases in which the third prong is likely satisfied: "Proving the illegality of the pattern or breach of contract require some evidence from members, but once proved as to some, the violations would be proved as to all."). The Court finds these common questions of law and fact to appropriately be considered at an association-wide level and rejects the City's associational standing challenge.[5]

### *b.* ***Statute of Limitations***

The next preliminary argument the City makes in its motion is that Plaintiffs' claims are barred by the statute of limitations. The statute of limitations period for § 1983 claims borrows from the personal injury statute of limitations of the forum state. *Piotrowski v. City of Houston*, 237 F.3d 567, 576 (5th Cir. 2001). Texas's personal injury statute of limitations is two years. TEX. CIV. PRAC. AND REM. CODE § 16.003. Although the applicable limitations period is governed by state law, federal law governs the rules surrounding accrual. *Piotrowski*, 237 F.3d 567 at 576. "'Under federal law, the [limitations] period begins to run 'the moment the plaintiff becomes aware that he has suffered an injury or has sufficient information to know that he has been injured.'" *Id.* (citations omitted).

It is not clear from Defendant's motion when precisely the City considers Plaintiffs' claims to have accrued, referencing various dates such as the Ordinance's enactment in 2012, its amendment in 2015, and Plaintiff Picone's[6] filing of a separate lawsuit challenging the Ordinance

---

[5] The Court acknowledges FNBH raises a distinct theory of standing (organizational standing) in the alternative. Since this Court has concluded that FNBH has standing to sustain this suit based on associational standing, the Court need not reach FNBH's alternative theory of standing.
[6] As mentioned, Plaintiff Phillip Picone is the Consolidated Plaintiff in this case. (Doc. No. 29). Specific issues relevant to his motion are addressed below.

in 2019. (Doc. No. 46 at 40). Plaintiffs' response counters that (1) FNBH was permitted by the City to host outside the library until February of 2023 and therefore had no cause (at least in an as-applied context) to challenge the Ordinance until then; and (2) any suit filed before then would likely have been dismissed for lack of standing. (Doc. No. 53 at 16–17). The City's reply does not address the timeliness arguments. (Doc. No. 58).

Plaintiffs' as-applied claims are not barred by the statute of limitations. Since the Court ultimately does not reach Plaintiffs' facial challenges, it considers only the arguments with respect to Plaintiffs' as-applied claims. Plaintiffs, in their response, have presented competent summary judgment evidence that FNBH initially was allowed to use the library's plaza to conduct their food-sharing events. (Lavergne Decl. ¶ 23); (Beckham Dep. 59:10–13).[7] This changed in 2023 when the City notified Plaintiffs that they were no longer permitted to use the library's plaza and would need to conduct activities at 61 Riesner. (Lavergne Decl. ¶ 27). Plaintiffs' as-applied challenge, therefore, stems from the 2023 change in enforcement: the City's decision to refuse permission to use the library premises for food-sharing events starting in 2023. Plaintiffs FNBH and Walsh filed suit less than a year later (January of 2024). (Doc. No. 1). Defendant's reply did not address Plaintiffs' argument, and it is the duty of the parties to point this Court to any relevant factual dispute. (Doc. No. 58). Accordingly, based on these undisputed facts, the Court concludes as a matter of law that Plaintiffs' as-applied challenges were timely filed.

---

[7] In a response to a Request for Admission regarding whether FNBH was permitted starting in 2012 to serve at the library plaza, the City's response was that they "cannot admit or deny, therefore denied." (Doc. No. 44-10 at 3). In any event, Houston's own motion states that, starting in 2023, "charitable feeding was *no longer* allowed" (emphasis added) outside the library (Doc. No. 46 at 19), and the City has not presented evidence disputing that the citations that form the basis of Plaintiffs' challenge were not issued in 2023. *See also* (Doc. No. 46-10 at 4) (in a response to a Request for Admission, the City identified the Central Library Plaza as an approved location for charitable food services for the period 2012–2016); (Kennedy Dep. 79:12–14) ("I don't believe there was any enforcement between 2016 to 2019 of the ordinance").

Having disposed of preliminary challenges by the City, the Court turns to the merits of the cross motions for summary judgment. The Court first considers Plaintiffs' motion given the posture at summary judgment: If the Court concludes that the Plaintiffs have succeeded on any of their merits arguments when the facts and inferences must be construed in favor of the City, then the Court need not reach the alternative arguments raised by Plaintiffs or Defendant's theories as to why the Ordinance is constitutional when the burden is against them. The Court will then address any unresolved arguments from the City's motion.

## II. Merits of Plaintiffs' Motion for Summary Judgment

The Court first turns to Plaintiffs' motion for summary judgment. The Court concludes the Plaintiffs have met their burden at the summary judgment stage in showing that there is no genuine dispute of material fact and that the undisputed facts entitle them to judgment as a matter of law on the following issues: (1) Plaintiffs' conduct is protected expressive conduct (as applied); (2) the permission requirement of the Ordinance fails intermediate scrutiny and therefore is an invalid content-neutral regulation (as applied).

### *a. Expressive Conduct*

The Ordinance, as applied to Plaintiffs' conduct, restricts expressive conduct, subjecting it to constitutional scrutiny.

The Supreme Court has recognized that conduct, not just written or spoken words, may be protected by the First Amendment as "expressive conduct." *Hurley v. Irish-Am. Gay, Lesbian & Bisexual Grp. of Bos.*, 515 U.S. 557, 569 (1995). To be expressive conduct, the Supreme Court typically looks to whether the parties (1) intend for their actions to be communicative and (2) whether their actions, in their context, would reasonably be understood as communicative. *Clark v. Cmty. for Creative Non-Violence*, 468 U.S. 288, 294 (1984) (citations omitted). In *Fort*

*Lauderdale Food Not Bombs et al. v. City of Fort Lauderdale* ("*FLFNB I*"), the Eleventh Circuit considered whether the food-sharing events of the local Food Not Bombs chapter constituted "expressive conduct" that warranted constitutional protection. 901 F.3d 1235, 1238 (11th Cir. 2018). In reaching its conclusion, the court considered not only the intent of the organization to communicate a message, but also emphasized certain contextual factors which, according to the court, "would lead the reasonable observer to view the conduct as conveying some sort of message." *Id.* at 1240, 1242. These factors included that the organization (1) sets up banners, tables, and shares literature at its food-sharing events; (2) the events are open to all; (3) the food sharing occurs at a public park near local government buildings; (4) the issue of homelessness is an issue of local concern; and (5) the history of food sharing as a cultural symbol. *Id.* at 1242–43. The Eleventh Circuit emphasized that these factors, taken together, made it more likely that a reasonable onlooker would infer that the food-sharing conduct projected a message, making it protected expressive conduct under the First Amendment. *Id.* at 1244.

Plaintiffs contend that their food-sharing events are expressive conduct protected by the First Amendment. (Doc. No. 44 at 21–24). In support of this contention, Plaintiffs have put forth declarations by their volunteers and their webpage describing their intent to convey a message with their actions. (Lavergne Decl. ¶¶ 4–7); (Walsh Decl. ¶¶ 7–8); (Picone Decl. ¶ 12); (Doc. No. 44-26). No doubt drawing on the Eleventh Circuit's opinion in *FLFNB I*, Plaintiffs have provided evidence that (1) their members wear t-shirts and hang banners at their events (Lavergne Decl. ¶ 17); (Walsh Decl. ¶ 4, Exhibit A; Walsh Decl. ¶ 14, Exhibit C); (Kennedy Dep. at 44:9–11); (2) their events are open to anyone who wants food (Lavergne Decl. ¶ 9); (3) their events take place outside the Central Library, which is across the street from local government buildings (e.g., City Hall) (Lavergne Decl. ¶ 8); (4) the treatment of the homeless is a community concern, citing to the

existence of local government initiatives on the issue of homelessness (Doc. No. 44-16, 44-17, 44-18); and (5) the fact that they are sharing food as their means of protest is particularly salient due to its historical significance as a symbol. (Lavergne Decl. ¶ 5).

Nowhere in its response does the City refer this Court to facts that would dispute that FNBH intends its conduct to convey a message and that the contextual factors support the likelihood that an onlooker would perceive it as such. The City has not pointed this Court to any facts to dispute: (1) FNBH and its members wear shirts and hang banners at their events; (2) the events that are open to everyone; (3) the events occur on the sidewalk and area outside the Central Library, across from City Hall (indeed, the dispute is precisely because of this location); (4) that the treatment of the homeless is not a local concern; and (5) that FNBH utilizes food as its manner to conduct its protests. More importantly, it is practically undisputed that Plaintiffs' conduct is expressive conduct protected by the First Amendment. (Doc. No. 51 at 18, 23). Accordingly, this Court finds that Plaintiffs' conduct constitutes expressive conduct subject to constitutional scrutiny as a matter of law.

### *b. <u>Constitutional Scrutiny</u>*

Determining the existence of expressive conduct only resolves the first of several threshold inquiries. After determining that conduct is protected under the First Amendment, the Court must next determine the appropriate standard to apply to evaluate the constitutionality of the City's Ordinance.

Plaintiffs have put forth alternative theories as to why the Ordinance fails constitutional scrutiny. These contentions include that the Ordinance (1) is an unconstitutional time, place, and manner restriction, both on its face and as applied; (2) is an invalid prior restraint, both on its face

and as applied; and (3) violates Plaintiffs' rights to expressive association, as applied. (Doc. No. 44 at 16–18).

The Fifth Circuit has instructed that, when faced with both as-applied and facial constitutional challenges, courts should first consider any as-applied challenges. *LIA Network v. City of Kerrville, Texas*, 163 F.4th 147, 162 (5th Cir. 2025). A court should only reach the facial challenge if the law is valid as applied. *Id.*

The Court turns, therefore, to the Plaintiffs' claim that the Ordinance is an invalid time, place, and manner restriction as applied to their conduct. First Amendment jurisprudence divides the appropriate level of scrutiny based on (1) the forum where the protected activity occurs and (2) whether the regulation is content-neutral or content-based. The Court turns to these threshold issues as applied to the Plaintiffs' conduct, before reaching the merits of their challenge.

If a regulation is content based (as in, discriminates based on the content of the message being conveyed), this will trigger strict scrutiny of the restriction. *Reed v. Town of Gilbert, Ariz.*, 576 U.S. 155, 155 (2015). If a regulation is content neutral, it will either be subject to intermediate or a reasonableness test depending on where the speech occurs. If the speech occurs in a traditional or designated public forum, intermediate scrutiny applies. *See Siders v. City of Brandon, Mississippi*, 123 F.4th 293, 305 (5th Cir. 2024). If the content-neutral restriction only regulates speech in a nonpublic or limited public forum, then the standard is a version of a reasonableness review. *Chiu v. Plano Indep. Sch. Dist.*, 260 F.3d 330, 347 (5th Cir. 2001). In addition to time, place, and manner analysis, which is used to evaluate content-neutral regulations of speech in public fora, there also exists the framework established under *United States v. O'Brien*, in which the Supreme Court set the standard to evaluate content-neutral regulations which incidentally burden expressive conduct. 391 U.S. 367, 376 (1968).

The parties appear to agree that intermediate scrutiny is the applicable framework to evaluate the Ordinance as applied to Plaintiffs, regardless as to whether it is considered an incidental restriction on expressive conduct or a content-neutral regulation of speech in a public forum. (Doc. No. 44 at 30–31); (Doc. No. 46 at 25); (Doc. No. 57 at 18). Specifically, Defendant concedes that either the traditional time, place, and manner analysis *or* the *O'Brien* standard for incidental burdens on expressive conduct is the appropriate framework—both of which employ intermediate scrutiny. (Doc. No. 46 at 25); (Doc. No. 51 at 23–24). Additionally, Plaintiffs employ intermediate scrutiny in their argument that the regulation is an invalid time, place, or manner restriction. (Doc. No. 44 at 30).

For all parties to have reached these conclusions, they inherently had to have conceded (or perhaps just assumed) that the regulation is a (1) content-neutral restriction of expression in a (2) public forum (whether traditional or designated). *Chiu*, 260 F.3d at 345–47 (explaining that designated public fora are analyzed in the same manner as traditional public fora).[8] The Court's review of the undisputed facts and relevant law provides the Court with no reason to question these concessions; therefore, the Court determines that intermediate scrutiny is the appropriate analytical framework.

### c. ***How Intermediate Scrutiny Applies***

Having determined that the Ordinance's permission requirement is a content-neutral regulation of expressive conduct as applied to Plaintiffs, the Court agrees with the parties and applies intermediate scrutiny. That being said, there still is considerable confusion in the caselaw

[8] The City specifically refers to the sidewalk adjacent to a library as a "designated public forum." (Doc. No. 51 at 38). The Court notes, without deciding, that there is a strong argument that the area, at least in part, is a traditional public forum, especially given its proximity to City Hall. *See McCullen v. Coakley*, 573 U.S. 464, 464–65 (2014) (noting that sidewalks and public ways are traditional public fora); *United States v. Grace*, 461 U.S. 171, 177 (1983) (noting that streets, sidewalks, and parks tend to be considered public fora). In any event, the City's concession leads the Court to the same result: intermediate scrutiny is appropriate.

(and in the briefing) as to the applicable framework. As noted above, there are two frameworks that are simultaneously implicated when dealing with content-neutral regulations that burden expressive conduct in public fora (as here). There is the test established by the Supreme Court in *O'Brien* for content-neutral regulations which incidentally burden expressive conduct. There also is the time, place, and manner analysis which is applied to content-neutral regulations of speech in public fora.

The standards under *O'Brien* and traditional forum analysis coalesce on the intermediate scrutiny analysis (regulation must be narrowly drawn/tailored to a significant/substantial interest), but the standards have distinct elements. Under *O'Brien*, the regulation must be (1) narrowly drawn to a (2) substantial interest that is (3) unrelated to speech and (4) it is within the government's authority to regulate the conduct. 391 U.S. at 377; *Clark v. Cmty. for Creative Non-Violence*, 468 U.S. 288, 294 (1984) (articulating elements). Under time, place, and manner analysis of a content-neutral regulation of expression in a public forum, the test is whether the regulation is (1) narrowly tailored to a (2) significant interest unrelated to speech and (3) leaves open ample alternative channels of communication. *Clark*, 468 U.S. at 293.

Both scholars and courts have noted that intermediate scrutiny under either framework is essentially indistinguishable.[9] Under *O'Brien,* the intermediate scrutiny standard applied is that the regulation must be narrowly drawn to further a substantial government interest that is unrelated to speech. *Clark*, 468 U.S. at 294. Under time, place, or manner analysis, content-neutral restrictions must be narrowly tailored to serve a significant government interest unrelated to speech. *Id.* at 293. Applying either framework lands this Court at the same place—the restriction

[9] The Supreme Court has commented that the *O'Brien* intermediate scrutiny standard "is little, if any, different from the standard applied to time, place, or manner restrictions." *Clark*, 468 U.S. at 298. Leading treatises have stated that the "rules governing time, place, or manner regulations and the O'Brien test are close cousins." 1 Smolla & Nimmer on Freedom of Speech § 9:16.

must be narrowly tailored/drawn to a substantial/significant government interest unrelated to speech.

Turning to the first prong of intermediate scrutiny analysis, the parties do not disagree that the City has raised significant/substantial interests; city officials have continuously justified their regulation by pointing to interests in food quality, quantity, and distribution; connecting the unhoused with service providers; and reducing the impacts of these operations on public or private property. (Kennedy Aff. at 2). Rather, the crux of Plaintiffs' argument as to why the regulation fails intermediate scrutiny is that the regulation is not narrowly tailored—that these interests are divorced from the requirements that the City imposes. (Doc. No. 44 at 30–35).

As for the second prong of intermediate scrutiny, the requirement of narrow tailoring as part of an intermediate scrutiny analysis does not require the City to employ the *least* restrictive means. *Ward v. Rock Against Racism*, 491 U.S. 781, 782, 798–99 (1989); *Clark*, 468 U.S. at 299. The standard, rather, is that the challenged restriction must promote a substantial government interest that would be achieved less effectively without it, and that the means chosen are not substantially broader than necessary. *Ward*, 468 U.S. 782–83. In any event, while intermediate scrutiny may not require the government to employ the least restrictive means, it does require the City to consider less restrictive alternatives. *McCullen v. Coakley*, 573 U.S. 464, 494 (2014) (requiring the government to show "that it seriously undertook to address the problem with less intrusive tools readily available to it").

It is necessary at this juncture to be clear about what restrictions the Plaintiffs specifically challenge. The Ordinance requires, by its terms, the consent of the property owner, public or private, before a group or individual may engage in a food-sharing event on the property. § 20-

252.[10] Moreover, the Ordinance authorizes the health director and parks director to issue rules, regulations, and criteria for the use of parks and other public property for food-sharing events. § 20-257. The health department has acted pursuant to this authority by promulgating "special requirements" for these food-sharing locations, such as adequate parking, hand-washing stations, trash receptacles, and bathrooms. (Kennedy Aff. at 3).

Plaintiffs specifically challenge the permission requirement of the Ordinance. (Doc. No. 44 at 8).[11] The Court does not take Plaintiffs' position to be that they oppose as unconstitutional the requirements of adequate hand-washing stations, trash, restrooms, and parking, which would present a different constitutional analysis. Further, given that this is an as-applied challenge, the specific challenge is to the City's refusal to grant permission to Plaintiffs from 2023 onwards to conduct their activities at any location other than 61 Riesner, which is evident from the notice posted and the citations FNBH's members received when they continued their activities outside the Central Library, in addition to the City's own briefing that 61 Riesner is the only location available to FNBH. (Doc. No. 46 at 21–22); (Doc. No. 46-8).

In *Fort Lauderdale Food Not Bombs v. City of Fort Lauderdale* ("*FLFNB II*"), the Eleventh Circuit considered the constitutionality of a regulation ("Park Rule") which required city permission before utilizing city parks for food-sharing activity. 11 F.4th 1266, 1291–97 (11th Cir. 2021). In analyzing the regulation under the intermediate scrutiny standard of *O'Brien*, the *FLFNB*

---

[10] The City admitted in a response to a Request for Admission that the permission requirement is the "only mandatory step" under the Ordinance to engage in charitable food services. (Doc. No. 44-10 at 7).

[11] The Court notes that, at the outset of their motion, Plaintiffs state that they are challenging both § 20-252 (property owner consent requirement) and § 20-257 (authorizing health and parks director to develop regulations and designate a list of approved locations). The Court interprets Plaintiffs' challenge to the latter section as only to the role that it plays in the permission scheme, and thus that their arguments regarding constitutionality follow with their arguments against § 20-252. To the extent that Plaintiffs challenge other portions of this section, such as authorizing the health department to require features like appropriate trash receptacles, restrooms, hand-washing stations, or parking, the Court emphasizes that this would require an entirely separate constitutional analysis, and this Court expresses doubt that such a challenge would be successful.

*II* Court evaluated the park's permission requirement in relation to the City's purported interests of park maintenance, sanitation, and "other logistical problems that crowded food distribution events cause." *Id.* at 1294–95. The court, holding that the scheme was not narrowly tailored to these interests, highlighted both the lack of standards guiding the permission scheme of the Park Rule, in addition to the broad applicability of the Park Rule to all public parks. *Id.* at 1296. ("The Park Rule amounts to an outright ban on public food sharing in all of Fort Lauderdale's parks; any exception is subject only to the standardless whims of City permitting officials"). To be sure, with respect to the lack of standards analysis, the Eleventh Circuit appears to have drawn reasoning from prior restraint cases to inform its narrow tailoring analysis. *Id.* at 1295–96. This Court finds—as the Eleventh Circuit presumably did—that applying this reasoning makes logical sense when evaluating whether a permission scheme is narrowly tailored to its purported interests. Without clear, binding standards guiding the decision-making process that are tied to the City's purported interests, it is difficult for any court to evaluate how the City made its decision, and thus how the mechanism of requiring permission bears any relationship to a City's purported interest(s). To bring the Ordinance within the realm of narrow tailoring, therefore, the Court must be able to connect the chosen mechanism (permission scheme) with the interests put forth. Without binding criteria, this Court is unable to do so.

The Court thus turns to whether there are binding standards connecting the permission requirement to the City's interests. Although the text of the Ordinance suggests that the health and parks department may play a role in determining the suitability of city property, Plaintiffs point to deposition testimony demonstrating that the decision to allow food-sharing at any particular location is ultimately up to the mayor's office. (Beckham Dep. 100:6–9, 113:10–24). Plaintiffs argue, and point to summary judgment evidence demonstrating, that there are insufficient

standards guiding the Mayor's evaluation process. *See, e.g.*, (Beckham Dep. 132:17–21) (admitting that even if a city park met the health department's "special requirements," food-sharing events would not be allowed at city parks without the mayor's ultimate approval). Other deposition testimony of city officials in the record confirms that this is how the permission scheme operates. (Kennedy Dep. 91:1–9) ("there's no locations at public parks that are authorized right now. So any criteria wouldn't matter if it's not an authorized location")[12]; (Beckham Dep. 43:2–5) ("Q: The ordinance itself does not contain any criteria for selecting city properties for food services events, right? A: Right."); *see also* (Kennedy Dep. 78:2–9, 94:11–14) (unaware of written guidance from 2012–2016 outlining approval criteria nor criteria from 2016–2022 that would allow activities to resume at publicly-owned locations); (Beckham Dep. 50:18–21, 55:8–12) (similar).

The City's briefing fails to point to facts to the contrary. Instead, the City first argues that no city official can deny the use of 61 Rieser. (Doc. No. 46 at 27); (Doc. No. 51 at 28). This argument fails to engage with Plaintiffs' challenge to the permission scheme for *all other properties besides 61 Riesner*. Further, the City argues that the criteria for obtaining approval for areas other than 61 Riesner are "well-established" and that Plaintiffs could "possibly" obtain approval beyond 61 Riesner "as long as they meet the criteria." (Doc. No. 51 at 29). Yet the evidence the City points to fails to support this contention. First, the City cites to a vast body of state and federal food safety regulations as the "criteria" guiding the grant of permission. (Doc. No. 46 at 23, 28); (Doc. No. 51 at 20). Second, the City appears to argue that the 2023 local regulations adopted by the health department are also "criteria" constraining discretion.[13] (Doc.

[12] The City denied that the parks department suspended all food sharing in City parks in July of 2016 in a response to a Request for Admission. (Doc. No. 44-10 at 7). Whether or not food sharing is formally barred or not at the parks does not change the fact that this Court is unable to detect what standards the decisionmaker has used or would use to grant permission to do so. Therefore, this potential factual dispute is not material.

[13] The Court notes that Plaintiffs appear to dispute whether the health department's "special requirements" were used in approving 61 Riesner. (Doc. No. 57 at 15, 19). The City has provided summary judgment evidence suggesting that the City considered the special requirements when designating 61 Riesner as the approved location. (Kennedy Dep.

No. 51 at 20, 29). Deposition testimony that the City itself points to, nevertheless, fails to show that if Plaintiffs demonstrated that their activities would conform with these various bodies of regulations, they would be guaranteed approval:

> Q: Now, if Food Not Bombs had identified another location, another publicly owned location that met those four criteria, could they have used it for a charitable food service event?
> A: If they received permission from the public or private owner. But if it was a public property, then that would be something that you had to be approved, you know, by the City. So if it was a private place then, yes, absolutely.
> Q: But in terms of public property, a location with those four criteria we discussed would not necessarily be approved for the charitable food service event. They would still need to ask the City for permission?
> A: Correct.
> Q: If a location had those four elements that we discussed – the porta potty, handwashing, parking, and trash reciprocals [sic] – would the City approve that location, or would they still just say 61 Riesner Street?
> […]
> A: I think that could be a possibility. But it would also have to be, you know, something where the City looks at the safety in providing, having, you know, resources as far as being able to provide officers for security so.
>
> (Kennedy Dep. 129:22–25, 130:1–22).

Not only does a lack of standards indicate that the permission may not be sufficiently connected to the City's purported interests, but the availability of more targeted alternatives to a sweeping permission requirement may also suggest a lack of narrow tailoring. *Fort Lauderdale Food Not Bombs*, 11 F.4th at 1296. The Eleventh Circuit highlighted an "abundance of targeted alternatives" to the permission scheme as it operated that were less burdensome on Plaintiffs' expressive conduct, including not only a scheme that imposed standards to guide official discretion, but also, perhaps, only requiring permission for specific parks or for events of a certain

---

133:18–25) (the City, in deciding to choose 61 Riesner, had to consider "Nothing outside of what the health department had already created – basically the parking restrictions, you know, minimum of ten parking spaces, sufficient trash reciprocals [sic], portable restrooms, and handwashing stations available during a food service event and available 24/7"). Nevertheless, the point remains that the City has not directed this Court to evidence that the special requirements (or other standards or requirements) are binding criteria by which the ultimate decisionmaker decides to permit activities *anywhere beyond 61 Riesner*. As such, this potential factual dispute as to 61 Riesner is not material to the immediate constitutional analysis before this Court.

size, or allowing the group to utilize the park as of right a certain number of times per year. *Id.* Given the plethora of alternatives available to the blanket and standardless permission scheme, the Court held that the scheme, as applied to Plaintiffs' food-sharing conduct, failed intermediate scrutiny (under both *O'Brien* and time, place, and manner analysis). *Id.* at 1295–97.

The scheme before this Court is even broader than the one the Eleventh Circuit considered. While, in that case, the Park Rule banned food sharing in all public parks, with any exception "subject [] to the standardless whims of City permitting officials," Houston's Charitable Food Services Ordinance (and its permission requirement) applies to *all* public property, not just public parks.[14] *Compare id.* at 1296 *with* § 20-252. Like the *FLFNB II* Court, this Court can imagine various targeted alternatives available to the City that would allow its permission requirement to meet the demands of intermediate scrutiny. The easiest alternative would simply be to implement (and make transparent) genuine standards guiding the City's ultimate grant or denial of permission (whether by the parks director, the health director, or the mayor), rather than the opaque way the permission scheme currently operates. If the City is concerned with food safety and public health, then its permission to use areas other than 61 Riesner,[15] such as the area outside of the library or

[14] The City argues that *Clark v. Community for Creative Non-Violence* provides the "appropriate analytical framework" for this case. (Doc. No. 46 at 25). To the extent this refers to the fact that *Clark* applies *O'Brien* and/or time, place, and manner analysis, the Court agrees and has applied intermediate scrutiny accordingly. 468 U.S. 288, 288–89 (1984). To the extent that the City argues that the result ought to be the same, this Court is not persuaded. In *Clark*, the National Park Service granted permission for a group of demonstrators to set up tents in Lafayette Park and the Mall in Washington, D.C. to raise public awareness to the issue of homelessness but prohibited the protestors from sleeping in the tents, as the NPS noted that their regulations only permitted sleeping in certain designated areas. *Id.* at 289–90. The scope of the regulation alone distinguishes the case: the regulation in *Clark* only extended to the parks; the regulation before this Court extends to *all public property*, including public fora protected by the First Amendment.

[15] The City denied that it has not approved any properties besides 61 Riesner since March of 2023 in a response to a Request for Admission (Doc. No. 44-10 at 4). It also identified some other locations where charitable feeding was occurring, such as a "Navigation Center" at 2903 Jensen Drive, "city-wide resource hubs" at "multiple Salvation Army locations," 6160 South Freeway East, and Houston Recovery Center's Sobering Center at 150 N. Chenevert, Ste. 100. (Doc. No. 46-10 at 4). These answers are confusing given statements in the City's own briefing that say that the only approved location for FNBH's food-sharing activities is 61 Riesner. (Doc. No. 46 at 36) ("Plaintiff acknowledges that 61 Riesner Street is the only Houston property currently designated for charitable feeding"). Some (but not total) clarity is provided by deposition testimony given by city officials, which clarified that (at least some) of these locations were not places where organizations, like FNBH, could serve food, but simply locations where individuals in need

City Parks, could be made contingent on Plaintiffs showing that their activities will not harm those interests. For example, in the instant case, the City could condition its grant of permission to utilize the library plaza on Plaintiffs demonstrating that their events will comport with specific health and safety requirements set out by the City. Given the lack of specific evidence that demonstrates any established procedures for how the City's ultimate grant of permission is made, in addition to the broad sweep of the Ordinance to all public property, this Court is unable to conclude that the City's permission scheme is narrowly tailored to its interests.

Lastly, this Court addresses the alleged past safety, property damage, sanitation, and drug-related incidents at the library or public parks on which much of the City's briefing and summary judgment evidence is focused. *See, e.g.*, (Doc. No. 46 at 17–19); (Doc. No. 51 at 14–15, 24–25); (Kennedy Aff. at 3–5); (Kennedy Dep. 81:13–25, 82:1–7, 128:13–17); (Doc. No. 46-9); (Doc. No. 46-21); (Doc. No. 46-24); (Doc. No. 46-25); (Doc. No. 46-26); (Doc. No. 46-27); (Doc. No. 46-28).[16] While past incidents may provide factual support for the contention that the City has valid interests in regulating these events in general, this still fails to demonstrate to this Court how the mechanism chosen (the opaque permission scheme) is narrowly tailored. As with the health and sanitation requirements, the City could condition its approval on Plaintiffs pledging that their events will conform with certain security requirements. If genuine security issues persist *because of* Plaintiffs' events, then the revocation or refusal to grant permission could conceivably be

---

could obtain food. (Kennedy Dep. 91:14–25, 92:1–25) ("Q: Could [] Food Not Bombs Houston, could they have conducted a charitable food service activity at one of these navigation centers? A: No."). In any event, whether the City has or has not approved locations beyond 61 Riesner does not change the fact that this Court is unable to detect what standards (if any) the decisionmaker would use to grant such permission.

[16] The Court notes that the evidence of past incidents that the City points to raises questions about whether these incidents are specifically attributable to FNBH events. *See, e.g.*, (Kadir. Dep. 115:9–25, 116:1–2) (when the Chief Librarian was asked how she knew that sanitation issues surrounding the library were attributable to FNBH events, she replied, "I have not said that it comes from any specific group or organization."). In any event, the Court concludes that potential factual disputes about these past incidents are not material; even if this Court construes the facts and inferences in the light most favorable to the City, the evidence of these past incidents does not change the fact that the permission scheme has no binding criteria and fails narrow tailoring.

tailored to the City's interests.[17] Without a rubric guiding the grant of permission for areas beyond 61 Riesner, nevertheless, there is no way for Plaintiffs to alter the status quo and no way for this Court to determine that the City's continued blanket refusal is actually tied to its interests.

As this Court concludes that the City has failed to demonstrate that its permission scheme, as applied to Plaintiffs' conduct, satisfies narrow tailoring, the regulation fails intermediate scrutiny (under either *O'Brien* or time, place, and manner analysis). The Court declines to address the other elements of these tests briefed by the parties, such as providing ample alternative channels for communication as required under time, place, and manner analysis.

Accordingly, this Court **GRANTS** Plaintiffs' Motion for Summary Judgment on the issue that the permission requirement is an unconstitutional content-neutral restriction (as applied).

Since this Court has granted Plaintiffs' motion for summary judgment on one of their as-applied theories, this Court need not reach the alternative theories of the Ordinance's unconstitutionality, including that the Ordinance is an invalid prior restraint and that it violates Plaintiffs' expressive association right. Additionally, taking heed of the Fifth Circuit's precedent, this Court declines to reach the theories of facial invalidity, as Plaintiffs have succeeded on an as-applied theory.

## III. Defendant's Motion for Summary Judgment

Having concluded that Plaintiffs succeed on their claim that the Ordinance's permission scheme, as applied to them, is unconstitutional as a matter of law, the Court **DENIES** Defendant's

---

[17] While incidents on public property might be one of the reasons that the City could deny permission at a given location, the permission scheme would need to be much more tailored and transparent. Analogizing to the prior restraint context, the Supreme Court upheld a park permitting scheme as the scheme allowed permit denial "only for one or more of the reasons set forth in the ordinance," which included, inter alia, "when the applicant has damaged Park District property on prior occasions and has not paid for the damage" or "violated the terms of a prior permit." *Thomas v. Chicago Park Dist.*, 534 U.S. 316, 324 (2002). Such a scheme is starkly different from the one at issue here, as the City has not shown there is a limited set of reasons as to why the city may deny the use of any public location other than 61 Riesner.

Motion for Summary Judgment. The Court has already addressed the City's separate procedural arguments above, and the Court need not evaluate the City's First Amendment merits arguments defending the Ordinance, as the Court has already concluded that the Ordinance's permission requirement as applied to Plaintiffs is invalid as a matter of law when the facts and inferences were to be construed in the light most favorable to the City.

The only unaddressed argument relating to the validity of the Ordinance and its application that this Court can glean from the City's motion directed at Plaintiffs FNBH and Walsh[18] is that this Court must presume the Ordinance valid, citing to Supreme Court of Texas precedent. (Doc. No. 46 at 37–39). In this federal question case, the Court need not apply Texas law. More fundamentally, under the Supremacy Clause, any presumptions of state law validity based on the police power are subordinated to federal constitutional scrutiny. U.S. CONST. ART. VI.

## IV. Injunctive Relief Is Warranted

In this circuit, Plaintiffs must demonstrate the following factors to be entitled to a permanent injunction: (1) success on the merits; (2) Plaintiffs have suffered or will suffer irreparable injury absent the injunction; (3) the balance of the hardships (relative benefits and burdens) weigh in favor of the party seeking the injunction; and (4) public interest is not harmed by the entry of the injunction. *Valentine v. Collier*, 993 F.3d 270, 280 (5th Cir. 2021).

As established above, Plaintiffs FNBH and Walsh have succeeded on the merits of their as-applied challenge. As for the second factor, in the context of preliminary injunction analysis, both

---

[18] The City also raises a *Monell* objection in its Motion, although seemingly limiting the argument to the Consolidated Plaintiff Picone's claims. (Doc. No. 46 at 33–37). To the extent this argument is directed at Plaintiffs FNBH and Walsh, this Court addresses it briefly. *Monell v. Dep't of Soc. Servs. of N.Y.* requires that, in order to sustain a § 1983 suit directly against the City, Plaintiffs must show that unconstitutional conduct "derived" from action on the part of the municipality, as demonstrated by a policy or custom. 436 U.S. 658, 659 (1978). Since the challenge is to the application of the Ordinance and its permission requirement (an official policy of the City), this is easily met. *Id.* (holding that municipalities can be sued when "action that is alleged to be unconstitutional implements or executes a policy statement, ordinance, regulation, or decision officially adopted or promulgated by those whose edicts or acts may fairly be said to represent official policy").

the Fifth Circuit and the Supreme Court have held that even de minimis loss of First Amendment freedoms "unquestionably constitutes irreparable injury." *Elrod v. Burns*, 427 U.S. 347, 373 (1976); *Texans for Free Enter. v. Texas Ethics Comm'n*, 732 F.3d 535, 539 (5th Cir. 2013). As Plaintiffs highlight in their motion, their members have already received citations and some volunteers have ceased volunteering with the organization, suggesting a chilling effect on their members' First Amendment rights. (Lavergne Decl. ¶ 29, 32–35).

The third and fourth factors weigh in favor of Plaintiffs. The benefit to Plaintiffs of the injunction is the obvious vindication of their First Amendment freedoms and protection from irreparable injury to those rights. The Court is convinced that the City's interests can still be preserved through more narrowly tailored means, and therefore that the burden on the City can be minimized. To that end, the Court orders the Parties to consult and present to this Court a proposed injunction, in the hope that the City can craft a permission scheme that minimizes the burden on their interests while providing transparency and protection to Plaintiffs' rights. Further, the Court concludes that granting an injunction is in the public interest, as the Fifth Circuit has held (in the preliminary injunction context) "'injunctions protecting First Amendment freedoms are always in the public interest.'" *Texans for Free Enter.*, 732 F.3d at 539 (quotations omitted).

The City's response as to Plaintiffs' request for injunctive relief is only that (1) this Court should not act as a "*de facto* federal housing best practices board" and (2) that Plaintiffs have no substantive cause of action to support their request for injunctive relief. (Doc. No. 46 at 42–44); (Doc. No. 51 at 41). The Plaintiffs have succeeded on the merits, and this Court is permitted to intervene to vindicate federal constitutional rights. Accordingly, this Court concludes that the City has failed to raise a factual dispute, and that injunctive relief is warranted as a matter of law.[19]

---

[19] While the Court does not include Plaintiff Picone by name in this injunction analysis, the Court finds that he is likewise entitled to injunctive relief for the same reasons.

## II. Plaintiff Phillip Picone

Much of the above background and analysis are applicable to Plaintiff Picone as a member of FNBH. (Picone Decl. ¶ 4). On March 3, 2023, Picone was serving food at Central Library Plaza with FNBH when he received a ticket for violating the Ordinance. (*Id.* at ¶ 4, 13). Picone attended two resets and a trial in Houston municipal court to resolve the ticket. (*Id.* at ¶ 17). Picone was found not guilty in a jury trial. (Picone Dep. 84:17–25).

Picone filed this lawsuit in March of 2023 and amended the Complaint in May of 2023. (4:24-cv-1206, Doc. No. 1; 4:24-cv-1206, Doc. No. 8).[20] The Amended Complaint alleged Fourth Amendment illegal seizure violations and First Amendment violations concerning freedom of religion and speech. (4:24-cv-1206, Doc. No. 8 at 12–16). These claims were brought against both the officer that cited him and the City of Houston. (*Id.* at 1). In ruling on a Motion to Dismiss, this Court dismissed all claims against the officer as barred by qualified immunity. (4:24-cv-1206, Doc. No. 25 at 10). This Court also dismissed Plaintiff's Fourth Amendment claim against the City. (*Id.*).

Nevertheless, this Court allowed Plaintiff's *Monell* claim based on alleged First Amendment violations and his claim for injunctive relief to proceed. (*Id.*). As mentioned, Plaintiff Picone's suit was subsequently consolidated with the lead case in June of 2024. (Doc. No. 29). Picone (Doc. No. 47) and the City (Doc. No. 46) have filed cross Motions for Summary Judgment. This Court has already addressed many of the City's arguments in its consolidated motion and responses that pertain to all Plaintiffs. This Court now considers Picone's motion (Doc. No. 47) and any remaining arguments made by the City directed at Plaintiff Picone.

---

[20] For clarity, whenever the docket for the member case (Picone's suit before consolidation) is referenced, this Court includes the case number (4:24-cv-1206). If the case number is not referenced, this Court refers to the docket of the lead case (4:24-cv-338), which Picone became a part of as a consolidated plaintiff in June of 2024. (Doc. No. 29).

In his Motion, Plaintiff Picone seeks summary judgment as to the constitutionality of the Ordinance. Specifically, Plaintiff seeks summary judgment on the following issues: (1) the Ordinance is an unconstitutional burden on free speech in violation of the First Amendment on its face; (2) the Ordinance is an unconstitutional burden on freedom of religion in violation of the First Amendment on its face; (3) the Ordinance is unconstitutional as applied to Plaintiff; and (4) the City should be held liable under *Monell*. (Doc. No. 47 at 6–16). Picone supports the injunctive relief sought in Plaintiffs FNBH and Walsh's motion. (*Id.* at 16). He further requests an evidentiary hearing as to the determination of any further relief to which he may be entitled, including damages. (*Id.*).

There is no factual dispute that Plaintiff Picone was cited pursuant to the Ordinance for engaging in food-sharing activities with FNBH. The City has conceded in its briefing that Picone was cited pursuant to the Ordinance in March of 2023. (Doc. No. 55 at 17–18). This Court has already held the Ordinance's permission scheme is unconstitutional as applied to the conduct of FNBH members. This Court declines to reach Plaintiff's theories that he was targeted "arbitrarily" or that his citation lacked probable cause.[21] (Doc. No. 47 at 14–16). Further, this Court declines to reach the facial challenges raised in Picone's motion. (*Id.* at 6–14); *see LIA Network v. City of Kerrville, Texas*, 163 F.4th 147, 162 (5th Cir. 2025). The fact that Picone was cited pursuant to the Ordinance as a FNBH member engaging in protected conduct is sufficient to establish a constitutional violation as detailed above.

The only further arguments that this Court can glean directed at Picone[22] are arguments regarding the availability of City liability under *Monell* and the statute of limitations. This Court

---

[21] This Court notes that Picone claims that, when he was cited, he was serving food at a place other than 61 Riesner without permission, so it seems that such an argument would be a stretch.
[22] This Court need not address any of the City's arguments that are in response to theories that this Court has not ruled on this motion, such as lack of probable cause/arbitrary targeting or that the Ordinance is subject to strict scrutiny.

has already considered similar arguments in the context of the other Plaintiffs' claims but considers them here as applied to Picone in particular.

As for *Monell* liability, the City appears to argue that Picone has failed to demonstrate that a "policy or custom" caused the constitutional violation, and therefore Picone cannot hold the City liable under *Monell*. (Doc. No. 46 at 35). The Ordinance (and its application to all Plaintiffs, including Picone) is action attributable to the City under the plain language of *Monell*: "Local governing bodies . . . [can be sued where the] action that is alleged to be unconstitutional implements or executes a policy statement, ordinance, regulation, or decision officially adopted or promulgated by those whose edicts or acts may fairly be said to represent official policy." *Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658, 659 (1978). This Court is unable to understand how enforcement pursuant to the City's own ordinance is not action attributable to the City. This argument fails as a matter of law.

As for the statute of limitations, the City argues that Picone's claims began to accrue in 2012 when the Ordinance was adopted, in 2015 when the Ordinance was amended, or in 2019 when he challenged the Ordinance in a separate lawsuit. (Doc. No. 55 at 35–36). According to the City, Picone clearly felt that the Ordinance was unconstitutional at these points in time and therefore had enough information to bring suit. (*Id.* at 36). The City points to deposition testimony stating as much. (Picone Dep. 58:17–25). The City argues, therefore, that Picone's claims began to accrue in either 2012, 2015, or 2019 (and thus that this 2023 lawsuit is barred by the two-year limitations period that applies to his § 1983 causes of action). TEX. CIV. PRAC. AND REM. CODE § 16.003.

Notably, Picone's prior lawsuit was dismissed in 2020 on the grounds that the plaintiffs, including Picone, lacked standing because they had not been cited nor shown that there was a

serious threat of enforcement.[23] (Order Granting Defendant's Motion to Dismiss, Doc. No. 23 at 5, *Houston Food Not Bombs et al. v. City of Houston, Texas*, No. 4:19-cv-1661 (S.D. Tex. 2020, Gilmore, J.)). In this as applied challenge, the action that forms the basis of Picone's suit (the enforcement of the Ordinance against him) occurred in March of 2023. Picone filed suit in 2023. His claims are timely. *Longoria v. City of Bay City, Tex.*, 779 F.2d 1136, 1138 (5th Cir. 1986) (a § 1983 claim accrues "when plaintiff knows or has reason to know of the injury which is the basis of the action" (quotations omitted)).

## CONCLUSION

For the reasons set out above, this Court **GRANTS IN PART** Plaintiffs FNBH and Walsh's Motion for Summary Judgment, **GRANTS IN PART** Plaintiff Picone's Motion for Summary Judgment, and **DENIES** Defendant's Motion for Summary Judgment.

The parties are ordered to present to the Court their (joint-if-possible) proposed injunction for the Court's consideration. The City may agree "in form only." This must be filed within 30 days. After this, the Court will consider the appropriate form and content of any further Order and will issue a final judgment as appropriate. Picone is also ordered to supplement his briefing with regard to his entitlement to and proof of damages within 30 days.

It is so ordered.

Signed on this the 3rd day of November, 2026.

Andrew S. Hanen
United States District Judge

[23] The standing issue is clearly not implicated in the present suit, as Picone was cited in 2023.